IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EIG ENERGY FUND XIV, L.P. | : | |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | |
| Washington, D.C.  20006, | : | |
| | : | |
| EIG ENERGY FUND XIV-A, L.P. | : | |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | |
| Washington, D.C.  20006, | : | |
| | : | |
| EIG ENERGY FUND XIV-B, L.P. | : | |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | |
| Washington, D.C.  20006, | : | |
| | : | |
| EIG ENERGY FUND XIV (CAYMAN), L.P. | : | |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | Case No. _____ |
| Washington, D.C.  20006, | : | |
| | : | |
| EIG ENERGY FUND XV, L.P. | : | **COMPLAINT** |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | |
| Washington, D.C.  20006, | : | |
| | : | |
| EIG ENERGY FUND XV-A, L.P. | : | |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | |
| Washington, D.C.  20006, | : | |
| | : | |
| EIG ENERGY FUND XV-B, L.P. | : | |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | |
| Washington, D.C.  20006, | : | |
| | : | |
| EIG ENERGY FUND XV (CAYMAN), L.P. | : | |
| c/o EIG Management Company, LLC | : | |
| 1700 Pennsylvania Avenue, NW, Suite 800 | : | |
| Washington, D.C.  20006, and | : | |

EIG MANAGEMENT COMPANY, LLC          :
1700 Pennsylvania Avenue, NW, Suite 800   :
Washington, D.C.   20006,                             :
                                                                   :
                              Plaintiffs,              :
                                                                   :
            - against -                                  :
                                                                   :
PETRÓLEO BRASILEIRO S.A.,              :
                                                                   :
                              Defendant.             :

Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG

Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P.,

EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P. and EIG Energy Fund XV

(Cayman), L.P. (together, the "Funds") and EIG Management Company, LLC ("EIG"), by their

attorneys Coburn & Greenbaum PLLC and Kramer Levin Naftalis & Frankel LLP, for their

complaint against defendant Petróleo Brasileiro S.A. ("Petrobras"), allege as follows:

<u>Nature of the Action</u>

1.        This action arises from an unlawful scheme by which defendant Petrobras

fraudulently induced the Funds, acting through their investment manager EIG, to invest over

$220 million to purchase equity interests in Sete Brasil Participações, S.A. ("Sete").  Sete was

conceived and created at the behest of Petrobras; Sete was established solely to benefit Petrobras;

and Sete was initially staffed with senior Petrobras and ex-Petrobras officials, all for purposes of

enticing third party financiers in the United States and elsewhere -- such as the Funds -- to invest

billions of dollars in off-balance sheet financing to build, own and operate a portfolio of specialty

drillships exclusively for Petrobras's use in oil and gas drilling operations to be conducted

offshore of Brazil.  Petrobras then used Sete to perpetuate and expand a covert and massive

bribery and kickback scheme in which Petrobras had been engaged for years, and by which

Petrobras enriched itself, its senior executives and its political masters.  The scheme, when exposed, promptly and directly caused the collapse of Sete, and rendered the Funds' investment in Sete worthless.

2.      Petrobras, the Brazilian state petroleum company, devised the creation of Sete in early 2010, following the discovery of massive oil and gas reserves (commonly known as the "Pre-Salt Reserves") off the coast of Brazil.  To tap into the hydrocarbons contained in the Pre-Salt Reserves, Petrobras required the exclusive use -- for many years -- of drillships designed to operate in the ultra-deep waters off the shore of Brazil.  Petrobras envisioned a fleet of over 28 such drillships, at a cost of over $700 million *per drillship*, resulting in a total capital need of approximately $20 billion.  Rather than fund such a massive capital investment itself, Petrobras determined to locate third party financiers, such as the Funds, to instead own and capitalize a company -- Sete -- which would then use investor funds, and bank financing, to build the drillships in local shipyards.  Once completed, the drillships would be chartered back to Petrobras, and the resulting charter payments would be used to repay the banks' construction loans, cover the costs of operating Sete, and provide a return on investment to the Funds and other investors.

3.      To induce the Funds to invest in Sete, Petrobras and Sete (either directly or through their agents) provided certain "confidential information memoranda" and other marketing materials to EIG representatives in Washington, D.C. and elsewhere.  The memoranda and materials described and discussed Sete's business plan and ostensibly identified all material risks of investing in Sete.  Petrobras and Sete representatives further described and discussed Sete's business plan in oral representations made to EIG and EIG investors (which include

various U.S.-based pension funds and institutional investors) during, among other interactions, meetings in Houston, Texas, Washington, D.C and Rio de Janeiro, Brazil.

4.        But in such meetings and memoranda, Petrobras and Sete made material misrepresentations to EIG and never disclosed to EIG that, by the time Sete was created, Petrobras had already been perpetrating for years a massive and highly organized bribery and kickback scheme designed to line the pockets of Petrobras's management and the Workers Party of Brazil, which dominated Petrobras's majority shareholder, the Brazilian federal government. Nor did Petrobras disclose to EIG that Petrobras intended to -- and, in fact, did -- continue to expand its corrupt scheme by embedding bribes and kickbacks into each new shipbuilding contract Sete entered into with shipyards, some of which, upon information and belief, were owned and operated by Brazilian companies that had been engaged in systematic and longstanding bribery and kickback schemes with Petrobras.  When Brazilian federal police and prosecutors uncovered and revealed Petrobras's and Sete's corrupt schemes -- which revelation has become one of the largest public scandals in the history of Brazil, with criminal charges filed against 179 persons and 84 convictions to date, arising from offenses that involved the payment of a total of more than $1.5 billion in bribes and kickbacks -- Sete's drillship construction lenders promptly cut off further critical construction funding for Sete, thereby causing the company to default on its shipbuilding contracts (which are themselves now suspect as to content and pricing because, upon information and belief, Petrobras had a direct role in negotiating them) and Sete quickly collapsed.  Simply stated, without drillships to charter to Petrobras, Sete has no source of income to repay the construction banks, its own employees and other trade creditors, or the Funds.

5.      Brazilian prosecutors discovered Petrobras's corruption scheme in and after 2014, through an investigation dubbed Operação Lava Jato ("Operation Car Wash").  In connection with Operation Car Wash, authorities in Brazil have entered into cooperation agreements with, among others, João Carlos de Medeiros Ferraz ("Ferraz"), Pedro José Barusco Filho ("Barusco") and Eduardo Costa Vaz Musa ("Musa") -- three former Petrobras executives whom Petrobras installed as Sete's most senior executives.

6.      As part of his cooperation with Operation Car Wash, Barusco made signed and recorded statements to the Brazilian federal police, and gave sworn testimony before the Brazilian Congress, describing in detail Petrobras's and Sete's corruption scheme.  Barusco admitted, among other things, that Renato Duque ("Duque") and Roberto Gonçalves ("Gonçalves") of Petrobras, João Vaccari Neto ("Vaccari") -- the Secretary of Finance and Planning of the Workers Party -- and Sete executives Barusco, Ferraz and Musa procured bribes from the shipyards with whom Sete contracted at Petrobras's behest for construction of drillships in the amount of approximately 1 percent of the value of the twenty-eight contracts that Sete executed with the shipyards.   According to Barusco, the total value of these twenty-eight contracts was $22 billion.  Ferraz, Barusco and Musa have subsequently agreed to disgorge close to $100 million of bribes, much or all of which they had secreted in Swiss bank accounts opened in the names of phantom entities.

7.      The public disclosure of the corruption scheme at Petrobras and Sete has crippled Sete by, among other things, causing the cancellation of Sete's contracts to lease drillships to Petrobras and causing the withdrawal by lenders of bank financing vital to Sete's operations.  The Funds' investment in Sete is now worthless.  By this action, EIG and the Funds seek redress for the injuries they have suffered due to Petrobras's intentional fraud in inducing

EIG and the Funds to invest in Sete without revealing the existence of the above-described bribery and kickback schemes.

<u>Parties</u>

8.      Plaintiff EIG Energy Fund XIV, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

9.      Plaintiff EIG Energy Fund XIV-A, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

10.     Plaintiff EIG Energy Fund XIV-B, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

11.     Plaintiff EIG Energy Fund XIV (Cayman), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands.

12.     Plaintiff EIG Energy Fund XV, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

13.     Plaintiff EIG Energy Fund XV-A, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

14.     Plaintiff EIG Energy Fund XV-B, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

15.     Plaintiff EIG Energy Fund XV (Cayman), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands.

16.     Plaintiff EIG is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 1700 Pennsylvania Avenue, NW, Suite 800, Washington, D.C.   20006.  EIG is a registered investment adviser, and serves as investment adviser to, and investment manager of, the Funds.  As such, EIG acts as the legal representative and agent of the Funds and the Funds' investors (including the Funds' U.S. investors) in the Funds' investment activities.

17.     Upon information and belief, defendant Petrobras is a corporation organized and existing under the laws of Brazil, operating globally, with its principal place of business located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil.  Upon further information and belief, the government of Brazil is the majority owner of Petrobras, such that Petrobras is both a foreign state within the meaning of 28 U.S.C. § 1603(a) and an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b). Upon information and belief, debt and/or equity securities issued by Petrobras, either directly or through subsidiaries or affiliates, trade in the United States.

<u>Jurisdiction and Venue</u>

18.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because defendant Petrobras is a foreign state as defined in 28 U.S.C. § 1603(a), and plaintiffs have asserted claims for relief against Petrobras as to which it is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement.  This action falls within, among others, the exception to immunity created by 28 U.S.C. § 1605(a)(2).

19.     Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(f)(1) in that defendant Petrobras is both a foreign state as defined in 28 U.S.C. § 1603(a) and an agency

or instrumentality of a foreign state as defined in 28 U.S.C. § 1603(b), and a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

Facts Common to All Causes of Action

Petrobras Creates Sete as an
Off-Balance Sheet Entity

20.     In or about 2006, Petrobras announced one of the most significant discoveries of new oil reserves in the preceding 30 years, located in the Campos and Santos Basins off the coast of Brazil.  Petrobras and others believed that the Campos and Santos basins contained up to 50 billion barrels of oil, which prompted Petrobras to undertake a massive capital expenditure program to extract the oil. To carry out its extraction plan, Petrobras conceived of the idea of forming Sete in early 2010. According to Barusco's testimony before the Brazilian Congress, "the initiative to create Sete Brasil" was taken by Barusco and Ferraz, who, at the time of Sete's creation, were longtime and senior Petrobras employees.  By creating Sete, which itself would incur the massive amounts of financing required to carry out Petrobras's drilling program, Petrobras effectively shifted that massive amount of financing off of its balance sheet and onto Sete's.

21.     According to information memoranda that Petrobras and Sete prepared and provided to EIG, the initial plan was for Sete to build and own up to 28 deep-water drillships, and charter them to Petrobras.  The information memoranda further stated that Sete would have a competitive advantage over other potential drillship providers because it would construct its drillships using shipyards and labor in Brazil, and thus comply with "local content" rules that the Brazilian government imposed.  Moreover, according to the information memoranda, Sete had "strong support from the Brazilian Federal Government, including

financial support" because it was to be the bedrock of a program to revitalize the Brazilian ship building industry, an important political goal of the Brazilian government.

22.     The information memoranda stated that Sete planned to rely heavily on borrowed money to build the drillships and to otherwise conduct its operations, with equity investments making up the remainder of Sete's overall capital structure.  Thus, according to the memoranda, Sete's "funding strategy [would be] focused on financing sources with large underwriting potential."  And consistent with representations that Sete enjoyed "strong support from the Brazilian Federal Government," the information memoranda informed EIG (and other prospective investors) that Sete would benefit by a "special focus" on debt financing from Banco Nacional de Desenvolvimento Econômico e Social ("BNDES"), the Brazilian state-owned development bank.  Indeed, the information memoranda stated that Sete expected the single largest element of its overall capitalization to come in the form of loans from BNDES.  Stated differently, the information memoranda emphasized to potential investors -- such as EIG and the Funds -- that their equity investments (amounting to hundreds of millions of dollars) would be prudent because, although massive amounts of debt capital would also be necessary for Sete's success, such debt capital would be readily available to Sete because of Sete's preferential relationship with the Brazilian government and financial institutions under the effective control of the Brazilian government.

23.     Petrobras installed its own former employees as Sete's top executives.  Thus, Petrobras appointed Ferraz, who upon information and belief had previously spent more than 30 years working in a variety of roles at Petrobras, to be Chief Executive Officer of Sete.  Likewise, upon further information and belief, Barusco and Musa both worked at Petrobras for at

least 20 years before Petrobras appointed them to be Sete's Chief Operating Officer and

Engineering Director, respectively.

> Petrobras and Sete Induce EIG and
> the Funds to Invest in Sete

24.     EIG received from Petrobras a "Confidential Information Memorandum"

dated January 2010, prepared by Petrobras and one of its affiliates (the "Petrobras

Memorandum").  The Petrobras Memorandum provided a detailed discussion as to the business

and long term strategic reasons for why Petrobras was forming Sete.  The Petrobras

Memorandum also made clear that Petrobras was specifically targeting U.S. investors as sources

of capital for Sete, and that an investment in Sete was attractive because there would be "long-

term contracts with high probability of cash flows" and "opportunities for long-term upsides that

are very advantageous."  The Petrobras Memorandum listed Ferraz, who was an employee of

Petrobras, as the primary contact person for potential investors interested in Sete.

25.     The Petrobras Memorandum identified for potential investors seven

different "Risk Factors" associated with investing in Sete, including risks relating to project

design and engineering defects, cost overruns, operational delay, drillship performance in deep

water, refinancing, taxes and environmental.  That there were only seven Risk Factors was

materially false, as there was an eighth undisclosed Risk Factor -- that Petrobras had, for many

years, been engaged in a massive bribery and kickback scheme, and planned to perpetuate and

expand its corrupt scheme through Sete.

26.     The Petrobras Memorandum and other written materials that Petrobras

provided to EIG stated that Sete would enter into drillship construction contracts with shipyards

that would, among other things, oblige each shipyard to "comply with . . . applicable laws."

That representation was false, as Petrobras knew that the shipyards would be committing Brazilian crimes by paying bribes to executives of Petrobras, Sete and the Workers Party.

27.     The Petrobras Memorandum did not disclose any information about the massive bribery and kickback scheme that Petrobras intended to perpetuate and expand through Sete, nor the risk that disclosure of this corrupt scheme would cause the complete failure of Sete. Nor did Petrobras disclose that the Petrobras executives, including Ferraz and Barusco, that Petrobras intended to insert into Sete management were actively involved in orchestrating a massive bribery scheme on Petrobras's behalf.

28.     In September of 2010, EIG received in Washington, D.C. a multi-page presentation compiled by Petrobras entitled, "The Drilling Rigs Project:  Petrobras' Strategy for its successful implementation"  (the "Petrobras Drilling Presentation").  The only Petrobras employee referenced in this document was Ferraz, who was listed as the apparent author and who was identified by the title, "Petrobras-Finance Treasury, General Manager."  The Petrobras Drilling Presentation discussed the long term strategic and financing goals for an off balance sheet "finance structure" to develop and to charter drillships to Petrobras so that Petrobras could extract oil and gas from the Santos and Campos Basins.  Such "finance structure" became Sete. Petrobras, in its dissemination of the Petrobras Drilling Presentation, specifically targeted U.S. investors.  Indeed, the Petrobras Drilling Presentation contained a section titled "Cautionary Statement for US Investors," which read:

> "The United States Securities and Exchange Commission permits oil and gas companies, in their filings with the SEC, to disclose only proved reserves that a company has demonstrated by actual production or conclusive formation tests to be economically and legally producible under existing economic and operating conditions.  We use certain terms in this presentation, such as oil

and gas resources, that the SEC's guidelines strictly prohibit us
from including in filings with the SEC."

29.    The Petrobras Drilling Presentation contained a number of fraudulent

misrepresentations. The Petrobras Drilling Presentation identified six potential risks under the

heading "Main Risks and Challenges," including "Credit Risk," "Short Fall of Revenues,"

"Charter Daily Rates," "Guarantees," "Technological Risk" and "Delay and Cost Overrun." The

listing of only six "Main Risks and Challenges" was materially false, because there was a

seventh, enormous "main risk" with the investment -- that Petrobras had been engaged for years

in a massive corruption scheme, and intended to expand and perpetuate that scheme through the

Sete vehicle.

30.    Petrobras also misrepresented in the Petrobras Drilling Presentation the

"Main Players Objectives -- Petrobras and Brazilian Government."   According to Petrobras, its

"Main Objectives" were "[t]o ensure the availability of its demand for drilling rigs for Pre Salt

application, minimizing charter costs and associated risks."   That representation was materially

false because, upon information and belief, one of Petrobras's main objectives with Sete was to

perpetuate and expand its longstanding corruption scheme to enrich Petrobras executives and the

Workers' Party.

31.    The Petrobras Drilling Presentation also included a flow chart that

purported to describe "The basic Structure for Each Drilling Unit."   That flow chart was

materially false, as it did not reflect a key element of the basic structure in that the shipyards

would be paying executives of Petrobras, Sete and the Workers Party bribes with respect to each

drillship.

32.     In October of 2010, EIG received in Washington, D.C. a document prepared and circulated by Petrobras entitled, "Pre-Salt Oil Rigs Project."  This document also discussed the Sete investment premise and touted that Sete would have "management with extensive experience in the market."  This document did not disclose, however, that such management, which included Ferraz, would be perpetuating and expanding Petrobras's corruption and bribery schemes.

33.     Also in October of 2010, employees of EIG met with Ferraz, who was then still employed by Petrobras, at the offices of Petrobras in Rio de Janeiro, Brazil.  While Ferraz discussed the Sete project, he did not disclose that Petrobras intended to use Sete to continue Petrobras's kickback and bribery schemes.

34.     During March 2011, EIG representatives again met in Brazil with Ferraz, who at the time was a Petrobras employee.  During that meeting, Ferraz again discussed Sete, but did not disclose Petrobras's intention to use Sete to continue the corrupt scheme that, at the time, had already been in place at Petrobras for many years.

35.     On or about September 14, 2011, Lakeshore Financial Partners Participações Ltda. -- acting, upon information and belief, as an agent of and/or financial adviser to Sete and/or Petrobras -- transmitted to EIG, again at its offices in Washington, D.C., yet another confidential information memorandum promoting investment in Sete, dated September 2011 (the "Lakeshore Memorandum").  The Lakeshore Memorandum repeated the representations contained in the Petrobras Memorandum, concerning the construction contracts that Sete would enter into with shipyards, and the ways in which Sete would use the equity and

debt financing it raised.  And again, while this document warned of a number of potential operational risks with Sete, there was no mention of the massive corruption and bribery scheme.

36.    Throughout the periods referenced above, Ferraz also transmitted numerous e-mails concerning Sete to EIG in Washington, D.C.  Like Petrobras's and Sete's other written and oral statements to EIG, none of these e-mails disclosed the massive corruption scheme.

37.    For example, on October 5, 2011, Ferraz communicated by e-mail with EIG, at EIG's offices in Washington, D.C., to report on Sete's progress in bidding for drillship charter agreements with Petrobras, and touted Sete's intention and ability "to achiev[e] conditions that are both doable for Sete and its shareholders and practically unbeatable by [Sete's] competitor."

38.    On December 23, 2011, Ferraz communicated by e-mail with EIG, at EIG's offices in Washington, D.C., to report that he and others from Sete had traveled to China for meetings with "high level persons" of China Investment Corp. ("CIC").  Ferraz further reported that the CIC representatives he met with had said "unofficially" that CIC was "very inclined to invest in Sete," and that an investment in Sete by CIC would both "open the door to large international investors, including other sovereign funds" and "increase the success of [Sete's] future IPO."

39.    Ferraz also traveled to the United States several times to meet with representatives of EIG for the purpose of promoting investments in Sete.

40.    For example, one such meeting took place in Houston, Texas during the spring of 2013.  At that meeting, Ferraz offered rosy descriptions of Sete and its business

prospects.  But he never disclosed to EIG the massive corruption scheme in which he was participating personally, and that benefitted Petrobras and the Workers Party.

41.     In September 2013, in his capacity as a representative of Sete, Ferraz attended in Washington, D.C. an annual conference EIG holds for its investors, involving approximately 300 attendees and including representatives of numerous U.S. and state municipal pension plans, U.S. insurance companies and individual U.S. investors. The purpose of the conference was to review current investments, and prospective investment opportunities, for EIG and the Funds.   During the conference, Ferraz informed EIG and EIG's investors in the Funds that Sete expected drill ship charter revenue "of almost $90 billion [in] the next 20 years." Ferraz also reported that Sete was "ahead of schedule," and was "not facing any problem to raise" the necessary debt financing called for in its business plan.  Ferraz assured EIG and EIG's Fund investors that by 2019, Sete would "have 90 percent of all rigs already in operation," and that its "EBITDA [would] be $4.6 billion per year."  Finally, Ferraz told EIG and EIG's Fund investors that Sete was "performing as planned," and that he "[didn't] see any reason why [Sete] should deviate from that."  Ferraz's oral statements perpetuated the pattern of deception and lies promulgated in the various marketing materials previously provided to EIG.  And Ferraz must have known he was doing so given that, upon information and belief, by September 2013, he had been participating personally and directly for several years in Petrobras's and Sete's secret corruption scheme.

42.     Based on the glowing investment projections embedded in the above-described marketing materials, e-mails and oral presentations, EIG and the Funds began to invest in Sete in or about August 2012.  Between August 2012 and May 2013, the Funds invested approximately $77.4  million in Sete.  Subsequent to the September 2013 EIG investor

conference, at which Ferraz spoke so enticingly (but fraudulently) concerning Sete, the Funds

invested over $143 million more in Sete.  Ultimately, the Funds' aggregate investment in Sete

totaled $221,133,393.

> Brazilian Police and Prosecutors Uncover the
> Corruption Scheme at Petrobras and Sete

43.     In or about 2014, federal police and prosecutors in Brazil initiated an

investigation known as Operation Car Wash.  Although the investigation initially concerned

alleged money laundering by a number of criminal organizations, it ultimately revealed that

Petrobras had, for many years, been involved in an enormous corruption scheme.  The scheme

that Operation Car Wash uncovered involved, among other things, systematic payment of bribes

and kickbacks in connection with Petrobras contracts to Petrobras executives and to senior

officials of Brazil's governing Workers Party.  As a result of Operation Car Wash, authorities in

Brazil have arrested numerous current and former Petrobras executives and Brazilian politicians,

accusing them of crimes related to the scheme.

44.     Upon information and belief, in or about November 2014, the police and

prosecutors conducting Operation Car Wash arrested Barusco on suspicion that he had been

involved in corruption during his tenure at Petrobras.  Subsequently, Barusco, Ferraz and Musa

all entered into cooperation arrangements with Brazilian prosecutors and police.  In connection

with those arrangements, Barusco, Ferraz and Musa agreed to return, in the aggregate, close to

$100 million in bribes that they had personally received.

45.     In addition to agreeing to return ill-gotten money, Barusco provided

extensive information to Brazilian police and prosecutors, and to the Brazilian Congress,

demonstrating both the scope and duration of the corrupt scheme at Petrobras, and Sete's

intimate involvement in that scheme.  Among other things, Barusco stated that:

- There was an institutionalized bribery scheme in place at Petrobras no later than 2004;

- Barusco, while a Petrobras employee, personally received bribes beginning as early as 1997;

- Bribes paid in connection with Petrobras contracts generally were split, with a portion going to Vaccari -- the Secretary of Finance and Planning of the Workers Party -- and the balance going to "the House," which consisted of Duque and Barusco and, on occasion, other Petrobras executives;

- Barusco, Vaccari and agents of the shipyards with whom Sete contracted to build drillships agreed that approximately 1 percent of the value of each of Sete's construction contracts -- whose total value was approximately $22 billion -- would be paid as bribes;

- The bribes on these Sete contracts -- like the bribes paid in connection with Petrobras contracts -- generally were split, with two-thirds going to Vaccari and one-third shared between "House 1" (which consisted of Petrobras executives Duque and Gonçalves) and "House 2" (which consisted of Sete executives Barusco, Ferraz and Musa);

- In or about October 2011, Barusco, Duque and Ferraz traveled to Milan, Italy to meet with representatives of Banque Cramer, a bank based in Switzerland;

- Following that meeting, Barusco, Duque, Ferraz and Musa opened accounts at Banque Cramer, in the names of phantom companies, into which Sete related bribes could be deposited; and

- Duque, Gonçalves, Barusco, Ferraz, Musa and Vaccari all received millions of dollars in bribes from Sete contracts.

Tellingly, in his sworn testimony before the Brazilian Congress, Barusco stated that "[t]he issue

of [Sete], about the establishment of bribe amounts, <u>was a continuity of what happened in</u>

<u>PETROBRAS</u>."  In other words, upon information and belief, the moment that Ferraz and

Barusco -- while they worked at Petrobras -- came up with the idea to form Sete, they were well

aware, and intended, that Sete would perpetuate and expand Petrobras's and the Workers Party's longstanding bribery and kickback scheme.

46.     Brazilian prosecutors have arrested and/or brought criminal charges against various individuals in connection with Operation Car Wash, including Barusco, Duque, Gonçalves, Musa and Vaccari.

47.     The public revelation of Petrobras's corrupt activities, and of Sete's substantial and direct involvement in those activities, has had a devastating impact on Sete.  As a result of those revelations, upon information and belief, Sete has seen its bank financing lines cut off and the raising of further equity rendered impossible; it has defaulted on its ship building contracts for lack of money to pay necessary installments; and the lack of drillships has led to the cancellation (or an inability to timely perform) the Petrobras charter contracts that were to underpin its entire business plan.

48.     Indeed, during Barusco's testimony before the Brazilian Congress on March 10, 2015, a legislator asked Barusco about the impact of the corruption scandal on Sete and its investors.  In response, Barusco testified: "The [Sete] project is an intelligent project. It is a structuring that made things work. There was just one detail: it was obviously very dependent on financing from the BNDES -- extremely dependent. And with the discovery of the information that there was payment of bribes on contracts with the shipyards, the financial agents backed away. And if there is no contribution of the funds that are called for, that are in the Budget, are in the planning, Sete really can go bankrupt, it could end up unable to honor its commitments."

49.     Upon information and belief, as a result of its involvement in the scandals that Operation Car Wash exposed, Sete is insolvent -- as Barusco accurately predicted in his testimony to the Brazilian Congress -- and the Funds' investment in Sete is now worthless.

50.     In light of Barusco's stunning admissions, it appears that Petrobras created Sete, and installed its own trusted former employees as Sete's most senior officers, with the intention that Sete would perpetuate and expand the corruption scheme that had already been in place at Petrobras for as much as a decade or more.   It further appears that Petrobras and Sete solicited investments from EIG-managed Funds and other investors with the knowledge and intention that the money those investors entrusted to Sete would be used to fund a secret plan to generate contracts that, in turn, facilitated the payment of unlawful bribes and kickbacks.   And given Sete's heavy reliance on debt funding from BNDES and other government-backed lenders, Petrobras and Sete were surely aware of a substantial risk -- never disclosed to EIG or the Funds -- that their corruption scheme, if it ever came to light, would have a catastrophic impact on Sete and its investors. And that is exactly what happened.

## First Cause of Action
### (Fraud)

51.     Plaintiffs repeat the allegations contained in paragraphs 1 through 50 above.

52.     The Petrobras  Memorandum, the Petrobras Drilling Presentation and the other written materials that Petrobras prepared and supplied to EIG and the Funds contained material misrepresentations and made no mention of the corruption scheme in which Petrobras and Sete were engaged.   Nor did Petrobras disclose that scheme in any of the oral

communications it had with EIG and the Funds at any time before the Funds, under EIG's direction, invested more than $221 million in Sete.

53.     To the contrary, the written materials that Petrobras supplied to EIG and the Funds misrepresented the risks, purposes and structure of the Sete project and that Sete's drillship construction contracts would require shipyards to "comply with . . . applicable laws."

54.     The oral and written statements that Petrobras made to EIG and the Funds concerning Sete -- in addition to including affirmative falsehoods -- were incomplete and misleading in the absence of disclosure concerning the corruption scheme in which Petrobras and Sete were engaged.

55.     Had EIG and the Funds known about the falsity of Petrobras' statements, the corruption scheme, and Sete's intention to enter into shipbuilding contracts embroiled in a bribery and kickback scheme, the Funds never would have invested in Sete.

56.     Information about the corruption scheme was peculiarly within the knowledge of Petrobras.

57.     The false statements that Petrobras made to EIG and the Funds, and the information that Petrobras concealed from them, were material.  As a result of Petrobras's false statements and omissions, EIG and the Funds did not know the almost certain risk that if Petrobras's and Sete's corrupt scheme ever came to light, Sete's business would suffer irreparable, direct and immediate harm and the value of any investment in Sete would decline or be destroyed entirely.

58.    Neither EIG nor any of the Funds was aware of the falsity of the statements that Petrobras made to them concerning Sete, or of the corruption scheme that Petrobras and Sete were conducting.  Plaintiffs could not have discovered the falsity of Petrobras's statements, nor could they have become aware of Petrobras's and Sete's corruption scheme, through reasonable diligence, at any time before the Funds, under EIG's direction, invested money in Sete.

59.    Upon information and belief, Petrobras knew that it had made written and/or oral statements concerning Sete to EIG and the Funds that were false, or that were materially misleading absent disclosure of the corruption scheme it was conducting with Sete. Upon further information and belief, Petrobras made those false and/or materially misleading statements, and/or omitted material information from its statements, with the intention that EIG and the Funds would rely on them.

60.    EIG and the Funds actually and reasonably relied on the false and/or materially misleading oral and written statements that Petrobras made to them by, among other things, investing money in Sete.  Had EIG and the Funds known the true facts, the Funds would not have made such an investment.

61.    As a direct and proximate result of their reliance on Petrobras's false and/or materially misleading statements, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $221,133,393.

62.    Petrobras acted in willful disregard of Plaintiffs' rights, and of the wrongful nature of its course of deceitful conduct.  Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be proved at trial.

Second Cause of Action
(Aiding and Abetting Fraud)

63.     Plaintiffs repeat the allegations contained in paragraphs 1 through 62 above.

64.     The Lakeshore Memorandum that Sete prepared and supplied to EIG and the Funds in Washington, D.C. during 2011 made no mention of the corruption scheme in which Petrobras and Sete were engaged.  Nor did Sete disclose that scheme in any of the other oral and written communications it had with EIG and the Funds at any time before the Funds, under EIG's direction, invested more than $221 million in Sete.

65.     To the contrary, the Lakeshore Memorandum and other written materials that Sete supplied to EIG and the Funds misrepresented the risks, purposes and structure of the Sete project and that Sete's drillship construction contracts would require shipyards to "comply with . . . applicable laws."  Those statements were false, given that Sete, Petrobras and the shipyards had agreed to a massive corruption scheme whereby one percent of the value of each construction contract would be used to pay unlawful bribes and kickbacks.

66.     The oral and written statements that Sete made to EIG and the Funds concerning Sete -- in addition to including affirmative falsehoods -- were materially misleading absent disclosure concerning the corruption scheme in which Petrobras and Sete were engaged.

67.     Had EIG and the Funds known about the falsity of Sete's statements, the corruption scheme, and Sete's intention to enter into shipbuilding contracts embroiled in a bribery and kickback scheme, the Funds never would have invested in Sete.

68.     Information about the corruption scheme was peculiarly within the knowledge of Sete.

69.     The false statements Sete made to EIG and the Funds, and the information that Sete concealed from them, were material.  As a result of Sete's false statements and omissions, EIG and the Funds did not know the almost certain risk that if Petrobras's and Sete's corrupt scheme ever came to light, Sete's business would suffer irreparable, direct and immediate harm and the value of any investment in Sete would decline or be destroyed entirely.

70.     Neither EIG nor any of the Funds was aware of the falsity of the statements Sete made to them concerning itself, or of the corruption scheme that Petrobras and Sete were conducting.  Plaintiffs could not have discovered the falsity of Sete's statements, nor could they have become aware of Petrobras's and Sete's scheme, through reasonable diligence, at any time before the Funds, under EIG's direction, invested money in Sete.

71.     Upon information and belief, Sete knew that it had made written and/or oral statements concerning itself to EIG and the Funds that were false, or that were materially misleading absent disclosure of the corruption scheme it was conducting with Petrobras.  Upon further information and belief, Sete made those false and/or misleading statements, and/or omitted material information from its statements, with the intention that EIG and the Funds would rely on them.

72.     EIG and the Funds actually and reasonably relied on the false and/or materially misleading oral and written statements that Sete made to them by, among other things, investing money in Sete.  Had EIG and the Funds known the true facts, the Funds would not have made such an investment.

73.     As a direct and proximate result of their reliance on Sete's false and/or materially misleading statements, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $221,133,393.

74.     Upon information and belief, Petrobras was aware of the fraud that Sete perpetrated by concealing from EIG and the Funds, through a pattern of false and/or materially misleading statements, the corrupt scheme that Petrobras and Sete were conducting.

75.     Upon further information and belief, Petrobras substantially assisted Sete in perpetrating that fraud by, among other things, creating Sete with the intention of continuing and expanding a bribery scheme that had already been in place at Petrobras for many years; continuing to participate in the bribery scheme; appointing to key executive roles at Sete individuals who had been involved in the corrupt scheme when they were employed by Petrobras; and making its own materially false and/or misleading statements to EIG and the Funds, in order to induce the Funds to invest in Sete.

76.     Accordingly, Petrobras has aided and abetted in a fraud perpetrated by Sete against EIG and the Funds.

77.     As a direct and proximate result of Petrobras's misconduct, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $221,133,393.

78.     Petrobras acted in willful disregard of Plaintiffs' rights, and of the wrongful nature of its course of deceitful conduct.  Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be proved at trial.

Third Cause of Action
(Civil Conspiracy)

79.     Plaintiffs repeat the allegations contained in paragraphs 1 through 78
above.

80.     Upon information and belief, Petrobras and Sete engaged in an unlawful
and tortious conspiracy.  Among other things, the unlawful objects of the conspiracy included
paying bribes and kickbacks to employees of Petrobras and Sete and to the Workers Party in
Brazil, and fraudulently inducing the Funds and others to invest money in Sete by a pattern of
false and misleading written and oral statements.

81.     Petrobras and Sete engaged in various overt acts in furtherance of their
unlawful conspiracy.  Among others things, those overt acts included the materially misleading
oral and written statements that both Petrobras and Sete made, in order to induce the Funds,
under the direction of EIG, to invest money in Sete.

82.     As a direct and proximate result of wrongful acts by Petrobras and Sete in
furtherance of their unlawful conspiracy, Plaintiffs have suffered damages in an amount to be
proved at trial, but in no event less than $221,133,393.

83.     As a co-conspirator, Petrobras is liable for its own acts, and vicariously
liable for the acts of Sete, taken in furtherance of the conspiracy.

84.     Petrobras acted in willful disregard of Plaintiffs' rights, and of the
wrongful nature of its course of deceitful conduct.  Accordingly, Plaintiffs are entitled to recover
punitive damages in an amount to be proved at trial.

WHEREFORE, Plaintiffs respectfully request judgment against Petrobras as follows:

(a) Awarding them compensatory damages, on their first, second and third causes of action, in an amount to be proved at trial, but in no event less than $221,133,393;

(b) Awarding them punitive damages, on their first, second and third causes of action, in an amount to be proved at trial;

(c) Awarding them prejudgment interest, as well as their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees; and

(d) Awarding them such other and further relief as the Court deems just and proper.

Dated: Washington, D.C.
        February 23, 2016

Respectfully submitted,

Coburn & Greenbaum PLLC


By: _____/s/ Barry Coburn_____
        Barry Coburn
        DC Bar No. 358020
1710 Rhode Island Avenue, NW
Second Floor
Washington, D.C.   20036
(202) 657-4490

Kramer Levin Naftalis & Frankel LLP
Daniel B. Goldman
Stephen M. Sinaiko
1177 Avenue of the Americas
New York, New York   10036
(212) 715-9100

Attorneys for Plaintiffs