IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EIG ENERGY FUND XIV, L.P., | : | |
| EIG ENERGY FUND XIV-A, L.P., | : | |
| EIG ENERGY FUND XIV-B, L.P., | : | |
| EIG ENERGY FUND XIV (CAYMAN), L.P., | : | |
| EIG ENERGY FUND XV, L.P., | : | |
| EIG ENERGY FUND XV-A, L.P., | : | Case No. 1:16-cv-333-APM |
| EIG ENERGY FUND XV-B, L.P., | : | |
| EIG ENERGY FUND XV (CAYMAN), L.P., | : | |
| and EIG MANAGEMENT COMPANY, LLC, | : | |
| | : | |
| Plaintiffs, | : | **FIRST AMENDED COMPLAINT** |
| | : | |
| - against - | : | |
| | : | |
| PETRÓLEO BRASILEIRO S.A., | : | **DEMAND FOR JURY TRIAL** |
| ODEBRECHT S.A., ODEBRECHT | : | |
| PARTICIPAÇÕES E ENGENHARIA S.A., | : | |
| KEPPEL CORPORATION LTD., KEPPEL | : | |
| OFFSHORE & MARINE LTD., SEMBCORP | : | |
| INDUSTRIES LTD., SEMBCORP MARINE | : | |
| LTD., and JURONG SHIPYARD PTE LTD., | : | |
| | : | |
| Defendants. | : | |

Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG

Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P.,

EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P. and EIG Energy Fund XV

(Cayman), L.P. (together, the "**Funds**") and EIG Management Company, LLC ("**EIG**"), by their

attorneys Coburn & Greenbaum PLLC and Kramer Levin Naftalis & Frankel LLP, for their First

Amended Complaint against defendants Petróleo Brasileiro S.A. ("**Petrobras**"), Odebrecht S.A.

("**Odebrecht**"), Odebrecht Participações e Engenharia S.A. ("**Odebrecht Engenharia**"), Keppel

Corporation Ltd. ("**Keppel**"), Keppel Offshore & Marine Ltd. ("**Keppel Offshore**"), Sembcorp

Industries Ltd. ("**Sembcorp**"), Sembcorp Marine Ltd. ("**Sembcorp Marine**") and Jurong

Shipyard Pte Ltd. ("**Jurong**") (all defendants other than Petrobras are collectively referred to as the "**Shipyard Defendants**"), allege as follows:

## Nature of the Action

1.      This action arises from a fraudulent conspiracy perpetrated by defendants against plaintiffs whereby the Funds, acting through their investment manager EIG, were fraudulently induced to invest over $221 million to purchase equity in Sete Brasil Participações, S.A. ("**Sete**").  Sete was conceived and created by Petrobras for the sole purpose of enticing third party financiers in the United States and elsewhere, such as the Funds, to invest billions of dollars in off-balance sheet financing to build, own and operate a portfolio of specialty drillships exclusively for Petrobras's use in oil and gas drilling operations offshore of Brazil.  Through a series of misrepresentations and omissions directed at EIG, Petrobras fraudulently procured the Funds' investment and proceeded to use that money to perpetuate and expand a covert and massive corruption scheme to enrich itself and its co-conspirators.  The scheme, when exposed in late 2014, promptly and directly caused the collapse and bankruptcy of Sete, and rendered the Funds' investment worthless.

2.      Petrobras created Sete in early 2010, following the discovery of massive oil and gas reserves (commonly known as the "**Pre-Salt Reserves**") off the coast of Brazil.  To tap into the hydrocarbons contained in the Pre-Salt Reserves, Petrobras required the exclusive use, for many years, of drillships designed to operate in ultra-deep waters.  The contract-bidding process for the drillships was rigged from the start.  Upon information and belief, to procure drillship contracts, shipyards including the Shipyard Defendants agreed to pay – and did pay – bribes and kickbacks to Petrobras executives and representatives of the Workers Party of Brazil, the controlling political party that dominated Petrobras' major shareholder, the Brazilian federal government. Upon information and belief, the Shipyard Defendants had knowledge of, approved

of and/or directed these bribe payments, either directly or through their subsidiaries, agents or representatives.

3.     In order for this bribery scheme to advance, the co-conspirators required a substantial influx of capital.  Petrobras envisioned a fleet of over 28 drillships, at a cost of over $700 million *per drillship*, resulting in a total capital need of approximately $20 billion.  Rather than fund such a massive capital investment itself, Petrobras determined to locate third party financiers, such as the Funds, to own and capitalize a company, Sete, which would then use investor funds and bank financing to hire shipbuilding companies – including those owned by the Shipyard Defendants and their subsidiaries – to construct the drillships in local shipyards.  Once completed, the drillships would be chartered back to Petrobras, and the resulting charter payments would be used to repay the banks' construction loans, cover the costs of operating Sete, and provide a return on investment to the Funds and other investors.

4.     To induce the Funds to invest in Sete, Petrobras and Sete (both directly and through their agents) provided certain "confidential information memoranda" and other marketing materials to EIG representatives in Washington, D.C. and elsewhere.  The memoranda and materials described and discussed Sete's business plan and ostensibly identified all material risks of investing in Sete.  Petrobras and Sete representatives further described and discussed Sete's business plan in oral representations made to EIG and EIG investors (which include various U.S.-based pension funds and institutional investors) during, among other interactions, meetings in Houston, Texas, Washington, D.C and Rio de Janeiro, Brazil.  But in such meetings and memoranda, Petrobras and Sete made material misrepresentations to EIG and never disclosed to EIG that, by the time Sete was created, Petrobras had already been perpetrating for years a massive and highly organized scheme wherein companies, including Odebrecht and Keppel, in exchange for Petrobras contracts, would pay substantial bribes and kickbacks to line

the pockets of Petrobras's management and the Workers Party of Brazil.  Nor did Petrobras

disclose to EIG that Petrobras intended to – and, in fact, did – continue to expand its corrupt

scheme by embedding bribes and kickbacks into each new contract Sete entered into with the

shipyards including those controlled by the Shipyard Defendants.

5.       Upon information and belief, the fraudulent solicitation of capital from

investors such as the Funds was a prerequisite for, and was carried out in direct furtherance of,

an overarching bribery scheme involving Petrobras, Sete, the Shipyard Defendants and

additional co-conspirators.  Petrobras needed Sete to raise investment capital to pay the Shipyard

Defendants and their subsidiaries under the shipbuilding contracts which appear to have been

improperly obtained by the Shipyard Defendants.  In turn, Petrobras and the Shipyard

Defendants then used that investment capital not only for purposes of commencing construction

on certain drillships, but also to pay bribes pocketed by officials of the Workers Party,

employees of Petrobras and ex-Petrobras cronies installed by Petrobras at Sete.

6.       When Brazilian federal police and prosecutors uncovered and revealed

this scheme (the "**Petrobras Corruption Scheme**") – which has become part of the largest

public scandal in the history of Brazil, with criminal charges filed against 179 persons and 93

convictions to date, arising from offenses that involved the payment of a total of more than $1.8

billion in bribes and kickbacks – Sete's drillship construction lenders promptly cut off further

critical construction funding for Sete, thereby causing the company to default on its shipbuilding

contracts.  Sete quickly collapsed, and it filed for bankruptcy in April 2016.  Without drillships

to charter to Petrobras, Sete has no source of income to repay the construction banks, its own

employees and other trade creditors or the Funds.

7.       Brazilian prosecutors discovered defendants' Petrobras Corruption

Scheme in and after 2014 through an ongoing investigation dubbed Operação Lava Jato

("**Operation Car Wash**").  In connection with Operation Car Wash, authorities in Brazil have entered into plea agreements with, among others, João Carlos de Medeiros Ferraz ("**Ferraz**"), Pedro José Barusco Filho ("**Barusco**") and Eduardo Costa Vaz Musa ("**Musa**") – three former Petrobras executives whom Petrobras installed as Sete's most senior executives.

8.      As part of his plea agreement, Barusco made signed and recorded statements to the Brazilian federal police, and gave sworn testimony before the Brazilian Congress, describing in detail the Petrobras Corruption Scheme involving Petrobras, ex-Petrobras cronies installed by Petrobras at Sete, the Shipyard Defendants and others.  Barusco admitted, among other things, that Renato Duque ("**Duque**") and Roberto Gonçalves ("**Gonçalves**") of Petrobras, João Vaccari Neto ("**Vaccari**") of the Workers Party, and Sete executives Barusco, Ferraz and Musa, procured bribes from shipyards – including those owned and controlled by the Shipyard Defendants – in the amount of approximately 1 percent of the value of the twenty-eight contracts that Sete executed with the shipyards.  According to Barusco, the total value of these twenty-eight contracts was $22 billion.  Ferraz, Barusco and Musa have subsequently agreed to disgorge close to $100 million of the bribes they received, much or all of which they had secreted in Swiss bank accounts opened in the names of phantom entities.

9.      The public disclosure of the Petrobras Corruption Scheme has crippled Sete by causing, among other things, the cancellation of Sete's contracts to lease drillships to Petrobras, the withdrawal by lenders of bank financing vital to Sete's operations, and Sete's filing for bankruptcy in April 2016.  The Funds' investment in Sete is now worthless.  By this action, EIG and the Funds seek redress for the injuries they have suffered due to the defendants' fraudulent corruption conspiracy.

**Plaintiffs**

10.     Plaintiff EIG Energy Fund XIV, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

11.     Plaintiff EIG Energy Fund XIV-A, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

12.     Plaintiff EIG Energy Fund XIV-B, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

13.     Plaintiff EIG Energy Fund XIV (Cayman), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands.

14.     Plaintiff EIG Energy Fund XV, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

15.     Plaintiff EIG Energy Fund XV-A, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

16.     Plaintiff EIG Energy Fund XV-B, L.P. is a limited partnership organized and existing under the laws of the State of Delaware.

17.     Plaintiff EIG Energy Fund XV (Cayman), L.P. is a limited partnership organized and existing under the laws of the Cayman Islands.

18.     Plaintiff EIG is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 1700 Pennsylvania Avenue, NW, Suite 800, Washington, D.C.   20006.  EIG is a registered investment adviser, and serves as investment adviser to, and investment manager of, the Funds.  As such, EIG acts as the legal representative and agent of the Funds and the Funds' investors (including the Funds' U.S. investors) in the Funds' investment activities.

**Defendant Co-Conspirators**

19.     Upon information and belief, defendant co-conspirator Petrobras is a corporation organized and existing under the laws of Brazil, operating globally, with its principal place of business located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil, and an office located at 570 Lexington Avenue, New York, NY 10022. Upon further information and belief, the government of Brazil is the majority owner of Petrobras, such that Petrobras is both a foreign state within the meaning of 28 U.S.C. § 1603(a) and an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b). Upon information and belief, debt and/or equity securities issued by Petrobras, either directly or through subsidiaries or affiliates, trade in the United States.

20.     Upon information and belief, defendant co-conspirator Odebrecht is a corporate conglomerate organized and existing under the laws of Brazil, operating globally, with its principal place of business located at Av. Luís Viana, 2841, Edifício Odebrecht Paralela, SP 41730-900, Salvador, Brazil. Upon further information and belief, Odebrecht, through its wholly-owned subsidiary Odebrecht Engenharia and other intermediate entities, is the ultimate parent company and controlling shareholder of Enseada Indústria Naval S.A. (f/k/a Estaleiro Enseada do Paraguaçu S.A.) (the "**Odebrecht Shipyard**"), a shipbuilding company which owns and operates the shipyard known as the Paraguaçu Unit in the Bahia region of Brazil. Upon further information and belief, Odebrecht has maintained control over and knowledge of the activities of the Odebrecht Shipyard since it was founded in or about 2010.

21.     Upon information and belief, defendant co-conspirator Odebrecht Engenharia (f/k/a Santa Dorothea Empreendimentos e Participações S.A.) is a corporation and wholly-owned subsidiary of Odebrecht organized and existing under the laws of Brazil, operating globally, with its principal place of business at Rua Lemos Monteiro, 120 12º andar,

Parte F, Butanta, SP 05501-050, São Paulo, Brazil.  Upon further information and belief,

Odebrecht Engenharia, through intermediate entities, is a parent company and controlling

shareholder of the Odebrecht Shipyard and has maintained control over and knowledge of the

activities of the Odebrecht Shipyard since it was founded in or about 2010.

      22.    Upon information and belief, defendant co-conspirator Keppel is a

corporation organized and existing under the laws of Singapore, operating globally, with its

principal place of business located at 1 HarbourFront Avenue, 18-01 Keppel Bay Tower,

098632, Singapore.  Upon further information and belief, Keppel, through its wholly-owned

subsidiary Keppel Offshore and other intermediate entities, is the ultimate parent company and

one hundred percent shareholder of Estaleiro BrasFELS Ltda. (the "**Keppel Shipyard**"), a

shipbuilding company which owns and operates a shipyard in the Angra dos Reis region of

Brazil.  Upon further information and belief, Keppel has maintained control over and knowledge

of the activities of the Keppel Shipyard since it was founded in or about 2000.

      23.    Upon information and belief, defendant co-conspirator Keppel Offshore is

a corporation and wholly-owned subsidiary of Keppel organized and existing under the laws of

Singapore, operating globally, with its principal place of business at 50 Gul Road, 629351,

Singapore.  Upon further information and belief, Keppel Offshore, through intermediate entities,

is a parent company and one hundred percent shareholder of the Keppel Shipyard and has

maintained control over and knowledge of the activities of Keppel Shipyard since it was founded

in or about 2000.

      24.    Upon information and belief, defendant co-conspirator Sembcorp is a

corporation organized and existing under the laws of Singapore, operating globally, with its

principal place of business at No. 05-04, 30 Hill Street, 179360, Singapore.  Upon further

information and belief, Sembcorp, through its subsidiaries Sembcorp Marine and Jurong, is the

ultimate parent company and majority shareholder of Estaleiro Jurong Aracruz Ltda. (the "**Sembcorp Shipyard**"), a shipbuilding company, which owns and operates a shipyard in the Espirito Santo region of Brazil.  Upon further information and belief, Sembcorp has maintained control over and knowledge of the Sembcorp Shipyard since it was founded in or about 2009.

25.     Upon information and belief, defendant co-conspirator Sembcorp Marine is a corporation organized and existing under the laws of Singapore, operating globally, with its principal place of business at 29 Tanjong Kling Road, 628054, Singapore.  Upon further information and belief, Sembcorp Marine, through its wholly-owned subsidiary Jurong, is a parent company and one hundred percent shareholder of the Sembcorp Shipyard and has maintained direct control over and knowledge of the activities of the Sembcorp Shipyard since it was founded in or about 2009.

26.     Upon information and belief, defendant co-conspirator Jurong is a corporation organized and existing under the laws of Singapore, operating globally, with its principal place of business at 29 Tanjong Kling Road, 628054, Singapore.  Upon further information and belief, Jurong is a parent company and one hundred percent shareholder of the Sembcorp Shipyard and has maintained control over and knowledge of the activities of the Sembcorp Shipyard since it was founded in or about 2009.

27.     Upon information and belief, the acts charged in this First Amended Complaint to have been done by the defendant co-conspirators were authorized, ordered or done by their officers, agents, employees, or representatives, while actively engaged in the management of the defendant co-conspirators' affairs, and the acts taken by defendant co-conspirators in furtherance of the Petrobras Corruption Scheme are imputed to each and every member of the conspiracy.

**Jurisdiction and Venue**

28.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because defendant Petrobras is a foreign state as defined in 28 U.S.C. § 1603(a), and plaintiffs have asserted claims for relief against Petrobras as to which it is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement.  This action falls within, among others, the exception to foreign sovereign immunity created by 28 U.S.C. § 1605(a)(2).  This court has supplemental jurisdiction over the claims against the Shipyard Defendants pursuant to 28 U.S.C. § 1367 because those claims are so related to claims in the action within the Court's original subject matter jurisdiction that they form part of the same case or controversy.

29.     The Court has personal jurisdiction over Petrobras pursuant to 28 U.S.C. § 1330(b) because the claims asserted in this action fall within this Court's subject matter jurisdiction under 28 U.S.C. § 1330(a) and plaintiffs have effected service upon Petrobras in accordance with 28 U.S.C. § 1608.  The Court has personal jurisdiction over the Shipyard Defendants under D.C. Code § 13-423(a) because those defendants participated with Petrobras and others in an unlawful conspiracy and overt acts taken in furtherance of that conspiracy, such as the fraudulent inducement of the Funds' investment in Sete, were taken within and directed at the District of Columbia.  In addition, plaintiffs have suffered tortious injury in the District of Columbia, including the loss of their investment in Sete, as the result of acts and omissions taken in furtherance of the defendants' conspiracy.

30.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.  Defendant Petrobras is both a foreign state as defined in 28 U.S.C. § 1603(a) and an agency or instrumentality of a foreign state as defined in 28 U.S.C. § 1603(b) and a substantial part of the events giving rise to the claims asserted herein occurred and caused damages in this district.

## Statement of Facts

Petrobras Creates Sete

31.     In or about 2006, Petrobras announced one of the most significant discoveries of new oil reserves in the preceding 30 years: the Pre-Salt Reserves located in the Campos and Santos Basins off the coast of Brazil.  Petrobras and others believed that these basins contained up to 50 billion barrels of oil, which prompted Petrobras to undertake a massive capital expenditure program to extract the oil.  This discovery would mark another opportunity for Petrobras and its co-conspirators to perpetuate and grow their institutionalized corruption scheme.

32.     Petrobras conceived of the idea of forming Sete in early 2010.  According to Barusco's testimony before the Brazilian Congress, "the initiative to create Sete Brasil" was taken by Barusco and Ferraz, who, at the time of Sete's creation, were longtime and senior Petrobras employees.  By creating Sete, which itself would incur the massive amounts of financing required to carry out Petrobras's drilling program, Petrobras effectively shifted that financing off of its balance sheet and onto Sete's.

33.     According to information memoranda that Petrobras and Sete prepared and provided to EIG, the plan was for Sete – through contracts with shipyards – to build and own up to 28 deep-water drillships, and charter them to Petrobras.  The information memoranda further stated that Sete would have a competitive advantage over other potential drillship providers because it would construct its drillships using shipyards and labor in Brazil, and thus comply with "local content" rules that the Brazilian government imposed.  Moreover, according to the information memoranda, Sete had "strong support from the Brazilian Federal Government, including financial support" because it was to be the bedrock of a program to revitalize the Brazilian shipbuilding industry, an important political goal of the Brazilian government.

34.     The information memoranda stated that Sete planned to rely heavily on borrowed money to build the drillships and to otherwise conduct its operations, with equity investments making up the remainder of Sete's overall capital structure.  Thus, according to the memoranda, Sete's "funding strategy [would be] focused on financing sources with large underwriting potential."  And consistent with representations that Sete enjoyed "strong support from the Brazilian Federal Government," the information memoranda informed EIG (and other prospective investors) that Sete would benefit by a "special focus" on debt financing from Banco Nacional de Desenvolvimento Econômico e Social ("**BNDES**"), the Brazilian state-owned development bank.  Indeed, the information memoranda stated that Sete expected the single largest element of its overall capitalization to come in the form of loans from BNDES.  Stated differently, the information memoranda emphasized to potential investors – such as EIG and the Funds – that their equity investments (amounting to hundreds of millions of dollars) would be prudent because, although massive amounts of debt capital would also be necessary for Sete's success, such debt capital would be readily available to Sete because of Sete's preferential relationship with the Brazilian government and financial institutions under the effective control of the Brazilian government.

35.     Petrobras installed its own former employees as Sete's top executives.  Thus, Petrobras appointed Ferraz, who upon information and belief had previously spent more than 30 years working in a variety of roles at Petrobras, to be Chief Executive Officer of Sete.  Likewise, upon further information and belief, Barusco and Musa both worked at Petrobras for at least 20 years before Petrobras appointed them to be Sete's Chief Operating Officer and Engineering Director, respectively.  By 2010, Sete had been formed and the stage was set for a new wave of corruption at Petrobras.

Petrobras and Ex-Petrobras
Officials Fraudulently Induce EIG
and the Funds to Invest in Sete in
Furtherance of the
Petrobras Corruption Scheme

36.     To perpetuate its corruption scheme, Petrobras needed to raise capital for

Sete.  In furtherance of that effort, Petrobras sent EIG a "Confidential Information

Memorandum" dated January 2010, prepared by Petrobras and one of its affiliates (the

"**Petrobras Memorandum**").  The Petrobras Memorandum provided a detailed discussion as to

the business and long term strategic reasons for why Petrobras was forming Sete.  The Petrobras

Memorandum also made clear that Petrobras was specifically targeting U.S. investors as sources

of capital for Sete, and that an investment in Sete was attractive because there would be "long-

term contracts with high probability of cash flows" and "opportunities for long-term upsides that

are very advantageous."  The Petrobras Memorandum listed Ferraz, who was an employee of

Petrobras, as the primary contact person for potential investors interested in Sete.

37.     The Petrobras Memorandum identified for potential investors seven

different "Risk Factors" associated with investing in Sete, including risks relating to project

design and engineering defects, cost overruns, operational delay, drillship performance in deep

water, refinancing, taxes and environmental.  That there were only seven Risk Factors was

materially false, as there was an eighth undisclosed Risk Factor – that Petrobras had, for many

years, been engaged in a massive bribery and kickback scheme, and planned to perpetuate and

expand its corrupt scheme through Sete.

38.     The Petrobras Memorandum and other written materials that Petrobras

provided to EIG stated that Sete would enter into drillship construction contracts with shipyards

that would, among other things, oblige each shipyard to "comply with . . . applicable laws."

That representation was false, as Petrobras knew that the shipyards – including those owned

and/or operated by the Shipyard Defendants – would be committing Brazilian crimes by paying bribes to executives of Petrobras, ex-Petrobras cronies installed by Petrobras at Sete and the Workers Party.

39.     The Petrobras Memorandum did not disclose any information about the massive bribery and kickback scheme that Petrobras intended to perpetuate and expand through Sete, nor the risk that disclosure of this corrupt scheme would cause the complete failure of Sete. Nor did Petrobras disclose that the Petrobras executives, including Ferraz and Barusco, that Petrobras intended to insert into Sete management were actively involved in orchestrating a massive bribery scheme on behalf of Petrobras and the Workers Party.

40.     In September of 2010, EIG received in Washington, D.C. a multi-page presentation compiled by Petrobras entitled, "The Drilling Rigs Project:  Petrobras' Strategy for its Successful Implementation"  (the **Petrobras Drilling Presentation**").  The only Petrobras employee referenced in this document was Ferraz, who was listed as the apparent author and who was identified by the title, "Petrobras-Finance Treasury, General Manager."  The Petrobras Drilling Presentation discussed the long term strategic and financing goals for an off-balance sheet "finance structure" to develop and to charter drillships to Petrobras so that Petrobras could extract oil and gas from the Santos and Campos Basins.  Such "finance structure" became Sete. Petrobras, in its dissemination of the Petrobras Drilling Presentation, specifically targeted U.S. investors.  Indeed, the Petrobras Drilling Presentation contained a section titled "Cautionary Statement for US Investors," which read:

> "The United States Securities and Exchange Commission permits oil and gas companies, in their filings with the SEC, to disclose only proved reserves that a company has demonstrated by actual production or conclusive formation tests to be economically and legally producible under existing economic and operating conditions.  We use certain terms in this presentation, such as oil and gas resources, that the SEC's guidelines strictly prohibit us

from including in filings with the SEC."

41.     The Petrobras Drilling Presentation contained a number of fraudulent misrepresentations. The Petrobras Drilling Presentation identified six potential risks under the heading "Main Risks and Challenges," including "Credit Risk," "Short Fall of Revenues," "Charter Daily Rates," "Guarantees," "Technological Risk" and "Delay and Cost Overrun."  The listing of only six "Main Risks and Challenges" was materially false, because there was a seventh, enormous "main risk" with the investment – that Petrobras had been engaged for years in a massive corruption scheme, and that it intended to expand and perpetuate that scheme through the Sete vehicle.

42.     Petrobras also misrepresented in the Petrobras Drilling Presentation the "Main Players Objectives – Petrobras and Brazilian Government."  According to Petrobras, its "Main Objectives" were "[t]o ensure the availability of its demand for drilling rigs for Pre Salt application, minimizing charter costs and associated risks."  That representation was materially false because, upon information and belief, one of Petrobras's main objectives with Sete was to perpetuate and expand its longstanding corruption scheme to enrich Petrobras executives and the Workers Party.

43.     The Petrobras Drilling Presentation also included a flow chart that purported to describe "The Basic Structure for Each Drilling Unit."  That flow chart was materially false, as it did not reflect a key element of the basic structure in that the shipyards – including those owned by the Shipyard Defendants – would be paying executives of Petrobras, Sete and the Workers Party bribes with respect to each drillship.

44.      In October of 2010, EIG received in Washington, D.C. a document prepared and circulated by Petrobras entitled, "Pre-Salt Oil Rigs Project."  This document also discussed the Sete investment premise and touted that Sete would have "management with

extensive experience in the market." This document did not disclose, however, that such management, which included Ferraz, would be perpetuating and expanding Petrobras's corruption and bribery scheme.

45.     Also in October of 2010, employees of EIG met with Ferraz, who was then still employed by Petrobras, at the offices of Petrobras in Rio de Janeiro, Brazil. While Ferraz discussed the Sete project, he did not disclose that Petrobras intended to use Sete to continue and expand the Petrobras Corruption Scheme.

46.     During March 2011, EIG representatives again met in Brazil with Ferraz, who at the time was a Petrobras employee. During that meeting, Ferraz again discussed Sete, but did not disclose Petrobras's intention to use Sete to continue and expand the corrupt scheme that, at the time, had already been in place at Petrobras for many years.

47.     On or about September 14, 2011, Lakeshore Financial Partners Participações Ltda. – acting, upon information and belief, as an agent of and/or financial adviser to Sete and/or Petrobras – transmitted to EIG, again at its offices in Washington, D.C., yet another confidential information memorandum promoting investment in Sete, dated September 2011 (the "**Lakeshore Memorandum**"). The Lakeshore Memorandum repeated the representations contained in the Petrobras Memorandum, concerning the construction contracts that Sete would enter into with shipyards, and the ways in which Sete would use the equity and debt financing it raised. And again, while this document warned of a number of potential operational risks with Sete, there was no mention of the Petrobras Corruption Scheme.

48.     Throughout the periods referenced above, Ferraz also transmitted numerous e-mails concerning Sete to EIG in Washington, D.C. Like Petrobras's and Sete's other written and oral statements to EIG, none of these e-mails disclosed the Petrobras Corruption Scheme.

49.     For example, on October 5, 2011, Ferraz communicated by e-mail with EIG, at EIG's offices in Washington, D.C., to report on Sete's progress in bidding for drillship charter agreements with Petrobras, and touted Sete's intention and ability "to achiev[e] conditions that are both doable for Sete and its shareholders and practically unbeatable by [Sete's] competitor."

50.     On December 23, 2011, Ferraz communicated by e-mail with EIG, at EIG's offices in Washington, D.C., to report that he and others from Sete had traveled to China for meetings with "high level persons" of China Investment Corp. ("**CIC**").  Ferraz further reported that the CIC representatives he met with had said "unofficially" that CIC was "very inclined to invest in Sete," and that an investment in Sete by CIC would both "open the door to large international investors, including other sovereign funds" and "increase the success of [Sete's] future IPO."

51.     Ferraz also traveled to the United States several times to meet with representatives of EIG for the purpose of promoting investments in Sete.

52.     For example, one such meeting took place in Houston, Texas during the spring of 2013.  At that meeting, Ferraz offered rosy descriptions of Sete and its business prospects.  But he never disclosed to EIG the massive Petrobras Corruption Scheme in which he was participating personally, and which involved, among others, Petrobras, its executives, the Workers Party and the Shipyard Defendants.

53.     In September 2013, in his capacity as a representative of Sete, Ferraz attended in Washington, D.C. an annual conference EIG holds for its investors, involving approximately 300 attendees and including representatives of numerous U.S. and state municipal pension plans, U.S. insurance companies and individual U.S. investors. The purpose of the conference was to review current investments, and prospective investment opportunities, for EIG

and the Funds.  During the conference, Ferraz informed EIG and EIG's investors in the Funds

that Sete expected drillship charter revenue "of almost $90 billion [in] the next 20 years."  Ferraz

also reported that Sete was "ahead of schedule," and was "not facing any problem to raise" the

necessary debt financing called for in its business plan.  Ferraz assured EIG and EIG's Fund

investors that by 2019, Sete would "have 90 percent of all rigs already in operation," and that its

"EBITDA [would] be $4.6 billion per year."  Finally, Ferraz told EIG and EIG's Fund investors

that Sete was "performing as planned," and that he "[didn't] see any reason why [Sete] should

deviate from that."  Ferraz's oral statements perpetuated the pattern of deception and lies

promulgated in the various marketing materials previously provided to EIG.  And Ferraz must

have known he was doing so given that, upon information and belief, by September 2013, he had

been participating personally and directly for several years in the Petrobras Corruption Scheme.

54.     Based on the glowing investment projections embedded in the above-

described marketing materials, e-mails and oral presentations, EIG and the Funds began to invest

in Sete in or about August 2012.  Between August 2012 and May 2013, the Funds invested

approximately $77.4  million in Sete.  Subsequent to the September 2013 EIG investor

conference, at which Ferraz spoke so enticingly (but fraudulently) concerning Sete, the Funds

invested over $143 million more in Sete.  Ultimately, the Funds' aggregate investment in Sete

totaled $221,133,393.

Brazilian Police and Prosecutors
Uncover the Petrobras Corruption Scheme

55.     In or about 2014, federal police and prosecutors in Brazil initiated the

Operation Car Wash investigation.  Although the investigation initially concerned alleged money

laundering by a number of criminal organizations, it ultimately revealed that Petrobras had, for

many years, been involved in an enormous corruption scheme including, but also pre-dating, the

Petrobras Corruption Scheme. As a result of Operation Car Wash, authorities in Brazil have charged and/or convicted numerous current and former Petrobras executives and Brazilian politicians of various crimes including those related to the Petrobras Corruption Scheme. To date, 93 individuals have been convicted of crimes in connection with Operation Car Wash.

56.     Upon information and belief, in or about November 2014, the police and prosecutors conducting Operation Car Wash arrested Barusco on suspicion that he had been involved in corruption during his tenure at Petrobras. Subsequently, Barusco, Ferraz and Musa all entered into plea arrangements with Brazilian prosecutors and police wherein they agreed to cooperate with the investigation in exchange for lighter sentences. In connection with those arrangements, Barusco, Ferraz and Musa agreed to return, in the aggregate, close to $100 million in bribes that they had personally received.

57.     In addition to agreeing to return ill-gotten money, Barusco provided extensive information to Brazilian police and prosecutors, and to the Brazilian Congress, demonstrating both the scope and duration of the corruption scheme at Petrobras, and the development of the Petrobras Corruption Scheme. Tellingly, in his sworn testimony before the Brazilian Congress, Barusco stated that "[t]he issue of [Sete], about the establishment of bribe amounts, was a continuity of what happened in PETROBRAS" (emphasis added). In other words, upon information and belief, the moment that Ferraz and Barusco – while they worked at Petrobras – came up with the idea to form Sete, they were well aware, and intended, that Sete would perpetuate and expand the longstanding bribery and kickback scheme involving Petrobras, its executives, the Workers Party, and, upon information and belief, Odebrecht, Keppel and others.

58.     According to Barusco's plea statements, he personally began receiving bribes as a Petrobras employee in or about 1997. Barusco described that, from at least as early as

2003, corruption within Petrobras was "endemic and institutionalized."  Bribery and kickbacks

were "built in" to contracts and were "understood to be part of the relationship" between

Petrobras and most persons and entities with whom Petrobras had business dealings.  It was, to

use Barusco's words, Petrobras's "*modus operandi*" to require some form of bribe or kickback

payment in almost all of its business dealings.  Although the exact corrupt practices varied from

contract to contract, bribes and kickbacks paid in connection with Petrobras contracts generally

were split, with a portion going to Vaccari – the Secretary of Finance and Planning of the

Workers Party – and the balance going to "the House," which consisted of Duque, Barusco and,

on occasion, other Petrobras executives.  Barusco explained in his plea statements and in

testimony before the Brazilian Congress that he would at times keep bribe money at his own

house, and that he was often responsible for distributing Duque's agreed-upon share of the bribes

to foreign bank accounts on a monthly basis.  The scope of this corruption, both in terms of the

number of people involved and the amount of bribes paid, was massive – between 2005 and

2010 alone, Barusco estimated that Duque and he received millions of dollars in bribes in

connection with 60 separate Petrobras contracts.

59.     Upon information and belief, the pre-Petrobras Corruption Scheme at

Petrobras involved many repeat players.  In his plea statements, Barusco described a "cartel" for

contract acquisition in which certain corporations and their agents systematically paid bribes and

kickbacks to Petrobras executives and Workers Party officials in exchange for preferential access

to various kinds of Petrobras contracts.  Although membership in this cartel changed and grew

over the years, Barusco identified defendant Odebrecht as a long-term, "hard core" participant.

Specifically, Barusco stated that between 2004 and 2010, Odebrecht paid bribes in connection

with nine separate Petrobras contracts and that Odebrecht director Rogério de Araújo

("**Araújo**"), personally acted as an agent in the payment of many of those bribes.  As Operation

Car Wash would later reveal, several other high-ranking Odebrecht executives participated actively in the payment of bribes and kickbacks in exchange for Petrobras contracts.  Indeed, Marcelo Odebrecht, Odebrecht's Chief Executive Officer, has been convicted and sentenced to serve 19 years in jail in connection with Operation Car Wash.  Upon information and belief, since at least 2003, Keppel had also paid substantial bribes to representatives of Petrobras and the Workers Party.

        60.     In his plea-related statements and testimony, including Collaboration Agreement No. 1, dated March 3, 2014, between Barusco and, among others, the Brazilian Bureau for the Repression of Financial Crimes and Deviations of Public Resources, Barusco described the Petrobras Corruption Scheme:

- Duque and Gonçalves of Petrobras, Vaccari of the Workers Party and Ferraz, Barusco and Musa of Sete, and the agents of the shipyards with whom Sete contracted to build drillships, including those controlled by the Shipyard Defendants, agreed that approximately 1 percent of the value of each of Sete's construction contracts  -- whose total value was approximately $22 billion – would be paid as bribes;

- The Odebrecht Shipyard received six Sete contracts in exchange for the payment of bribes – Araújo, then an Odebrecht executive, was responsible for the payment of bribes;

- The Keppel Shipyard received six Sete contracts in exchange for the payment of bribes – Zwi Skornicki ("**Skornicki**") was responsible for the payment of bribes on behalf of the Keppel Shipyard, and Skornicki paid at least $4.5 million in bribes;

- The Sembcorp Shipyard received six Sete contracts in exchange for the payment of bribes – Guilherme Esteves de Jesus ("**de Jesus**") was responsible for the payment of bribes on behalf of the Sembcorp Shipyard, and de Jesus paid at least $5 million in bribes;

- The bribes on these Sete contracts – like the bribes paid in connection with past Petrobras contracts – generally were split, with two-thirds going to Vaccari of the Workers Party and one-third shared between "House 1" (which consisted of Petrobras executives Duque and Gonçalves) and "House 2" (which consisted of Sete executives Barusco, Ferraz and Musa).  Unbeknown to the other bribe recipients, Barusco negotiated an additional bribe from the

Sembcorp and Keppel Shipyards in the amount of 0.1% of contract value to be paid only to Barusco;

- In or about October 2011, Barusco, Duque and Ferraz traveled to Milan, Italy to meet with representatives of Banque Cramer, a bank based in Switzerland;

- Following that meeting, Barusco, Duque, Ferraz and Musa opened accounts at Banque Cramer, in the names of phantom companies, into which bribes from the Shipyard Defendants and others were deposited; and

- Duque, Gonçalves, Barusco, Ferraz, Musa and Vaccari all received millions of dollars in bribes from the shipyards, including those controlled by the Shipyard Defendants, and/or their owners, agents or representatives, in exchange for Sete contracts.

61.     Upon information and belief, the Shipyard Defendants had knowledge of, authorized and/or directed the payment of bribes to representatives of Petrobras, Sete and/or the Workers Party in exchange for shipbuilding contracts.

62.     Upon information and belief, Petrobras, the Shipyard Defendants and others (including but not limited to the ex-Petrobras officials installed at Sete by Petrobras) colluded to exchange illegal bribes for Sete shipbuilding contracts.  Although the exact timing and size of the bribes appear to have varied from shipyard to shipyard and from contract to contract, Barusco's statements and testimony indicate that the shipyards – by and through their agents and/or parent companies – generally paid approximately 1 percent of the value of their contracts as bribes, and that these payments were mostly made in and before 2013.  Upon information and belief, the shipyards and/or their parents, including the Shipyard Defendants, agreed to pay bribes in exchange for Sete contracts – and thereby joined the conspiracy – well before those bribes were actually paid.  At the moment that the Shipyard Defendants agreed to pay bribes, they became liable for all acts taken by their co-conspirators in furtherance of the Petrobras Corruption Scheme.

63.     Upon information and belief, the Petrobras Corruption Scheme required a

substantial influx of capital from investors to be effective, and it was equally important to all the co-conspirators that investments be procured without risking public revelation of their illegal activities. Without investors funding their multi-billion dollar shipbuilding and oil-extracting enterprise, neither the payers nor the recipients of the illegal bribes would have received the benefit of their *quid pro quo*. And, in order to secure investors while simultaneously protecting the viability of their illegal enterprise, Petrobras and the ex-Petrobras officials installed at Sete by Petrobras needed to conceal from those investors the corruption scheme in which Sete was embroiled. Thus, upon information and belief, when Petrobras and its Sete-installed cronies fraudulently misrepresented and omitted facts to investors in order to both fund and conceal their intended and ongoing bribery scheme, those actions were taken in direct furtherance of the Petrobras Corruption Scheme and the conspiracy involving all defendants.

64.     Brazilian prosecutors have charged and/or convicted various individuals in connection with Operation Car Wash, including Barusco, Duque, and Vaccari. Barusco was originally sentenced to 18 years in prison in 2014 for, among other things, his involvement in the Petrobras Corruption Scheme, but that sentenced was later reduced to two years of alternative confinement in exchange for his full cooperation in the investigation. In September 2015, Duque was convicted by a Brazilian court for the crimes of bribery and money laundering related to his involvement in the Petrobras Corruption Scheme, and is currently serving a prison sentence of more than 40 years for that and subsequent convictions. Vaccari was also convicted in September 2015 and received a 15 year prison sentence for, among other things, receiving bribes in connection with Sete contracts.

65.     In its most recent phases, Operation Car Wash has focused on the bribe-payers involved in the Petrobras Corruption Scheme, including the Shipyard Defendants. The direct involvement of "cartel" member Odebrecht in the Petrobras Corruption Scheme has been

confirmed by Operation Car Wash.  To date, Brazilian prosecutors have brought charges against over a dozen past and present Odebrecht executives and employees – including its former director Araújo, CEO Marcelo Odebrecht, and president Márcio Faria – for their involvement in the payment of bribes in exchange for Sete contracts.  For example, in a press release dated February 22, 2016, Brazilian Prosecutors revealed that Odebrecht, through accounts hidden abroad in the name of offshore companies – Klienfeld and Innovation – transferred approximately $3 million between April 2012 and March 2013 as a bribe to members of Petrobras and the Workers Party.  Upon information and belief, Brazilian prosecutors are still investigating the involvement of Odebrecht and/or its subsidiary Odebrecht Engenharia in the Petrobras Corruption Scheme.

66.     In the same February 22, 2016 press release, Brazilian prosecutors announced that Skornicki, who, upon information and belief was an agent of Keppel and Keppel Offshore, had been arrested for allegedly paying over $10 million in bribes between 2003 and 2013 – and another $4.5 million between 2013 and 2014 – to Petrobras, ex-Petrobras officials installed at Sete, and Workers Party representatives.  Upon information and belief, Brazilian prosecutors are still investigating the involvement of Keppel and/or Keppel Offshore in the Petrobras Corruption Scheme.

67.     In May 2015, formal charges were brought against de Jesus, who, upon information and belief, was a former agent of Sembcorp, Sembcorp Marine and Jurong. Brazilian prosecutors accused him of corruption, embezzlement and money laundering related to his involvement in the Petrobras Corruption Scheme.  In all, de Jesus is alleged to have passed at least $8.2 million in bribes to Petrobras executives.  In its own press release dated March 30, 2015, Sembcorp Marine admitted that de Jesus "is connected to companies which were engaged by [Sembcorp Marine] subsidiaries as consultants in connection with the [Sete] Contracts."

Notably, in that press release, Sembcorp Marine did not deny the allegations of its involvement, instead stating that it "is unable to comment on the truth or otherwise of these allegations [because] its internal (legally privileged) investigations are continuing."  Upon information and belief, Brazilian prosecutors are still investigating the involvement of Sembcorp, Sembcorp Marine and/or Jurong Shipyard in the Petrobras Corruption Scheme.

68.     The public revelation of the Petrobras Corruption Scheme, and of the substantial and direct involvement of ex-Petrobras officials installed at Sete in that scheme, has had a devastating impact on Sete.  As a result of this revelation, upon information and belief, Sete has had its bank financing lines cut off and the raising of further debt or equity rendered impossible; it has defaulted on its shipbuilding contracts for lack of money to pay necessary installments; and the lack of drillships has led to the cancellation (or an inability to timely perform) the Petrobras charter contracts that were to underpin its entire business plan.  Indeed, during Barusco's testimony before the Brazilian Congress on March 10, 2015, a legislator asked Barusco about the impact of the corruption scandal on Sete and its investors.  In response, Barusco testified:

> "The [Sete] project is an intelligent project. It is a structuring that made things work. There was just one detail: it was obviously very dependent on financing from the BNDES – extremely dependent. And with the discovery of the information that there was payment of bribes on contracts with the shipyards, the financial agents backed away.  And if there is no contribution of the funds that are called for, that are in the Budget, are in the planning, Sete really can go bankrupt, it could end up unable to honor its commitments."

69.     This prediction, in fact, came to pass.  In April 2016, Sete filed for bankruptcy in Brazil.

70.     Upon information and belief, as a result of the Petrobras Corruption Scheme, Sete is insolvent, and the Funds' investment in Sete is now worthless.

71.     In light of Barusco's stunning admissions, it appears that Petrobras created

Sete, and installed its own trusted former employees as Sete's most senior officers, with the

intention that Sete would perpetuate and expand the corruption scheme that had already been in

place at Petrobras for as long as a decade or more.  It further appears that Petrobras and ex-

Petrobras cronies installed by Petrobras at Sete solicited investments from EIG-managed Funds

and other investors with the knowledge and intention that the money those investors entrusted to

Sete would be used to fund a secret plan to generate contracts that, in turn, facilitated the

payment of unlawful bribes and kickbacks by, among others, the shipyards owned and operated

by the Shipyard Defendants.  And given Sete's heavy reliance on debt funding from BNDES and

other government-backed lenders, all of its co-conspirators were surely aware of a substantial

risk – never disclosed to EIG or the Funds – that the Petrobras Corruption Scheme, if it ever

came to light, would have a catastrophic impact on Sete and its investors.  And that is exactly

what happened.

### First Cause of Action
### (Fraud – Defendant Petrobras)

72.     Plaintiffs repeat each and every prior allegation, as if fully set forth herein.

73.     The Petrobras Memorandum, the Petrobras Drilling Presentation and the

other written materials that Petrobras prepared and supplied to EIG and the Funds contained

material misrepresentations and made no mention of the Petrobras Corruption Scheme.  Nor did

Petrobras disclose that scheme in any of the oral communications it had with EIG and the Funds

at any time before the Funds, under EIG's direction, invested more than $221 million in Sete.

74.     To the contrary, the written materials that Petrobras supplied to EIG and

the Funds misrepresented the risks, purposes and structure of the Sete project and that Sete's

drillship construction contracts would require shipyards to "comply with . . . applicable laws."

- 26 -

75.     The oral and written statements that Petrobras made to EIG and the Funds concerning Sete – in addition to including affirmative falsehoods – were incomplete and misleading in the absence of disclosure concerning the corruption scheme in which defendants and Sete were engaged.

76.     Had EIG and the Funds known about the falsity of Petrobras's statements and the existence of the Petrobras Corruption Scheme, EIG would have never caused the Funds to invest in Sete.

77.     Information about the Petrobras Corruption Scheme in which Petrobras and the Shipyard Defendants were engaged was peculiarly within the knowledge of Petrobras.

78.     The false statements that Petrobras made to EIG and the Funds, and the information that Petrobras concealed from them, were material.  As a result of Petrobras's false statements and omissions, EIG and the Funds did not know the almost certain risk that if the Petrobras Corruption Scheme ever came to light, Sete's business would suffer irreparable, direct and immediate harm and the value of any investment in Sete would decline or be destroyed entirely.

79.     Neither EIG nor any of the Funds was aware of the falsity of the statements that Petrobras made to them concerning Sete, or of the existence of the Petrobras Corruption Scheme.  Plaintiffs could not have discovered the falsity of Petrobras's statements, nor could they have become aware of the Petrobras Corruption Scheme, through reasonable diligence, at any time before the Funds, at EIG's direction, invested money in Sete.

80.     Upon information and belief, Petrobras knew that it had made written and/or oral statements concerning Sete to EIG and the Funds that were false, and/or that were materially misleading absent disclosure of the Petrobras Corruption Scheme it was conducting with Sete, the Shipyard Defendants and others.  Upon further information and belief, Petrobras

made those false and/or materially misleading statements, and/or omitted material information from its statements, with the intention that EIG and the Funds would rely on them.

81.     EIG and the Funds actually and reasonably relied on the false and/or materially misleading oral and written statements that Petrobras made to them by, among other things, investing money in Sete.  Had EIG and the Funds known the true facts, including the existence and scope of the Petrobras Corruption Scheme, the Funds, at EIG's direction, would not have made such an investment.

82.     As a direct and proximate result of their reliance on Petrobras's false and/or materially misleading statements, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $221,133,393.

83.     Petrobras acted in willful disregard of Plaintiffs' rights, and of the wrongful nature of its course of deceitful conduct.  Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be proved at trial.

## Second Cause of Action
### (Aiding and Abetting Fraud – Defendant Petrobras)

84.     Plaintiffs repeat each and every prior allegation, as if fully set forth herein.

85.     The oral and written statements concerning Sete made to EIG and the Funds by ex-Petrobras officials intentionally installed by Petrobras as the most senior officers at Sete – in addition to including affirmative falsehoods – were materially misleading absent disclosure concerning the corruption scheme in which defendants were engaged.

86.     Had EIG and the Funds known about the falsity of these statements, the existence of the Petrobras Corruption Scheme, and Petrobras manipulation of Sete to cause it to enter into shipbuilding contracts embroiled in a bribery and kickback scheme, the Funds never would have invested in Sete.

87.     Information about the Petrobras Corruption Scheme was peculiarly within the knowledge of Petrobras, ex-Petrobras officials installed at Sete and the Shipyard Defendants all times before the Funds, at EIG's direction, invested money in Sete.

88.     The false statements by Sete's senior officers (all ex-Petrobras) made to EIG and the Funds, and the information that such ex-Petrobras officers concealed from them, were material.  As a result of these false statements and omissions, EIG and the Funds did not know the almost certain risk that if the Petrobras Corruption Scheme ever came to light, Sete's business would suffer irreparable, direct and immediate harm and the value of any investment in Sete would decline or be destroyed entirely.

89.     Neither EIG nor any of the Funds was aware of the falsity of the statements Petrobras and ex-Petrobras officials made to them concerning itself, or of the corruption scheme that defendants were conducting.  Plaintiffs could not have discovered the falsity of these statements, nor could they have become aware of the Petrobras Corruption Scheme, through reasonable diligence, at any time before the Funds, at EIG's direction, invested money in Sete.

90.     Upon information and belief, Sete (acting through Petrobras-installed senior officers) knew that it had made written and/or oral statements concerning itself to EIG and the Funds that were false, and/or that were materially misleading absent disclosure of the Petrobras Corruption Scheme it was conducting with defendants.  Upon further information and belief, such false and/or misleading statements were made, and/or material information was omitted from  statements made to EIG and the Funds, with the intention that EIG and the Funds would rely on them.

91.     EIG and the Funds actually and reasonably relied on the false and/or materially misleading oral and written statements made to them by, among other things,

investing money in Sete.  Had EIG and the Funds known the true facts, the Funds, at EIG's direction, would not have made such an investment.

92.     As a direct and proximate result of their reliance on such false and/or materially misleading statements, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $221,133,393.

93.     Upon information and belief, Petrobras was aware of the fraud that its Sete-installed officers perpetrated on EIG and the Funds by concealing the Petrobras Corruption Scheme from EIG and the Funds through a pattern of false and/or materially misleading statements.

94.     Upon further information and belief, Petrobras substantially assisted those Sete officers in perpetrating that fraud by, among other things, creating Sete with the intention of continuing and expanding a bribery scheme that had already been in place at Petrobras for many years; participating in the Petrobras Corruption Scheme; appointing to key executive roles at Sete individuals who had been involved in the corrupt scheme when they were employed by Petrobras; and making its own materially false and/or misleading statements to EIG and the Funds, in order to induce the Funds to invest in Sete.

95.     Accordingly, Petrobras has aided and abetted in a fraud perpetrated by Sete, acting under the direction of ex-Petrobras officers then in charge of Sete,  against EIG and the Funds.

96.     As a direct and proximate result of Petrobras's misconduct, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $221,133,393.

97.     Petrobras acted in willful disregard of Plaintiffs' rights, and of the wrongful nature of its course of deceitful conduct.  Accordingly, plaintiffs are entitled to recover punitive damages in an amount to be proved at trial.

**Third Cause of Action**
**(Civil Conspiracy to Defraud – All Defendants)**

98.     Plaintiffs repeat each and every prior allegation, as if fully set forth herein.

99.     Upon information and belief, all of the defendants agreed to participate in – and in fact did participate in – the Petrobras Corruption Scheme, an unlawful and tortious conspiracy.  Among other things, the unlawful objects of that conspiracy included (a) paying illegal bribes and kickbacks to representatives of Petrobras, ex-officials of Petrobras installed at Sete and/or representatives of the Workers Party in exchange for shipbuilding contracts and (b) preventing the public disclosure of those bribe payments by, among other things, fraudulently concealing the existence of those payments from Sete investors.

100.     Upon information and belief, multiple overt acts were taken in furtherance of this unlawful conspiracy.  Upon information and belief, the Shipyard Defendants, either directly or through their agents, knowingly paid and/or authorized the payment of bribes and kickbacks to representatives of Petrobras, Sete and/or the Workers Party in exchange for Sete shipbuilding contracts.  In an effort to finance this unlawful conspiracy while maintaining its covert nature, and thus with at least the implicit assent of all co-conspirators, Petrobras and its Sete-installed Petrobras cronies fraudulently induced the Funds to invest in Sete through materially false and misleading written and oral statements.

101.     Upon information and belief, the Shipyard Defendants' agreement to join the Petrobras Corruption Scheme occurred before and/or during the time Petrobras and Sete-installed Petrobras cronies perpetrated acts of fraud upon EIG and the Funds, and thus those acts of fraud – whether or not explicitly agreed to or even known about by the Shipyard Defendants – can be fully imputed to them for the purposes of imposing civil conspiratorial liability.

102.    As a direct and proximate result of wrongful acts by defendants  in furtherance of their unlawful conspiracy, plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $221,133,393.

103.    As a co-conspirator, Petrobras is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether Petrobras knew of, participated actively in or benefited directly from those acts.

104.    As co-conspirator, Odebrecht is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether it knew of, participated actively in or benefited directly from those acts.

105.    As co-conspirator, Odebrecht Engenharia is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether it knew of, participated actively in or benefited directly from those acts.

106.    As co-conspirator, Keppel is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether it knew of, participated actively in or benefited directly from those acts.

107.    As co-conspirator, Keppel Offshore is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether it knew of, participated actively in or benefited directly from those acts.

108.    As co-conspirator, Sembcorp is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether it knew of, participated actively in or benefited directly from those acts.

109.    As co-conspirator, Sembcorp Marine is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether it knew of, participated actively in or benefited directly from those acts.

110.    As co-conspirator, Jurong is liable for its own acts, and is vicariously liable for the acts of all other co-conspirators taken in furtherance of the conspiracy, regardless of whether it knew of, participated actively in or benefited directly from those acts.

111.    Defendants acted in willful disregard of Plaintiffs' rights, and of the wrongful nature of their course of deceitful conduct.  Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be proved at trial.

WHEREFORE, Plaintiffs respectfully request judgment against defendants as follows:

(a) Awarding them compensatory damages, on their first, second and third causes of action, in an amount to be proved at trial, but in no event less than $221,133,393;

(b) Awarding them punitive damages, on their first, second and third causes of action, in an amount to be proved at trial;

© Awarding them prejudgment interest, as well as their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees; and

(d) Awarding them such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  Washington, D.C.
      May 18, 2016

Respectfully submitted,

Coburn & Greenbaum PLLC


By: _____/s/ Barry Coburn_____
      Barry Coburn
      DC Bar No. 358020

1710 Rhode Island Avenue, NW
Second Floor
Washington, D.C.   20036
(202) 657-4490

Kramer Levin Naftalis & Frankel LLP
Daniel B. Goldman, admitted *pro hac vice*
Kerri Ann Law, admitted *pro hac vice*
Michael J. Calb, admitted *pro hac vice*
1177 Avenue of the Americas
New York, New York   10036
(212) 715-9100

*Attorneys for Plaintiffs*