**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EIG ENERGY FUND XIV, L.P., *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:16-cv-333-APM |
| v. | ) |
| | ) |
| PETRÓLEO BRASILEIRO S.A., *et al*., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS OF PETRÓLEO BRASILEIRO S.A.—PETROBRAS**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 4

ARGUMENT ............................................................................................................... 9

   I.   THE COURT SHOULD DISMISS THIS CASE UNDER THE DOCTRINE
      OF *FORUM NON CONVENIENS*. ..............................................................9

         A.   The Brazilian Forum Selection Clause Is Valid and Enforceable. ........................ 10

         B.   The Courts of Brazil Are an Available and Adequate Alternative Forum. .......... 12

         C.   Public Interests Favor the Courts of Brazil. ......................................................... 13

         D.   To the Extent Private Interests Are Relevant, They Too Favor Brazil. ............... 17

   II.   BECAUSE PETROBRAS HAS SOVEREIGN IMMUNITY UNDER THE
       FSIA, THE COURT LACKS SUBJECT MATTER AND PERSONAL
       JURISDICTION. ......................................................................................................19

         A.   Petrobras's Relevant "Activity" for FSIA Purposes Is an Alleged Omission. ..... 20

         B.   None of the Three Clauses of the Commercial Activity Exception Applies. ....... 23

   III.   PLAINTIFFS LACK STANDING. ...............................................................................26

   IV.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST
       PETROBRAS. ...........................................................................................................28

         A.   Plaintiffs Have Failed to Plead Fraud Against Petrobras. ..................................... 29

            1.   Plaintiffs Have Not Pled Any Fraudulent Omissions By Petrobras. .............. 30

            2.   Plaintiffs Have Not Pled Material Misrepresentations. .................................. 33

            3.   Plaintiffs Have Not Pled That They Reasonably
                Relied On Any Statements By Petrobras. ...................................................... 36

         B.   Plaintiffs Have Failed to State a Claim for Aiding and Abetting. ........................ 38

            1.   D.C. Does Not Recognize Aiding and Abetting Liability. ............................. 38

            2.   Plaintiffs Have Not Sufficiently Pled an Underlying Tort. ............................ 38

            3.   Plaintiffs Have Not Pled That Petrobras Knowingly
                and Substantially Assisted Sete Brasil. ......................................................... 41

         C.   Plaintiffs Have Failed to State a Claim for Civil Conspiracy. ............................. 43

CONCLUSION ............................................................................................................ 45

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*3M Co. v. Boulter*,
    842 F. Supp. 2d 85 (D.D.C. 2012) ..................................................................38

*\*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) .......................................................... *passim*

*Adams v. Raintree Vacation Exch., LLC*,
    702 F.3d 436 (7th Cir. 2012) ........................................................................11

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ......................................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................28, 29, 37, 45

*\*Atlantic Marine Const. Co. v. U.S. Dist. Ct. for the W.D. Tex.*,
    134 S. Ct. 568 (2013) .......................................................................9, 12, 13, 17

*Baker v. Henderson*,
    150 F. Supp. 2d 13 (D.D.C. 2001) ....................................................................6

*Bank of N.Y. Mellon Trust Co. N.A. v. Henderson*,
    107 F. Supp. 3d 41 (D.D.C. 2015) ..................................................................43

*BCCI Holdings (Luxembourg) S.A. v. Mahfouz*,
    828 F. Supp. 92 (D.D.C. 1993) ......................................................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................28

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
    734 F.3d 1175 (D.C. Cir. 2013) .....................................................................19

*Bell v. D.C.*,
    82 F. Supp. 3d 151 (D.D.C. 2015) ..................................................................29

*Bent v. Zounds Hearing Franchising*,
    2015 WL 7721838 (S.D.N.Y. Nov. 30, 2015) ..................................................11

*Busby v. Capital One, N.A.*,
    932 F. Supp. 2d 114 (D.D.C. 2013) ............................................................29, 43

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Cadet v. Draper Golberg, PPLC,*
  2007 WL 2893418 (D.D.C. Sept. 28, 2007) ................................................................30, 31, 36

*Caldwell v. Kagan,*
  865 F. Supp. 2d 35 (D.D.C. 2012) ........................................................................27

*Canen v. Wells Fargo Bank, N.A.,*
  118 F. Supp. 3d 164 (D.D.C. 2015) ......................................................................28

*Cashman Equip. Corp. v. Dana Marine Serv., Inc.,*
  2006 WL 2390245 (E.D. La. Apr. 4, 2006) ............................................................13

*City of Brockton Ret. Sys. v. Avon Products, Inc.,*
  2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ........................................................35

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
  752 F.3d 173 (2d Cir. 2014) ................................................................................31

*Council on American-Islamic Relations Action Network, Inc. v. Gaubatz,*
  82 F. Supp. 3d 344 (D.D.C. 2015) .......................................................................38

*\*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,*
  212 F. Supp. 2d 30 (D.D.C. 2002) ................................................................. *passim*

*Dalberth v. Xerox Corp,*
  766 F.3d 172 (2d Cir. 2014) ................................................................................30

*Dingee v. Wayfair Inc.,*
  2016 WL 3017401 (S.D.N.Y. May 24, 2016) ........................................................30

*Dooley v. United Techs. Corp.,*
  1992 WL 167053 (D.D.C. June 17, 1992) .............................................................43

*Dooner v. Keefe, Bruyette & Woods, Inc.,*
  157 F. Supp. 2d 265 (S.D.N.Y. 2001) ..................................................................40

*El-Fadl v. Cent. Bank of Jordan,*
  75 F.3d 668 (D.C. Cir. 1996) .........................................................................12, 23

*Essroc Cement Corp v. CTI/D.C., Inc.,*
  740 F. Supp. 2d 131 (D.D.C. 2010) .....................................................................16

*In re Estate of McKenney,*
  953 A.2d 336 (D.C. 2008) ..................................................................................29

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)....................................................................33

*In re Federal-Mogul Corp. Sec. Litig.*,
  166 F. Supp. 2d 559 (E.D. Mich. 2001)...............................................................41

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
  602 F.3d 69 (2d. Cir. 2010)...................................................................................23

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
  784 F.3d 804 (D.C. Cir. 2015)...............................................................................26

*Henok v. Chase Home Fin., LLC*,
  915 F. Supp. 2d 109 (D.D.C. 2013).......................................................................37

*Hercules & Co. v. Shama Rest. Corp.*,
  613 A.2d 916 (D.C. 1992)......................................................................................37

*Heroth v. Kingdom of Saudi Arabia*,
  331 F. App'x 1 (D.C. Cir. 2009).............................................................22, 23, 36

*Howard v. Riggs Nat'l Bank*,
  432 A.2d 701 (D.C. 1981)......................................................................................34

*IMARK Mktg. Servs., LLC v. Geoplast, S.p.A.*,
  753 F. Supp. 2d 141 (D.D.C. 2010).......................................................................24

*Irwin v. World Wildlife Fund, Inc.*,
  448 F. Supp. 2d 29 (D.D.C. 2006)...................................................................12, 14

*Jefferson v. Collins*,
  905 F. Supp. 2d 269 (D.D.C. 2012).......................................................................30

*Kapiloff v. Abington Plaza Corp.*,
  59 A.2d 516 (D.C. 1948)........................................................................................30

*Kauffman v. Dreyfus Fund, Inc.*,
  434 F.2d 727 (3d Cir. 1970)...................................................................................27

*Kotan v. Pizza Outlet, Inc.*,
  400 F. Supp. 2d 44 (D.D.C. 2005).........................................................................11

*Labovitz v. Washington Times Corp.*,
  900 F. Supp. 500 (D.D.C. 1995)............................................................................27

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006) ........................................................34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................26

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
    693 F.2d 1094 (D.C. Cir. 1982) ........................................................22

*Marra v. Papandreou*,
    59 F. Supp. 2d 65 (D.D.C. 1999) ........................................................11

*Mattiaccio v. DHA Group, Inc.*,
    20 F. Supp. 3d 220 (D.D.C. 2014) ........................................................44

*\*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
    558 F. Supp. 2d 21 (D.D.C. 2008) ........................................................9, 15

*MBI Grp., Inc. v. Credit Foncier Du Cameroun*,
    616 F.3d 568 (D.C. Cir. 2010) ........................................................17

*McCreary v. Heath*,
    2005 WL 3276257 (D.D.C. Sept. 26, 2005) ........................................................44

*In re MCI Worldcom, Inc. Secs. Litig.*,
    191 F. Supp. 2d 778 (S.D. Miss. 2002) ........................................................41

*\*Menaldi v. Och-Ziff Capital Mgmt. Group LLC*,
    2016 WL 634079 (S.D.N.Y. Feb. 17, 2016) ........................................ *passim*

*Moncrief v. Lexington Herald-Leader Co.*,
    807 F. 2d 217 (D.C. Cir. 1986) ........................................................24

*\*OBB Personenverkehr AG v. Sachs*,
    136 S. Ct. 390 (2015) ........................................................20, 21, 24

*Odihiambo v. Republic of Kenya*,
    764 F.3d 31 (D.C. Cir. 2014) ........................................................25

*Pain v. United Techs. Corp.*,
    637 F.2d 775 (D.C. Cir. 1980) ........................................................18

*Peterson v. Royal Kingdom of Saudi Arabia*,
    416 F.3d 83 (D.C. Cir. 2005) ........................................................19

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)............................................................................19

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ................................................................41

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992)............................................................................25

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987)..........................................................30, 32

\*Rogers v. Petroleo Brasileiro, S.A.,
    673 F.3d 131 (2d Cir. 2012)........................................................13, 23

*Rogers v. Petroleo Brasileiro, S.A.*,
    741 F. Supp. 2d 492 (S.D.N.Y. 2010) ............................................12

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
    2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ..................................39

*S.K. Innovation, Inc. v. Finpol*,
    854 F. Supp. 2d 99 (D.D.C. 2012)..............................................19, 20

*Sabre Int'l Sec. v. Torres Advanced Enter. Sol., LLC*,
    60 F. Supp. 3d 21 (D.D.C. 2014)................................................10, 11

\*Saudi Arabia v. Nelson,
    507 U.S. 349 (1993)..............................................................19, 21, 24

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)............................................................................12

*Security Bank, N.A. v. Tauber*,
    347 F. Supp. 511 (D.D.C. 1972)......................................................24

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)............................................................40

*Silverman v. Weil*,
    662 F. Supp. 1195 (D.D.C. 1987) ....................................................39

\*Song fi, Inc. v. Google Inc.,
    72 F. Supp. 3d 53 (D.D.C. 2014) ....................................................11

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*In re Sotheby's Holdings, Inc.*,
  2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) .......................................................32

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ...............................................................................36

*Strumsky v. Washington Post Co.*,
  842 F. Supp. 2d 215 (D.D.C. 2012) .......................................................................6

*Sundberg v. TTR Realty, LLC*,
  109 A.3d 1123 (D.C. 2015) ..................................................................................38

*Sununu v. Philippine Airlines, Inc.*,
  792 F. Supp. 2d 39 (D.D.C. 2011) ........................................................................31

*U.S. ex rel. Grynberg v. Alaskan Pipeline Co.*,
  1997 WL 33763820 (D.D.C. Mar. 27, 1997) .........................................................41

*Ungar v. Islamic Republic of Iran*,
  211 F. Supp. 2d 91 (D.D.C. 2002) ..................................................................41, 43

*Vasaturo v. Peterka*,
  2016 WL 1435661 (D.D.C. Apr. 11, 2016) ...........................................................44

*Venable LLP v. Overseas Lease Grp., Inc.*,
  2015 WL 4555372 (D.D.C. July 28, 2015) ...........................................................34

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008) ................................................................................28

*Wu v. Stomber*,
  750 F.3d 944 (D.C. Cir. 2014) .............................................................................16

*In re XM Satellite Radio Holdings Sec. Litig.*,
  479 F. Supp. 2d 165 (D.D.C. 2007) .................................................................33, 34

*Zedan v. Kingdom of Saudi Arabia*,
  849 F.2d 1511 (D.C. Cir. 1988) ...........................................................................21

**RULES:**

Fed. R. Civ. P. 9(b) ..................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)..................................................................................3, 28

## <u>TABLE OF AUTHORITIES</u>—Continued

**Page(s)**

Fed. R. Civ. P. 19 .................................................................................................................28

STATUTES:

28 U.S.C. § 1330(a) ............................................................................................................17

28 U.S.C. § 1603 ................................................................................................................20

28 U.S.C. § 1604 ................................................................................................................20

28 U.S.C. § 1605(a)(2) ............................................................................................20, 23, 25

Luxembourg Companies Act of 10 Aug. 1915 §191bis ...............................................28

OTHER AUTHORITIES:

H.R. No. 94-1487 (Sept. 9, 1976) ........................................................................................21

5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) ......................6

Restatement (Second) of Torts § 876.................................................................................43

Defendant Petróleo Brasileiro S.A.—PETROBRAS ("Petrobras") respectfully submits this memorandum in support of its motion to dismiss the First Amended Complaint ("Complaint").

## INTRODUCTION

This is a case about shareholders in a corporation seeking relief for an investment that they did not make and that they cannot challenge in the U.S. courts. The entity at the heart of the bribery scandal that Plaintiffs allege—Sete Brasil Participações S.A. ("Sete Brasil")—is in bankruptcy-related proceedings in Brazil. As a result, Plaintiffs have chosen to weave a grand tale of fraud and conspiracy against entities affiliated with Sete Brasil in a desperate effort to recoup the funds they claim to have lost. As demonstrated below, however, the problems with this approach are legion and are fatal to Plaintiffs' claims.

Start with a fundamental fact that Plaintiffs ignore: Not one Plaintiff owns a single share of Sete Brasil, the entity in which Plaintiffs claim Petrobras and others somehow duped them into investing. Sete Brasil only has two shareholders: Petrobras, which owns 5%, and a Brazilian entity called Fundo de Investimento em Participações Sondas ("FIP Sondas"), which owns the remaining 95%. *See infra* at 6. FIP Sondas, in turn, is owned by a handful of entities that do not include any of the Plaintiffs. One of those entities is a Luxembourg-based entity, which in turn is owned by another Luxembourg-based entity, which in turn is owned by the Plaintiff Funds, which are based in the Cayman Islands and Delaware.

In their Complaint, Plaintiffs carefully avoid disclosing just how far removed they are from Sete Brasil, and the reason why jumps off the pages of the controlling investment agreement. In that agreement, the Luxembourg-based corporate grandchild through which Plaintiffs chose to make their investment agreed—with Petrobras—that disputes arising out of the investment would be litigated ***in Brazil*** in the Court of the District of Rio de Janeiro. *See infra*. at 8-9.

1

It is not surprising that Plaintiffs have regrets about this forum-selection clause, and not just for the usual reasons why litigants sometimes prefer to sue in the U.S.  As Plaintiffs admit, the bribery scandal that lies at the heart of their case has been a major focus of attention by Brazilian prosecutors and courts for the better part of two years.  *See* Dkt. 11 (First Am. Compl.) ("Compl.") ¶ 6.  But the results of the proceedings in Brazil do not support the story that Plaintiffs try to spin.  To the contrary, Brazilian courts and prosecutors repeatedly have confirmed that Petrobras was a "*victim*" of a cartel that allowed contractors, with the help of politicians and a few disloyal Petrobras employees, to overcharge Petrobras for contracts.  *See infra* at 7.

As a result, the Court should reject Plaintiffs' gambit to litigate their meritless claims against Petrobras in this forum for four principal reasons.  *First,* as demonstrated below and in the attached Declaration of Professor Cândido Rangel Dinamarco, one of Brazil's leading authorities on civil procedure, this is a classic case for the application of *forum non conveniens*. *See* Ex. 1.  The controlling investment document requires the parties' disputes to be litigated in Brazil, not the United States.  Likewise, Brazil has an enormous interest in the resolution of this case, which overlaps substantially with ongoing proceedings in Brazil concerning what Plaintiffs describe as "the largest public scandal in the history of Brazil."  Compl. ¶ 6.  The U.S., in contrast, has little interest in providing a forum to litigate about the alleged loss at issue—a loss on a Brazilian investment that Plaintiffs' Luxembourgian corporate grandchild reported in its public filings.  Moreover, the key documents and witnesses are concentrated in Brazil, outside the Court's subpoena power, and the Court likely would need to grapple with multiple issues of Brazilian law and language to resolve this case on the merits.

*Second*, Plaintiffs' claims against Petrobras are barred by sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA").  Plaintiffs admit, as they must, that Petrobras is a foreign state for purposes of the FSIA.  But their attempt to invoke the FSIA's "commercial activity exception" fails because the gravamen of their Complaint is based on conduct and harms

that allegedly occurred abroad.  For the same reason, the FSIA does not provide a basis for subject matter or personal jurisdiction over Petrobras.

*Third*, Plaintiffs lack standing because they did not invest in Sete Brasil.  It is black-letter law that investors in a corporation may not sue for damages that are the indirect result of an injury to the corporation in which they hold shares.  Here, Plaintiffs invested in a corporation that was at least three degrees of separation away from Sete Brasil.  Having reaped the benefits of investing through their corporate grandchild based in Luxembourg, Plaintiffs cannot now sue for harms allegedly suffered by that entity.

*Fourth*, even if the Court were inclined to review Plaintiffs' allegations on their merits— which it should not—the Complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6) and 9(b). The heart of the Complaint is that Plaintiffs were victims of a fraud because nobody informed them of an alleged bribery scheme.  Based on this theory, Plaintiffs purport to assert three claims:  a fraud count against Petrobras (Count I), an aiding and abetting fraud count against Petrobras (Count II), and a "civil conspiracy to defraud" claim against all Defendants (Count III).

Plaintiffs fall far short of pleading sufficient facts to support any of these claims.  The fraud claim fails because Plaintiffs—who are among the most sophisticated of investors—cannot establish any actionable omissions by Petrobras as a matter of law.  And although Plaintiffs make a half-hearted attempt to assert that Petrobras made affirmative misrepresentations, they shirk their duty under Rule 9(b) to identify particular misstatements that were materially false and to plead other elements of their claim.

Plaintiffs' aiding and abetting and conspiracy claims fare no better.  Aiding and abetting fraud is not an actionable claim in this jurisdiction, and in any event, Plaintiffs have failed to plead the existence of an underlying tort—an essential requirement for both aiding and abetting and conspiracy.  Plaintiffs' aiding and abetting claim also lacks merit because Plaintiffs have failed to plead that Petrobras substantially assisted in, or even knew about, any alleged fraud. Similarly, Plaintiffs have not pled any facts that support the existence of a conspiratorial agreement between Petrobras and anyone else.

3

In sum, this is a supposed fraud Complaint where Plaintiffs make allegations "upon information and belief" an incredible *forty-one times*, including on such central points as whether key witnesses participated in the alleged bribery scheme (Compl. ¶ 53) and whether "[u]pon information and belief, all of the defendants agreed to participate in" "an unlawful and tortious conspiracy" at all (*id.* ¶ 99). That simply is not enough under Rule 9(b) and the federal pleading requirements. All of Plaintiffs' claims fail as a matter of law and should be dismissed.

## BACKGROUND [1]

**The Creation of Sete Brasil.** Petrobras is an energy company that is majority-owned by the Brazilian government. Compl. ¶ 19. In 2006, Petrobras announced the discovery of new oil reserves, called the Pre-Salt Reserves, off the coast of Brazil. *Id.* ¶ 31. In order to extract the oil—possibly as much as 50 billion barrels—plans were made to create a fleet of 28 specialized deep-water drillships. *Id.* ¶ 3. At a cost of over $700 million each, the aggregate cost of the drillships was expected to run approximately $20 billion. *Id.*

Given the contemplated size and expense, Petrobras naturally did not want to take on a project of this magnitude on its own. *Id.* Thus, Sete Brasil, a separate entity, was created to raise the funds needed to construct the drillships through both debt and equity investments. *Id.* The plan was for Sete Brasil to use the money it raised to hire shipbuilding companies to construct the drillships. *Id.* Because of certain requirements relating to Brazil's "local content" laws, the drillships had to be constructed in Brazilian shipyards, which included shipyards operated by the eight Shipyard Defendants[2] and their subsidiaries. *Id.* ¶ 33. Once the drillships were complete, Sete Brasil was to charter them to Petrobras, generating profits that would be used to repay the loans and generate returns for Sete Brasil's equity investors. *Id.*

---

[1]    Unless otherwise noted, the statements in this section are based on the allegations of the Complaint. Petrobras disputes Plaintiffs' allegations and adamantly denies liability, but assumes the truth of certain allegations solely for purposes of the background discussion in this Motion.

[2]    The Shipyard Defendants all are based in Brazil or Singapore and include Odebrecht S.A., Odebrecht Participações e Engenharia S.A., Keppel Corporation Ltd., Keppel Offshore & Marine Ltd., Sembcorp Industries Ltd., Sembcorp Marine Ltd. and Jurong Shipyard Pte Ltd. *See* Compl. ¶¶ 20-26.

**Plaintiffs' Indirect Investment.** EIG Management Company, LLC ("EIG Management") is the investment advisor and manager for the eight Plaintiffs that the Complaint describes as the "Funds."[3]  Compl. ¶ 18.  EIG Management is based in Washington, D.C., but the Funds are not; they are incorporated and based either in the Cayman Islands or in Delaware.  *See* Compl. ¶¶ 10-17; Ex. 2.

Plaintiffs claim that the EIG family of companies first became involved in the underlying project starting in 2010 when EIG Management received information about Sete Brasil.  In particular, EIG Management claims to have had two meetings with a then-Petrobras employee, João Carlos de Medeiros Ferraz ("Ferraz"), to discuss Sete Brasil.  *Id.* ¶¶ 45-46.  Those meetings allegedly occurred in Rio de Janeiro in October 2010 and March 2011, respectively.  *Id.*

EIG claims that Petrobras also allegedly "sent EIG" a memorandum dated January 2010, which Plaintiffs refer to as the "Petrobras Memorandum."  *Id.* ¶ 36.  This memorandum—which is attached as Exhibit 3 and is *not*, in fact, titled the "Petrobras Memorandum"—was written in Portuguese.  Notably, Plaintiffs do not assert that Petrobras sent this document to EIG Management's office in Washington, D.C.

Plaintiffs also allege that EIG Management "received in Washington, D.C." two documents prepared by Petrobras in September and October of 2010.  Compl. ¶¶ 40, 44.  These documents allegedly included a presentation entitled "The Drilling Rigs Project: Petrobras' Strategy for its Successful Implementation," and a document entitled "Pre-Salt Oil Rigs Project." *Id.*

At some point between March and October 2011, Ferraz left Petrobras and assumed a position at Sete Brasil.  *See id.* ¶¶ 45, 49.  At this time, Plaintiffs had not yet made any investments.  *Id.* ¶ 54.  But Plaintiffs claim that they continued to communicate with Ferraz after

---

[3]      The Funds include Plaintiffs EIG Energy Fund XIV, L.P., EIG Energy Fund XIV-A, L.P., EIG Energy Fund XIV-B, L.P., EIG Energy Fund XIV (Cayman), L.P., EIG Energy Fund XV, L.P., EIG Energy Fund XV-A, L.P., EIG Energy Fund XV-B, L.P., and EIG Energy Fund XV (Cayman), L.P.  *See* Compl. ¶¶ 10-17.

he left Petrobras. In particular, Ferraz allegedly "communicated by e-mail with EIG, at EIG's offices in Washington, D.C." in October and December 2011, and attended two meetings in the U.S. in Spring and September 2013. *Id.* ¶¶ 49-53. As Plaintiffs admit, however, Ferraz attended the latter "in his capacity as a representative of Sete," *not* Petrobras. *Id.* ¶ 53.

Plaintiffs assert that they invested in Sete Brasil starting in August 2012. *Id.* ¶ 54. The Plaintiff Funds allegedly invested a total of more than $221 million, including approximately $77.4 million invested between August 2012 and May 2013, and an additional $143 million invested after September 2013. *Id.*

What Plaintiffs fail to disclose, however, is that they did not actually purchase any shares of Sete Brasil. As illustrated in Exhibit 4, the governing contract, which, as the basis of the investment at issue are incorporated into the Complaint,[4] make clear that Sete Brasil has only two shareholders: Petrobras, which owns 5%, and FIP Sondas, which owns the remaining 95%. *See* 3d Am. to Inv. Agmt. §§ 3.4, 4.3 [Ex. 4]. FIP Sondas, in turn, is owned by a handful of entities. Those entities include Petrobras, which owns a minority share, but they do *not* include any of the Plaintiffs. *See id.* Instead, the only EIG-affiliated entity that invested in FIP Sondas (and thus indirectly in Sete Brasil) is a Luxembourg-based entity called EIG Sete Holdings SÀRL ("EIG Luxembourg"). *Id.*; *see also* EIG Luxembourg Notes to Annual Accounts for 2015 at 14 ("[EIG Luxembourg] is invested in Sete Brasil . . . indirectly through FIP Sondas.") [Ex. 5]. EIG Luxembourg, in turn, is owned by another Luxembourg entity, EIG Sete Parent SÀRL. *See* Ex. 6 & Ex 7.[5] The eight Plaintiff Funds collectively own all of the shares of EIG Sete Parent

---

[4]     A court deciding a motion to dismiss may consider "matters incorporated by reference or integral to the claim." 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004); *accord Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 217-18 (D.D.C. 2012) ("A document need not be mentioned by name to be considered . . . 'incorporated by reference' into the complaint.").

[5]     For purposes of a motion to dismiss, the "court may take judicial notice of matters of a general public nature" including public filings and court records. *See Baker v. Henderson*, 150 F. Supp. 2d 13, 15 (D.D.C. 2001).

SÀRL. *Id.*  Thus, contrary to the Complaint, the Plaintiff Funds are far removed from any investment in Sete Brasil, and Plaintiff EIG Management is not an investor at all. *See* Ex. 2.

**The Alleged Bribery Scheme and "Operation Car Wash."**  Plaintiffs assert that, unbeknownst to them, Defendants engaged in a bribery scheme that led to the demise of Sete Brasil and the loss of their investment. *See, e.g.*, Compl. ¶¶ 55-71.  The alleged scheme purportedly involved a "cartel" in which participants paid bribes to certain Petrobras employees and officials of Brazil's governing political party, the Workers' Party. *See id.* ¶ 59.  Plaintiffs also assert—"upon information and belief"—that Petrobras and the Shipyard Defendants or their affiliates purportedly "colluded to exchange illegal bribes for Sete Brasil shipbuilding contracts." *See id.* ¶ 62.  In exchange for such bribes, the participants allegedly received "preferential access to various kinds of Petrobras contracts." *Id.* ¶ 59.

The Complaint asserts that in or about 2014, the public learned about the alleged bribery scheme through a Brazilian government investigation known as "Operation Car Wash," which included an examination of bribes allegedly paid in connection with Sete Brasil contracts. *Id.* ¶ 55.  As the Complaint notes, the investigation has since led to extensive legal proceedings in Brazil, including criminal prosecutions of more than 170 people, *id.* ¶ 6, and continues to this day. *See id.* ¶ 66.

Operation Car Wash, however, has not pointed the finger at Petrobras as a perpetrator of the alleged scheme.  Quite the opposite:  Although a handful of individuals affiliated with Petrobras have been implicated in receiving bribes, the Brazilian courts have found that Petrobras itself is not a target of the investigation because "[t]he state-run company is a *victim* of the crimes." Fed. Cir. of Curitiba Order (Sept. 12, 2014) (emphasis added) [Ex. 8]; *see also* Fed. Cir. of Curitiba Order (Dec. 16, 2014) (same) [Ex. 9].  Indeed, Petrobras has had to mark down the value of its assets to account for the amount for which it overpaid on contracts implicated by

the investigation.[6]  Petrobras thus had no incentive to act as Plaintiffs assert, and was harmed, not helped, by the alleged bribery scheme at the heart of the Complaint.

**The Sete Brasil Bankruptcy-Related Proceedings.**  According to the Complaint, after Operation Car Wash became public, Sete Brasil struggled to raise sufficient funds, and it defaulted on its shipbuilding contracts.  Compl. ¶ 68.  Sete Brasil commenced bankruptcy-related proceedings in April 2016.  *Id.* ¶ 69.[7]  "Upon information and belief," Plaintiffs assert, Sete Brasil is insolvent due to the alleged bribery scheme, and "the Funds' investment in Sete is now worthless."  *Id.*

**The Forum Selection Clause.**  Although the Complaint is silent on this point, the operative Investment Agreement—to which both Petrobras and EIG Luxembourg are parties—contains forum selection provisions that apply to "[a]ny disputes, doubts, conflicts, questions or discrepancies of any nature arising out of or related to this Agreement ('Conflict')."  *See* 3d Am. to Inv. Agmt. §§ 13.12, 13.12.4.  [Ex. 4].[8]  The provisions have a two-tier structure:  First, if Brazilian law would permit the Conflict at issue to be resolved by arbitration, the Agreement requires arbitration to take place in Rio de Janeiro, in Portuguese, and under Brazilian law.  *See id.* §§ 13.12, 13.12.4, 13.12.5.  Second—and critically for purposes of this motion—the Agreement also provides that, for Conflicts that "under Brazilian law cannot be submitted to arbitration, it is hereby elected the Court of the District of Rio de Janeiro, State of Rio de Janeiro, as the *only* competent [forum], waiving all others."  *Id.* ¶ 13.12.12 (emphasis added).  In another

---

[6]      *See* Petrobras 2015 Financial Statements at 10, 12-15, available at http://www.investidorpetrobras.com.br/en/financial-results/holding (last visited Aug. 10, 2016).

[7]      Although the Complaint alleges that Sete Brasil "filed for bankruptcy," Compl. ¶ 69, in fact the company is in "recuperação judicial," a procedure intended to avoid bankruptcy.

[8]      Annex 1.1 of the Agreement also includes a definition of "Conflict," and the definition there appears to be consistent with the definition in section 13.12.  In any event, the definition set forth in section 13.12 obviously controls section 13.12 and its subparts, including the forum selection clause in section 13.12.12(iv).

provision, the parties agreed that "the laws of the Federative Republic of Brazil" would govern the Agreement. *Id.* ¶ 13.9.[9]

**This Lawsuit.**   Ignoring the forum selection clause, Plaintiffs filed this lawsuit on February 23, 2016 and filed the operative Complaint on May 18, 2016.   The Complaint, at its core, alleges that Petrobras failed to warn Plaintiffs about the existence of the purported bribery scheme and aided and abetted Sete Brasil, which likewise allegedly defrauded Plaintiffs by failing to disclose the scheme.   *See* Compl. ¶¶ 93-95.   Plaintiffs also allege a claim for "civil conspiracy to defraud" against all Defendants.

## ARGUMENT

I.   **THE COURT SHOULD DISMISS THIS CASE UNDER THE DOCTRINE OF
     *FORUM NON CONVENIENS*.**

The doctrine of *forum non conveniens* presents "one of the rare occasions where a court may dismiss a case on prudential grounds prior to assessing its own jurisdiction." *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 27 (D.D.C. 2008).   Ordinarily, courts resolve *forum non conveniens* motions by (1) determining whether an "adequate alternative forum" exists, (2) balancing the parties' private interests, weighing in the balance a presumption in favor of the plaintiffs' choice of forum, and (3) balancing the relevant public interests.   *See Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 41-42 (D.D.C. 2002).   But this is not an ordinary case.   Where, as here, a forum selection clause is in play, the Supreme Court has held that that the *forum non conveniens* analysis changes in three important ways.   First, "the plaintiff's choice of forum merits no weight," and the plaintiff must "bear the burden" of showing why the Court should not grant the motion.   *Atlantic Marine Const. Co. v. U.S. Dist. Ct. for the W.D. Tex.*, 134 S. Ct. 568, 581-82 (2013).   Second, the Court "should not consider arguments about the parties' private interests," but instead should "deem the private-interest factors to weigh entirely in favor of the preselected forum."   *Id.* at 582.

---

[9]     The first version of the Investment agreement that EIG Luxembourg signed contains substantially identical provisions.   *See*  2d Addendum to Inv. Agmt. §§ 13.11-13.12.12 [Ex. 10].

Third, although the public-interest factors must be considered, those factors will only "rarely" overcome the forum-selection clause. *Id.* Thus, the forum-selection clause will be controlling "except in unusual cases." *Id.*

All of the relevant *forum non conveniens factors* point toward dismissal here, as demonstrated below and in the attached Declaration of Professor Cândido Rangel Dinamarco [Ex. 1]. Professor Dinamarco is a leading authority on Brazilian law and procedure. In addition to having authored multiple treatises on Brazilian civil procedure, Professor Dinamarco is a Professor of Civil Procedure at the Law School of the University of São Paulo and has served as a Justice of the High Court of Appeals of the State of São Paulo and as a State Attorney for the State of São Paulo. Dinamarco Decl. ¶ 3. As Professor Dinamarco's Declaration establishes, "[i]t is indisputable that the Brazilian Court System has jurisdiction over [this] case," and has a profound interest in the subject matter of this dispute. *Id.* ¶¶ 23, 46-47.

### A.     The Brazilian Forum Selection Clause Is Valid and Enforceable.

Plaintiffs are bound by the forum selection clause in the operative Investment Agreement and thus must litigate their claims in the venue set forth in the Agreement: the District Court for Rio de Janeiro, Brazil. "[F]orum selection clauses are presumptively enforceable" under both U.S. and Brazilian law. *Sabre Int'l Sec. v. Torres Advanced Enter. Sol., LLC*, 60 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also* Dinamarco Decl. ¶ 24 (explaining that, under Brazilian law, there cannot be "any doubt concerning the validity of a clause selecting a Brazilian venue"). Here, Plaintiffs can scarcely dispute that the clause at issue—which covers "[a]ny disputes, doubts, conflicts, questions or discrepancies of any nature arising out of or related to" the investment agreement—applies to this case. The very first paragraph of the Complaint asserts that "[t]his action arises from a fraudulent conspiracy . . . whereby the Funds, acting through their investment manager EIG, were fraudulently induced to invest over $221 million to purchase equity in Sete Brasil." Compl. ¶ 1. There never would have been an investment in Sete Brasil without the Investment Agreement. And any harm to Plaintiffs' alleged investment naturally arises out of or is related to the governing agreement that Plaintiffs claim EIG was "induced" to

enter as a condition to invest. The forum selection clause undoubtedly applies. *See Bent v. Zounds Hearing Franchising, LLC*, 2015 WL 7721838, at \*6 (S.D.N.Y. Nov. 30, 2015) (holding that forum selection clause, which covered "any actions arising out of or related to this Agreement," applied to tort claims because the claims "implicate[d] the business relationship").

Plaintiffs cannot escape this result by arguing that EIG Luxembourg—a party they improperly chose to omit from the Complaint—is the only signatory to the Investment Agreement. "'Were it not for judicial willingness . . . to enforce forum selection clauses against affiliates of signatories, such clauses often could easily be evaded.'" *Song fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53, 60 (D.D.C. 2014) (quoting *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 441 (7th Cir. 2012)). Thus, courts in this District routinely enforce forum selection clauses against non-signatories if their "conduct is closely related to the contractual relationship so that it is foreseeable that they would be bound by such clause." *Id.*[10]

This case fits comfortably within such well-settled authority. Plaintiffs bring this action in their capacity as purported investors in Sete Brasil, but they chose to funnel their investment through an entity in Luxembourg that they collectively own and control. *See* Ex. 2. Plaintiffs no doubt benefited from structuring the investment in this way, and they cannot now have their cake and eat it too. Plaintiffs' investment was closely related to the EIG Luxembourg contract, and they cannot claim to be surprised that their suit to recover EIG Luxembourg's loss is subject to the forum selection clause. *See Song fi*, 72 F. Supp. 3d at 60. Nor should Plaintiffs be able to evade the terms of the underlying investment by intentionally omitting the signatory as a party to the case. As a matter of law, Plaintiffs are bound by EIG Luxembourg's agreement to the forum selection clause, and the case thus should be dismissed on *forum non conveniens* grounds. *See*

---

[10]    *See also Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 49 (D.D.C. 2005) (corporation was bound by forum-selection clause signed by its principal because otherwise it could evade the clause by "simply join[ing] a newly formed corporation to its complaint"); *Marra v. Papandreou*, 59 F. Supp. 2d 65, 77 (D.D.C. 1999), *aff'd* 216 F.3d 1119 (D.C. Cir. 2000) (holding that sole shareholder of Greek corporation was bound by corporation's agreement to litigate in Greece); *accord Sabre Int'l*, 60 F. Supp. 3d at 33 (corporate officers were bound by forum selection clause signed by corporation).

*Atlantic Marine*, 134 S. Ct. at 580 ("[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*.").[11]

### B.    The Courts of Brazil Are an Available and Adequate Alternative Forum.

Even if the forum selection clause were not controlling (which it is), every other *forum non conveniens* factor also favors dismissal, starting with the fact that the Brazilian courts are a suitable forum.  In assessing an alternative forum, courts look to "whether [it] is available (*i.e.*, whether defendants are amenable to process or otherwise within the forum's jurisdiction) and whether [it] is adequate (*i.e.*, whether the parties will be deprived of all remedies or treated unfairly)."  *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 33 (D.D.C. 2006).  Under this standard, a foreign forum is not inadequate merely because it has less favorable substantive laws or different adjudicative procedures.  *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

Brazilian courts easily clear this bar.  As explained in detail in Professor Dinamarco's Declaration, there is "no doubt" that this case could be tried in the Brazilian court system. Dinamarco Decl. ¶ 28; *see also id.* ¶ 29 ("A claim like the one the plaintiffs filed before [this Court] . . . is inarguably admissible before the Brazilian Courts") (emphasis in original). Consistent with Professor Dinamarco's Declaration, multiple federal courts, including in this District, routinely have recognized the adequacy of Brazilian tribunals.  *See, e.g.*, *Croesus*, 212 F. Supp. 2d at 41-42 (holding Brazilian courts to be available and adequate forum for suit against Brazilian government).  Indeed, in recent years, two district courts have specifically held that Brazilian courts were available and adequate in cases brought against Petrobras.  *See Rogers v. Petroleo Brasileiro, S.A.*, 741 F. Supp. 2d 492, 506 (S.D.N.Y. 2010) ("[B]ased on the record thus far, this Court concludes that Brazilian courts would provide an adequate alternative forum for

---

[11]    In addition, EIG Luxembourg is a necessary party to this litigation.  *See infra* n. 18.  If this case should make it past this Motion—which it should not—the Court should require Plaintiffs to join EIG Luxembourg as a party and then dismiss pursuant to the forum selection clause.

the current actions."), *rev'd on other grounds*, 673 F.3d 131 (2d Cir. 2012); *Cashman Equip. Corp. v. Dana Marine Serv., Inc.*, 2006 WL 2390245, at *4 (E.D. La. Apr. 4, 2006) ("Petrobras has shown that Brazil is an available and adequate forum.").

This Court should follow suit. Petrobras is subject to jurisdiction and, unlike here, "would be unable to claim sovereign immunity in [Brazilian] courts." *Croesus*, 212 F. Supp. 2d at 38; *see also* Dinamarco Decl. ¶¶ 31-34 (explaining that Petrobras could not invoke sovereign immunity if sued in Brazil). Moreover, none of the other Defendants is alleged to have undertaken any conduct in the United States; instead, their alleged wrongdoing related to an alleged scheme that was centered in Brazil. Thus, Brazilian courts are far more likely than this Court to have jurisdiction over those Defendants. *See* Dinamarco Decl. ¶¶ 21-23. Brazilian law also permits Plaintiffs to bring claims similar to those that they have attempted to bring here. *See id.* ¶ 50 ("[I]t is feasible . . . to claim damages, before the Brazilian Courts, on the grounds of . . . (a) fraud (b) aiding and abetting fraud and (c) civil conspiracy."). In addition, Brazilian courts have the same safeguards as U.S. federal courts to ensure impartiality, including life tenure of judges and a guarantee that judges' compensation cannot be reduced. *See id.* ¶¶ 31, 36. Recent political scandals in Brazil, if anything, have only reinforced the Brazilian judiciary's reputation as "the guardian of the integrity of the Brazilian Constitution and its principles." *Id.* ¶ 38. In sum, there is simply no reason a court in Brazil could not hear this case.

## C.   Public Interests Favor the Courts of Brazil.

Because this case involves a forum selection clause, the Court should dismiss in favor of the Brazilian forum unless Plaintiffs can demonstrate that this is one of the "unusual" and "rare[]" cases in which public interests so strongly favor U.S. litigation that the Court should disregard the forum selection clause. *Atlantic Marine*, 134 S. Ct. at 582. Plaintiffs cannot come close to meeting this burden. All of the relevant factors—including (1) the "local interest in having localized controversies decided at home," (2) "administrative difficulties caused by foreign litigation congesting local court dockets," and (3) "avoiding unnecessary problems in

choice-of-law and the application of foreign law"—militate in favor of a Brazilian forum.  *Irwin*, 448 F. Supp. 2d at 35.

As for the first factor, Judge Bates's decision in *Croesus* is closely on point.  In that case, the plaintiffs were U.S. hedge funds that sought to recover over $140 million from the Brazilian government based on allegations that Brazil improperly refused to pay on government bonds that the plaintiffs purchased in part through secondary securities markets in the United States.  *Id.* at 32.  The court held that the public interest factors "weigh[ed] heavily in favor of a Brazilian forum."  *Id.* at 39.  On the one hand, the court reasoned that the U.S. had only "minimal interests in [the] litigation other than its general interest in policing its financial markets."  *Id.* at 41.  On the other hand, the court held, the case "implicate[d] issues of substantial concern and consequence for Brazil and its citizens."  *Id.*  In particular, the case raised issues concerning "the propriety of the actions of [Brazilian] government officials" and involved claims seeking "over $140,000,000 from the government, and hence the people of Brazil."  *Id.*  The court also stressed that there were "numerous lawsuits" in Brazil addressing similar issues.  *Id.*  "The existence of [those] other lawsuits," the court reasoned, "not only attest[ed] to the interest of the Brazilian people in the issues at stake . . . but also counsel[ed] in favor of adjudication of [the] case in Brazil's domestic courts so as to avoid inconsistent results."  *Id.*  The case thus, in many ways, posed the risk of "significant reverberations for Brazil's government and economy."  *Id.*

So too here.  The U.S. has even less of an interest in this case than it did in *Croesus*.  In *Croesus*, the plaintiffs at least suffered losses in the U.S. from investing through U.S. securities markets.  Here, in contrast, no purchases were made on U.S. securities markets, and no U.S. entity invested in Sete Brasil.  Instead, Plaintiffs invested in a Luxembourgian entity, which invested in another Luxembourgian entity, which invested in a Brazilian fund, which then invested in Sete Brasil.  Plaintiffs no doubt had good reason to conduct these transactions outside the U.S., but having done so, they cannot now claim that the U.S. has a strong interest in protecting their investments with its courts and its law.

14

On the other side of the scale, this case poses at least the same risk of "significant reverberations" for Brazil as did *Croesus*.   According to the Complaint, the alleged bribery scheme at issue is "the largest public scandal in the history of Brazil."  Compl. ¶ 6.  Just like in *Croesus*, Plaintiffs' allegations implicate the propriety of actions by Brazilian officials.  *See* 212 F. Supp. 2d at 40; Compl. ¶ 2.  And here, Plaintiffs seek to recover even more money—$221 million—from a majority-state-owned entity than the plaintiffs sought in *Croesus*.  Moreover, as in *Croesus*, the fact that there are hundreds of Brazilian legal proceedings arising out of this scandal—not to mention the bankruptcy-related proceedings involving Sete Brasil—provides further evidence of the major interest of Brazilian tribunals in this dispute.  *See* Compl. ¶¶ 6, 69.  These proceedings not only demonstrate Brazil's keen interest in the subject matter of this case, but also counsel in favor of litigation in Brazilian courts "so as to avoid inconsistent results."  *Croesus*, 212 F. Supp. 2d at 40.   The Brazilian courts also most likely have "institutional knowledge of the relevant legal issues that is lacking here," which is yet another factor that points toward dismissal.  *Id.* at 41 n.14; *see also* Dinamarco Decl. ¶ 46 (emphasizing the importance of the Brazilian judiciary's awareness of the "social and political context" of the present dispute).

The second public interest factor—"administrative difficulties caused by foreign litigation congesting local court dockets"—also favors a Brazilian forum.  Should this case go forward here, the administrative burdens would likely be far greater than in the typical case.  As discussed below, because Brazil is the epicenter of Plaintiffs' allegations, the vast majority of documents and witnesses are located there, beyond the Court's subpoena power.  *See infra* at 17-19.  The "administrative difficulties of trying this case in a forum thousands of miles away from the majority of witnesses and the evidence are obvious" and would "manifest themselves especially in the need for extensive translation of documents and testimony, as well as the lack of an adequate means to compel the participation of unwilling witnesses."  *MBI Group*, 558 F. Supp. 2d at 34 (quotation omitted) (dismissing on *forum non conveniens* grounds in favor of litigation in Cameroon).  Moreover, by excluding their Luxembourg-based affiliate that actually

invested in FIP Sondas from the case and attempting to sue a foreign sovereign in this Court, Plaintiffs have needlessly complicated this dispute by creating myriad issues that a Brazilian court may not need to confront. These include issues of sovereign immunity, subject matter jurisdiction, personal jurisdiction, failure to join a necessary and indispensable party, and standing (because presumably Plaintiffs would have no reason to omit EIG Luxembourg as a party if they sued in Brazil). The second factor thus tilts heavily in favor of dismissal.

The third factor—"avoiding unnecessary problems in choice-of-law and the application of foreign law"—also militates in favor of a Brazilian forum. There is a strong likelihood that Brazilian law governs Plaintiffs' substantive claims. The controlling investment agreement, after all, contains a Brazilian choice of law provision, which is presumptively enforceable. *See* Third Am. to Inv. Agmt. ¶ 13.9 [Ex. 4]; *Essroc Cement Corp. v. CTI/D.C., Inc.*, 740 F. Supp. 2d 131, 141 (D.D.C. 2010).

Even if the agreement did not exist, there is a strong chance that Brazilian law still would apply. Courts in this District "apply the tort law of the jurisdiction that has the 'most significant relationship' to the dispute." *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) (citation omitted).[12] Here, that jurisdiction is likely Brazil. Brazil is plainly the epicenter of the alleged misconduct. *See infra* at 23-25 (discussing absence of allegations of misconduct in U.S.). All of the Defendants are incorporated and based either in Brazil or Singapore. *See* Compl. ¶¶ 20-26. Moreover, although some of the Plaintiffs are based in the U.S., others are based in the Cayman Islands, and the relevant injury occurred in Brazil or Luxembourg. *See infra* at 26-28. At a minimum, this case presents significant choice-of-law issues and a strong likelihood that the

---

[12] In conducting this analysis, courts consider four factors: "the place where the relationship is centered," "the domicile, residence, nationality, place of incorporation and place of business of the parties," "the place where the conduct causing the injury occurred," and "the place where the injury occurred." *Wu*, 750 F.3d at 949.

Court will have to apply Brazilian law.  The Court can—and should—avoid these issues by dismissing for *forum non conveniens*.[13]

### D.     To the Extent Private Interests Are Relevant, They Too Favor Brazil.

Because EIG Luxembourg agreed to litigate in Brazil, the Court need not weigh private interests in order to "deem the private-interest factors to weigh entirely in favor of" a Brazilian forum.  *Atlantic Marine*, 134 S. Ct. at 582.  In any event, however, all of the relevant private-interest factors point toward Brazil.  These factors include "ease of access to sources of proof," the "availability of compulsory process for attendance of unwilling witnesses," and the "cost of obtaining attendance of willing witnesses."  *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 576 (D.C. Cir. 2010) (internal quotation marks and citation omitted).

The first factor, "ease of access to proof," weighs strongly in favor of Brazil because the relevant evidence is concentrated predominately there.  Brazil was the locus of the alleged bribery scheme that lies at the heart of Plaintiffs' case.  Should the case go forward and make it past the pleading stage—which it should not do—evidence relating to that scheme would be relevant to the resolution of many of the liability and (if necessary) damages issues that this Court would need to confront.

Documents relevant to these issues will be concentrated in Brazil and written in Portuguese.  Notably, of the nine non-demonstrative exhibits attached to this Motion, six had to be translated from Portuguese, including the so-called "Petrobras Memorandum" upon which Plaintiffs rely (and two of the three remaining exhibits had to be translated from French).  *See* Ex. 3; Compl. ¶¶ 36-39; *see also Croesus*, 212 F. Supp. 2d at 39 (citing need to translate documents from Portuguese in support of *forum non conveniens* dismissal).  To complicate matters further, many such documents will be in the files of Brazilian non-parties, including Sete Brasil, FIP Sondas, and the individuals mentioned in the Complaint (*e.g.*, Ferraz).  These non-

---

[13]     Another public interest factor that courts often consider—the potential for the lawsuit to burden citizens with jury duty—is not relevant "because claims under the FSIA are not eligible for resolution by a jury."  *Croesus*, 212 F. Supp. 2d at 40 (citing 28 U.S.C. § 1330(a)).

parties are beyond the Court's subpoena power, and their documents could be obtained, if at all, pursuant to letters rogatory—a process that "should be avoided when possible" because it is "cumbersome, expensive, and time-consuming." *BCCI Holdings (Luxembourg) S.A. v. Mahfouz*, 828 F. Supp. 92, 98 (D.D.C. 1993) (internal quotation marks and citation omitted). As explained by Professor Dinamarco, the process of obtaining evidence from Brazil through letters rogatory involves multiple steps and "has been known to take years in some situations." Dinamarco Decl. ¶ 41. This strongly supports dismissal. *See Pain v. United Techs. Corp.*, 637 F.2d 775, 786-87 (D.C. Cir. 1980) (dismissal warranted in part because relevant evidence was "immune from the compulsory process of American courts").

As for the second factor, the fact that many witnesses "are likely to reside in Brazil, outside the reach of compulsory process," strongly favors dismissal. *Croesus*, 212 F. Supp. 2d at 39. Of the individuals identified in the Complaint as having been involved in the formation of Sete Brasil or in the payment of bribes relating to Sete Brasil, all are located in Brazil. These individuals include Ferraz, who, as discussed below, is the individual who allegedly made misleading statements to Plaintiffs.[14] None of these individuals is a current employee of any party, and none is likely to be available to testify in this case if it goes forward here.

Although Plaintiffs are not based in Brazil, that fact does nothing to change the analysis. Plaintiffs are likely to have fewer witnesses than Defendants, especially given the premise of the Complaint, which is that Plaintiffs supposedly did not know anything about the alleged scheme at the heart of this case. Defendants, of course, would be entitled to probe whether this is true and to inquire about other issues. But the ultimate EIG investor is based in Luxembourg, not the U.S., and agreed by contract to a Brazilian forum for disputes. And the prospect of taking some depositions and obtaining some documents in the U.S. is far outweighed by all the factors that support litigating this case in Brazil. Basic considerations of fairness thus counsel in favor of dismissal. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 259 (1981) (*forum non conveniens*

---

[14]     In addition to Ferraz, other individuals identified in the Complaint as potentially having relevant knowledge include Barusco, Musa, Duque, Gonçalves and Vaccari. *See* Compl. ¶ 8.

dismissal appropriate because it would have been "unfair" to make defendants proceed in a forum where "crucial witnesses and evidence were beyond the reach of compulsory process").

The third factor, the "cost of obtaining attendance of willing witnesses," also favors litigating in Brazil. Petrobras is based in Brazil, and the same is true for two of the Shipyard Defendants. *See* Compl. ¶¶ 19-22. The remaining Shipyard Defendants are based in Singapore, but they all have been sued based on their alleged activities with respect to shipyards located in Brazil and based on investigations involving those shipyards that are taking place in Brazil. *Id.* ¶¶ 22-26, 66-67. The Complaint also alleges that certain agents of the Shipyard Defendants with relevant knowledge of the alleged scheme are responsible for paying bribes to Brazilian entities and individuals. *See id.* ¶¶ 66-67. The cost of obtaining the attendance of these witnesses—many of whom no doubt would require interpreters—would be significant.

Accordingly, every factor in the *forum non conveniens* test favors Brazil, not the U.S. The case should be dismissed.

## II.   BECAUSE PETROBRAS HAS SOVEREIGN IMMUNITY UNDER THE FSIA, THE COURT LACKS SUBJECT MATTER AND PERSONAL JURISDICTION.

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). As the Supreme Court has recognized, the FSIA "is not a particularly generous" means for obtaining jurisdiction. *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005). Under the statute, foreign states are "presumptively immune" from U.S. litigation. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also* 28 U.S.C. § 1604. Once a *prima facie* showing is made that a defendant qualifies as a foreign state, the burden shifts to the plaintiff to show that an exception applies. *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 107-08 (D.D.C. 2012); *accord Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013) ("[T]he plaintiff bears the initial burden to . . . produc[e] evidence that an exception applies.").

19

Plaintiffs admit, as they must, that Petrobras is a foreign state under the FSIA. *See* Compl. ¶ 19 ("[T]he government of Brazil is the majority owner of Petrobras, such that Petrobras is both a foreign state within the meaning of 28 U.S.C. § 1603(a) and an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b)."). Plaintiffs nonetheless assert that they can proceed against Petrobras pursuant to the FSIA's "commercial activity" exception, codified at 28 U.S.C. § 1605(a)(2). *See id.* ¶ 29.

Not so. Plaintiffs have failed to meet their burden of pleading sufficient facts to show that the commercial activity exception applies. *See S.K. Innovation*, 854 F. Supp. 2d at 107-08. The exception provides, in full, that a foreign state is not immune from a civil action if:

> the action is based upon [1] a commercial activity carried on in the United States by the foreign state; or upon [2] an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon [3] an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The first step in applying the commercial activity exclusion is to determine what particular conduct of the foreign sovereign the action is "based upon." Once that determination is made, the next step is to assess whether Plaintiffs have met their burden of showing that such conduct satisfies one of the commercial activity exception's three clauses for abrogating immunity. Here, the relevant conduct attributed to Petrobras is quite limited, and the commercial activity exception does not apply.

### A. Petrobras's Relevant "Activity" for FSIA Purposes Is an Alleged Omission.

To determine what conduct a complaint is "based upon," and thus what conduct might give rise to the commercial activity exception, courts look to "the gravamen of the complaint," which refers to "those elements that, if proven, would entitle a plaintiff to relief." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 395 (2015) (quotations and citations omitted). Under this standard, even if a foreign state's activity was part of a chain of events that led to a

plaintiff's injury, a complaint is not "based upon" that activity unless that activity itself was the wrongful conduct for which the plaintiff seeks to recover. *See Nelson*, 507 U.S. at 358 ("While [the alleged] activities led to the conduct that eventually injured the Nelsons, they are not the basis for the Nelsons' suit . . . those [alleged activities] alone entitle the Nelsons to nothing."); *accord Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988) (holding that the "legislative history is crystal clear . . . that 'the acts (or omissions) . . . are limited to those which in and of themselves are sufficient to form the basis of a cause of action'") (quoting H.R. No. 94-1487, at 19 (Sept. 9, 1976)).

Here, Plaintiffs' claims, at their core, are centered on a theory that Petrobras or others defrauded them by failing to disclose the existence of an alleged bribery scheme.  This omissions theory takes a variety of forms in the Complaint, including investor presentations with alleged "undisclosed Risk Factor[s]," Compl. ¶ 37; meetings with Ferraz in Brazil where he allegedly "did not disclose" the purported scheme, *id*. ¶¶ 45-46; and e-mails that likewise never "disclosed the Petrobras Corruption Scheme," *id*. ¶ 48.  Omissions are the "gravamen" of Plaintiffs' fraud claim, and are the relevant activity for purposes of assessing whether the commercial activity exception applies. *See Sachs*, 136 S. Ct. at 395.

Plaintiffs also attempt to assert that Petrobras made "affirmative falsehoods," Compl. ¶ 75, not just omissions, but as shown below, none of these statements amounts to a materially false statement as a matter of law. *See infra* at 33-36.  Thus, none of the alleged misstatements counts as a fact that, "if proven, would entitle a plaintiff to relief," and none is pertinent to the commercial activity analysis. *See Sachs*, 136 S. Ct. at 395.

Moreover, even if Plaintiffs could rely on misstatements, only three might qualify as relevant for evaluating whether Petrobras is immune from suit:  (1) the so-called "Petrobras Memorandum" dated January 2010, *see* Compl. ¶ 36 & Ex. 3; (2) the "Petrobras Drilling Presentation" from September 2010, *see* Compl. ¶ 40; and (3) the "Pre-Salt Oil Rigs Project" document from October 2010, *see id*. ¶ 44.  These documents are at least potentially relevant to

the FSIA analysis because Plaintiffs allege that these materials were provided to them by Petrobras in furtherance of the supposed conspiracy.[15]

However, every other asserted misstatement in the Complaint is not alleged to have been made by Petrobras and is thus irrelevant when evaluating if Petrobras is immune from suit.  The whole point of the commercial activity exception is to assess whether the sovereign has engaged in sufficient activities to abrogate its statutory immunity.  As a result, the law is clear that only the foreign state's own activities can trigger the commercial activity exception.  *See, e.g.*, *Heroth v. Kingdom of Saudi Arabia*, 331 F. App'x 1, 2-3 (D.C. Cir. 2009); *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1107 (D.C. Cir. 1982) ("Global's activities in the United States cannot waive Guinea's immunity….").

Here, while Plaintiffs rely on a number of other alleged misstatements, none was purportedly made by Petrobras itself.  Take, for example, the allegations at Paragraphs 49-53 of the Complaint, all of which relate to purported misstatements by Sete Brasil.  The Complaint acknowledges that Ferraz left Petrobras and became an employee of Sete Brasil sometime between March 2011 (when Plaintiffs allege that Ferraz "was a Petrobras employee," Compl. ¶ 46) and late Fall of that same year (by which time, Plaintiffs allege, Ferraz was sending e-mails "to report on Sete's progress" and "to report that *he and others from Sete*" had meetings with potential Sete Brasil investors, *id.* ¶¶ 49-50 (emphasis added)).  Plaintiffs likewise admit (as they must) that Ferraz was acting "in his capacity *as a representative of Sete*" when he attended a September 2013 conference in Washington, D.C.  *Id.* ¶ 53 (emphasis added).

---

[15]      Plaintiffs also claim to have received the so-called "Lakeshore Memorandum," which they allege "repeated the representations contained in the Petrobras Memorandum."  Compl. ¶ 47.  But the Complaint falls well short of sufficiently attributing this document to Petrobras for purposes of the FSIA.  The Complaint only alleges, "upon information and belief," that Lakeshore Participações Ltda. (a Brazilian entity) transmitted the memo at issue while acting "as an agent of and/or financial adviser to Sete and/or Petrobras."  *Id.*  Surely more is required to abrogate a foreign sovereign's immunity than a vague assertion with two "and/or" and "upon information and belief" allegations.  In fact, as discussed below, Lakeshore Participações holds itself out as an advisor of Sete Brasil, not Petrobras.  *See infra* n.21.

Sete Brasil's activities, and statements made by Sete Brasil executives, cannot be used to show that *Petrobras* engaged in activity that would allow it to be subject to suit in the United States. Thus, Plaintiffs cannot rely on any alleged misstatements after March 2011 in the Complaint to invoke the FSIA's commercial activity exception. Rather, the gravamen of Plaintiffs' claims is based upon alleged omissions and, at most, misstatements in only three, pre-March 2011 documents that are referenced in the Complaint—none of which meets the test for the commercial activity exception of the FSIA.[16]

### B. None of the Three Clauses of the Commercial Activity Exception Applies.

**Clause 1.** Plaintiffs fail the first clause of the commercial activity exception because the relevant "activity"—Petrobras's alleged omissions in disclosing the existence of the bribery scheme—occurred in Brazil and thus does not count as "commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). In *Rogers v. Petroleo Brasileiro, S.A.*, the Second Circuit addressed "the 'metaphysical conundrum' that arises within the FSIA context when a foreign sovereign's relevant act actually is an omission." 673 F.3d 131, 138 (2d Cir. 2012) (quoting *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 76 (2d. Cir. 2010)). Drawing support from case law addressing minimum contacts for personal jurisdiction purposes, the court held that an omission by a foreign sovereign "is itself an act, but it is not an act in the United States; it is an act in the foreign state." *Id.* (quotation and citation omitted). The *Rogers* court thus held that a foreign state's alleged omission to pay an obligation occurred abroad and did not trigger the commercial activity exception. *Id.*

---

[16] The activity of a third party may be attributed to the foreign state for FSIA purposes if the third party acts as an agent of the foreign state. But for such attribution to occur, a plaintiff must plead facts sufficient to show the existence of an agency relationship between the foreign state and the third party. *See Heroth*, 331 F. App'x at 3. The Complaint here contains an entirely generic allegation of agency, but it does not contain any facts to back up that allegation. *See* Compl. ¶ 27. Because Plaintiffs' "allegation of agency is 'conclusory' and unsupported by 'specific' factual allegations," that allegation has no legal significance for FSIA purposes. *Heroth*, 331 F. App'x at 3 (quoting *El-Fadl*, 75 F.3d at 676).

The rule established in *Rogers* is plainly correct not only because of its straightforward intuitive appeal—foreign states, after all, make their decisions abroad—but also because any other rule would frustrate the FSIA's "manifest purpose" to codify a "restrictive theory of foreign sovereign immunity." *Nelson*, 507 U.S. at 363.  If the law allowed plaintiffs to claim that omissions occurred elsewhere, then plaintiffs could easily "recast" any fraud-related claim as an omission claim in order to manufacture jurisdiction over foreign sovereigns.  Such a rule "would give jurisdictional significance to a feint of language," contrary to the purpose of the FSIA. *Sachs*, 136 S. Ct. at 395 (alteration, quotation, and citation omitted); *see also Nelson*, 507 U.S. at 363 (rejecting argument that would have allowed "a plaintiff [to] recast virtually any claim of intentional tort committed by [a] sovereign . . . as a claim of failure to warn" in order to defeat immunity for claims based on acts that occurred abroad).  Thus, Petrobras's alleged omission occurred in Brazil as a matter of law, and it cannot support FSIA jurisdiction.

The result would be the same even if the Court were to consider the three supposedly misleading communications that arguably are attributable to Petrobras.  Even setting aside the fact that these communications are not relevant "activity" for FSIA purposes, *see supra* at 21, none of them involves alleged U.S. activity by Petrobras.  "[T]he D.C. Circuit has repeatedly rejected the notion that a defendant may 'project[] [its] presence' into the District" for jurisdictional purposes through communications originating from elsewhere.  *IMARK Mktg. Servs., LLC v. Geoplast, S.p.A.*, 753 F. Supp. 2d 141, 160 (D.D.C. 2010) (quoting *Moncrief v. Lexington Herald-Leader Co.*, 807 F. 2d 217, 220 (D.C. Cir. 1986)).  In *IMARK*, for example, the Court held that a defendant who allegedly made tortious communications in telephone calls and e-mails from Italy to D.C. "acted from Italy, and not from within the District" for jurisdictional purposes.  *Id.* at 159-60; *see also Security Bank, N.A. v. Tauber*, 347 F. Supp. 511, 516-17 (D.D.C. 1972) (holding that, where a defendant allegedly made fraudulent misrepresentations in telephone calls from Florida to the plaintiff in D.C., the calls "were the act of the defendant in Florida, and not an 'act or omission in the District of Columbia'").

24

This rule dooms Plaintiffs' argument for the Petrobras communications alleged here, because Plaintiffs do not allege any communications made by Petrobras in the United States. For the "Petrobras Drilling Presentation" and the "Pre-Salt Oil Rigs Project" document, Plaintiffs are careful to assert only that the communications were "received in Washington, D.C." by EIG Management. *See* Compl. ¶¶ 40, 44. The Complaint does not allege that Petrobras even sent these documents to EIG Management, let alone say from where they were sent. For the remaining document, the so-called "Petrobras Memorandum," Plaintiffs allege that Petrobras sent the document to EIG Management, but they do not allege the geographic locations from which and to which this document—written in Portuguese—was sent. *See* Compl. ¶ 36 & Ex. 3.

Plaintiffs have not alleged that Petrobras did anything in the U.S. or engaged in the type of significant conduct in the U.S. that could sustain FSIA jurisdiction. *See Odihiambo v. Republic of Kenya*, 764 F.3d 31, 37 (D.C. Cir. 2014) ("[C]lause one requires a plaintiff's claim to be 'based upon' the aspect of the foreign state's commercial activity that establishes substantial contact with the United States."). Clause 1 does not apply.

**Clause 2.** Clause 2 of the exception applies only to claims based upon acts "performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). For all of the reasons stated above with respect to Clause 1, none of Petrobras's acts were "performed in the United States" for FSIA purposes. *See also* Compl. ¶ 45 (EIG employees met with Ferraz at Petrobras offices "in Rio de Janeiro, Brazil"); ¶ 46 ("EIG representatives again met *in Brazil* with Ferraz . . .") (emphasis added). Thus, Clause 2 does not apply.

**Clause 3.** Plaintiffs also cannot rely on Clause 3, which applies if a lawsuit is based on "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). In order for Clause 3 to apply, a plaintiff must allege that it suffered a "direct effect" that "follows as an ***immediate consequence*** of the defendant's activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (emphasis added; quotation omitted). As the D.C.

Circuit has put it, a direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 816 (D.C. Cir. 2015) (quotation and citation omitted).

As explained below, Plaintiffs did not suffer any legally cognizable harm here at all. *See infra* at 26-28. But even if that were not the case, Plaintiffs' supposed losses certainly did not "flow[] in a straight line" from Petrobras's alleged conduct. Instead, the line starts at Sete Brasil, zigs to FIP Sondas, zags across the Atlantic to EIG Luxembourg, jumps to EIG Sete Parent SÀRL, and then splits in two for another trip across the Atlantic, with one splinter heading to the Cayman Islands (where two of the plaintiff Funds are incorporated), and the other to Delaware (where the remaining Funds are based). This five-legged, 11,000-mile journey is hardly the "straight line" required under controlling law. *See id.* Moreover, as discussed below, the line never even reaches Washington, D.C., where EIG Management is based, because EIG Management made no investment whatsoever. And that is not all: Plaintiffs' alleged harm here also is impermissibly indirect because it relies on a lengthy chain of intervening events involving multiple independent, intervening actors even to get to the point where FIP Sondas suffered a harm. These events include the revelation of the Car Wash investigation, banks' decisions not to finance Sete Brasil, Sete Brasil's inability to perform on contracts, and its resulting bankruptcy-related proceedings. *See* Compl. ¶ 68. Thus, Plaintiffs cannot rely on Clause 3 to abrogate Petrobras's sovereign immunity.

## III.   PLAINTIFFS LACK STANDING.

Plaintiffs have failed to meet their burden of pleading that they have suffered the "irreducible constitutional minimum of standing," which requires an "injury in fact" that is "fairly traceable to the challenged action of the defendant." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-61 (1992) (quotations and citations omitted). This case presents a classic scenario where standing does not exist: a complaint through which shareholders are suing to recover harms that were suffered by the corporation in which they invested. It is well-settled that, "[i]f

the gravamen of the complaint is injury to the corporation or if the shareholder's damages are the indirect result of an injury to the corporation, the shareholder may not sue." *Labovitz v. Washington Times Corp.*, 900 F. Supp. 500, 504 (D.D.C. 1995); *see also, e.g.*, *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970) ("[I]t has been consistently held that [if] the primary wrong is to the corporate body . . . the shareholder, experiencing no direct harm, possesses no primary right to sue.").

That is exactly the situation here. The Plaintiff Funds are shareholders in an entity, which is a shareholder in another entity, which is a shareholder in another entity, which invested in Sete Brasil. *See* Ex. 2. Contrary to what Plaintiffs allege, the Plaintiff Funds themselves did not invest in Sete Brasil. And the corporations in which the Plaintiff Funds are shareholders did not invest in Sete Brasil either. In fact, Plaintiffs are at least four steps removed from having standing.

The harm alleged in this case is the alleged loss of EIG's investment in Sete Brasil. *See, e.g.*, Compl. ¶ 70. But that purported harm was *not* suffered directly by any of the named plaintiffs in the lawsuit. It was instead suffered by Sete Brasil's two corporate shareholders, FIP Sondas and Petrobras (Step 1). *See* Ex. 2. FIP Sondas's investors, including EIG Luxembourg and Petrobras, then suffered an alleged loss on their "indirect[]" investment in Sete Brasil—to use the phrasing that EIG Luxembourg used when it reported this loss in its public filings (Step 2). *See* Ex. 5 at 19. That alleged loss then filtered up to EIG Luxembourg's parent company (Step 3). *See* Ex. 2. And, finally, that parent company's losses were indirectly passed on to its shareholders, the Plaintiff Funds (Step 4). Thus, any losses that Plaintiffs suffered are—to put it mildly—"the indirect result of an injury to the corporation" in which they invested. *Labovitz*, 900 F. Supp. at 504. The Plaintiff Funds lack standing, and the Court lacks subject matter jurisdiction to hear their claims. *See Caldwell v. Kagan*, 865 F. Supp. 2d 35, 41 (D.D.C. 2012) (holding that a defect in standing "is a defect in subject matter jurisdiction").[17]

---

[17]     To the extent that Luxembourg's corporate law is relevant to the standing issue, it is fully consistent with the principles reflected in *Labovitz* and *Kauffman*. EIG Luxembourg is a *société*

The standing of the only remaining Plaintiff—EIG Management—is even weaker.  EIG Management does not claim to have made any investments, but instead sues in its capacity as "the legal representative and agent" of the Funds.  Compl. ¶ 18.  Thus, because the Funds lack standing, so does EIG Management.  To make matters worse, it is well established that an investment manager does not have standing to pursue claims for losses suffered by its clients unless it obtains an assignment of their claims.  *See, e.g.*, *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108-110 (2d Cir. 2008).  EIG Management has alleged no such assignment here.  Plaintiffs therefore lack standing, and their claims should be dismissed.[18]

## IV.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST PETROBRAS.

The Court should not hear this case for the many reasons discussed above.  But even if the Court should choose to wade into the merits, it should dismiss the case because Plaintiffs have failed to state a claim against Petrobras as to each of their three counts.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain more than "[n]aked assertion[s] devoid of further factual enhancement."  *Canen v. Wells Fargo Bank, N.A.*, 118 F. Supp. 3d 164, 167 (D.D.C. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Merely offering "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  If the non-conclusory factual content alleged in the complaint "stops short of the

---

*à responsabilité limitée*, or SÀRL.  *See* Ex. 6.  The Luxembourg statute governing this type of corporation vests in the management of the SÀRL the sole right and duty to pursue claims on behalf of the corporation, which must be brought in the name of the corporation itself.  *See* Luxembourg Companies Act of 10 Aug. 1915 §191bis.

[18]    This case should not proceed in this forum for many reasons, but if it were to go forward, EIG Luxembourg should be joined as a necessary and indispensable party.   EIG Luxembourg plainly has "an interest relating to the subject of the action," Fed. R. Civ. P. 19(a)(1)(B), given that it has reported the very same loss Plaintiffs are seeking to recover in its public financial statements.  *See* Ex. 5.  If EIG Luxembourg were to attempt to recover that loss in separate litigation, that would expose Petrobras to a risk of incurring "double liability"—which is precisely one of the risks that Rule 19 was crafted to avoid.  *See* Fed. R. Civ. P. 19(a)(1)(B)(ii).  Thus, should this case move forward, the Court should require Plaintiffs to join EIG Luxembourg as a party, and if they will not do so, dismiss the case under Rule 19(b).

line between possibility and plausibility of 'entitlement to relief,'" it fails to state a claim. *Bell v. D.C.*, 82 F. Supp. 3d 151, 154-55 (D.D.C. 2015) (quoting *Iqbal*, 556 U.S. at 678).

In addition, "[a] complaint alleging fraud must also 'meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 96 (D.D.C. 2010) (citing *In re Estate of McKenney*, 953 A.2d 336, 341 (D.C. 2008)).  Thus, a plaintiff alleging fraud must meet a "more demanding pleading standard" by pleading the "'who, what, when, and how' concerning the circumstances of the alleged fraud." *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 139 (D.D.C. 2013).

### A.      Plaintiffs Have Failed to Plead Fraud Against Petrobras.

As discussed above, this case primarily, if not entirely, revolves around an alleged omission—namely, Petrobras's alleged omission to disclose the bribery scheme involving Sete Brasil.  Petrobras has no reason to doubt that Plaintiffs wish they had been told about the bribery scheme before EIG Luxembourg made its investment.  In fact, nobody could understand Plaintiffs' point of view on this issue better than Petrobras.  Petrobras, after all, not only was an investor in FIP Sondas—just like EIG Luxembourg—but it also invested directly in Sete Brasil. *See* Ex. 2.  Petrobras also placed its trust in Sete Brasil to obtain the drillships that it needed to extract 50 billion barrels of oil from the Pre-Salt Reserves.  *See* Compl. ¶ 33.  Sete Brasil indisputably was a real company, with a major customer—Petrobras—and real prospects for success.

But this Motion does not depend on these facts—or any of the other facts that have led courts and government investigators in Brazil to conclude that Petrobras was a victim, not a perpetrator, of the alleged bribery scheme.  That is because the only question before the Court is whether Plaintiffs have pled sufficient facts to meet the stringent standard that Rule 9(b) imposes for stating a claim for fraud.  And under that standard, no matter how much Plaintiffs may wish they had been told about the alleged bribery scheme, that is not enough to state a fraud claim as a matter of law.

It is well-established that non-disclosure can only be a predicate for a fraud claim in a few, narrow circumstances.  As a federal district court put it just three months ago, "[t]here is no duty to disclose a fact 'merely because a reasonable investor would very much like to know that fact.'"  *Dingee v. Wayfair Inc.*, 2016 WL 3017401, at *5-6 (S.D.N.Y. May 24, 2016) (quoting *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014)); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (holding that the importance, or "materiality" of information to an investor "is *not enough* to make out a sustainable claim . . . unless there was a duty to disclose it") (emphasis added).  Plaintiffs' fraud claim falls apart on this axiomatic principle because Plaintiffs have not pled—and could not plead—any facts to support the conclusion that this case falls into one of the narrow categories in which a duty to speak arises.

### 1.    Plaintiffs Have Not Pled Any Fraudulent Omissions By Petrobras.

Plaintiffs have not pled any basis, as a matter of law, to impose a duty on the part of Petrobras to disclose the alleged bribery scheme.  "It is well established under District of Columbia law that 'mere silence does not constitute fraud unless there is a duty to speak.'" *Cadet v. Draper Golberg, PPLC*, 2007 WL 2893418, at *6 (D.D.C. Sept. 28, 2007) (quoting *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948)).  A "duty to speak arises in the fraud context only when there is [1] some special relationship or [2] contact between the parties justifying the imposition of a duty." *Jefferson v. Collins*, 905 F. Supp. 2d 269, 287 (D.D.C. 2012). [19]

Plaintiffs do not attempt to allege a special relationship here, nor could they.  The Plaintiff Funds are sophisticated investors who claim to have invested over $221 million in the transactions at issue, relying on the advice of EIG Management.  *See* Compl. ¶¶ 18, 54. Plaintiffs do not claim that Petrobras acted in a fiduciary capacity toward them or acted as their

---

[19]    As stated above, Brazilian law likely governs Plaintiffs' claims.  However, because Plaintiffs have pled their Complaint based on local law, we assume solely for the sake of argument that District of Columbia law applies to the question of whether Plaintiffs have stated a claim in Counts 1-3 of their Complaint.

advisor. Indeed, it is difficult to imagine a more arms-length relationship than the one at issue here. *See Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 51 (D.D.C. 2011) (finding no duty to disclose where there was "no suggestion by [either party] that their arrangement . . . was anything more than an arms-length transaction").

Plaintiffs also have failed to allege any particular "contact between the parties" that would justify the imposition of a duty to speak. *Cadet*, 2007 WL 2893418, at *6. It is well-settled that "[c]orporations do not, as a general matter, have a duty 'to disclose uncharged, unadjudicated wrongdoing'" that exists at the time of the alleged fraud. *Menaldi v. Och-Ziff Capital Mgmt. Group LLC*, 2016 WL 634079, at *8 (S.D.N.Y. Feb. 17, 2016) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)). That is especially true here, where courts have already held that Petrobras was a victim of the bribery scheme, not its perpetrator. Consistent with the D.C. law discussed above, a duty to disclose is only triggered where there is a connection between the allegedly illegal conduct and statements made by the defendant "'beyond the simple fact that a criminal conviction could have an adverse impact upon the corporation's operations in general or the bottom line.'" *Menaldi*, 2016 WL 634079, at *8-9 (finding no duty to disclose alleged violations of anti-bribery laws, the concealment of which allegedly inflated the company's stock) (citation omitted).

Courts have found the requisite connection between uncharged illegal conduct and defendants' statements in three situations, none of which corresponds to this case. *First*, courts have found a connection when an entity "puts the reasons for its success at issue, but 'fails to disclose that a material source of its success is the use of improper or illegal business practices.'" *Menaldi*, 2016 WL 634079, at *8 (citation omitted). Plaintiffs have not alleged that the bribery scheme at issue is a "material source of [Sete Brasil's] success," nor could they. The fact that shipyards allegedly paid bribes to corrupt employees and government officials to procure contracts with Sete Brasil conceivably could have helped the shipyards, but it would not have helped Sete Brasil succeed.

*Second*, courts have found a duty to disclose "when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring." *Id.* For example, courts have found a duty when a corporation states that competition is "intense" but the corporation and its competitor were actually involved in a price-fixing cartel. *Id.* (citing *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000)). Plaintiffs allege nothing of the sort here.

*Third,* courts have found the requisite connection "when a defendant states an opinion that, absent disclosure [of the alleged illegal conduct], misleads investors about material facts underlying that belief." *Menaldi*, 2016 WL 634079, at *9. In *Menaldi*, for example, the court addressed a company's allegedly-misleading statements that "scrutiny by regulatory agencies" and ongoing legal proceedings were not expected to have a material financial impact on the company. Those statements, the court held, required defendants to make disclosures about certain pending government investigations, but they did not require the company to disclose the underlying alleged bribery conduct that was the focus of the investigations. *Id.* at *9. The court reasoned that the connection between the actual statements "and the alleged criminal conduct [was] too tenuous to give rise to a duty to disclose [the alleged] criminal wrongdoing." *Id.* Here, Plaintiffs have alleged even less of a connection. The statements upon which Plaintiffs rely— each of which will be discussed below—say nothing that could be reasonably interpreted to mislead the Plaintiffs concerning whether a bribery scheme was ongoing at Sete Brasil. Instead, the alleged statements have nothing to do with that issue. Thus, information relating to the alleged scheme was not a "material fact[] underlying [Petrobras's] belief" with respect to any particular statement, *id.*, and did not trigger a duty to disclose.

Consistent with these principles—and with D.C.'s common law limiting claims for fraud by omission—multiple courts have rejected fraud claims based on defendants' alleged failures to disclose bribery schemes and similar misconduct to investors. For example, in *Roeder*, the First Circuit held that a defendant did not have a duty to disclose a bribery scheme run by its president—even though the court assumed the existence of the scheme was material to the

32

plaintiff investor.  No duty to speak existed, the court held, because there was "no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures." 814 F.2d. at 27; *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) (finding no duty to disclose defendant's potential liability arising out of provision of certain investment banking services).  Plaintiffs likewise have failed to state a claim here based on the existence of "uncharged, unadjudicated wrongdoing" at the time of the alleged fraud.  *Menaldi*, 2016 WL 634079, at *8.

### 2.    Plaintiffs Have Not Pled Material Misrepresentations.

Unable to plead an actionable omission, Plaintiffs also purport to assert that Petrobras made a handful of affirmative misrepresentations.  Plaintiffs' assertions, however, are missing an essential ingredient:  facts showing that the statements were materially false.  Plaintiffs' allegations thus do not pass muster under Rule 9(b).   Plaintiffs also have failed to plead that many of the purported misstatements were material.  And many—perhaps most—of the alleged misstatements were mere "puffery," which is "immaterial as a matter of law."  *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 179-80 (D.D.C. 2007).

*        *        *

As discussed above, only the following communications warrant discussion for purposes of Plaintiffs' fraud claim against Petrobras, and none contains a material misrepresentation.[20]

**The "Petrobras Memorandum."**  Plaintiffs complain about three statements in this document, which is dated January 2010 and is attached as Exhibit 3:

(1) It stated "that an investment in Sete was attractive because there would be 'long-term contracts with high probability of cash flows' and 'opportunities for long-term upsides that are very advantageous.'"  Compl. ¶ 36.

(2) It "identified for potential investors seven different 'Risk Factors' associated with investing in Sete," but did not disclose the alleged bribery scheme.  *Id.* ¶ 37.

---

[20]    For ease of reference, the alleged misstatements that are purportedly attributable to Petrobras are listed separately in Exhibit 11.

> (3) It "stated that Sete would enter into drillship construction contracts with shipyards that would, among other things, oblige each shipyard to 'comply with . . . applicable laws.'" *Id.* ¶ 38.

None of these statements is actionable.

Statement (1) is pure puffery, *i.e.*, "'generalized statements of optimism that are not capable of objective verification.'" *Venable LLP v. Overseas Lease Grp., Inc.*, 2015 WL 4555372, at *4-5 (D.D.C. July 28, 2015) (citation omitted). Statements about expectations of "continued strong growth" and "confiden[ce] in long-term growth prospects" are classic puffery. *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1146 (W.D. Wash. 2006). Statement (1) also is a statement of opinion, and Plaintiffs have not alleged any facts to support the conclusion that this opinion was not honestly held. *See Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 706–07 (D.C. 1981) ("Opinions or predictions of future events do not constitute representations of material fact upon which a plaintiff successfully may place dispositive reliance.").

Plaintiffs also fail to plead that statement (2) is misleading. Courts look to the "total mix" of facts to determine whether a statement is misleading. *In re XM Satellite*, 479 F. Supp. 2d at 178. Here, those facts include a prominent warning that Plaintiffs conveniently fail to mention. On the very first page, the memorandum warns:

> **Notice** . . . This material contains summary information without the intention of being complete. We make no statement, implicit or explicit, and no guarantee as to the correctness, appropriateness or completeness of this information.

Ex. 3 at 2-3. Moreover, the portion of the document that discusses risk factors makes no representation that ***all*** risks have been disclosed, and Plaintiffs do not contend otherwise. *See id.* at 126-139. Under these circumstances, no reasonable investor would interpret the memorandum's non-exhaustive list of risks to be a representation that no other risks existed.

Plaintiffs also fail to plead that statement (3)—the statement that the shipyards' contracts with Sete Brasil would require compliance with law—was materially false. The Complaint does not say one way or another whether the shipyards' contracts did in fact require compliance with law. Without this key information, Plaintiffs have pled no basis for concluding that this

34

statement is false, especially given the pleading requirements of Rule 9(b).  In any event, statement (3) cannot reasonably be interpreted as an assertion by Petrobras that the shipyards would not engage in criminal activity.  Petrobras, of course, does not control the shipyards and could not possibly make representations concerning their future legal compliance.  In *City of Brockton Ret. Sys. v. Avon Products, Inc.*, 2014 WL 4832321, at *14-15 (S.D.N.Y. Sept. 29, 2014), for example, the court held that a statement in a corporate responsibility report emphasizing the company's commitment to "compliance with all applicable laws," amounted to "no more than 'puffery'" and non-actionable generalizations.  *Id.*  Thus, the court held, the statement could not be the basis of a fraud claim, even though the company allegedly had paid bribes to the Chinese government in violation of the Foreign Corrupt Practices Act.  *See id.* at *14-15.  The same logic applies here.

**The "Petrobras Drilling Presentation."**  This document, which Plaintiffs claim to have received in September 2010, allegedly made the following statements (which are numbered starting at 4 to avoid confusion with the statements discussed above):

> (4) It stated that the "'Main Objectives' were '[t]o ensure the availability of its demand for drilling rigs for Pre Salt application, minimizing charter costs and associated risks.'"  Compl. ¶ 42.

> (5) It "included a flow chart that purported to describe 'The Basic Structure for Each Drilling Unit.'"  *Id.* ¶ 43.

> (6) It "identified six potential risks under the heading 'Main Risks and Challenges.'"  *Id.* ¶ 41.

Once again, Plaintiffs have not met their burden of pleading that any of these statements contains an affirmative misrepresentation.  For statement (4), Plaintiffs allege no facts showing that obtaining drilling rigs and minimizing charter costs were not the main objectives of the Sete Brasil project.  For statement (5), Plaintiffs do not identify any false statement in the flow-chart.  For statement (6), Plaintiffs again do not claim that the presentation purported to disclose *all risks*, and they do not claim that any of the particular risks discussed in the presentation had any connection to the bribery scheme.  Thus, at the end of the day, Plaintiffs' theory as to all of these

statements must be that they somehow triggered a duty to disclose. That theory fails as a matter of law: None of the statements even relates to the bribery scheme, and none could "be understood, by a reasonable investor, to deny that . . . illegal conduct [was] occurring." *Menaldi*, 2016 WL 634079, at \*9.

**The "Pre-Salt Oil Rigs Project" Document.** This document, which EIG Management claims it received in October 2010, allegedly made the following statement:

> (7) It "touted that Sete would have 'management with extensive experience in the market.'" Compl. ¶ 44.

Plaintiffs do not allege any facts showing that this statement is false; instead, they allege just the opposite: that two of the Sete Brasil managers had 20 years of experience and that the third had 30 years. *See id.* ¶ 35. Moreover, as a "generalized, positive statement[] about the company's . . . experienced management," this statement is mere puffery and is thus immaterial as a matter of law. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004).

In short, none of the three relevant Petrobras communications contains actionable misrepresentations, and Plaintiffs' fraud claim against Petrobras should be dismissed.[21]

### 3. Plaintiffs Have Not Pled That They Reasonably Relied On Any Statements By Petrobras.

To survive a motion to dismiss, a plaintiff alleging fraud must show that it "relie[d] upon the representation or omission." *Cadet*, 2007 WL 2893418, at \*6. A "party alleging that it was defrauded, at least in the context of commercial dealings at arm's length, must establish not only that it actually relied on a false representation, but also that its reliance was objectively

---

[21] Plaintiffs also make allegations about statements in the memorandum they received from Lakeshore Participações, an entity that Plaintiffs allege, upon "information and belief," was "an agent of and/or financial adviser to Sete and/or Petrobras." Compl. ¶ 47. Plaintiffs offer no facts to back up this bald allegation of agency, and thus communications by Lakeshore Participações are not attributable to Petrobras as a matter of law. *See Heroth*, 331 F. App'x at 3. In fact, the website of Lakeshore Participações indicates that the firm served as the "exclusive financial advisor to Sete Brasil," not Petrobras. *See* http://lakeshorepartners.com.br/en/transacos/ (last visited Aug. 11, 2016). In any event, Plaintiffs have failed to allege any material misstatements by Lakeshore Participações, as demonstrated below. *See infra* at 39.

reasonable." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 933 (D.C. 1992); *Henok v. Chase Home Fin., LLC*, 915 F. Supp. 2d 109, 118-19 (D.D.C. 2013) (dismissing where plaintiff did "not provide facts to support [that] . . . he took [action] in reasonable reliance on the representations").

Plaintiffs have not pled—nor could they plead—that they reasonably relied on any of the statements allegedly attributable *to Petrobras*, all of which occurred before September 2011. Plaintiffs allege that they "began to invest" in Sete Brasil "in or about" August 2012—over a year after the last alleged communication attributable to Petrobras—and then invested $77.4 million between August 2012 and May 2013 and another $143 million after September 2013. *Id.* Given this significant time gap, it is not surprising that the Complaint is devoid of any allegation that they relied on any particular communications by Petrobras. Indeed, according to Plaintiffs, Ferraz was already at Sete Brasil, not Petrobras, by late Fall 2011. *See* Compl. ¶ 50. The Complaint is silent as to how or why Plaintiffs thus could have relied on alleged fraud by Petrobras when making their investments as late as 2013. The only reference to reliance is a bare, formulaic allegation that "EIG and the Funds actually and reasonably relied on the false and/or materially misleading oral and written statements that Petrobras made." Compl. ¶ 81. And that conclusory allegation, of course, will not do. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").[22]

---

[22] It is also hard to fathom that Plaintiffs would have relied on the few fraud allegations in the Complaint to make their investment decisions. Despite claiming decades of experience as some of the most sophisticated energy investors in the world, *see generally* https://www.eigpartners.com/about-us (last visited Aug. 11, 2016), Plaintiffs would have the Court believe that they chose to invest over $221 million based on nothing more than statements contained in a few marketing materials provided to their investment manager years earlier. *See* Compl. ¶¶ 36-54. That is implausible. *See Iqbal*, 556 U.S. at 679 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

**B.      Plaintiffs Have Failed to State a Claim for Aiding and Abetting.**

No doubt recognizing the weakness of their fraud claim against Petrobras, and that statements by Sete Brasil's employees cannot be attributed to Petrobras, Plaintiffs assert that Petrobras should be on the hook for fraud allegedly committed by Sete Brasil on an aiding and abetting theory.   *See* Compl. ¶ 95.   This attempt fails for three reasons:   (1) This jurisdiction does not recognize a cause of action for aiding and abetting, (2) Plaintiffs have failed to plead that Sete Brasil committed fraud, and (3) Plaintiffs have failed to allege sufficient facts to support their conclusory claim that Petrobras aided and abetted Sete Brasil.

**1.      D.C. Does Not Recognize Aiding and Abetting Liability.**

District of Columbia law does not recognize aiding and abetting as a theory of civil liability.   *Acosta*, 711 F. Supp. 2d at 107-08.   Thus, where, as here, a plaintiff alleges a claim for aiding and abetting a tort, several courts have "swiftly resolve[d]" aiding and abetting claims by dismissing them.   *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 356 (D.D.C. 2015) ("Because the D.C. Court of Appeals has not recognized a claim for aiding and abetting a tort, this claim fails."); *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 119 (D.D.C. 2012) (finding plaintiff's "claim for aiding abetting will be dismissed" because "[a]ccording to the District of Columbia Court of Appeals . . . the tort of aiding and abetting is not recognized under District law"); *see also Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) ("[W]e have not recognized the tort of aiding and abetting in the District . . . ."). Plaintiffs' claim here should meet the same fate.

**2.      Plaintiffs Have Not Sufficiently Pled an Underlying Tort.**

In the handful of D.C. decisions that have discussed the merits of aiding and abetting claims, that "typically [has] occurred in situations where a plaintiff's attempt to hold a defendant liable under the doctrine has been rejected."   *Acosta*, 711 F. Supp. 2d at 107-08.   Plaintiffs' claims likewise fail here.   Courts in this District consistently hold that aiding and abetting is "reliant upon derivative tortious activity and therefore must be premised on some underlying tort."   *Id*. at 106.   Because Plaintiffs' aiding and abetting claim is premised on fraud by Sete

Brasil, *see* Compl. ¶ 95, Plaintiffs first must plead—with particularity under Rule 9(b)—that Sete Brasil is liable for fraud.  *See Silverman v. Weil*, 662 F. Supp. 1195, 1200 (D.D.C. 1987), *aff'd* 839 F.2d 824 (D.C. Cir. 1988).  Plaintiffs have alleged only five communications with Sete Brasil that they claim contained twelve allegedly misleading statements.  None of them is actionable.[23]

**The "Lakeshore Memorandum."**  This document, which Plaintiffs claim to have received in September 2011 from Sete Brasil's purported advisor, Lakeshore Participações, *see supra* n. 21, allegedly contained the following statements:

> (1) It "repeated the representations contained in the Petrobras Memorandum, concerning the construction contracts that Sete would enter into with shipyards, and the ways in which Sete would use the equity and debt financing it raised." Compl. ¶ 47.

> (2) It "warned of a number of potential operational risks within Sete." *Id.*

Plaintiffs have not sufficiently alleged falsity as to either of these statements.  Statement (1) is not misleading for all the same reasons the "Petrobras Memorandum" was not misleading.  Statement (2) is not misleading because, as with the Petrobras Memorandum, Plaintiffs do not claim that the document purported to disclose all risks or made any other particular statements that triggered a duty to disclose the alleged bribery scheme.

**The October 5, 2011 E-mail.**  Plaintiffs allege that in October 2011, Ferraz made the following statements to Plaintiffs via e-mail:

> (3) He "report[ed] on Sete's progress in bidding for drillship charter agreements with Petrobras." Compl. ¶ 49.

> (4) He "touted Sete's intention and ability 'to achiev[e] conditions that are both doable for Sete and its shareholders and practically unbeatable by [Sete's] competitor.'" *Id.*

Here again, Plaintiffs do not identify anything about either of these statements that was false.  Statement (4) also is textbook puffery.  *See In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013

---

[23]  For ease of reference, the alleged misstatements that are purportedly attributable to Sete Brasil are listed separately in Exhibit 12.

WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) (holding that statements about an "intention to compete successfully" and the "encouraging" prospect of early bookings were puffery).

**The December 23, 2011 E-mail.**   On December 23, 2011, Ferraz allegedly communicated with Plaintiffs by e-mail again, making the following statements:

(5) He "report[ed] that he and others from Sete had traveled to China for meetings with 'high level persons' of Chinese Investment Corp. ('CIC')."  Compl. ¶ 50.

(6) He reported that "the CIC representatives he met with had said 'unofficially' that CIC was 'very inclined to invest in Sete.'"  *Id.*

(7) He reported that "an investment in Sete by CIC would both 'open the door to large international investors, including other sovereign funds' and 'increase the success of [Sete's] future IPO.'"  *Id.*

For all of these statements, Plaintiffs have not pled any facts suggesting that the statements were false, or that they had any connection to the alleged bribery scheme.   Statement (7) is also puffery.  *See Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 280 (S.D.N.Y. 2001) (holding that fraud allegation based on prediction or promise of future IPO was not actionable).

**The Spring 2013 Meeting.**   In Spring 2013, Ferraz allegedly made the following statement at a meeting with Plaintiffs:

(8) "Ferraz offered rosy descriptions of Sete and its business prospects."  Compl. ¶ 52.

This alleged statement is clearly puffery; it even tracks specific language that courts have used to describe the puffery doctrine.  *See, e.g., Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) (noting that "rosy affirmation[s]" made by corporate managers are not actionable).

**The September 2013 Conference.**   Finally, in September 2013, Plaintiffs allege that Ferraz, "in his capacity as a representative of Sete," said the following at a conference:

(9) He informed Plaintiffs that "Sete expected drillship charter revenue 'of almost $90 billion [in] the next 20 years.'"  Compl. ¶ 53.

(10) He said that "Sete was 'ahead of schedule,' and was 'not facing any problem to raise' the necessary debt financing called for in its business plan."  *Id.*

40

(11) He stated that, "by 2019, Sete would 'have 90 percent of all rigs already in operation,' and that its EBITDA [would] be over $4.6 billion per year.'" *Id.*

(12) He reported that "Sete was 'performing as planned,' and that he '[didn't] see any reason why [Sete] should deviate from that.'" *Id.*

Plaintiffs have not pled facts to support that any of these statements were false. Courts also have found statements similar to all of these alleged statements to be corporate puffery. *See Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (finding statements regarding expected annual growth rate over next several years to be puffery); *In re MCI Worldcom, Inc. Secs. Litig.*, 191 F. Supp. 2d 778, 786 (S.D. Miss. 2002) (finding statement that "integration ran ahead of schedule" to be puffery); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563-64 (E.D. Mich. 2001) (finding statements that defendant "is proceeding with its plans" and that "plans remain on track" were puffery). And, once again, these statements had no connection to the alleged bribery scheme and thus did not trigger a duty to disclose. *See Menaldi*, 2016 WL 634079, at *8.

### 3. Plaintiffs Have Not Pled That Petrobras Knowingly and Substantially Assisted Sete Brasil.

To plead aiding and abetting, a plaintiff must show that the defendant engaged in (1) "knowing" and (2) "substantial" assistance with respect to the underlying tort. *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 99 (D.D.C. 2002). Here, Plaintiffs have not sufficiently pled either of these requirements.

**Knowledge.** Per the usual practice in their Complaint, Plaintiffs' allegations as to Petrobras's purported knowledge of the alleged bribery scheme at Sete Brasil are overly vague: "*Upon information and belief*," Plaintiffs assert, "Petrobras was aware of the fraud that its Sete-installed officers perpetrated on EIG and the Funds by concealing the Petrobras Corruption Scheme from EIG and the Funds through a pattern of false and/or materially misleading statements." Compl. ¶ 93 (emphasis added). This plainly does not pass muster. *See U.S. ex rel. Grynberg v. Alaskan Pipeline Co.*, 1997 WL 33763820, at *4 (D.D.C. Mar. 27, 1997) (emphasizing that a "complaint cannot be supported by 'information and belief'"). The

Complaint is devoid of any particular facts to suggest that Petrobras knew that anyone at Sete Brasil made any of the purported misstatements alleged in the Complaint. For example, Plaintiffs do not assert that Petrobras was aware of Ferraz's alleged presentation in Spring 2013, his meeting at EIG's annual conference in September 2013, or any of his other communications as a Sete Brasil representative. *See* Compl. ¶¶ 52-53. To be sure, the Complaint includes allegations that a few employees at Petrobras allegedly knew that shipyards had paid bribes. *See* Compl. ¶ 60. The payment of bribes, however, is not the "fraud" at issue in this case; instead, the alleged fraud relates to Sete Brasil's purported communications with Plaintiffs. *See id.* ¶ 95. On that score, the Complaint pleads no knowledge whatsoever with respect to Petrobras.

**Substantial Assistance.** By the same token, Plaintiffs have failed to plead the second element of aiding and abetting: "substantial assistance *in the principal violation*." *Acosta*, 711 F. Supp. 2d at 109-10 (emphasis in original). To meet this burden, a plaintiff is "required to plead a link between the aid rendered and the principal violation (or violations) alleged." *Id.*

Plaintiffs have not pled the required link here, namely, that Petrobras acted in a way that substantially assisted Sete Brasil in misleading Plaintiffs. Once again, Plaintiffs resort to broad, generalized allegations—this time that Petrobras itself made misstatements, that it "created" Sete Brasil, and that it "appoint[ed]" Sete Brasil's officers while supposedly knowing that they had been involved with bribery before. Compl. ¶ 94. None of these theories works. For starters, as demonstrated above, Plaintiffs have not pled any misstatements by Petrobras. *See supra* at 33-36.

Moreover, the Complaint fails to explain how Petrobras's alleged role in creating Sete Brasil and appointing its officers is linked to the particular tort asserted here: Sete Brasil's allegedly misleading communications to investors. Even if one assumes that Petrobras had known that Ferraz and others would accept bribes while at Sete Brasil—and Petrobras vehemently denies that it had any such knowledge—Plaintiffs' allegations still would fail. Even if an aider and abettor allegedly assists a tortfeasor with one category of wrongdoing—*e.g.*, receiving bribes—the law is clear that "ordinarily [it] is *not* liable for other acts that, although

42

done in connection with the intended tortious act, were not foreseeable" to the defendant—*e.g.*, misleading investors.  Rest. (2d) Torts § 876, Comment on Clause (b) (emphasis added); *accord Acosta*, 711 F. Supp. 2d at 110 (holding it is "not enough" to allege that a defendant generally provided aid to a third party, who in turn purportedly engaged in tortious activity").  Plaintiffs have not alleged any facts to support the conclusion that Petrobras should have foreseen that Sete Brasil would defraud investors like the Plaintiffs.  Nor could they plausibly make such allegations.  Petrobras, after all, was an investor in Sete Brasil and was a victim of the bribery scheme that suffered losses as a result.  *See supra* at 7, 29-30.

### C.      Plaintiffs Have Failed to State a Claim for Civil Conspiracy.

To state a claim for civil conspiracy, Plaintiffs must plead sufficient facts to show the existence of (1) an underlying tort and (2) "an agreement between two or more persons" to participate in that tort.  *Ungar*, 211 F. Supp. 2d at 100.  Because Plaintiffs have not met either requirement here, the Court should dismiss their civil conspiracy claim (Count 3).

**No Underlying Tort.**  Other than labeling Count 3 as a claim for "civil conspiracy to defraud," the Complaint provides virtually no information to identify—let alone properly allege—an underlying tort.  Instead, the Complaint states that Defendants agreed to "participate in . . . the Petrobras Corruption Scheme, an unlawful and tortious conspiracy."  Compl. ¶ 99. Plaintiffs purport to define the "Petrobras Corruption Scheme," *see id.* ¶ 6, but the term's two-word definition—literally, "this scheme"—is utterly incoherent.  Even under the generous assumption that the definition incorporates the first five paragraphs of the Complaint, those paragraphs do not describe the particulars of any fraud claim, including who exactly committed the fraud, what statements were made, when they were made, *etc.*  When a conspiracy claim is based on fraud, Plaintiffs must plead the underlying fraud with particularity under Rule 9(b).  *See Bank of N.Y. Mellon Trust Co. N.A. v. Henderson*, 107  F. Supp. 3d 41, 48 (D.D.C. 2015).  This requires Plaintiffs to plead the "'who, what, when, and how' concerning the circumstances of the alleged fraud."  *Busby*, 932 F. Supp. 2d at 139; *see also Dooley v. United Techs. Corp.*, 1992 WL 167053, at *14 (D.D.C. June 17, 1992) (dismissing civil conspiracy claim for failure to identify

"any specific tort which the civil conspirators allegedly committed").  Plaintiffs have not come close to meeting that burden here.

**No Unlawful Agreement.**  Plaintiffs' conspiracy claim also fails because the Complaint does not sufficiently allege that Defendants entered into an agreement to defraud.  The existence of an agreement is "the 'essential element of a conspiracy claim.'" *Mattiaccio v. DHA Group, Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014) (citation omitted).  Moreover, "[t]o survive a motion to dismiss, a plaintiff must set forth more than just conclusory allegations of an agreement." *McCreary v. Heath*, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005).  Thus, courts routinely dismiss conspiracy claims in which plaintiffs have "alleged only that defendants had 'agreed' or 'conspired' to violate their rights but did not provide a 'description of the persons involved in the agreement, the nature of the agreement, what particular acts were taken to form the conspiracy, or what overt acts were taken in furtherance of the conspiracy.'" *Vasaturo v. Peterka*, 2016 WL 1435661, at *2 (D.D.C. Apr. 11, 2016) (citation omitted).

Plaintiffs have not plausibly pled that Petrobras entered into any agreement to defraud them or any other investors.  Instead, Plaintiffs make conclusory allegations that the Shipyard Defendants "agreed to pay" bribes to enter into construction contracts *with Sete Brasil*, that "Defendants agreed to participate" in the "Petrobras Corruption Scheme," and that "[u]pon information and belief" the agreement occurred "before and/or during" the time of the "fraud." Compl. ¶¶ 2, 99, 100, 101.  That is all.  Notably, Plaintiffs fail to say what the terms of the alleged "agreement" were or that Petrobras ever had any particular communications with alleged co-conspirators, including the Shipyard Defendants.  Because Plaintiffs "fail[] to allege the existence of any events, conversations or documents indicating that there was ever an agreement or 'meeting of the minds between any of the defendants," Plaintiffs have "failed to plead facts from which the Court could infer that any conspiracy exists" as a matter of law.  *McCreary*, 2005 WL 3276257, at *5.

Plaintiffs' claims also are defective because they fail to allege any plausible reason why Petrobras would conspire with the Shipyard Defendants to defraud Sete Brasil investors.

44

Petrobras itself was a Sete Brasil investor, and it did not stand to benefit in the least from the alleged bribery scheme.[24]  Quite the opposite.  Petrobras, according to the Complaint, depended on Sete Brasil to construct the drillships it needed to extract billions of barrels of oil from the Pre-Salt Reserves.  *See* Compl. ¶¶ 31-32.  As such, the alleged collapse of Sete Brasil, and its "inability to timely perform" on "Petrobras charter contracts," are just more examples of why Petrobras was a victim, not a perpetrator, of the alleged bribery scheme, as Brazilian authorities have recognized.  Thus, Plaintiffs' conspiracy allegations "stop[] short of the line between possibility and plausibility" and fail as a matter of law.  *Iqbal*, 556 U.S. at 678.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss Plaintiffs' First Amended Complaint with prejudice.

Dated:  August 12, 2016                    Respectfully submitted,

By:    */s/ Adam K. Levin*
        Adam K. Levin (D.C. Bar No. 460362)
        David M. Foster (D.C. Bar No. 497981)
        Carolyn A. DeLone (D.C. Bar No. 1004476)
        HOGAN LOVELLS US LLP
        555 Thirteenth Street, N.W.
        Washington, D.C. 20004
        Telephone: (202) 637-5600
        Facsimile: (202) 637-5910
        adam.levin@hoganlovells.com
        david.foster@hoganlovells.com
        carrie.delone@hoganlovells.com

        *Counsel for Defendant*
        *Petróleo Brasileiro S.A.—PETROBRAS*

---

[24]    The Complaint contains only one allegation that could be read to imply that Petrobras itself, as opposed to a few corrupt Petrobras employees, received a bribe.  *See* Compl. ¶ 66 (asserting that a February 2016 press release by government investigators said that bribes were paid "to Petrobras").  The actual press release, however, is attached as Exhibit 13, and it does not include this statement.  Instead, the press release discusses funds that allegedly were "diverted from Petrobras."  *See* Ex. 13 at 1.