# EXHIBIT 1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS OF PETRÓLEO BRASILEIRO S.A.—
PETROBRAS



718 384 8040
718 388 3516
info@targemtranslations.com
TargemTranslations.com

## CERTIFIED  TRANSLATION

I, Wolf Markowitz, Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language service with a firm track record of providing expert language services to the business and legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders are professionally trained and vastly experienced in providing professional translations, from Portuguese to English and vice versa; and they have professionally translated the document referenced as **"Parecer - Prof. Cândido Rangel Dinamarco"** from Portuguese to English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: August 12, 2016

_____

Wolf Markowitz

_____

Signature of Notary

ROCHAL WEISS
Notary Public, State of New York
Registration No.: 01WE6293785
Qualified in Kings County
My Commission Expires December 16, 2017

**TARGEM TRANSLATIONS** | Headquarters
143 Rodney Street, Brooklyn, NY 11211

OFFICES | New York, California, and Asia



**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| EIG ENERGY FUND XIV, L.P., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:16-cv-333-APM |
| v. | ) |
| | ) |
| PETRÓLEO BRASILEIRO S.A., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF CÂNDIDO RANGEL DINAMARCO**

I, Cândido Rangel Dinamarco, hereby state the following:

1.     I submitt this declaration prepared on the basis of my true and personal knowledge of the subject matter herein. I am over 18 years of age, am able to testify to these facts, and would testify if called as a witness.

2.     I am an attorney residing in São Paulo, Brazil, and am legally authorized to practice law in Brazil.

3.     I am a partner at the law firm of Dinamarco, Rossi, Beraldo & Bedaque, in São Paulo, Brazil, a Full Professor of Civil Procedure at the University of São Paulo's School of Law, a retired Justice of the High Court of Appeals of the State of São Paulo, and served as a State Attorney for the State of São Paulo. I also studied Civil Procedure at the State University of Milan, under the supervision of Prof. Enrico Tullio Liebman.

4.     I have written many books on Civil Procedure, among which *Fundamentos do processo civil moderno,* v. 1-2 (Malheiros 2010), *A nova era do processo civil* (Malheiros 2009), *A reforma do Código de Processo Civil* (Malheiros 2001), *Instituições de Direito Processual Civil*, v. 1-4 (Malheiros, 2009), *A arbitragem na Teoria Geral do Processo Civil* (Malheiros, 2013), *Capítulos de sentença* (Malheiros, 2014), *A instrumentalidade do*

*processo* (Malheiros, 2013), *Intervenção de terceiros* (Malheiros, 2009), and *Litisconsórcio* (Malheiros, 2009).

5.     I am often requested to produce legal opinions on Brazilian law, especially civil procedure, in all national courts.

6.     I am aware of the fact that Petróleo Brasileiro S.A. - PETROBRAS ("PETROBRAS") has been named a defendant in the aforementioned civil lawsuit filed in the US Federal court system, in Washington, D.C. I hereby present this opinion at the request of counsel for Petrobras in support of its motion to dismiss.

7.     I have analyzed the documents below in relation to my work with regard to this matter:

- Plaintiffs' First Amended Complaint ("Complaint") in the above-captioned action.

## THE CASE PENDING IN THE UNITED STATES

8.     PETRÓLEO BRASILEIRO S.A., which is consulting me at this time, is the defendant in a case brought before the District Court for the District of Columbia, in the United States, by EIG ENERGY FUND XIV, LP ("c/o Eig Management Company, LLC") and eight other companies of the same group. These plaintiffs request, among other things, that PETROBRAS be ordered to pay damages in an amount not less than $221,133,393 for losses it allegedly caused by inducing them to invest in a company, SETE BRASIL PARTICIPAÇÕES S.A., which it incorporated and controlled.

9.     They claim that PETROBRAS acted fraudulently in collusion with SETE BRAZIL to induce the Funds to invest extremely high sums, which added up to over 220 million US dollars.

10.     The plaintiffs state that, during negotiations with PETROBRAS and SETE BRASIL representatives, they were led to believe that these Brazilian companies operated in

accordance with the domestic law, and that they were not informed of the corruption scheme subsequently uncovered by the investigation referred to as "*Operação Lava Jato*" (Operation Car Wash), the disclosure of which frustrated their return on investments. They argue, therefore, that they were given false information and that data essential to the investments were omitted – which would not have been made had the reality been known.

### THE CONSULTATION MADE BY PETROBRAS AND THE DOCTRINE OF *FORUM NON CONVENIENS*

11.     PETROBRAS consulted me, inviting me to examine various topics and principles of Brazilian Law, beginning with (a) the international jurisdiction of the country's judges, then (b) the range of relief that can be awarded by the Brazilian Judiciary, (c) the organization of the courts, (d) the independence and reliability of its judges and courts, and (e) the law applicable to the judgment of cases by these judges and courts, *etc.*

12.     I understood perfectly well that this information is intended for the American judge responsible for the case pending before the District Court for the District of Columbia, in order to enlighten him regarding the Brazilian Judicial System, its jurisdiction at the international level, and the effectiveness of the guarantees of *due process of law*, impartiality, and the *access to justice*. I have no doubt that no US Court would propose applying the *forum non conveniens* doctrine if the cause could not be adjudicated by a Brazilian judge, if Brazilian courts were not reliable or independent, or if the constitutional process guarantees did not prevail here.

13.     That is why the PETROBRAS' distinguished counsel asked me to examine the Brazilian Court System, its international jurisdiction, our procedural system, and the reliability of our judges, *etc.*

### GENERAL RULES OF INTERNATIONAL JURISDICTION: THE SYSTEM ADOPTED IN BRAZIL

14.      The Brazilian Federal Constitution is silent on the subject of the international jurisdiction of Brazilian judges, which has traditionally been addressed by the Introductory Law to Brazilian Law Rules (art. 12), then procedural legislation went on to do so with the advent of the 1973 Code of Civil Procedure (arts. 88-90), which has been maintained by the current Civil Procedure Code.

15.      Arts. 21-24 of the Civil Procedure Code, in addition to establishing exclusive or concurrent jurisdictions, are directly responsible for listing the cases for which Brazilian judges have jurisdiction. As is well known, such provisions do so for property and values inherent to the Brazilian State (territory, population, institutions) and take into account its interest in the resolution of conflicts.

16.      We have in Brazilian Law a system that is closer to the Italian system, with the direct determination of the territorial scope of Brazilian jurisdiction. These provisions establish such jurisdiction based on the criteria of the defendant's domicile, of the *forum destinatae solutionis*, of the *forum rei sitae*, of the status of the assets of the estate, *etc.*

17.      These provisions contain the systematic and political criteria ordinarily adhered to in the laws of countries in general, namely, (a) that of feasibility (or effectiveness), by divesting the country's judges of jurisdiction over decisions that would inevitably, or at least very likely, not be enforceable abroad, and (b) that of the *interest*, refraining from expanding such jurisdiction to cases, property or persons that have no connection with Brazilian life.

18.      It is notorious among this country's jurists that its procedural law distinguishes quite clearly the cases in which a Brazilian judge's jurisdiction is *exclusive*, and Brazil does not recognize, under any circumstance, any decisions delivered abroad in reference to cases that fall under any one of the circumstances mentioned above (CPC, art.

23); and cases of *concurrent* international jurisdiction, in which the Brazilian judge is allowed to hear the case, but the possibility that a judge from some other country may also do so is not excluded (CPC, arts. 21-22).

19.     The Brazilian judge's jurisdiction is exclusive in regards to certain property or issues of public interest, among which the country's territory stands out – and that is the raison d'être of art. 23, item I of the Civil Procedure Code, according to which only Brazilian judges have jurisdiction over actions related to real estate located in Brazil. With the exception of art. 23, all jurisdictions are concurrent.

## THE CONCRETE CASE
### THE INTERNATIONAL JURISDICTION OF THE BRAZILIAN JUDGE

20.     The Brazilian judiciary has jurisdiction to adjudicate the claim made by the companies in the EIG ENERGY group based on two essential grounds.

21.     The first, noticeable to the naked eye, is the fact that it has its headquarters in Brazil. Pursuant to the provisions of art. 21, item I of the Civil Procedure Code, "the Brazilian judicial authority is the competent authority to prosecute and judge actions in which [...] the defendant, whatever his nationality, is domiciled in Brazil." It is absolutely undisputed among all (legal scholars and courts) that this provision refers not only to natural persons domiciled here, but also to companies based in the country – and the Civil Procedure Code itself reconfirms this idea by proclaiming that "for the purposes of the provisions of paragraph I, a foreign legal entity is deemed to be domiciled in Brazil if it has an agency, branch or subsidiary in Brazil" (art. 21, sole paragraph).

22.     The second factor connecting this claim to Brazil and to its Courts is the fact that it is based on actions performed in Brazil, as provided for under art. 21, item III of the Code of Civil Procedure. The Companies' complaint describes a corruption scheme installed in Brazil and to the repression of the members of this scheme by the Brazilian Federal Police

through the very well-known Operation "Lava Jato". There is no doubt that, in addition to the fact that the defendant is headquartered in Brazil, the allegations contained in the complaint also cause the Brazilian Court System to have jurisdiction over this case, whose impact on the country's economic life is evident.

23.     It is indisputable that the Brazilian Court System has jurisdiction over the case due to these two converging factors, each being sufficient in and of itself.

**INTERNATIONAL FORUM SELECTION CLAUSE**

24.     In addition to all this, by establishing a Brazilian judge's jurisdiction with regard to actions "in which the parties, expressly or tacitly, submit to national jurisdiction," art. 22, item III of the Civil Procedure Code, paves the way for the proper understanding of the possible causes of the application of international jurisdiction – especially to extend the jurisdiction of Brazilian judges, with the absorption of cases that might not ordinarily come to this country's Court System (extension of International jurisdiction). This was not really an innovation, because the jurisprudence of the Brazilian courts had already admitted the effectiveness of international venue selection clauses, especially in cases related to certain obligations (international trade, financial institutions, international transport). And now, with the straightforward provision in the Civil Procedure Code, there can no longer be any doubt concerning the validity of a clause selecting a Brazilian venue, which is an explicit manifestation of the acceptance of the competent jurisdiction of this country's judge.[1]

---

[1]. *According to* Dinamarco, *Instituições de direito processual civil,* I, 8ª ed., São Paulo, Malheiros, 2016, n. 197, esp. p. 516.

### COMPARISON BETWEEN THE AMERICAN AND BRAZILIAN SYSTEMS

25.    The existence of concurring international jurisdiction, where the party may opt for one or another country's Courts, does not mean that the Brazilian international jurisdiction system is in any way close to that of the United States, where the judge is authorized to decline jurisdiction upon the application of the *forum non conveniens* doctrine. There, the judicial authority has the "discretionary authority to decline to adjudicate an action whose facts arose in another jurisdiction whenever it appears that the cause may be more appropriately tried elsewhere" (JAMES-HAZARD-LEUBSDORF).[2] Here, the legality criterion is in place, where the judicial body, as defined in the provisions contained in the Constitution or in the law, has jurisdiction, and the Court cannot change on its own the jurisdiction over the case or decline jurisdiction. Despite understanding that it would be better that the case be tried in a more convenient forum, there is nothing that the judge can do against the provisions established in the law. Thus, in Brazil the judgment of convenience is left exclusively to the legislature while enacting general and abstract rules on jurisdiction, without allowing the judge to make any judgment of convenience.

26.    A Court may and must only decline hearing and deciding a case when, by a provision of the Constitution or of federal law, he/she absolutely lacks jurisdiction. In case of relative lack of jurisdiction, the judge does not have this power because its acknowledgment depends on a party's request (Code of Civil Procedure, art. 337, §5).

27.    It is crystal clear, however, that in the present case it is not a question of excluding the jurisdiction of the Brazilian judge, but of the American judge, as long as the Court before which the case was filed and is pending understands it in this manner. And, as I already demonstrated, the transmittal of the case to this country shall not be an increase of

---

[2]. *According to Civil procedure*, 4th ed., Boston-Toronto-London, Little Brown and Company, 1992, § 2.20, p. 86.

the jurisdiction of the Brazilian authority, since it already has this jurisdiction because of the express provision of art. 21, items I and III of the Civil Procedure Code.

28.      In other words: if the North American Court comes to apply the *forum non conveniens* doctrine, there is no doubt that the case will have full condition to be tried and judged by the Brazilian judicial authorities (Civil Procedure Code, art. 21, items I and III).

## THE BRAZILIAN CIVIL PROCEDURE SYSTEM
### THE AMPLITUDE OF ADMISSIBLE RELIEF

29.      In the Brazilian procedural system we have, among others, the constitutional guarantee of the *non-obviation of the jurisdictional control*, whereby "the law shall not exclude any violation or threat to a right from review by the Judiciary Branch" (Constitution, art. 5, item XXXV). In this context, the Judiciary Branch is open to actions or claims of every nature, whether of public or private law, whether between private parties or involving the Public Authority, whether involving personal or real property, whether for the performance of contracts or to seek compensation for tort, etc. Neither the Federal Constitution nor the infra-constitutional laws make any reservation in this respect. A claim like the one the plaintiffs filed before the District Court for the District of Columbia with the request to award the plaintiffs damages for losses allegedly caused by PETROBRAS is inarguably admissible before the Brazilian Courts.

30.      Rest assured because there is no danger in the present case of the court denying the plaintiffs the right of action or their right of access to justice, for matters relative to the jurisdiction of Brazilian judicial authorities.

**THERE ARE NO IMMUNITIES OF NATIONAL STATE ENTITIES TO SUCH JURISDICTION**

31.     What was just said is reiterated by the fact that in the Brazilian procedural system there is no immunity of national government agencies to the jurisdiction of the country's courts. The Federal Government itself, represented by the Government of the Republic, is subject to this jurisdiction – and in relation to it the only relevant peculiarity consists of the jurisdiction of the Federal Court to judge cases in which it is a party (Constitution, art. 209, item I). However, the Federal Courts are bodies of the Judiciary Branch (Const., art. 92, item III) and their judges are protected by guarantees offered by the Constitution to judges in general − especially life tenure, irrevocability and irreducibility of earnings (Constitution, art. 95, items I-III).

32.     In Brazil there are no jurisdictional bodies or mechanisms that are outside of the structure of the Judiciary Branch, similar to the *contentieux administrative* in French law or Italy's *Consiglio di Stato*. Here, all jurisdiction is exercised by the judicial bodies and not by any other.

33.     An entity like PETROBRAS, although controlled by the Federal Government, is defined by Brazilian law as a legal entity organized under private law (mixed capital company) and the jurisdiction to judge the cases in which it is a party is strictly of the ordinary courts – in other words, the cases in which *Petrobras* is a party are tried and judged by the judges of the federate States, not by federal judges. The case law of the Superior Courts is well established in this sense.

34.     Something like the concept of sovereign immunity in American law exists here exclusively with respect to sovereign foreign States and to certain international organizations. With respect to the Brazilian State and to all entities connected to or

dependent on it, the rule whereby "a government may not be subjected to suit without its consent" is not even minimally applicable. [3]

### CONDUCT AND INDEPENDENCE OF THE BRAZILIAN JUDICIARY BRANCH

35.     The Federal Constitution grants extremely secure guarantees of independence not only to judges individually, but also to the Judiciary as a whole.

36.     To judges, it assures life tenure, whereby the judge can only be removed by a decision issued in a jurisdictional proceeding; the immovability from a position or office to another, which assures the magistrate the peace of not being harassed with arbitrary removals; and the irreducibility of earnings, to prevent pressures by government leaders on judges (Constitution, art. 95, items I-III). Judges are also assured the right to alternate promotions by merit or by seniority, in order to prevent them from being subject to spurious pressures.

37.     To the Judiciary as a whole the Federal Constitution offers a series of institutional guarantees, all intended to keep the balance between the Branches of the State, without spurious influences of the Executive or of the Legislative on the Judiciary. Courts have the exclusive power of creating the laws for judicial organization, draft their own internal regulations, and are responsible for the appointment and promotion of judges, etc. (arts. 96, 125, etc.).

38.     In the last years, at the mercy of the extremely serious economic crisis that the country is experiencing and the no less serious political, institutional and ethical crisis that has been ravaging the Legislative and the Executive Branches, the Judiciary Branch has been reaffirming itself, more than ever, as the guardian of the integrity of the Brazilian

---

[3]. *According to* JAMES-HAZARD-LEUBSDORF, *op.cit.,* n. 2.16, p. 81.

Constitution and its principles, and of the legality and for the repression of immoralities. Including in Lava Jato Operation, which the plaintiffs' initial complaint repeatedly mentions, courts of all levels have deserved the trust that they enjoy before the population, because of their independence, balance, probity and courage.

39.    In this scenario there are no motives for the U.S. Court to fear the plaintiffs' exposure or an arbitrary denial of relief, or distortions in the decision from the Brazilian Judiciary Branch.

## GREATER FACILITY FOR PRODUCTION OF EVIDENCE

40.    Processing the case in Brazil will facilitate access to the sources of evidence. For instance, think about the testimony of those held up to be the architects of the frauds denounced in the initial complaint. Considering that these people are presumably in Brazil, the proceedings before the US authorities will, per force, require that statements be collected through the use of judicial instruments of international cooperation. I refer here to the instruments called letters rogatory, which are nothing more than a "request for international jurisdictional cooperation sent by a court in one country to the judicial authority of another country".[4]

41.    The use of such an instrument, however, is always a factor of difficulty. From the outset, its use generates an unequivocal delay in the production of evidence due to the required bureaucracy:  Case proceedings and documents are required to be translated into the language of the country of destination, and processing of letters rogatory depends on the efficiency of diplomatic authorities, as they are conveyed from one country to the other via diplomatic channels (CPC, art. 41).  In addition, as expressly stipulated in our Constitution, compliance with letters rogatory addressed to this country depends on the Brazilian Superior

---

[4]. *According to* Dinamarco, *Instituições de direito processual civil,* II, 6ª ed, São Paulo, Malheiros, 2009, n. 664, esp. p. 531.

Court of Justice granting the necessary prior *exequatur* (Const., art. 105, I(i)).  This entire sequence of acts naturally imposes a substantial loss on the speed of the proceedings, and due compliance with letters rogatory has been known to take years in some situations, due to all the comings and goings.

42.    This loss, however, is not limited to time alone. The usefulness of the evidence itself also diminishes to a certain extent, since the American Court would not be able to establish direct contact with a witness, to address any questions or inconsistencies arising from their testimony.  The Court examining the case would only be able to interact with the witness through intermediaries.

43.    I also wish to reassure the distinguished American readers of the broad evidentiary powers Brazilian judges are afforded under its legislation and case law in order to ascertain the truth of a matter.  The system allows them to take the initiative and request all types of evidence, and to call witnesses that were not listed by the parties or, to some extent, request documents from private entities or governmental agencies.

44.    Our Civil Procedure Code firmly states that "no one is exempt from the duty to cooperate with the Judicial Authorities in their search for the truth" (CPC, art. 378), adding that it is imperative that a person "inform the Court of the facts and circumstances they are aware of" (art. 380(I)).  In keeping with these guidelines, a Brazilian judge can force witnesses to appear, and determine that any who fail to do so be taken to Court by a bailiff or, if necessary, with the assistance of the police.  Failure to appear may even constitute contempt of court, as defined in the Brazilian Criminal Code (art. 330).

45.    It is also worth noting the power of a Brazilian judge to issue an order requesting certain documents or things that are in the possession of one of the parties (CPC, art. 396) or third parties (CPC, Art. 401 c/c 403) to be displayed, making this one more

effective tool at the Court's disposal to ensure that the process is always an instrument of justice.

### A BRAZILIAN JUDGE'S GREATER EXPERIENCE WITH THE PROBLEMS

46.     The insertion of Brazilian judges in the social and political context in which the events took place is just as important as the aforementioned evidentiary conveniences. Naturally their sensitivity to said context and the ethical and economic connotations that characterize it, is much keener than that of an American judge, who may receive such information through the evidence produced in the proceedings, but who lacks the personal experience in relation thereto.  A judge's integration in this context is immensely important to be able to form the opinions that will serve as the basis for the court's ruling.

47.     Furthermore, the core of the facts claimed by the plaintiffs is already being intensively investigated by Brazilian authorities, who have demonstrated their determination to uncover the truth.  Several of the individuals involved have even signed agreements to collaborate with the Brazilian authorities in the investigation, as widely reported by the media.  In light of this, there is no doubt that they have access to a much wider range of information and elements than might be available to the US authorities.

### SUBSTANTIVE LAW
### APPLICABLE LAW

48.     I would also like to reassure the American judge that Brazilian law strongly penalizes those who commit fraudulent acts, as well as those who aid, incite or conspire to commit such acts. Objective good faith is expressly adopted as a mandatory standard of conduct.

49.     Hence my certainty in affirming (a) that Brazilian law repudiates, in no uncertain terms, fraudulent acts and cunning maneuvers in general, and, as a consequence,

(b) anyone who commits any type of fraud, commits an illegal act (Brazilian Civil Code - CC, art. 186), resulting in the obligation to pay damages (CC, art. 927).

50.     In view of the foregoing, I can only conclude that it is feasible, in abstract terms, to claim damages, before the Brazilian Courts, on the grounds of the causes of action set out in the initial complaint presented to me:  (a) fraud (b) aiding and abetting fraud and (c) civil conspiracy.

I hereby declare, under penalty of perjury, according to the laws of the United States of America, that the foregoing is true and correct.  Executed on August 11, 2016.

_____

Cândido Rangel Dinamarco

## CORTE DISTRITAL DE COLUMBIA DOS ESTADOS UNIDOS DA AMÉRICA

|  |  |
|---|---|
| EIG ENERGY FUND XIV, L.P., *et al.*,      ) | |
| ) | |
| Requerentes,    ) | Ação Civil No. 1:16-cv-333-APM |
| ) | |
| v.      ) | |
| ) | |
| PETRÓLEO BRASILEIRO S.A., *et al.*,    ) | |
| ) | |
| Requeridos.    ) | |
| ) | |

### DECLARAÇÃO DE CÂNDIDO RANGEL DINAMARCO

Eu, Cândido Rangel Dinamarco, declaro o quanto segue:

1.  Eu entrego este parecer elaborado com meu verdadeiro conhecimento pessoal sobre os assuntos aqui tratados. Eu tenho mais de 18 anos de idade, sou capaz de testemunhar tais fato, e testemunharia se arrolado como testemunha.

2.  Eu sou um advogado residente em São Paulo, Brasil. Eu estou legalmente autorizado para praticar a advocacia no Brasil.

3.  Eu sou sócio do escritório de advocacia Dinamarco, Rossi, Beraldo & Bedaque, em São Paulo, Brasil. Eu sou Professor Titular de Processo Civil da Faculdade de Direito da Universidade de São Paulo, Desembargador aposentado do Tribunal de Justiça do Estado de São Paulo e fui Procurador de Justiça do Estado de São Paulo. Também estudei Direito Processual Civil na Universidade Estatal de Milão, sob orientação do prof. Enrico Tullio Liebman.

4.  Eu escrevi muitos livros de Direito Processual Civil, incluindo *Fundamentos do processo civil moderno*, v. 1-2 (Malheiros 2010), *A nova era do processo civil* (Malheiros 2009), *A reforma do Código de Processo Civil* (Malheiros 2001), *Instituições de Direito Processual Civil*, v. 1-4 (Malheiros, 2009), *A arbitragem na Teoria Geral do Processo Civil*

(Malheiros, 2013), *Capítulos de sentença* (Malheiros, 2014), *A instrumentalidade do processo* (Malheiros, 2013), *Intervenção de terceiros* (Malheiros, 2009) e *Litisconsórcio* (Malheiros, 2009).

5. Eu sou frequentemente consultado para elaborar pareceres sobre direito brasileiro, em especial de direito processual civil, em todos os tribunais nacionais.

6. Eu tenho conhecimento de que Petróleo Brasil S.A – PETROBRÁS ("Petrobrás") foi nomeada ré na ação civil acima mencionada ajuizada no sistema do tribunal federal dos Estados Unidos em Washington, D.C. Eu apresento este parecer por requisição dos advogados da Petrobrás em apoio ao seu pedido de declinação de competência.

7. Eu analisei os documentos abaixo relacionados com o meu trabalho a ser desenvolvido na presente questão:

   • Petição inicial dos requerentes apresentada na ação acima mencionada.

## O PROCESSO PENDENTE NOS ESTADOS UNIDOS

8. PETRÓLEO BRASILEIRO S.A., que ora me consulta, figura como ré em um processo instaurado perante a Corte Distrital de Columbia, nos Estados Unidos da América, por iniciativa de EIG ENERGY FUND XIV, LP ("c/o Eig Management Company, LLC") e outras oito empresas do mesmo grupo. Pedem essas autoras, entre outras coisas, a condenação da PETROBRÁS por um valor não inferior a US$ 221,133,393 a título de perdas-e-danos, em razão de prejuízos alegadamente causados por esta ao induzi-las a investir em uma companhia, que é a SETE BRASIL PARTICIPAÇÕES S.A., por ela instituída e controlada.

9. Alegam que a consulente atuou fraudulentamente em conluio com a SETE BRASIL ao induzir os FUNDOS a investir elevadíssimas somas, que chegaram a mais de 220 milhões de dólares norte-americanos.

10. Segundo narram as autoras, durante as negociações com representantes da PETROBRÁS e da SETE BRASIL foram induzidas a crer que essas empresas brasileiras se

portavam de acordo com as leis nacionais e nunca foram inteiradas do esquema de corrupção depois detectado pela "Operação Lava Jato", cuja revelação frustrou o retorno dos investimentos realizados. Alegam, portanto, que receberam informações inverídicas e que foram omitidos dados essenciais para a realização dos investimentos – os quais não teriam ocorrido se a suposta realidade fosse conhecida.

### A CONSULTA FORMULADA PELA PETROBRÁS E A TEORIA DO *FORUM NON CONVENIENS*

11.     Dirige-me a PETROBRÁS uma consulta, convidando-me a examinar diversos temas e institutos do direito brasileiro, a principiar (a) pelo da competência internacional dos juízes deste país e passando (b) pela dimensão da oferta de tutela jurisdicional pelo Poder Judiciário brasileiro, (c) pela organização judiciária, (d) pela independência e confiabilidade dos juízes e tribunais, (e) pelo direito aplicável no julgamento das causas por esses juízes e tribunais *etc*.

12.     Compreendi perfeitamente que essas informações se destinam ao espírito do juiz norte-americano responsável por aquele processo pendente perante a Corte Distrital de Columbia, com o objetivo de esclarecê-lo a propósito da Justiça brasileira, sua competência no plano internacional e efetividade das garantias do *due process of law*, da imparcialidade e da oferta de *acesso à justiça*. Segundo me parece fora de qualquer dúvida, nenhum juiz norte-americano se aventaria a aplicar a doutrina do *forum non conveniens* quando a causa não pudesse ser conhecida pelo juiz brasileiro, quando os tribunais brasileiros não fossem confiáveis ou independentes, quando aqui não prevalecessem aquelas garantias constitucionais do processo.

13.     Foi por isso que os ilustres advogados da consulente trataram de me pedir o exame da Justiça brasileira, da sua competência internacional, do nosso sistema processual, da confiabilidade dos nossos juízes *etc*.

## DISCIPLINA GERAL DA COMPETÊNCIA INTERNACIONAL:
### O SISTEMA ADOTADO NO BRASIL

14.      A Constituição Federal brasileira nada dispõe sobre o tema da competência internacional do juiz brasileiro, fazendo-o tradicionalmente a Lei de Introdução às Normas do Direito Brasileiro (art. 12), passando a legislação processual a fazê-lo desde o advento do Código de Processo Civil de 1973 (arts. 88-90) e assim se mantendo no Código vigente.

15.      Os arts. 21 a 24 do Código de Processo Civil, mais que fixarem competências exclusivas ou concorrentes, são diretamente responsáveis pela enumeração das causas em que o juiz brasileiro é competente. Como é notório, tais dispositivos o fazem com atenção aos bens e valores inerentes ao Estado brasileiro (território, população, instituições) e levando em conta o interesse deste na solução dos conflitos.

16.      Temos no direito brasileiro um sistema que mais se aproxima do italiano, com a determinação direta do âmbito territorial da jurisdição brasileira. Esses dispositivos fixam tal competência pelos critérios do domicílio do demandado, do *forum destinatæ solutionis*, do *forum rei sitæ*, da situação dos bens da herança *etc.*

17.      Estão presentes nesses dispositivos os critérios sistemáticos e políticos ordinariamente acatados nas legislações dos países em geral, a saber, (a) o da *viabilidade* (ou efetividade), não se aventurando a lei a dar aos juízes do país a competência para decisões que fatalmente, ou ao menos muito provavelmente, não terão como ser impostas aliunde e (b) o do *interesse*, abstendo-se de expandir essa competência para causas, bens ou pessoas sem ligação alguma com a vida nacional.

18.      É notório entre os juristas deste país que a lei processual distingue de modo bastante claro as hipóteses em que a competência do juiz brasileiro é *exclusiva*, não reconhecendo o Brasil em hipótese alguma eventual sentença proferida no exterior com referência às causas enquadradas nessas hipóteses (CPC, art. 23); e hipóteses de competência

internacional *concorrente*, nas quais o juiz brasileiro é autorizado a oficiar mas não se exclui que também possa fazê-lo o juiz de algum outro país (CPC, arts. 21-22).

19.    A competência da autoridade judiciária brasileira é exclusiva em relação a certos bens ou valores de interesse público, entre os quais se destaca o território do país – e é essa a razão de ser do art. 23, I do Código de Processo Civil, segundo o qual para as ações sobre imóvel situado no país somente os juízes brasileiros serão competentes. Fora do art. 23, todas as competências são concorrentes.

## O CASO CONCRETO
## A COMPETÊNCIA INTERNACIONAL DO JUIZ BRASILEIRO

20.    Por dois fundamentos a autoridade judiciária brasileira é competente para essa demanda promovida pelas empresas do grupo EIG ENERGY.

21.    O primeiro, perceptível a olho desarmado, é o fato de ter sede no Brasil. Pelo disposto no art. 21, inc. I do Código de Processo Civil, "compete à autoridade judiciária brasileira processar e julgar as ações em que [...] o réu, qualquer que seja a sua nacionalidade, estiver domiciliado no Brasil". É rigorosamente pacífico entre todos (doutrinadores e tribunais) que esse dispositivo se refere não somente a pessoas naturais aqui domiciliadas mas também a pessoas jurídicas com sede no país – e o próprio Código de Processo Civil reconfirma essa ideia ao proclamar que "para o fim do disposto no inciso I, considera-se domiciliada no Brasil a pessoa jurídica estrangeira que nele tiver agência, filial ou sucursal" (art. 21, par.).

22.    O segundo fator de ligação dessa demanda com o Brasil e sua Justiça consiste no fato de ter ela por fundamento atos praticados no Brasil, conforme prevê o art. 21, inc. III do estatuto processual. A petição inicial das Empresas descreve um esquema de corrupção instalado no Brasil e à repressão aos integrantes desse esquema pela Polícia Federal brasileira mediante a conhecidíssima "Operação Lava Jato". Não resta dúvida de que, não fora pelo fato

de a ré ter sede no Brasil, também pelas alegações contidas na petição inicial a Justiça brasileira é competente para essa causa, cujas repercussões na vida econômica do país são manifestas.

23.    É indiscutível que a competência da Justiça brasileira em razão desses dois fatores convergentes e cada um deles suficiente por si próprio.

## CLÁUSULA DE ELEIÇÃO DE FORO INTERNACIONAL

24.    Além de tudo isso, ao estabelecer a competência internacional do juiz brasileiro para as ações "em que as partes, expressa ou tacitamente, se submeterem à jurisdição nacional", o art. 22, inc. III do Código de Processo Civil abre caminho para o correto entendimento das possíveis causas de prorrogação da competência internacional – especialmente para a ampliação da competência dos juízes brasileiros, com absorção de causas que ordinariamente não pudessem vir a ter à Justiça deste país (prorrogação da competência internacional). Essa não foi verdadeiramente uma inovação, porque a jurisprudência dos tribunais brasileiros já vinha admitindo a eficácia das cláusulas de eleição de foro internacional, especialmente em causas relacionadas com matéria obrigacional (comércio internacional, instituições financeiras, transporte internacional). E agora, com a presença daquele dispositivo bastante direto no Código de Processo Civil, já não pode haver dúvida quanto à aceitação da cláusula de eleição de um foro brasileiro, a qual é uma manifestação explícita de aceitação da competência do juiz deste país.[1]

## CONFRONTO ENTRE O SISTEMA AMERICANO E O BRASILEIRO

25.    A existência de uma competência internacional concorrente, podendo a parte optar pela Justiça deste país ou de outro, não significa que o sistema brasileiro de disciplina

---

[1]. *Cfr.* DINAMARCO, *Instituições de direito processual civil,* I, 8ª ed., São Paulo, Malheiros, 2016, n. 197, esp. p. 516.

da competência internacional se aproxime de alguma maneira do norte-americano, no qual o juiz é autorizado a declinar de sua competência mediante aplicação da doutrina do *forum non conveniens*. Lá, a autoridade judiciária tem a "discretionary authority to decline to adjudicate an action whose facts arose in another jurisdiction whenever it appears that the cause may be more apropriately tried elsewhere" (JAMES-HAZARD-LEUBSDORF).[2] Aqui vige o critério da *legalidade*, sendo competente o órgão judiciário que resultar das disposições contidas na Constituição ou na lei, sem que o juiz tenha qualquer possibilidade de modificar por decisão própria a competência para a causa ou declinar de sua competência. Por mais que entenda ser melhor que a causa flua por outro foro ou outro juízo mais conveniente, nada pode o juiz fazer contra as disposições postas na lei. O juízo de conveniência, como se vê, no Brasil cabe exclusivamente ao legislador, o qual o realiza ao ditar normas gerais e abstratas sobre a competência, não se permitindo ao juiz qualquer juízo de conveniência.

26.    Pode o juiz somente, e deve, declinar do comando e julgamento da causa somente quando, por disposição da Constituição ou da lei federal, ele for *absolutamente incompetente*. Em caso de incompetência relativa ele não tem sequer esse poder, pois o reconhecimento desta depende de iniciativa da parte (CPC, art. 337, § 5°).

27.    Como está muito claro, porém, aqui no presente caso não se trata de excluir a competência do juiz brasileiro, mas do americano, desde que assim entenda a Corte perante a qual a causa foi proposta e está pendente. E, como já tratei de demonstrar, a remessa da causa para este país não será um ato de acréscimo da esfera de competência da autoridade brasileira, a qual já dispõe dessa competência por disposição expressa do art. 21, incs. I e III do Código de Processo Civil.

---

[2]. *Cfr. Civil procedure*, 4ª ed., Boston-Toronto-Londres, Little Brown and Company, 1992, § 2.20, p. 86.

28.     Em outras palavras: se a Corte norte-americana vier a aplicar a doutrina do *forum non conveniens*, não haverá dúvida de que a causa reunirá plenas condições para ser processada e julgada pelas autoridades judiciárias brasileiras (CPC, art. 21, incs. I e III).

## O SISTEMA PROCESSUAL CIVIL BRASILEIRO
## A AMPLITUDE DA TUTELA JURISDICIONAL ADMISSÍVEL

29.     Na ordem processual brasileira vige, entre outras, a garantia constitucional da *inafastabilidade do controle jurisdicional*, pela qual "a lei não excluirá da apreciação do Poder Judiciário lesão ou ameaça a direito" (Const., art. 5°, inc. XXXV). Nesse contexto, o Poder Judiciário está aberto a ações ou pretensões de toda ordem, seja de direito público, seja privado, seja entre particulares ou envolvendo o Poder Público, seja sobre bens móveis ou imóveis, seja para o cumprimento de contratos ou para buscar uma indenização por ato ilícito *etc*. Nem na Constituição Federal nem na lei infraconstitucional existe qualquer ressalva a esse respeito. Uma demanda como esta que as empresas autoras promoveram perante a Corte Distrital de Columbia com o pedido de condenação a indenizar as autoras por danos supostamente causados pela PETROBRAS é indiscutivelmente admissível perante a Justiça brasileira.

30.     Tranquilize-se pois aquela corte, porque no presente caso não existe o perigo de privar as Empresas autora do direito de ação, ou do seu direito de acesso à justiça, por questões relativas à competência das autoridades judiciárias brasileiras.

## NÃO HÁ IMUNIDADES DE ENTES ESTATAIS NACIONAIS À JURISDIÇÃO

31.     O que acaba de ser dito é reconfirmado pelo fato de que não há no sistema processual brasileiro qualquer imunidade dos órgãos governamentais nacionais à jurisdição dos juízes do país. A própria União Federal, representada pelo Governo da República, está sujeita a essa jurisdição – e quanto a ela a única peculiaridade relevante consiste na

competência da Justiça Federal para julgar as causas em que é parte (Const., art. 209, inc. I). A Justiça Federal é porém um organismo integrante do Poder Judiciário (Const., art. 92, inc. III) e seus juízes são amparados por todas as garantias oferecidas pela Constituição aos juízes em geral — especialmente a da vitaliciedade, da inamovibilidade e a da irredutibilidade de vencimentos (Const., art. 95, incs. I-III).

32.     Não há no Brasil órgãos ou mecanismos jurisdicionais estranhos à estrutura do Poder Judiciário, como é o caso do *contentieux administrative* do direito francês ou o *Consiglio di Stato* da Itália. Aqui, toda a jurisdição é exercida pelos órgãos judiciais e não por qualquer outro.

33.     Uma entidade como a PETROBRÁS, embora controlada pela União Federal, é definida pela lei brasileira como uma pessoa jurídica de direito privado (sociedade de economia mista) e a competência para julgar as causas em que ela é parte é rigorosamente a competência comum — ou seja, as causas em que a PETROBRÁS é parte tramitam e recebem julgamento dos juízes dos Estados federados, não dos juízes federais. A jurisprudência dos Tribunais Superiores é rigorosamente tranquila nesse sentido.

34.     Algo como a *sovereign immunity* existente no direito americano existe aqui exclusivamente no tocante aos Estados estrangeiros soberanos e a certos organismos internacionais. No tocante ao Estado brasileiro e a todos os entes a ele ligados ou dele dependentes não tem a mais mínima aplicação a regra segundo a qual "a government may not be subjected to suit without its consense".[3]

## IDONEIDADE E INDEPENDÊNCIA DO PODER JUDICIÁRIO BRASILEIRO

35.     A Constituição Federal outorga seguríssimas garantias de independência não somente aos juízes individualmente, como também à Magistratura como um todo.

---

[3]. *Cfr.* JAMES-HAZARD-LEUBSDORF, *op.cit.*, n. 2.16, p. 81.

36. Aos juízes ela assegura a vitaliciedade no cargo, pela qual o juiz só pode ser demitido por força de decisão proferida em processo jurisdicional; a inamovibilidade de um cargo ou função para uma outra, que assegura ao magistrado a tranquilidade de não poder ser molestado com remoções arbitrárias; e a irredutibilidade de vencimentos, para evitar pressões de governantes sobre os juízes (Const., art. 95, incs. I-III). Também se assegura aos juízes o direito a promoções alternadas por merecimento ou por antiguidade, com o objetivo de evitar que fiquem sujeitos a pressões espúrias.

37. À Magistratura como um todo a Constituição Federal oferece uma série de garantias institucionais, todas destinadas a manter o equilíbrio entre os Poderes do Estado, sem espúrias influências do Executivo ou do Legislativa sobre o Judiciário. Os tribunais têm o poder exclusivo de iniciativa de leis de organização judiciária, elaboram seus próprios regimentos internos, são responsáveis pela nomeação e promoção de juízes *etc*. (arts. 96, 125 *etc*.).

38. Nos últimos anos, mercê da gravíssima crise econômica pela qual passa o país e da não menos grave crise política, institucional e ética que vem assolando o Poder Legislativo e o Executivo, o Poder Judiciário vem sendo reafirmando, mais do que nunca, como guardião da integridade Constituição brasileira e seus princípios, e responsável pela legalidade e pela repressão às imoralidades. Inclusive na operação *car wash*, da qual seguidamente fala a petição inicial das autoras, os juízes de todas as instâncias têm merecido a confiança de que gozam perante a população, mercê de sua independência, equilíbrio, probidade e coragem.

39. Nesse quadro não há motivos para eventual temor daquela Corte norte-americana quanto à exposição das Empresas autoras nem a uma arbitrária negativa de tutela jurisdicional, nem a distorções no julgamento que podem esperar do Poder Judiciário brasileiro.

## MAIOR FACILIDADE PROBATÓRIA

40.    A tramitação da demanda no Brasil facilitará o acesso às fontes de prova. Pensem, por exemplo, na oitiva daqueles que são colocados como artífices das fraudes denunciadas na inicial. Como essas pessoas supostamente se encontram no território brasileiro, a tramitação do processo perante as autoridades norte-americanas forçosamente exigirá que os depoimentos sejam colhidos por intermédio de instrumentos jurisdicionais de cooperação internacional. Refiro-me aqui às denominadas cartas rogatórias, que nada mais são do que uma "solicitação de cooperação jurisdicional internacional enviada por juiz de um país a um órgão judiciário de outro país".[4]

41.    O uso de tal instrumento, contudo, sempre é um fator de dificuldade. Logo de partida gera inequívoca morosidade na produção da prova como resultado da burocracia exigida: faz-se necessária a tradução de peças e documentos para o idioma do país destinatário e sua tramitação depende da eficiência dos órgãos diplomáticos, pois as cartas rogatórias transitam de um país a outro, por regra, pela via diplomática (CPC, art. 41). Mais: o cumprimento das cartas rogatórias dirigidas a este país, nos termos da nossa Constituição, depende de um prévio *exequatur* a ser concedido pelo Superior Tribunal de Justiça (Const., art. 105, inc. I, letra i). Toda essa sequência de atos naturalmente impõe um substancial custo à celeridade, sendo conhecidas situações em que, entre idas e vindas, o correto cumprimento dessas cartas consome anos.

42.    O prejuízo, contudo, não se limita à celeridade. O próprio proveito da prova de alguma forma acaba diminuído, na medida em que o julgador norte-americano não teria a possibilidade de estabelecer contato direto com a testemunha, não podendo, ao menos de

---

[4]. *Cfr.* DINAMARCO, *Instituições de direito processual civil,* II, 6ª ed, São Paulo, Malheiros, 2009, n. 664, esp. p. 531.

imediato, questioná-la sobre eventuais dúvidas e incoerências oriundas da narrativa. O julgador da causa somente poderá interagir com a testemunha por meio de intermediários.

43.    Quero também tranquilizar os ilustres leitores norte-americanos sobre os amplos poderes instrutórios que a legislação e a jurisprudência concedem aos magistrados brasileiros a fim de que consigam alcançar a verdade. O sistema lhes permite tomar a iniciativa de determinar a realização de provas de toda espécie, bem como de chamar testemunhas não indicadas pelas partes ou, em certa medida, de requisitar documentos a entidades privadas ou repartições públicas

44.    O nosso Código de Processo Civil enuncia de forma incisiva que "ninguém se exime do dever de colaborar com o Poder Judiciário para o descobrimento da verdade" (CPC, art. 378), sendo imperioso "informar ao juiz os fatos e as circunstâncias de que tenha conhecimento" (art. 380, inc. I). Coerentemente com essas diretrizes, o juiz brasileiro pode impor coercitivamente o comparecimento de testemunhas, determinando que aquela que se ausentar seja conduzida por oficial de justiça e, se necessário, com o auxílio da força pública. O não-comparecimento poderá caracterizar, inclusive, *crime de desobediência*, como tal definido no Código Penal (art. 330).

45.    Merece registro também o poder do juiz brasileiro de determinar a *exibição de documentos ou coisas* que estejam em poder da outra parte (CPC, art. 396) ou de terceiro (CPC, arts. 401 c/c 403), sendo esse mais um eficaz instrumento de que dispõe o Poder Judiciário para garantir que o processo seja sempre um instrumento de justiça.

### MAIOR VIVÊNCIA DOS PROBLEMAS PELO JUIZ BRASILEIRO

46.    Tão relevante quanto essas conveniências probatórias é a inserção dos juízes brasileiros no contexto social e político em que os fatos se deram. É natural que sua sensibilidade a esse contexto e às conotações éticas e econômicas que o caracterizam esteja

muito mais aguçada que a do juiz norte-americano, ao qual tais notícias poderão chegar mediante a prova produzida no processo, mas em relação às quais não tem qualquer vivência pessoal. A integração do juiz nesse contexto é algo de imensa importância para a formação dos juízos de valor com fundamento nos quais haverá de decidir.

47.    Mais: o núcleo dos fatos reclamados pelas autoras já está sendo intensamente investigado pelas autoridades brasileiras, as quais vêm demonstrando empenho em sua apuração. Muitos dos indivíduos envolvidos, inclusive, firmaram acordos de colaboração com as autoridades brasileiras que conduzem as investigações, conforme amplamente divulgado pela mídia. Em razão de tudo isso, não há dúvida de que têm acesso a uma gama de informações e elementos muito maior do que se pode imaginar que estará à disposição das autoridades norte-americanas.

### A LEI DE DIREITO MATERIAL
### LEI DE REGÊNCIA

48.    Quero aqui também tranquilizar o julgador norte-americano de que o direito brasileiro sanciona com veemência a prática de atos fraudulentos, bem como o auxílio, incitação, ou conspiração para seu cometimento A boa-fé objetiva é expressamente adotada como um *standard* de conduta de observância obrigatória.

49.    Daí a minha segurança em afirmar (a) que o direito brasileiro externa absoluto repúdio a atitudes fraudulentas e manobras ardilosas em geral e, consequentemente, (b) que aquele que prática qualquer tipo de fraude comete ato ilícito (CC, art. 186), do qual decorre a obrigação de indenizar os prejuízos causados (CC, art. 927).

50.    A partir disso, não posso deixar de concluir pela viabilidade em abstrato de se deduzir, perante o Poder Judiciário brasileiro, pretensão indenizatória amparada nas *causes of action* expostas na inicial que me foi apresentada: (a) *fraud* (b) *aiding and abetting fraud* e (c) *civil conspiracy*.

Eu declaro, sob pena de perjúrio pelas leis dos Estados Unidos da América,
que o acima exposto é verdadeiro e correto. Executado em 12 de agosto de 2016.

Cândido Rangel Dinamarco