**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
**EIG ENERGY FUND XIV, L.P., et al.,**          )
                                                          )
     **Plaintiffs,**                                )
                                                          )
          **v.**                                        )        **Case No. 16-cv-00333 (APM)**
                                                          )
**PETRÓLEO BRASILEIRO S.A., et al.,**          )
                                                          )
     **Defendants.**                              )
_____ )

## MEMORANDUM OPINION

### I.  INTRODUCTION

This case arises out of the largest modern political scandal in the history of Brazil.  In 2014, Brazilian investigators discovered that Defendant Petróleo Brasileiro S.A. ("Petrobras"), a Brazilian state-owned oil company, was at the center of a complex web of political and corporate corruption.  The investigation, now popularly known as "Operation Car Wash," revealed that Petrobras had a long-standing practice of soliciting bribes in exchange for awarding construction and service contracts.  In addition to enriching its executives, Petrobras also funneled portions of those payments to officials in Brazil's majority political party—the Workers Party—presumably to curry favor with those officials.  These revelations sent shockwaves through Brazil and led to the prosecution and incarceration of several high-ranking Petrobras executives and government officials.  The investigation into the full scope of the scandal continues to date.

Plaintiffs are eight related U.S.-based and Cayman Islands-based investment funds, plus their investment adviser, that equity financed one of the entities entangled in the corruption scheme:  Sete Brasil Participações ("Sete").  Petrobras established Sete to serve as a financing

vehicle to fund the construction of a large fleet of drillships that Petrobras planned to use in developing large, newly discovered oil reserves located off the coast of Brazil.  To that end, Petrobras installed three of its former officials—João Carlos de Medeiros Ferraz, Pedro José Barusco Filho, and Eduardo Costa Vaz Musa—as Sete executive officers.  Through those officials, Sete then solicited bribes from various shipyards—including Defendants Odebrecht S.A., Odebrecht Participações e Engenharia S.A., Keppel Corporation Ltd., Keppel Offshore & Marine Ltd., Sembcorp Industries Ltd., Sembcorp Marine Ltd., and Jurong (collectively, the "Shipyard Defendants")—in exchange for drillship construction contracts.  Those bribe payments were split amongst Ferraz, Barusco, and Musa; current Petrobras executives; and Workers Party officials.

Sete collapsed soon after investigators uncovered the bribe scheme.  Sete depended on capital raised primarily through debt financing from government-backed lending institutions to pay the costs of building the drillships.  After the scandal broke, however, those lenders withdrew their financing, causing Sete to default on the drillship contracts.  As a result, Sete was forced into bankruptcy, where it remains today.

Plaintiffs, who lost the hundreds of millions of dollars they invested in Sete, filed this lawsuit against Petrobras and the Shipyard Defendants.  In their Amended Complaint, Plaintiffs advance three claims:  (1) common law fraud, against Petrobras, premised on Petrobras fraudulently inducing Plaintiffs to invest in Sete; (2) aiding and abetting, against Petrobras, for providing substantial assistance to Sete in fraudulently inducing Plaintiffs to invest in Sete; and (3) civil conspiracy, against all Defendants, premised on the theory that Defendants conspired to conceal the existence of the Sete bribe scheme in an effort to fraudulently induce Plaintiffs, and other investors, to invest in Sete.  Plaintiffs point to several allegedly fraudulent representations and material omissions that Petrobras and Sete made in pursuit of Plaintiffs' investment to support

their claims.   As a result of those misrepresentations, Plaintiffs allege that both Petrobras, individually, and all Defendants, as co-conspirators, are liable for Plaintiffs' investment losses.

This matter is before the court on Motions to Dismiss.   Petrobras and the Shipyard Defendants each filed separate Motions.   Read together, Defendants seek dismissal under (1) Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction, because (a) Plaintiffs do not have Article III standing and (b) Petrobras is immune from suit under the Foreign Sovereign Immunities Act; (2) Rule 12(b)(6), for failing to adequately state their claims; and (3) Rule 12(b)(2), for lack of personal jurisdiction over the Shipyard Defendants. Alternatively, certain Defendants, most prominently Petrobras, urge the court to dismiss this matter under the doctrine of forum non conveniens.

The court rules as follows.   First, all Plaintiffs other than EIG Management Company, LLC—the Funds' investment manager—have standing to assert claims against Petrobras.   Second, the court will not dismiss this matter on forum non conveniens grounds because Petrobras and other movants have not met their burden to show that this court is an inconvenient forum in which to address Plaintiffs' claims.   Third, the court has jurisdiction over Petrobras under the "commercial activity exception" to the Foreign Sovereign Immunities Act.   Fourth, Plaintiffs have alleged plausible claims against Petrobras, under District of Columbia law, for fraud and aiding and abetting fraud.   Fifth, this court lacks personal jurisdiction over the Shipyard Defendants, both under the District of Columbia long-arm statute and the Due Process Clause of the United States Constitution.   And, sixth, Plaintiffs failed to plead a plausible claim of conspiracy against any Defendant.

Accordingly, for the reasons discussed in greater detail below, the court grants in part and denies in part Defendant Petrobras' Motion. The court grants the Shipyard Defendants' Motions and will dismiss them from this case.

## II. BACKGROUND

### A. Factual Background

#### 1. The Creation of Sete Brasil

Defendant Petróleo Brasileiro S.A. ("Petrobras") is a Brazilian state-owned energy company. Am. Compl., ECF No. 11 [hereinafter Am. Compl.], ¶¶ 1, 19. In or around 2006, Petrobras publicly announced the discovery of significant new oil reserves off the coast of Brazil, containing an estimated 50 billion barrels of oil (the "Pre-Salt Reserves"). *Id.* ¶ 31. In 2010, Petrobras endeavored to construct a fleet of 28 deep-water drillships to extract the oil in the Pre-Salt Reserves. *Id.* ¶¶ 3, 32–33. In light of the high cost of constructing that fleet—approximately $20 billion, in total—Petrobras formed an independent entity, Sete Brasil Participações ("Sete"), to finance the project. *Id.* ¶¶ 32–35. This financing plan was devised by two senior Petrobras employees—João Carlos de Medeiros Ferraz ("Ferraz") and Pedro José Barusco Filho ("Barusco")—and allowed Petrobras to shift the large capital expenditure required to build the drillships off its balance sheet and onto Sete's balance sheet. *Id.* ¶¶ 31–32. Petrobras subsequently "installed" Ferraz as Sete's Chief Executive Officer; Barusco as its Chief Operating Officer; and a third Petrobras executive, Eduardo Costa Vaz Musa, as its Engineering Director. *Id.* ¶ 35.

Petrobras and Sete raised the capital required to fund Sete's operations through both debt and equity financing sources. *Id.* ¶¶ 3–4. Sete's primary source of capital came from bank credit lines, including from the Brazilian state-owned development bank, Banco Nacional de Desenvolvimento Econômico e Social. *Id.* ¶ 34. In addition, the companies sought out equity

investors in the United States and elsewhere.  *Id.* ¶ 36.  Once it secured that capital, Sete entered into contracts with several Brazil-based shipyards, including the Shipyard Defendants and their subsidiaries, to build the drillship fleet.  Sete planned to lease those ships to Petrobras for use in developing the Pre-Salt Reserves.  *Id.* ¶¶ 2–3.  Sete anticipated that the lease proceeds would cover its operating costs, repay its loans, and provide a return to its investors.  *Id.* ¶¶ 3, 33, 60.

### 2.   *Plaintiffs' Investment in Sete*

Plaintiffs are eight related energy investment funds (the "Funds") and their investment manager, EIG Management Company, LLC ("EIG Management"), through which the Funds invested in Sete (collectively, "Plaintiffs").  *Id.* ¶¶ 1, 10–18.  Six of the Funds are limited partnerships organized under the laws of the State of Delaware and two are limited partnerships organized under the laws of the Cayman Islands.  *Id.* ¶¶ 10–17.  EIG Management is incorporated in Delaware, with its principal place of business in Washington, D.C.  *Id.* ¶ 18.

Beginning in 2010, Petrobras and Sete provided various promotional materials to EIG Management, including in Washington, D.C., in an effort to solicit the Funds' investment.  *Id.* ¶¶ 36–44, 47.  In January 2010, Petrobras sent EIG Management—the Amended Complaint does not specific precisely to which EIG Management office[1]—a "Confidential Informational Memorandum" (the "Petrobras Memorandum") describing the strategic details and investment outlook of the Sete project.  *Id.* ¶ 36.  The Petrobras Memorandum included specific disclosures regarding several project-related risk factors—e.g., cost overruns, engineering defects, and environmental concerns—as well as favorable financial projections associated with investing in Sete.  *Id.* ¶ 37.  It also contained representations that Sete would enter into shipbuilding contracts that complied with Brazilian law.  *Id.* ¶ 38.

---

[1] EIG Management has offices throughout the world, including in Rio de Janeiro, Brazil.  *See Our Locations,* EIG PARTNERS, https://www.eigpartners.com/locations (last visited March 30, 2017).

In September 2010, EIG Management received, in Washington, D.C., a multi-page presentation prepared by Petrobras (the "Petrobras Drilling Presentation"), which provided further detail concerning how Petrobras planned to finance and construct the drillship fleet. *Id.* ¶¶ 40–43. The Petrobras Drilling Presentation contained similar risk disclosures as the Petrobras Memorandum and also specifically cautioned U.S. investors, among other things, that the technical terminology used therein, such as oil and gas reserves, did not meet the definitional requirements governing similar filings made with the Securities and Exchange Commission. *Id.* ¶ 40. Then, in October 2010, EIG Management received, in Washington, D.C., another document prepared and circulated by Petrobras entitled the "Pre-Salt Oil Rigs Project," which largely mirrored the disclosures and representations contained in the Petrobras Memorandum and Petrobras Drilling Presentation. *Id.* ¶ 44.[2]

In addition to circulating these solicitation materials, Plaintiffs allege that Ferraz regularly communicated with EIG Management employees, both in person and via e-mail, to solicit the Funds' investment. *Id.* ¶¶ 45–46, 48–53. These communications took place both while Ferraz worked for Petrobras and after he assumed his position at Sete. For instance, in both October 2010 and March 2011, EIG Management representatives met with Ferraz, then an employee of Petrobras, at EIG Management's office in Rio de Janeiro to discuss the Funds' potential investment in Sete. *Id.* ¶¶ 45–46. EIG Management representatives again met with Ferraz in September 2013, this time in Washington, D.C., after he had officially joined Sete. *Id.* As part of that trip, Ferraz attended EIG Management's investor conference, where he informed the Funds' investors that Sete expected to earn nearly $90 billion in revenue over 20 years from its charter contracts with

---

[2] EIG Management also received, in Washington, D.C., a memorandum in September 2011, after Sete's formation, from Lakeshore Financial Partners Participações Ltda. ("Lakeshore Partners"), which contained the same representations as the Petrobras Memorandum. Am. Compl. ¶ 47. Plaintiffs allege that Lakeshore Partners was likely acting on behalf of "Sete and/or Petrobras" at that time. *Id.*

Petrobras and that it projected an annual EBITDA of $4.6 billion.[3]  *Id*. ¶ 53.  Throughout this period, Ferraz also was in regular e-mail contact with EIG Management employees, touting the rapid progress on fleet construction, the substantial international investment interest in Sete, and its favorable financial projections.  *Id*. ¶¶ 48–50.

No one at Petrobras or Sete, however, ever disclosed to EIG Management that Petrobras had formed Sete, at least in part, to further a long-standing bribe scheme.  Years before Sete's formation, Petrobras executives, including Barusco, began extracting bribes and kickbacks from various contractors, including the Shipyard Defendants or their subsidiaries, in exchange for Petrobras contracts.  *Id.* ¶¶ 8, 58–59.  Those contractors would pay kickbacks directly to Petrobras executives, who kept some portion for themselves and disbursed the rest to various Workers Party officials.  *Id.* ¶¶ 5, 58–59.  This practice would continue at Sete.  *Id.* ¶¶ 8, 57–58.  Over time, the bribe scheme enriched Petrobras executives to the tune of nearly $100 million dollars.  *Id.* ¶¶ 8, 56.

The Funds ultimately invested $221,133,393 in Sete, but did so indirectly.  *Id*. ¶ 54. Plaintiffs established two Luxembourg-based companies—EIG Sete Parent SÀRL and its subsidiary, EIG Sete Holdings SÀRL ("EIG Luxembourg")—specifically for the purpose of making their investment.  The Funds first transferred capital to EIG Luxembourg, which, in turn, invested those funds into a Brazilian holding company, FIP Sondas.  *See* Def. Petrobras' Mot. to Dismiss, ECF No. 58, Mem. in Supp., ECF No. 58-1 [hereinafter Petrobras Mot.], Ex. 4, ECF No. 58-7 [hereinafter Investment Agreement], §§ 3.4, 4.3.  FIP Sondas, which owned 95 percent of Sete's shares—Petrobras directly owned the remaining five percent—then invested the Funds' money into Sete pursuant to an Investment Agreement signed by EIG Luxembourg, FIP Sondas,

---

[3] EBITDA is a common accounting term used to measure a company's net income plus interest, taxes, depreciation and amortization.

and others.  *Id.*  The Investment Agreement contains both a choice-of-law clause, designating Brazilian law as the law governing interpretation of the Agreement, and a forum selection clause, specifying that disputes arising from the Investment Agreement be settled through arbitration in Brazil or, if arbitration is unavailable under Brazilian law, in a Brazilian court.  *Id.* §§ 13.9, 13.12, 13.12.4, 13.12.5, 13.12.12.

### 3.    *Criminal Investigation of Petrobras and Sete*

In or about 2014, Brazilian investigators revealed Operation Car Wash to the public.  Am. Compl. ¶¶ 55–60.  In the wake of that revelation, Brazilian authorities convicted or charged several Petrobras executives—including Renato Duque and Roberto Gonçalves—and Sete officials— including Ferraz, Barusco, and Musa—for their involvement in the bribe scheme.  *Id.* ¶ 64. Barusco, Ferraz, and Musa entered into plea agreements that required them to cooperate in the ongoing investigation.  *Id.* ¶ 56.  As part of his plea agreement, Barusco agreed to testify at a public hearing, where he explained that he and Ferraz had established Sete in an effort to expand the pre- existing bribe scheme at Petrobras.  *Id.* ¶¶ 57–58 (quoting Barusco's testimony that "[t]he issue of [Sete], about the establishment of bribe amounts, was a continuity of what happened in Petrobras"). According to Barusco, the discovery of the Pre-Salt Reserves provided Petrobras the opportunity not only to create Sete, but also to have a number of shipyards pay bribes in exchange for shipbuilding contracts.  *Id.* ¶¶ 57–59.  Barusco admitted that shipyards, including those owned or controlled by the Shipyard Defendants, agreed to pay kickbacks of approximately one percent of the value of the contracts to Petrobras executives and government officials in exchange for securing the contracts.  *Id.* ¶¶ 8, 57–58, 62.

To date, nearly 200 corporate executives, Workers Party officials, and others have been charged or convicted in connection with the Brazilian investigation, including several alleged

agents of the Shipyard Defendants. *Id.* ¶¶ 6, 64–67.  Additionally, according to Plaintiffs, Brazilian officials continue to investigate the Shipyard Defendants' participation in the bribe scheme. *Id.* ¶ 67.

>    *4.   Sete's Bankruptcy*

The public revelation of the corruption scheme led to Sete's ruin.  The company's lenders quickly pulled their credit lines, blocking Sete's access to capital and leaving it unable to secure replacement debt or equity financing.  Lacking access to capital, Sete defaulted on its shipbuilding contracts and, as a result, Petrobras canceled its charter agreements with Sete. *Id.* ¶ 68.  Subsumed by debt, Sete filed for bankruptcy in April 2016. *Id.* ¶¶ 68–69.  According to Plaintiffs, Sete's bankruptcy rendered the Funds' investment worthless. *Id.* ¶ 70.

### B.    Procedural Background

Plaintiffs filed a three-count Amended Complaint.  Count One alleges that Petrobras defrauded Plaintiffs by making materially false and misleading statements and material omissions with the purpose of inducing the Funds to invest in Sete.  Plaintiffs specifically assert that both the materials provided by Petrobras and statements made by its agents failed to disclose the ongoing bribe scheme and its associated risks.  Plaintiffs further allege that by failing to disclose those risks, Petrobras fraudulently induced the Funds to invest in Sete and, thus, caused the Funds' investment losses. *Id.* ¶¶ 72–83.

Count Two alleges that Petrobras aided and abetted Sete in fraudulently inducing Plaintiffs to invest in Sete.  Plaintiffs contend that Petrobras created and staffed Sete for the purpose of perpetrating and expanding the existing bribe scheme.  As a result, Plaintiffs allege, Petrobras provided substantial assistance to Sete in making materially false and misleading written and oral statements designed to induce the Funds' investment.  Plaintiffs further assert that, for the same

reasons as in Count One, Petrobras' actions were the proximate cause of the Funds' investment losses. *Id.* ¶¶ 84–97.

Lastly, Count Three alleges that all Defendants engaged in a civil conspiracy to defraud Plaintiffs into investing in Sete. Specifically, Plaintiffs allege that the Shipyard Defendants' payment and concealment of bribes to Sete were integral elements of the aforementioned scheme to defraud the Funds. Plaintiffs assert that Defendants, as co-conspirators, are jointly and severally liable for Plaintiffs' injuries. *Id.* ¶¶ 98–111.

## III.   LEGAL STANDARD

Defendants move to dismiss on three grounds.[4] First, under Rule 12(b)(1) of the Federal Rules of Civil Procedure, they contend that the court is without subject matter jurisdiction to hear Plaintiffs' claims because (1) Plaintiffs lack Article III standing and (2) Petrobras is immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq. See* Petobras Mot. at 19–28; Def. Odebrecht's Mot. to Dismiss, ECF No. 56, Mem. in Supp., ECF No. 56-1 [hereinafter Odebrecht Mot.], at 14. Additionally, certain Defendants have moved to dismiss under the doctrine of forum non conveniens, asserting that Brazil is the better forum in which to resolve the parties' disputes. Petrobras Mot. at 9–19; Odebrect Mot. at 22–27; Defs. Sembcorp Marine & Jurong's Mot. to Dismiss, ECF No. 51, Mem. in Supp., ECF No. 51-1 [hereinafter Jurong Mot.], at 8–13.

Second, under Rule 12(b)(6), Defendants argue that Plaintiffs have failed to state plausible claims of fraud, aiding and abetting, and conspiracy to defraud, upon which relief can be granted. *See* Petrobras Mot. at 28–45; Odebrect Mot. at 27–30; Jurong Mot. at 13–16; Def. Keppel's Mot.

---

[4] For ease of reference the court refers to the arguments advanced as those by "Defendants" collectively, even though some Shipyard Defendants have not joined in all of the grounds for dismissal asserted by the lead defendant, Petrobras.

to Dismiss, ECF No. 54 [hereinafter Keppel Mot.], at 18–31; Def. Sembcorp Industries' Mot. to Dismiss, ECF No. 55 [hereinafter Sembcorp Mot.], at 9–14.

Finally, under Rule 12(b)(2), the Shipyard Defendants argue that the court lacks personal jurisdiction over them under both the District of Columbia long-arm statute, D.C. Code § 13-423(a), and the Due Process Clause. *See* Odebrect Mot. at 14–22; Keppel Mot. at 8–18; Sembcorp Mot. at 2–8; Jurong Mot. at 5–8.

### A.      Dismissal for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)

When deciding a motion to dismiss under Rule 12(b)(1), although a court has discretion to consider materials outside the pleadings, it still must accept all well-pleaded factual allegations in the complaint as true. *Jerome Stevens Pharm., Inc. v. Food & Drug Admin*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005). The plaintiff bears the burden of invoking the court's subject matter jurisdiction. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

When ruling on a Rule 12(b)(1) motion, in which the defendant challenges the plaintiff's standing to assert a claim, a federal court must presume that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)). The burden of establishing the elements of standing "rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A plaintiff must establish standing "for each claim" and "for each form of relief sought," *DaimlerChrysler*, 547 U.S. at 352 (internal quotation marks omitted), "with the manner and degree of evidence required at the successive stages of litigation," *Lujan*, 504 U.S. at 561.

## B.      Dismissal for Failure to State a Claim Under Rule 12(b)(6)

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint.

*See Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 129 (D.D.C. 2009).

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to "state a claim to relief that is
> plausible on its face."  A claim has facial plausibility when the
> plaintiff pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for the misconduct
> alleged.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 556 (2007)).

When assessing a motion to dismiss under Rule 12(b)(6), the court must accept the

plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences from those

allegations in the plaintiff's favor.  *Id.*; *Arpaio*, 797 F.3d at 19.  The court is not required, however,

to assume the truth of legal conclusions or accept inferences that are not supported by the facts set

out in the complaint.  *Iqbal*, 556 U.S. at 678; *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728,

732 (D.C. Cir. 2007).  "Threadbare recitals of the elements of the cause of action, supported by

mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  If a complaint lacks sufficient

facts "to state a claim that is plausible on its face," then the court must dismiss it.  *Id.* (quoting

*Twombly*, 550 U.S. at 570); *see also Arpaio*, 797 F.3d at 19.

## C.      Dismissal for Lack of Personal Jurisdiction Under Rule 12(b)(2)

A motion to dismiss under Rule 12(b)(2) challenges whether a federal court can exercise

its jurisdiction over a particular defendant.  The plaintiff bears the burden of establishing a prima

facie case of personal jurisdiction by coming forward with specific and pertinent facts that connect

the defendant with the forum.  *Reuber v. United States*, 750 F.2d 1039, 1052 (D.C. Cir. 1984).

Unlike a Rule 12(b)(6) or Rule 12(b)(1) motion to dismiss, however, the court need not treat all

the plaintiff's allegations as true when making a personal jurisdiction determination.  The court may, instead, "receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts."  5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1351 (1990); *accord Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 77 (D.D.C. 2004).    However, the court must resolve any factual discrepancies with regard to establishing personal jurisdiction in favor of the plaintiff.  *See Crane v. New York Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).

## IV.    DISCUSSION

### A.    Article III Standing

The court begins its analysis, as it must, with whether Plaintiffs have standing to bring suit. *See, e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." (internal quotation marks omitted)).  That inquiry, as will be seen, also informs the court's analysis of several other asserted grounds for dismissal.

As a general matter, a plaintiff has standing when she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. ___, ___, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan,* 504 U.S. at 560 (footnote, citations, and internal quotation marks omitted).  The plaintiff must demonstrate that she meets each of these requirements. *Id.* at 561.

Plaintiffs advance one theory to establish the Funds' standing and another to establish EIG Management's standing.   As to the Funds' standing, Plaintiffs allege that the Funds suffered an injury-in-fact when they were induced to invest in Sete and that such injury is directly traceable to Petrobras and Sete's fraudulent misrepresentations to EIG Management.   Pls.' Opp'n to Defs.' Motions to Dismiss, ECF No. 62 [hereinafter Pls.' Opp'n], at 11–12; *see also* Oral Hearing Tr. (rough draft) [hereinafter Tr.], at 54.   In contrast, Plaintiffs conceded at oral argument that EIG Management—as distinct from the Funds—did not suffer any legal injury as a result of Defendants' actions.   *See* Tr. at 54.   Plaintiffs, therefore, try a less direct route to establish EIG Management's standing.   After Plaintiffs filed suit in this case, EIG Luxembourg—the Funds' second-tier subsidiary that was established to make the Sete investment through FIP Sondas— assigned its rights to any and all claims arising out of the Sete Investment to EIG Management. *See* Pls.' Opp'n, Ex. B, ECF No. 62-6 [hereinafter "Assignment Agreement"].   Plaintiffs contend that the assignment places EIG Management in the shoes of EIG Luxembourg, which itself has a cognizable injury-in-fact—the losses EIG Luxembourg suffered.   *See* Pls.' Opp'n at 12.

Petrobras counters that the Funds lack standing under what is known as the "shareholder standing rule."   Petrobras Mot. at 26–28.   Under that rule, "[c]laims based on injury to the corporation . . . are derivative in nature and any damages suffered are owed to the corporation," not the shareholder.   *See Labovitz v. Washington Times Corp.*, 172 F.3d 897, 901 (D.C. Cir. 1999). Shareholders "can bring an individual claim [only] if they suffer injuries 'directly or independently of the corporation.'"   *Id.* at 900–01.   Here, Petrobras asserts that the shareholder standing rule bars the Funds' suit because they are mere shareholders of the corporation that suffered the actual injury resulting from Sete's demise, EIG Luxembourg.   Petrobras Mot. at 27.   Petrobras points out that EIG Luxembourg, and not the Funds, recorded the losses arising from the failed investment.   *Id.*;

*id.*, Ex. 5 at 19.  Therefore, Petrobras contends, the Funds, at most, suffered only a derivative injury and thus lack standing to bring the asserted claims.  *See* Petrobras Mot. at 26–27.

As to EIG Management, Petrobras maintains that the September 2016 assignment agreement—signed six months after Plaintiffs filed their original Complaint—does not confer standing on EIG Management because the assignment comes too late.  As standing must exist at the time the suit is filed, *see Davis*, 544 U.S. at 732; *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570 (2004); *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 13 (D.D.C. 2014), EIG Luxembourg's post-suit assignment to EIG Management is ineffective for purposes of this suit.

The court addresses whether either the Funds or EIG Management have standing, in turn.

### 1.    The Funds' Standing

Petrobras' argument that the Funds lack standing boils down to this:  the multi-layer investment structure through which the Funds invested in Sete not only insulated the Funds from any losses incurred, but also protected them from suffering the requisite injury for purposes of Article III standing.  *See* Petrobras Mot. at 26–27.  Although that argument has surface appeal, the court disagrees and finds the Funds have standing.

At its core, the Amended Complaint advances claims premised on the tort of fraudulent inducement.  For that common law tort, the aggrieved party suffers injury at the time it is dispossessed of the money or property sought by the defendant.  *See, e.g.*, *Parr v. Ebrahimian*, 774 F. Supp. 2d 234, 240 (D.D.C. 2011) (finding, in fraud action against seller of condominium who allegedly misrepresented facts about the property, that plaintiff was injured upon her purchase of the condominium); *see also Lichtenstein v. Reassure Am. Life Ins. Co.*, No. 07-1653, 2009 WL 792080, at *9 (E.D.N.Y. Mar. 23, 2009) (measuring injury in the context of fraudulent inducement

from time of purchase of insurance policies); *Womack v. Nissan N. Am., Inc.*, 550 F. Supp. 2d 630, 634 (E.D. Tex. 2007) (finding that plaintiff was injured upon purchasing a vehicle with a computer software device that registered a mileage different from the actual mileage).  As the Restatement (Second) of Torts summarizes:

> The word "injury" . . . denote[s] the fact that there has been an invasion of a *legally protected interest* which, if it were the legal consequence of a tortious act, would entitle the person suffering the invasion to maintain an action of tort. . . .  The meaning of the word "injury," as here defined, differs from the sense in which the word "injury" is often used, to indicate that the invasion of the interest in question has been caused by conduct of such a character as to make it tortious.

RESTATEMENT (SECOND) OF TORTS § 7 cmt. a (AM. LAW. INST. 1965) (emphasis added).  Here, the Funds' "legally protected interest" was their property right in the millions of dollars they committed as an investment in Sete, as well as their intangible right to control how they spent that money.  *Cf. United States v. Akinyoyenu*, 201 F. Supp. 3d 82, 86 (D.D.C. 2016) (citing 18 U.S.C. § 1341, collecting cases, and explaining that, for purposes of the federal mail and wire fraud statutes, "money or property" includes the intangible right to control how to use one's property).  Plaintiffs have alleged that Petrobras and Sete invaded those protected interests by directly making misrepresentations to them that induced the Funds' investment, thus causing the Funds' injury.  Those allegations are sufficient to establish a cognizable injury for purposes of Article III standing.

This conclusion finds support in case law concerning fraud claims brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j.  In that context, it is well established that a plaintiff suffers legal injury at the moment she makes her investment, not when she suffers actual losses.  *See Solano v. Delmed, Inc.*, 759 F. Supp. 847, 854 (D.D.C. 1991) ("In a securities fraud case, the injury occurs at the time the investor enters into a transaction relying on material misrepresentations[.]"); *see also In re Merrill Lynch Ltd. P'ships Lit.*, 154 F.3d 56, 59 (2d Cir.

1998); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987); *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F. Supp. 2d 444, 458–59 (S.D.N.Y. 2001) (collecting cases).  Petrobras argues that these S.E.C. Rule 10b-5 fraud cases, 17 C.F.R. § 250.10b-5, are entirely inapposite, or at the very least unhelpful, because securities fraud claims are governed by statutory standing requirements not at issue here.  Def. Petrobras' Reply in Supp. of Mot. to Dismiss, ECF No. 67 [hereinafter Petrobras Reply], at 5.  But Petrobras offers no authority to support that assertion. If anything, because Article III standing is a constitutional minimum, standing to raise a Rule 10b-5 securities fraud claim is more restrictive because it requires a plaintiff to have met *both* constitutional and statutory standing requirements to advance such a claim.  *Cf. Zavolta v. Lord, Abbett & Co. LLC*, No. 08-4546, 2010 WL 686546, at *4 (D.N.J. Feb. 24, 2010) (finding that "it is implicit in any" holding that statutory standing exists "that Article III standing must also exist"). Thus, the court sees no reason for differentiating between when an injury arises for common law fraud and for Rule 10b-5 securities fraud claims.

Petrobras' insistence that EIG Luxembourg, rather than the Funds, incurred the injury at hand conflates two related, but distinct, tort concepts:  injury and harm.  The Restatement explains the difference as follows:

> [Injury] differs from the word "harm" in this: "harm" implies the existence of loss or detriment in fact, which may not necessarily be the invasion of a legally protected interest. The most usual form of injury is the infliction of some harm; but there may be an injury although no harm is done. [Injury] denote[s] the type of result which, if the act which causes it is tortious, is sufficient to sustain an action even though there is no harm for which compensatory damages can be given.

RESTATEMENT (SECOND) OF TORTS § 7 cmt. a (AM. LAW. INST. 1965).  Applying the concepts of "injury" and "harm" here, it is clear that the Funds suffered a legally cognizable *injury* when Petrobras and Sete fraudulently induced them to invest in the Petrobras-Sete project, whereas EIG

Luxembourg suffered the *harm flowing from that injury* most directly because it is the entity that wrote down the investment losses.  Ultimately, for purposes of standing, it does not matter that the Funds decided to make their investment through EIG Luxembourg.  What matters is that they suffered injury for purposes of Article III when Petrobras and Sete fraudulently induced them to part with their capital.  *Cf. Abbey v. 3F Therapeutics, Inc.*, No. 06-409, 2009 WL 4333819, at *7–8 (S.D.N.Y. Dec. 2, 2009) (concluding that the plaintiff had standing to assert securities fraud claim even though it chose to make its investment through a pass-through entity); *Walther v. Maricopa Int'l Inv. Corp.*, No. 97-4816, 1999 WL 64280, at *2 (S.D.N.Y. Feb. 9, 1999) (same).

Admittedly, this might be a different case if EIG Luxembourg was a pre-existing, fully formed, independent entity.  On such facts, the Funds' claims may very well be barred under the shareholder standing rule.  Here, though, Plaintiffs' sole purpose in establishing EIG Luxembourg was to effectuate their investment in Sete, *cf. Grubb v. Fed. Deposit Ins. Corp.*, 868 F.2d 1151, 1162 (10th Cir. 1989), and the Funds' injury arose at the time they were induced to make that investment.

Having concluded that the Funds suffered a cognizable injury-in-fact, the remaining elements of Article III standing—causation and redressability—are easily satisfied.  Plaintiffs allege that the Funds would not have invested in Sete absent Petrobras' fraudulent misrepresentations, thereby satisfying the causation element of Article III standing.  *See* Am. Compl. ¶¶ 76, 81.  Additionally, a favorable judgment from the court and an award of money damages would redress the Funds' injury.  Accordingly, the court concludes the Funds have standing to bring suit.

2.      *EIG Management's Standing*

The court reaches a different conclusion, however, as to EIG Management.   EIG Management admits that it lacked standing at the start of this case.  Tr. at 54; *see W.R. Huff Asset Mgm't Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 108–10 (2d Cir. 2008) (holding that investment manager lacked standing because it did not have legal title to, or ownership of, its clients' claims and was not injured by investor losses).   Instead, Plaintiffs maintain that EIG Management acquired standing through EIG Luxembourg's assignment of claims after this suit commenced.  It is well settled, however, that a plaintiff must have standing at the start of the suit. *See Davis*, 554 U.S. at 732.    That black-letter rule, therefore, renders ineffectual EIG Luxembourg's post-suit assignment.

To escape this straightforward analysis, Plaintiffs argue that the court should allow EIG Management to proceed because Petrobras "cannot possibly show any prejudice from the assignment at this early stage of the litigation."  Pls.' Opp'n at 12–13 n.5.  That contention is a non-starter.  The court lacks constitutional authority to act absent a showing that the party bringing the action has standing to do so.  *See Lujan*, 504 U.S. at 583.  Article III standing cannot be acquired by demonstrating an absence of prejudice to the defendant.    Thus, EIG Management lacks standing, and its claims are dismissed for lack of subject matter jurisdiction.

**B.      Foreign Sovereign Immunities Act**

Petrobras also challenges the court's jurisdiction on another ground:  the Foreign Sovereign Immunities Act ("FSIA").  *See* Petrobras Mot. at 19–26.  Under the FSIA, foreign states, their "political subdivisions," and their "agencies or instrumentalities" enjoy immunity from suit, *see* 28 U.S.C. §§ 1603(a), 1604, unless one of the statute's enumerated exceptions applies, *id.* § 1610; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  These statutory exceptions provide the only

bases for United States courts to obtain both subject matter and personal jurisdiction over a qualifying foreign entity. 28 U.S.C. § 1330(a); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

The parties here do not dispute that Petrobras is a qualifying foreign entity under the FSIA, but they do strongly disagree over whether the court could nonetheless assert jurisdiction under an applicable statutory exception. Plaintiffs contend that the court can exercise its personal jurisdiction over Petrobras under the "commercial activity exception" to the FSIA. Pls.' Opp'n at 13–25. That exception abrogates sovereign immunity in any case in which:

> the action is based [(1)] upon a commercial activity carried on in the United States by the foreign state; or [(2)] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [(3)] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect on the United States.

28 U.S.C. § 1605(a)(2). Plaintiffs contend all three subsections apply, but they rely primarily on Clause Three—the "direct effect" exception. Pls.' Opp'n at 15–25. That clause is satisfied here if Petrobras' "act[s] outside the territory of the United States in connection with commercial activity . . . cause[d] a direct effect on the United States." 28 U.S.C. § 1605(a)(2). Though the parties agree that this matter is based, at least in part, on Petrobras' commercial activities outside the United States, they are at odds over whether those activities had a "direct effect" on the United States. *See* Pls.' Opp'n at 15–16; Petrobras Mot. 20–23. As the court finds that Clause Three applies in this case, it does not reach whether jurisdiction exists under Clauses One or Two.

A "direct effect" is one that "follows as an immediate consequence of the defendant's . . . activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (alteration in original) (internal quotation mark omitted). Stated another way, it "is one which has no intervening element,

but, rather, flows in a straight line without deviation or interruption." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 817 (D.C. Cir. 2015). Petrobras argues that, even if its investment dealings had some effect on the Funds in the United States, that effect did not flow in a straight line. Rather, "the line starts at Sete Brasil, zigs to FIP Sondas, zags across the Atlantic to EIG Luxembourg, jumps to EIG Sete Parent SÀRL, and then splits in two for another trip across the Atlantic, with one splinter heading to the Cayman Islands . . . and the other to Delaware." Petrobras Mot. at 26.

Petrobras' peripatetic description of the route of the effects, while clever, is ultimately unpersuasive. Again, the injury to the Funds occurred at the time Petrobras successfully induced them to invest in the Petrobras-Sete project. That injury occurred, at least in part, in the United States, where six of the eight Funds are organized. Thus, at least as to those Funds, the effect of Petrobras' fraudulent commercial activities outside the United States was felt "direct[ly]" in the United States—and not indirectly through various other countries and entities.

Nor did intervening events, as Petrobras argues, render "indirect" the domestic effect of its foreign commercial activities. Petrobras Mot. at 26. In particular, at oral argument, Petrobras argued that Sete's alleged fraudulent acts were closest in time to the Funds' decision to invest and, therefore, those acts interrupted the "straight line" necessary to establish a "direct effect." Tr. 92–96. Petrobras is correct that the intervening acts of a third party sometimes can break the direct causal connection required to satisfy Clause Three. *See Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna*, 813 F.3d 98, 114 (2d Cir.), *cert. denied*, 580 U.S. ___, 137 S. Ct. 493 (2016) (mem.). Here, however, Plaintiffs have alleged an uninterrupted straight line between Petrobras' actions and the Funds' injuries in the United States. Plaintiffs allege that Petrobras established Sete, in part, for the purpose of continuing an ongoing bribe scheme that would require a massive

21

influx of capital to perpetuate.  Am. Compl. ¶¶ 1, 3.  Petrobras did not merely establish Sete.  It also "installed its own former employees"—including the architects of Sete and the bribe scheme, Ferraz and Barusco—for the purpose of continuing the corrupt enterprise.  *Id.* ¶¶ 32, 35, 71.  Critically, after leaving Petrobras, Ferraz is alleged to have continued his former employer's practice of making repeated representations about Sete, without ever disclosing that the capital would be used to finance a corruption scheme.  *Id.* ¶¶ 49–54.  Sete's deceptive conduct, occurring only after it grabbed the baton from Petrobras, is not the kind of "independent" third-party action that breaks the causal chain between Petrobras' own misrepresentations and the Funds' injury.  *See Atlantica*, 813 F.3d at 114 (stating that a third-party's intervening acts might break the causal chain "where the defendant's actions affect the third party, who in turn takes some independent action that causes a further effect in the United States").

Viewed in this light, the court agrees with Plaintiffs and finds this case to be analogous to the Second Circuit's decision in *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna*.  There, U.S.-investor plaintiffs alleged that a Panamanian investment company had fraudulently induced them to invest in a Kazakhstani bank holding company.  The Second Circuit held that Clause Three of the commercial activity exception abrogated the Kazakhstani defendants' sovereign immunity because "Plaintiffs have adequately shown that [the Kazak bank holding company] 'contemplated investment by United States persons' and that [the bank holding company's] alleged misrepresentations caused a direct effect in the United States when at least some investors in the [investment] . . . suffered an economic loss in this country as a result of those misrepresentations."  *Id.* at 110.  Notably, in reaching that conclusion, the Second Circuit treated the "direct effect" and legal injury analyses interchangeably under the FSIA for fraudulent inducement claims brought by U.S.-based investor plaintiffs:  "Thus, a determination that a tort's

22

locus is the United States is, in effect, often a determination that the plaintiff has been injured in this country by the defendant's tortious actions—meaning that those actions caused a 'direct effect' (the plaintiff's injury) in this country." *Id.* at 109.

So it is here. Plaintiffs have alleged that Petrobras targeted U.S.-based entities to invest in the Petrobras-Sete project, Am. Compl. ¶¶ 1, 4, and fraudulently induced the U.S.-based Funds to invest in that project by, among other things, failing to disclose the existence of a premeditated bribe scheme in materials used to market the project in the United States, *id.* ¶¶ 41–44. Those allegations are sufficient to establish a "direct effect" and satisfy Clause Three of commercial activity exception. *See Atlantica*, 813 F.3d at 111 ("And the fact that the locus of the fraud was the United States means (at least in circumstances where the securities were also marketed here and . . . the defendant contemplated and acted to encourage investment by United States persons) the direct-effect clause is satisfied."). Petrobras' attempt to distinguish *Atlantica* rests on the same contention the court already has rejected; namely, that Plaintiffs did not suffer injury in the United States, but in Luxembourg. *See* Petrobras Reply at 12 (arguing that *Atlantica*'s "holding has no relevance here because the loss in this case admittedly was suffered outside the United States in Luxembourg"). Accordingly, the court finds that it has jurisdiction to hear this dispute under the FSIA.

### C.     Forum Non Conveniens

Next, Petrobras contends that, even if the court has jurisdiction over this action, it should nonetheless dismiss it under the doctrine of forum non conveniens. Petrobras posits that this dispute should be litigated in Brazil because (1) the Investment Agreement contains a forum selection clause designating Brazil as the chosen forum in which to resolve disputes arising out of

the contract and (2) the public and private interests heavily favor a Brazilian forum.  *See* Petrobras

Mot. at 9–19.  The court concludes otherwise.

"The principle of forum non conveniens is simply that a court may resist imposition upon

its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf

Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947), *superseded by statute on other grounds by statute*,

Jones Act, 46 U.S.C. § 688, *as recognized in Am. Dredging Co. v. Miller*, 510 U.S. 443 (1994).

Although a plaintiff is ordinarily entitled to substantial deference in their chosen forum, "when an

alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would

'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's

convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting

the court's own administrative and legal problems,' the court may, in the exercise of its sound

discretion, dismiss the case." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (alterations

in original).  In deciding whether to dismiss a case on forum non conveniens grounds, the court

must weigh the ordinary deference owed to a plaintiff's chosen forum against a "range of

considerations, [but] most notably the convenience to the parties and the practical difficulties that

can attend the adjudication of a dispute in a certain locality." *Sinochem Int'l Co. Ltd. v. Malaysia

Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (internal quotation mark omitted).

A multi-step inquiry guides the court's forum non conveniens analysis.  First, the court

determines whether an adequate forum exists in the defendant's preferred jurisdiction—in this

case, Brazil.  *See Piper Aircraft Co.*, 454 U.S. at 241.  If it does, then the court must determine the

nature and strength of the deference owed to the plaintiff's choice of forum, including, for example,

whether a forum selection clause applies to the dispute.  *KPMG Fin. Advisory Servs. Ltd. v.

Diligence LLC*, No. 05-2204, 2006 WL 335768 at *1 (D.D.C. Feb. 14, 2006).  The court then

proceeds to "weigh all relevant factors of private and public interest against the presumed validity

of plaintiff's initial choice of forum." *Id.*  "A strong tilt towards a particular forum in the private

interest factors or the public interest factors counsels towards dismissal." *MBI Grp., Inc. v. Credit*

*Foncier du Cameroun* (*MBI Grp. I*), 558 F. Supp. 2d 21, 26–27 (D.D.C. 2008), *aff'd*, *MBI Grp.,*

*Inc. v. Credit Foncier du Cameroun* (*MBI Grp. II*), 616 F.3d 568 (D.C. Cir. 2010).  If an alternative

forum is adequate and available and, upon weighing the public and private interests the court

concludes that the alternative forum is "the strongly preferred location for the litigation," then the

court may choose to dismiss.  *MBI Grp. II*, 616 F.3d at 571.  The defendant bears the burden on

all aspects of a motion to dismiss on forum non conveniens grounds, including the obligation to

establish the adequacy of an alternative forum.  *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668,

677 (D.C. Cir. 1996), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

### 1.    *The Adequacy of the Forum*

The court begins with the threshold question of whether Brazil is an adequate forum to

resolve the parties' dispute.  Generally, an alternative forum is adequate if the defendants are

subject to service of process there and the forum permits "litigation of the subject matter of the

dispute."  *Piper Aircraft Co.*, 454 U.S. at 254 n.22.  A forum is inadequate, however, if the

applicable statute of limitations would bar the case from being heard in that jurisdiction.  *See MBI*

*Grp. I*, 558 F. Supp. 2d at 28 (finding Cameroon an adequate forum because "neither sovereign

immunity nor the applicable statute of limitations . . . would bar plaintiffs' claims before the

courts" there); *see also Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*,

273 F.3d 241, 246 (2d Cir. 2001); *Mercier v. Sheraton Int'l, Inc.,* 935 F.2d 419, 426 n.8 (1st Cir.

1991); *Kontoulas v. A.H. Robins Co.*, 745 F.2d 312, 316 (4th Cir. 1984); *Crimson Semiconductor,*

*Inc. v. Electronum*, 629 F. Supp. 903, 908–09 (S.D.N.Y. 1986).

Plaintiffs contend that Brazil is an inadequate forum for that very reason.  Pls.' Opp'n at 30.  To support their contention, Plaintiffs offer the declaration of a Brazilian law expert, José Rogério Cruz e Tucci, a professor of law and specialist in Brazilian civil procedure at the University of São Paulo School of Law.  Pls.' Opp'n, Ex. 2, ECF No. 62-3 [hereinafter Tucci Decl.].  According to Professor Tucci, "it is not clear" under Brazilian law when, precisely, a claim for fraudulent inducement accrues for purposes of calculating the statute of limitations, i.e., upon either commission of the fraud or discovery of the fraud.  *Id*. ¶ 22.  Professor Tucci, therefore, opines that "there [is] risk that a potential claim brought at this moment in the Brazilian courts on the referred subject could be barred by [the] relevant statute of limitation."  *Id.* ¶ 23.

Petrobras advances two arguments in response, neither of which proves persuasive. Initially, Petrobras contends that "the uncertainty of Plaintiffs' expert [concerning the effect of the statute of limitations in Brazil] cannot be enough to carry the day."  Petrobras Reply at 7.  That contention, however, improperly inverts the parties' respective burdens.  It is the party seeking dismissal on forum non conveniens grounds that bears the "heavy burden" of showing that the statute of limitations in the alternative forum would *not* bar the asserted claims.  *Kontoulas*, 745 F.2d at 316; *see also El-Fadl*, 75 F.3d at 677 (stating that "the defendant must provide more detailed information if the plaintiff provides evidence that controverts the defendant's evidence"); *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 133–34 (D.D.C. 2011).  Accordingly, it is Petrobras that must overcome Professor Tucci's expressed statute of limitations concerns; Plaintiffs need not show definitively that Brazil's statute of limitations would bar their claims.  It is enough that they have raised a statute of limitations concern, thereby putting the burden on Petrobras to provide "more detailed information" supporting the adequacy of a Brazilian forum.  *El-Fadl*, 75 F.3d at 677.

To meet its burden, Petrobras offers a declaration from its own Brazilian law expert, Cândido Rangel Dinamarco, a practicing lawyer with expertise in Brazilian civil procedure. Petrobras Reply, Ex. 1, ECF No. 67-1.  Mr. Dinamarco opines that the statute of limitations would not in fact bar Plaintiffs from bringing this suit in Brazil.  He explains:

> The statute of limitations [under Brazilian law] is a fact that extinguishes rights, and as such, it is in the domain of substantive law.  In the specific terms of our Civil Code:  "when a right is violated, a claim is born to the holder, and it is extinguished by limitation, according the terms that are established in arts. 205 and 206" (Civil Code, art. 189).  Consistently with this provision, our Code of Civil Procedure provides that "there will be a resolution on the merit[s] when the judge" rules on the "incidence of extinction of the right or statute of limitation (Code of Civil Procedure, art. 487, inc. II).  Therefore, if ruling for the incidence of the statute of limitations, the judge will deny the claim, rejecting, in a substantive decision, the intended protection. . . .  As I myself have said in doctrine, "*the sentence that rules for the statute of limitation is [a sentence] on the merits*.  Because it is a fact that extinguishes rights, through its enforcement, the plaintiff no longer has the right that it could have, and therefore its claim is baseless."

*Id*. ¶¶ 22–23.  Petrobras, for its part, interprets Mr. Dinamarco's declaration as stating that, under Brazilian law, the statute of limitations operates as "a matter of substantive, rather than procedural, law and as such it would be evaluated as part of the merits of Plaintiffs' case."  Petrobras Reply at 7.

Even allowing that some of Mr. Dinamarco's declaration might be lost in translation, the court does not understand Mr. Dinamarco's opinion.  The substantive versus procedural law distinction, as it pertains to the statute of limitations, is lost on the court.  If anything, it seems that a statute of limitations in Brazil functions in much the same way as it does under U.S. law:  it extinguishes a stale or an unduly delayed claim.  *See Credit Suisse Securities (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012).  That Brazilian law considers statute of limitations defenses "substantive," as opposed to "procedural," does not ultimately change the practical outcome—a

plaintiff whose claims are time-barred will not receive a decision on the merits of those claims. Regardless, the Dinamarco Declaration draws, at best, an ambiguous distinction that does not satisfy Petrobras' "heavy burden" of demonstrating that Brazil is an adequate forum to resolve Plaintiffs' claims. *See Rundquist*, 798 F. Supp. 2d at 133–34; *MBI Grp. I*, 558 F. Supp. 2d at 28.

Petrobras' failure to satisfy its burden is not, however, fatal. If the court were to find that the public-private balancing weighs in favor of dismissal, the court could dismiss the case contingent upon the satisfaction of certain conditions that would ensure Plaintiffs a forum in Brazil. *See MBI Grp. II*, 616 F.3d at 572 ("A conditional forum non conveniens dismissal protects a plaintiff against the possibility that the foreign forum will not hear his case."). Here, the court could dismiss the case conditioned upon Petrobras' agreement to waive any statute of limitations defense available under Brazilian law and a Brazilian forum's acceptance of the case. *See, e.g.*, *Stromberg v. Marriott Int'l, Inc.*, 256 F. App'x 359, 360 (D.C. Cir. 2007) (finding that the district court did not abuse its discretion in finding Mexico an adequate forum only because "appellees agreed to accept service in Mexico and waived any statute of limitations defenses"); *see also MBI Grp. II*, 616 F.3d at 572 (affirming the district court's conditional dismissal upon defendants submitting to jurisdiction in Cameroon and on the Cameroonian courts' acceptance of the case). Accordingly, the court will proceed with the remaining steps of the forum non conveniens analysis to determine whether a conditional dismissal would be appropriate.

### 2. The Strength of the Presumption in Favor of Plaintiffs' Choice of Forum

Before evaluating the private and public interest factors, the court must address an important threshold question: How much deference, if any, should it afford Plaintiffs' choice of forum? Under the ordinary *Piper Aircraft* balancing test, a plaintiff's choice of forum is entitled to substantial deference. 454 U.S. at 242; *accord MBI Grp. II*, 616 F.3d at 571 ("There is a

'substantial presumption' in favor of a plaintiff's chosen forum."). Petrobras contends that this presumption is eliminated because the parties' dispute is governed by a valid forum selection clause and, even if the clause does not apply, the presumption is weakened because this case involves international commerce.

a.     The Forum Selection Clause

The presence of a valid forum selection clause radically alters the forum non conveniens calculus in two critical ways that are pertinent here.  First, where there exists a valid forum selection clause, "the plaintiff's choice of forum merits no weight." *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. ___, ___, 134 S. Ct. 568, 581 (2013).  Second, a forum selection clause forecloses the court's consideration of the parties' private interests.  *Id.* at 582.  "[A] district court may consider arguments about public interest factors only" and, as a consequence, "forum-selection clauses should control except in unusual cases." *Id.*

According to Petrobras, *Atlantic Marine*'s upending of the traditional forum non conveniens analysis controls here because the Investment Agreement—the agreement setting forth the terms governing the Funds' investment in Sete—contains a forum selection clause.  Petrobras Mot. at 10–12.  That clause reads:

> Any disputes, doubts, conflicts, questions or discrepancies of any nature arising out of or related to this Agreement ("Conflict"), involving any of Shareholders ("Stakeholders") will be resolved by arbitration, to be conducted before and administered by the Arbitration and Mediation Center of the Chamber of Commerce Brazil-Canada ("Chamber").
>
> . . . .
>
> [And for] the conflicts that under Brazilian law cannot be submitted to arbitration, it is hereby elected the Court of the District of Rio de Janeiro, State of Rio de Janeiro, as the only competent [forum], waiving all others, however more specific or privileged be.

Investment Agreement §§ 13.12, 13.21.12.  Petrobras maintains that Plaintiffs' claims here meet the definition of "Conflict" under the agreement and that, as a result, this matter must be dismissed in favor of a Brazilian forum.[5]  Petrobras Mot. at 10; Tr. at 15–18.

Plaintiffs dispute that the forum selection clause applies here.  Pls.' Opp'n 27–29.  To support their position, Plaintiffs again point to Professor Tucci, who asserts that the forum selection clause is "absolutely ineffective" under Brazilian law because "among the defendants and even the plaintiffs there are companies who have not executed the Investment Agreement." Tucci Decl. ¶ 13.  In other words, according to Professor Tucci, under Brazilian law, only signatories to a contract are bound by its forum selection clause.  Consequently, because Plaintiffs are non-signatories to the Investment Agreement, they are not bound by its forum selection clause under Brazilian law.  Professor Tucci also explains that the clause is ineffective under Brazilian law "because the lawsuit . . . is grounded on a tort."  *Id.* ¶ 14.

Petrobras offers no rebuttal to Professor Tucci's opinion.  Instead, it cites District of Columbia law to support its contention that the forum selection clause applies to and binds Plaintiffs.  Specifically, Petrobras relies on the principle that even non-signatories to an agreement are bound by a forum selection clause if their "conduct is closely related to the contractual relationship so that it is foreseeable that they would be bound by such clause."  Petrobras Mot. at 11 (quoting *Song fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53, 60 (D.D.C. 2014)).  Applying that principle, Petrobras posits, Plaintiffs are subject to the forum selection clause because they made

---

[5] The Investment Agreement contains two different definitions of "Conflict"—the one quoted above from the arbitration clause and a second contained in the Appendix to the Agreement.  *See* Investment Agreement app. § 1.1. Because the court concludes that the forum selection clause does not apply to Plaintiffs' suit, the court need not decide which of the two definitions controls.

their investment through, and are thus "closely related" to, EIG Luxembourg, which was a party to the Investment Agreement.  *Id.*

Petrobras' reliance on District of Columbia law is misplaced.  Although the D.C. Circuit has not yet weighed in on this choice-of-law issue, the Second Circuit has held that when courts are "called upon to determine whether a particular forum selection clause is mandatory or permissive, *or whether its scope encompasses the claims or parties involved in a certain suit*, . . . the law contractually selected by the parties" controls.  *Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014) (emphasis added) (citation omitted).  Applying that principle here, Brazilian law governs the applicability of the forum selection clause to Plaintiffs.  *See* Investment Agreement § 13.9 (choice-of-law clause stating that the Investment Agreement shall be "governed by and construed in accordance with the laws of the Federative Republic of Brazil").

The only evidence of how forum selection clauses operate under Brazilian law comes from Plaintiffs' expert, Professor Tucci.  As noted, Professor Tucci opines that, under Brazilian law, the Investment Agreement's forum selection clause would not be enforced against Plaintiffs because they did not sign the Investment Agreement.  Tucci Decl. ¶ 13.  The court has no choice but to accept that conclusion.  Petrobras bears the burden of demonstrating that the forum selection clause applies to the parties' dispute, *see, e.g.*, *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 455 (9th Cir. 2007); *Dean St. Capital Advisors, LLC v. Otoka Energy Corp.*, No. 15-824, 2017 WL 476720, at *3 (S.D.N.Y. Feb. 2, 2017), and it has offered no evidence to contradict Professor Tucci's opinion.  Therefore, applying the only evidence of Brazilian law available on the record, the court finds that the forum selection clause does not bind Plaintiffs and the modifications announced in *Atlantic Marine* are inapplicable.

b.      International Commerce

Although the court concludes that a valid forum selection clause does not fully negate the presumption in favor of Plaintiffs' choice of forum, that presumption nevertheless is diminished because Plaintiffs' decision to invest abroad put them on notice that they might be required to litigate disputes in a foreign forum.  The D.C. Circuit has not squarely addressed this issue, but several other Circuits have held that plaintiffs involved in disputes arising from international commerce receive less choice-of-forum deference than plaintiffs engaging in domestic transactions.  *See DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 795 (5th Cir. 2007); *Intec USA, LLC v Engle*, 467 F.3d 1038, 1040 (7th Cir. 2006); *Guidi v. Interr-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000); *cf. EFCO Corp. v. Aluma Sys. USA, Inc.*, 268 F.3d 601, 603 (8th Cir. 2001) (acknowledging that a plaintiff's involvement in international commerce may discount choice-of-forum deference); *Mizokami Bros. of Ariz., Inc. v. Baychem Corp.*, 556 F.2d 975, 977–8 (9th Cir. 1977) (per curiam) (same); *Founding Church of Scientology of Washington, D.C. v. Verlag*, 536 F.2d 429, 435 (D.C. Cir. 1976) ("The doctrine that a United States citizen does not have an absolute right to use United States courts usually is expressed in the context of a citizen doing business abroad expecting still to use United States courts." (quoting *Thompson v. Palmieri*, 355 F.2d 64, 65 (2d Cir. 1966)), *receded from on other grounds by Moncrief v. Lexington Herald-leader Co.*, 807 F.2d 217 (D.C. Cir. 1986).  As the Ninth Circuit has explained:

> In an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every

> reasonable consideration leads to the conclusion that the site of the
> litigation should be elsewhere.

*Mizokami Bros.*, 556 F.2d at 978.

Plaintiffs are sophisticated investors that chose to invest in Brazil through Luxembourg-based overseas investment vehicles.  Surely, it was reasonably foreseeable to them that, if a dispute arose, its resolution might not take place in a U.S. forum.  Accordingly, while the court finds that Plaintiffs' choice of forum is entitled to some deference, that deference is diminished in light of Plaintiffs' decision to engage in international commerce.  As a result, Petrobras' burden of showing that the public and private interest factors favor dismissal is correspondingly relaxed. *Cf. Sinochem*, 549 U.S. at 430 (holding that a plaintiff's selection of a forum other than its home forum diminishes the presumption in favor of the plaintiff's choice of forum).

### 3.     *The Private/Public Balancing*

The court now turns to balancing the public and private interest factors, starting with the parties' private interests in each forum.

### a.     Private Interest Factors

In evaluating whether private interest factors weigh in favor of plaintiff's chosen forum or the foreign forum, the court considers the following:  "(1) the relative ease of access to sources of proof; (2) the availability of process for compelling unwilling witnesses; (3) the cost for obtaining attendance of willing witnesses; (4) the possibility of inspecting the premises, if appropriate; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Irwin v. World Wildlife Fund, Inc*., 448 F. Supp. 2d 29, 34 (D.D.C. 2006) (citing *Gulf Oil Corp.*, 330 U.S. at 508).

The court finds that the private interest factors, considered together, tip only slightly in favor of resolving this dispute in Brazil.  The parties agree that the key players in the Sete bribery

scandal are located in Brazil and beyond the reach of this court's compulsory process. There is also little dispute that the cost of litigating in the United States is likely higher than in Brazil. Petrobras Mot. at 17–19; Pls.' Opp'n at 40. They strongly disagree, however, as to what those realities mean for this litigation. Plaintiffs assert that there will be little need for foreign evidence because, in their view, "[t]his is a simple case." Pls.' Opp'n at 35. According to Plaintiffs, "[t]here will be no proof problems due to third party witnesses residing in Brazil" because, among other reasons, Plaintiffs can use existing testimony—such as publicly available testimony from Barusco and Ferraz—to establish the existence of the scheme to defraud. They also anticipate limited document discovery from Brazilian sources. *Id.* at 35–36. Moreover, they submit, the higher cost of litigating in this court should be discounted because Petrobras is a multi-national company familiar with litigating in U.S. courts. *Id.* at 40.

Petrobras, on the other hand, maintains that litigating in a U.S. forum would pose a severe burden to them. They argue that they intend to "present a vigorous defense" and that doing so would involve putting into evidence "numerous foreign witnesses and documents that counter Plaintiffs' allegations." Petrobras Reply at 8. Petrobras further asserts that Plaintiffs' attempt to circumvent these issues by relying on publicly available testimony implicates a multitude of evidentiary and related concerns, including costs. In short, Defendants hotly contest Plaintiffs' assertion that this is a "simple case."

The court agrees with Petrobras. Notwithstanding Plaintiffs' expressed disinterest in deposing the key players in the bribe scheme, Petrobras certainly has a right to do so, and those witnesses are all located in Brazil. Petrobras Mot. at 18–19. Litigation in this forum also will make it more challenging to secure documentary evidence from Brazilian sources over which Petrobras does not have control. In fact, the record is unclear as to whether Petrobras even controls

Sete documents, which are undoubtedly relevant to Plaintiffs' claims, complicating the matter even further. Thus, the court finds that Petrobras would face some challenges if forced to litigate in this forum.

Those potential difficulties are mitigated, however, by several facts unique to this case. First, Petrobras presently is a defendant in a major securities fraud class action lawsuit, and related individual actions, in the Southern District of New York concerning the broader corruption scheme uncovered during Operation Car Wash. *See In re Petrobras Sec. Litig.*, No. 14-9662 (S.D.N.Y.). That case has been in active litigation for over two years and, according to Plaintiffs, the parties have conducted substantial fact and expert discovery. *See* Pls.' Opp'n at 33. Petrobras neither disputes that representation nor, importantly, has it identified any forum-specific discovery challenges arising in that litigation. *See* Petrobras Reply at 7–9. Thus, either Petrobras encountered no evidentiary burdens to speak of while litigating in the Southern District of New York litigation or—far more likely—has already confronted and addressed those problems, thus ameliorating any difficulties that might arise from litigating this case in a U.S. court.

Second, the court has strong reason to believe that Petrobras is the subject of ongoing investigations by the U.S. Department of Justice relating to the Operation Car Wash scandal. Recently, Shipyard Defendant Odebrecht entered into a plea agreement to "resolve charges with authorities in the United States, Brazil and Switzerland arising out of their schemes to pay hundreds of millions of dollars in bribes to government officials around the world," including in Brazil. Pls.' Mot. to Suppl. Record, ECF No. 69 [hereinafter Pls.' Mot. to Suppl.], Ex. B, ECF No. 69-3, at 1.[6] An excerpt from the Statement of Facts supporting Odebrecht's plea agreement makes clear Petrobras' involvement in the bribe scheme: "Beginning in or about 2004 and continuing through

---

[6] The court grants Plaintiffs' Motion to Supplement the Record.

at least 2012, Odebrecht agreed to make, and caused to be made, corrupt payments to, and for the benefit of, foreign officials, including Brazilian politicians and Petrobras executives and employees, in order to secure contracts with Petrobras." Pls.' Mot. to Suppl., Ex. A, ECF No. 69-2, ¶ 33. It does not take a huge leap of faith to conclude from Odebrecht's plea agreement that Petrobras—which sells securities on the New York Stock Exchange, *see* Petrobras, Annual Report (Form 20-F) at 33 (Apr. 27, 2016)—also is the subject of investigation by U.S. law enforcement authorities. Petrobras almost certainly has identified, translated, and produced a trove of documents to U.S. authorities relating to the Operation Car Wash scandal. Almost equally certain is that Petrobras has conducted an extensive internal investigation—no doubt with the assistance of a substantial U.S.-based law firm—to determine, among other things, how the bribe scheme operated, who was involved, how much was paid or received in bribes, and which contracts were the subject of bribe demands. The likelihood of an existing parallel criminal investigation in the United States mitigates the seriousness of any challenges Petrobras might face in preparing its defense and accessing evidence in this case.

Third, it appears Petrobras was a party to the Brazilian criminal proceedings against Barusco, which afforded it an opportunity to question him. *See* Pls.' Opp'n at 35; Pls.' Opp'n, Ex. D, ECF No. 62-8, at 2 (listing Petrobras as a plaintiff in the proceedings against Barusco). It is equally possible that Petrobras was a party to other Brazilian criminal proceedings as well. Thus, Petrobras appears already to have had some opportunity to question at least Barusco, and perhaps other key players in the bribery scandal, which further weakens its arguments about the hardship posed by obtaining testimony from witnesses located in Brazil.

Finally, although not unique to this case, Petrobras may be able to secure needed evidence located in Brazil through the letters rogatory process, through which U.S. courts may ask foreign

courts for assistance in obtaining evidence.  *See* Fed. R. Civ. P. 28(b)(1)(B); *Letters rogatory (letter of request)*, BLACK'S LAW DICTIONARY (10th ed. 2014).  Through the FSIA, Congress empowered U.S. courts to exercise jurisdiction over foreign actors in certain cases.  In doing so, Congress surely understood that the foreign actors haled into U.S. courts, not to mention plaintiffs seeking to bring suit in a U.S. court, might face challenges in securing foreign evidence.  The court, therefore, cannot ignore the availability of methods of foreign evidence collection, such as letters rogatory, in weighing the private interest factors.  Although that process is admittedly cumbersome, the fact that Petrobras would prefer to have more direct and efficient means of accessing evidence does not, without more, render litigation of Plaintiffs' claims in this forum unduly burdensome.  *Cf. Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 769 (S.D.N.Y. 2006) (explaining that the availability of letters rogatory is relevant to a court's analysis when deciding whether to dismiss on forum non conveniens grounds).

In sum, litigating in the United States does burden Petrobras.  On balance, however, the court finds that, while Petrobras will face some challenges in accessing evidence in this forum, those difficulties largely are ameliorated by the fact of ongoing litigation and investigations relating to the Operation Car Wash scandal in the United States; Petrobras' previous access to at least one key player in the bribe scheme through the Brazilian criminal proceedings; and the availability of the letters rogatory process to obtain evidence located in Brazil.  Accordingly, the court finds that the private interest factors favor a Brazilian forum, but only slightly.

b.    Public Interest Factors

The court turns now to the public interest factors.  These include:  (1) administrative difficulties caused by foreign litigation congesting local court dockets; (2) local interest in having regional controversies decided at home; (3) avoiding imposing jury duty on residents of a

jurisdiction having little relation to the case; and (4) avoiding unnecessary problems in choice of law and the application of foreign law.  *See Gulf Oil Corp.*, 330 U.S. at 508–09.

The court can quickly dispose of the first and third factors.  As to the first factor, this matter would not unduly congest this court's docket, and it does not appear that Brazilian courts would be able to resolve the case more expeditiously.  *See* Tucci Decl. ¶ 21 (stating that this case could take "in excess of 10 years," including appellate review, to reach final adjudication in Brazil).  As to the third factor, because claims under the FSIA are not eligible for resolution by a jury, this litigation imposes no burden on the community.  *See* 28 U.S.C. § 1330(a); *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002).

The second and fourth public factors warrant further discussion.  Petrobras insists that this matter should be dismissed and sent to Brazil because of "Brazil's keen interest in the subject matter of this case."  Petrobras Mot. at 15.  In support of that position, it relies heavily on Judge Bates' decision in *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, a case in which a Brazilian defendant also sought dismissal on forum non conveniens grounds.  *See* 212 F. Supp. 2d 30.  In *Croesus*, hedge fund plaintiffs sued the Republic of Brazil for its alleged failure to pay principal and interest on Brazilian bonds.  *Id.* at 31–32.  The court held that the public interest factors weighed in favor of litigating the matter in Brazil because, among other reasons, "[n]one of the events in question occurred in the District of Columbia and none of the parties claims to have any connection to the District."  *Id.* at 40.  Further, the court found that, "[a]lthough the American plaintiffs . . . may have suffered losses, and some of the Bonds at issue may have been purchased in the United States, the Bonds are internal debt obligations of Brazil, *and were not issued by Brazil with an intent to be sold abroad to U.S. investors in U.S. markets.*"  *Id.* (emphasis added).  Petrobras asserts that *Croesus* should control the court's analysis here because

"the U.S. has even less of an interest" in this case than it did in *Croesus*, and this case "poses at least the same risk of 'significant reverberations' for Brazil as did *Croesus*." Petrobras Mot. at 14–15.

The court finds *Croesus* readily distinguishable.  Here, unlike in *Croesus*, several of the Funds are located in the United States and are connected to this jurisdiction through their managing agent, EIG Management, which, though no longer a party, is based in Washington, D.C. Moreover, events critical to this litigation occurred in the United States, including the receipt of the allegedly fraudulent marketing materials in Washington, D.C.  Additionally, unlike in *Croesus*, Petrobras is alleged to have proactively sought out investors in the United States. Am. Compl.¶¶ 1, 3–4, 40.  There is also a much clearer national interest in this case—the "United States has a strong interest in providing a forum for its citizens' grievances against an allegedly predatory foreign business that actively solicited business and caused harm within the home forum."  *See SME Racks, Inc. v. Sistemas Mecanicos Para Electronica*, 382 F.3d 1097, 1104 (11th Cir. 2004)*; see also Boston Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1211–12 (9th Cir. 2009).

The Brazilian interest *in this case*, by contrast, is not as overwhelming as Petrobras suggests.  Admittedly, there is intense Brazilian public interest in the political corruption scandal underlying Plaintiffs' claims.  But that interest does not necessarily extend to this litigation, which concerns a business dispute arising as a collateral consequence of the scandal.  Framed in this way, this case is highly unlikely to produce the kind of evidence that would command the interest of the Brazilian public.[7]  Indeed, the alleged improprieties that lie at the heart of this case have already

---

[7]  In that respect, this case also differs from *MBI Group, Inc. v. Credit Foncier du Cameroun (MBI Grp. I)*, another forum non conveniens decision on which Petrobras relies.  *See* 558 F. Supp. 2d 21.  In that case, plaintiffs sued the Republic of Cameroon for, among other things, breach of contract and tortious interference with contract after Cameroonian officials demanded bribe payments in exchange for allowing the plaintiffs to continue construction work

been exhaustively covered in both Brazilian and international media.  Nor will a judgment here against Petrobras "have significant reverberations for Brazil's government and economy," as was the case in *Croesus*.  *See* 212 F. Supp. 2d at 40.  The third public interest factor, therefore, does not justify dismissal of this matter.

The fourth public interest factor—avoiding application of foreign law—does not cut in favor of litigating in Brazil, either.  Petrobras first points to the choice-of-law clause in the Investment Agreement as proof that the court will have to apply Brazilian law.  Petrobras Mot. at 16.  That clause, however, only provides that "[t]he Investment Agreement will be governed by and construed in accordance with the laws of the Federal Republic of Brazil."  Investment Agreement § 13.9.  It does not demand resolution of the fraud claims at issue in this case in accordance with Brazilian law.

Additionally, Petrobras contends that choice-of-law principles will require the court to apply Brazilian law.  *See* Petrobras Mot. at 16.  The court is not convinced.  Tort claims between diverse parties are governed by the law of the jurisdiction with the "most significant relationship to the dispute."  *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) (internal quotation mark omitted).  That principle, Petrobras maintains, militates in favor of applying Brazilian law because Brazil "is plainly the epicenter of the alleged misconduct."  Petrobras Mot. at 16.  True, the bribe scheme occurred in Brazil, but this case, at its core, concerns defrauding U.S.-based investors who received materially misleading marketing pitches, orally and in writing, in the United States, including in Washington, D.C.  *See* Am. Compl. ¶ 4.  Thus, while the "epicenter" of the Operation

---

in Cameroon.  *See id.* at 22.  Unlike this case, in which a harsh public light already has been cast on the corrupt actions of Petrobras executives and Brazilian government officials, the bribe allegations at issue in *MBI Grp. I* surfaced during the litigation itself.  *See id.* at 24–25.  As a result, the court found that any U.S. interest in providing domestic corporations a domestic forum to redress wrongs against them "pales in comparison to Cameroon's stake in adjudicating a dispute that involves accusations of bribery against government officials and an affordable housing project of national concern."  *Id.* at 35.  The court finds that the balance of those interests is inverted here.  Thus, neither *Croesus* nor *MBI Grp. I* compels the court to dismiss this matter on forum non conveniens grounds.

Car Wash scandal is unquestionably Brazil, the jurisdiction with the most significant relationship to the parties' dispute is arguably Washington, D.C.  Regardless, "the need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens, and [courts] must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform."  *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 67–68 (2d Cir. 1981) (citation and internal quotation marks omitted).

Petrobras raises one final point.  It contends that the court, by retaining the case, risks creating "inconsistent results" that could potentially conflict with rulings or impact creditor priority in the Sete bankruptcy proceedings.  Petrobras Mot. at 15.  Petrobras, however, has not provided any record evidence concerning the Sete bankruptcy, other than its existence, and so the court finds any such concern is, at best, speculative.

As a whole, then, the public interest factors do not weigh in favor of a Brazilian forum. This case imposes no administrative burden on the court's docket or a local jury's time, the U.S. interest in retaining jurisdiction over this particular matter is equal to, if not greater than, any countervailing Brazilian interest, and any concerns arising from the possibility that Brazilian law would govern this case do not, standing alone, convince the court that dismissal is warranted.

*             *             *

In sum, the court finds that while the private interest factors narrowly favor a Brazilian forum, the public interest factors stand in equipoise and perhaps even slightly favor a U.S. forum. Balancing those factors then, alongside even the diminished deference owed Plaintiffs' choice of forum, the court concludes that Petrobras has failed to carry its burden of showing that Brazil is the "strongly preferred location" for this action.  *MBI Grp. II*, 616 F.3d at 571.  Accordingly, the court will not decline to exercise jurisdiction under the doctrine of forum non conveniens.

**D.     Whether Plaintiffs State Plausible Claims for Relief**

Having rejected Petrobras' jurisdictional and prudential arguments for dismissal, the court now turns to the sufficiency of Plaintiffs' Amended Complaint.  Petrobras urges the court to dismiss Counts I and II of the Amended Complaint for failure to state a claim under Rule 12(b)(6) because Plaintiffs failed to adequately plead that (1) Petrobras made fraudulent misrepresentations upon which Plaintiffs relied, *see* Petrobras Mot. at 29–37, and (2) Petrobras aided and abetted Sete in defrauding Plaintiffs, *see id*. at 38–43.  The court will address Petrobras' arguments pertaining to Count III of the Amended Complaint in the section that follows.

For the reasons explained below, the court concludes that Plaintiffs have sufficiently pleaded plausible common law claims of fraud and aiding and abetting fraud.

*1.     Count I—Fraud*

Petrobras' contention that Plaintiffs have not stated a claim of fraud rests on three grounds: (1) Petrobras owed no duty of disclosure to Plaintiffs; (2) Plaintiffs failed to plead any materially false statements or material omissions that satisfy Rule 9(b)'s heightened pleading standard; and (3) Plaintiffs have not pleaded that they reasonably relied on any materially false statements or omissions.  Petrobras Mot. at 29–37.

Starting with Petrobras' first argument, it is well settled "mere silence does not constitute fraud unless there is a duty to speak."  *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948).  The question here, then, is whether Petrobras had a duty to disclose to Plaintiffs that Petrobras and then Sete executives solicited hundreds of millions of dollars from Plaintiffs knowing that some portion of their capital would be used to underwrite a massive bribe scheme. So framed, the question answers itself.  Of course, it did.

Neither side has cited a case with facts quite like this one.  The central allegation here is that Petrobras conceived of Sete, at least in part, as a way for Petrobras executives to expand their long-standing bribe scheme and thereby further enrich themselves and members of the Brazilian Workers Party.  Sete's operations could not get off the ground without a substantial outside capital infusion, as Petrobras did not want to shoulder the financial burden on its own.  Petrobras thus sought out investors to capitalize Sete, such that Sete could enter into contracts to pay various shipyards to build the drillships needed to explore and develop the Pre-Salt Reserves.  As Petrobras sought out investors, key executives knew, but did not disclose, that some portion of the capital raised to pay the shipyards would be paid as kickbacks to Petrobras (and later Sete) executives, as well as certain politicians.  Simply stated, Sete was a corrupt enterprise from its very inception.  In that respect, Sete is no different than a company formed for the purpose of perpetuating a Ponzi scheme.  The act of soliciting money to fund such a scheme, without disclosing it is a criminal enterprise, is quintessential fraud.  That is precisely what Petrobras is alleged to have done here: It induced Plaintiffs to part with their money knowing full well that Plaintiffs' money would be used for a criminal purpose, and without disclosing that intention.  The fact that Sete, unlike a Ponzi scheme, at the start had *some* legitimate purpose, does not, as Petrobras' suggests, Tr. at 130–31, offset its concealment of the bribe scheme that induced Plaintiffs to invest in the first place.  This is as straightforward as fraud gets.

Petrobras spends much of its argument attempting to show that the fraudulent statements and omissions specifically alleged in the Amended Complaint are not actionable, while missing the larger picture.  However, even if the court looks at the particulars, the Amended Complaint still states a claim of fraud that satisfies the heightened pleading standard of Rule 9(b).  *See U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (stating that

the combination of Rules 8 and 9(b) require the pleader to "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud" (internal quotation marks omitted)).

Both parties agree that the court's decision in *Menaldi v. Och–Ziff Capital Management Group LLC*, a Rule 10b-5 securities fraud case, provides useful guideposts to ascertain when a company has a duty to disclose uncharged wrongdoing by its officers or its employees. *See* 164 F. Supp. 3d 568 (S.D.N.Y. 2016); Petrobras Mot. at 31–32; Pls.' Opp'n at 52–53. According to *Menaldi*, a company has a duty to disclose the uncharged wrongdoing of its employees when it: (1) "puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices"; (2) "makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring"; or (3) "states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." 164 F. Supp. 3d at 581 (internal quotation marks omitted); *see also Kapiloff*, 59 A.2d at 518 ("[U]nder the familiar principle that when one undertakes to speak, either voluntarily or in response to inquiry, he must not only . . . state truly what he tells but also must not suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure." (internal quotation marks omitted)).

At least three statements in Petrobras' marketing materials triggered a duty to disclose the underlying bribe scheme. First, in September 2010, EIG Management received a presentation "compiled by Petrobras" entitled "The Drilling Rigs Project: Petrobras' Strategy for its Successful Implementation," which the Amended Complaint refers to as the "Petrobras Drilling Presentation." Am Compl. ¶ 40. That document generally discusses "the long term strategic and financial goals for an off-balance sheet 'finance structure' to develop and to charter drillships to Petrobras so that

Petrobras could extract oil and gas" from the newly found reserves.  *Id.*  One of the "Main Objectives" identified in the Petrobras Drilling Presentation was "to ensure the availability of its demand for drilling rights for Pre Salt application, minimizing charter costs and associated risks." *Id.* ¶ 42.  What the Presentation did not disclose, however, was that one of Petrobras' other main objectives in establishing Sete was to further the "longstanding corruption scheme to enrich Petrobras executives and the Workers Party."  *Id.*  In other words, when Petrobras told potential investors that their capital would be used for the legitimate purpose of building and ensuring the demand for drillships, it also became duty-bound to disclose the corresponding illegitimate purpose of underwriting a bribe scheme designed to enrich certain Petrobras executives and government officials.  That material omission easily fits within *Menaldi*'s third guidepost triggering a duty to disclose—the company "states an opinion," or in this case makes a statement, "that, absent disclosure, misleads investors about material facts underlying that belief" or statement—and thus obligated Petrobras to disclose the bribe scheme to investors.

Second, Plaintiffs allege that, in "information memoranda that Petrobras and Sete prepared and provided to EIG [Management]," Petrobras touted Sete's "strong support from the Brazilian Federal Government, including financial support" because revitalizing Brazil's shipbuilding industry was an important goal of the Brazilian government.  *Id.* ¶ 33.  Consistent with that representation, Petrobras also stated that its funding strategy included a "special focus" on securing debt-financing from the Brazilian state-owned development bank, which Petrobras expected would be Sete's largest capital contributor.  *Id.* ¶¶ 33–34.  Of course, what Petrobras did not disclose was that its "strong relationship" with the Brazilian government was built, at least in part, on the payment of bribes.  That material omission comfortably fits within *Menaldi*'s first guidepost—the company "puts the reasons for its success . . .  at issue, but fails to disclose that a

material source of its success is the use of improper or illegal business practices." Here, Petrobras touted its close relationship with government officials as evidence of Sete's potential future success, which required it to disclose its corrupt agreement with government officials to the investors it targeted. *Menaldi*, 164 F. Supp. 3d at 581.[8]

Third, the Amended Complaint alleges that the Petrobras Memorandum represented that Sete would enter into drillship-building contracts that would require each shipyard to "comply with . . . applicable laws." Am. Compl. ¶ 38. In the ordinary case, as Petrobras contends, such a general representation of legal compliance might not give rise to a claim for an actionable fraud. Petrobras Mot. at 35 (citing *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11-4665, 2014 WL 4832321, at *14–15 (S.D.N.Y. Sept. 29, 2014)). But this is not the ordinary case. At the same time that Petrobras was assuring potential investors the shipyards would be contractually bound to follow the law, Petrobras knew that the shipyards would break the law. For years, as part of the price of doing business with Petrobras, company executives had demanded that its contractors pay kickbacks of approximately one percent of the contract's value. Am. Compl. ¶¶ 8, 60, 62. So, when Petrobras told investors that Sete's contracts would require shipyards to comply with applicable laws, that representation was intentionally misleading. Petrobras responds that the alleged statement was literally true—the contracts did in fact contain a clause that required shipyard builders to comply with laws—and, thus, could not be fraudulent. Petrobras Reply at 17. That argument is too clever by half. The statement was plainly aimed at assuring investors that the shipyards would be expected to comply with the law—why else would Petrobras make a

---

[8] Plaintiffs could have been more precise in identifying which "information memorandum" contained the referenced representations. The court is satisfied, however, that, when read in concert with the specific descriptions of the marketing materials found elsewhere in the Amended Complaint, *see* Am. Compl. ¶¶ 4, 34, 36–44, 47, Plaintiffs have identified the alleged fraudulent omissions with sufficient particularity to satisfy Rule 9(b). *See Williams*, 389 F.3d at 1256.

representation about an otherwise standard contract clause?   Accordingly, the second *Menaldi* circumstance—"mak[ing] a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring"— is applicable here.  164 F. Supp. 3d at 581.

Having found that Petrobras had a duty to speak but failed to do so, the court has little trouble also concluding that Plaintiffs have pleaded reasonable reliance on Petrobras' failure to disclose the bribe scheme.  For example, Plaintiffs allege that "[h]ad EIG [Management] and the Funds known about the falsity of Petrobras's statements and the existence of the . . . corruption scheme, EIG [Management] would have never caused the Funds to invest in Sete."  Am. Compl. ¶ 76; *see id.* ¶¶ 54, 81.  Although Petrobras claims this to be a "formulaic recitation," it is sufficient at the motion to dismiss stage.  Any more fulsome inquiry into the extent of Plaintiffs' reliance is better suited for summary judgment.  *See Minebea Co. v. Pabst*, 13 F. Supp. 2d 35, 43 (D.D.C. 1998).

In sum, the court finds that the Amended Complaint contains sufficient allegations that Petrobras made at least three statements that triggered a duty to disclose the bribe scheme to Plaintiffs, Petrobras failed to make such disclosures, and Plaintiffs reasonably relied on those material omissions.   Accordingly, the court will not dismiss Count One of the Amended Complaint.[9]

### 2.    *Count II—Aiding and Abetting*

The court turns now to Count Two of the Amended Complaint, which alleges that Petrobras "aided and abetted in a fraud perpetrated by Sete."  Am. Compl. ¶ 95.  Petrobras maintains that

---

[9] As the court has found three actionable allegations, it need not address the sufficiency of the remaining allegations in the Amended Complaint at this juncture.  *See Sage v. Broad. Publ'ns, Inc*., 997 F. Supp. 49, 53 n. 4 (D.D.C. 1998) (declining to address each alleged fraudulent misrepresentation in plaintiff's complaint "because the misrepresentations discussed [in the decision were] sufficient to establish a prima facie case of fraudulent misrepresentation").

Count Two fails to state a claim for aiding and abetting fraud for three reasons:  (1) the District of Columbia does not recognize aiding and abetting as an independent tort or as a theory of civil liability; (2) Plaintiffs failed to plead an underlying tort (fraud); and (3) Plaintiffs have not alleged that Petrobras had knowledge of, or substantially assisted in, Sete's alleged fraudulent activities.  *See* Petrobras Mot. at 38–43.  None of those arguments requires dismissal of Count Two.

To begin, this court is bound to recognize an actionable tort of aiding and abetting under the D.C. Circuit's decision in *Halberstam v. Welch*.  In *Halberstam*, the Circuit observed that "[t]he separate tort of aiding-abetting has not yet, to our knowledge, been recognized explicitly in the District," yet predicted that the "existence of the civil conspiracy action [in the District] suggests a high probability that the legal rationale underlying aiding-abetting would also be accepted."  705 F.2d 472, 479 (D.C. Cir. 1983).  Notwithstanding *Halberstam*, Petrobras urges that more recent decisions from the D.C. Court of Appeals firmly establish that District of Columbia law does not recognize aiding and abetting as a separate tort or as a theory of vicarious liability.  Petrobras Mot. at 38; Petrobras Reply at 21–22.  This court does not share Petrobras' resolve.

Petrobras' argument relies primarily on *Sundberg v. TTR Realty, LLC*.  Petrobras Mot. at 38; Tr. at 145.  There, the D.C. Court of Appeals held that vicarious liability under an aiding and abetting theory was not available under the District of Columbia's Consumer Protection Procedures Act.  109 A.3d 1123, 1129 (D.C. 2015).  The court gave two reasons for that conclusion, including, as pertinent here, "we have not recognized the tort of aiding and abetting." *Id*.  Petrobras seizes upon that rationale as confirming the nonexistence of aiding and abetting tort liability under District of Columbia law.  Tr. at 145.

*Sundberg* does not, however, bear the weight that Petrobras ascribes to it.  The court's statement that "we have not recognized the tort of aiding and abetting" was not an affirmative

statement about the current state of District of Columbia tort law, but rather a mere acknowledgment that none of the court's prior cases had recognized the tort. *Sundberg*'s citation to *Flax v. Schetler* makes that purpose clear. *See Sundberg*, 109 A.3d at 1129. In *Flax*, the D.C. Court of Appeals repeated *Halberstam*'s observation that "[t]he separate tort of aiding-abetting has not yet, to our knowledge, been recognized explicitly in the District." 935 A.2d 1091, 1107 (D.C. 2007) (quoting *Halberstam*, 705 F.2d at 479); *see also Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 711 (D.C. 2013) (quoting the court's observation in *Flax* and determining that "we need not decide here whether a cause of action exists in the District of Columbia for aiding and abetting"). The court further noted that, "[a]lthough the *Halberstam* court predicted that this court would recognize a tort of aiding and abetting tortious conduct, we have not done so to date, and we are not bound by that court's ruling." 935 A.2d at 1107 n.15.

This court does not, however, enjoy the same discretion as the D.C. Court of Appeals. It *is* bound by *Halberstam*, and in the absence of an opinion from the D.C. Court of Appeals plainly contradicting *Halberstam*, this court must apply Circuit precedent. *Cf. Blair-Bey v. Quick*, 151 F.3d 1036, 1050 (D.C. Cir. 1998) ("We are bound to follow interpretations of D.C. law by the D.C. Court of Appeals, and hence must defer to that court's ruling to the extent that it interprets D.C. law."). For that reason, the court disagrees with those decisions Petrobras cites from this District Court that have departed from *Halberstam*. *See, e.g.*, *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 356 (D.D.C. 2015); *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 119 (D.D.C. 2012); *Acosta Orellana v. CropLife Intern.*, 711 F. Supp. 2d 81, 107–08 (D.D.C. 2010) (Walton, J.); *but see Baker v. Gurfein*, 744 F. Supp. 2d 311, 317 (D.D.C. 2010) (Walton, J.) (reversing conclusion in *Acosta* and determining that "the Court is required by [*Halberstam*] to recognize [the] legal concept" of aiding and abetting).

49

Next, the court finds that Plaintiffs have stated a claim against Petrobras for aiding and abetting Sete in committing fraud.  Such a claim requires Plaintiffs to plead sufficient facts establishing that:  (1) Sete committed fraud against Plaintiffs; (2) Petrobras was aware Sete was defrauding Plaintiffs; and (3) Petrobras knowingly and substantially assisted Sete in committing that fraud.  *See Halberstam*, 705 F.2d at 477.  The Amended Complaint meets those requirements.

As to the first element, Plaintiffs sufficiently allege that Sete had a duty to disclose the bribe scheme to Plaintiffs and, by failing to do so, also defrauded Plaintiffs.  Like Petrobras, Sete is alleged to have committed classic fraud—it convinced Plaintiffs to part with millions of dollars knowing that some portion of those funds would be used to finance a massive corruption scheme, and it never disclosed that nefarious purpose to the investors.  Sete's half-truthful statements only reinforced its silence.  For instance, on September 14, 2011, Sete, through an adviser, sent EIG Management a memorandum, referred to as the "Lakeshore Memorandum," which "repeated the representations contained in the Petrobras Memorandum, concerning the construction contracts that Sete would enter into with shipyards and the ways in which Sete would use the equity and debt financing it raised."  Am. Compl. ¶ 47.[10]  Those statements made out a fraud claim against Petrobras and are enough to do the same with respect to Sete.

The Amended Complaint also sufficiently alleges the second and third elements of an aiding and abetting claim—that Petrobras knew Sete was defrauding Plaintiffs and that it substantially assisted Sete in committing that fraud.  Plaintiffs have alleged that "Ferraz and Barusco—while they worked at Petrobras—came up with the idea to form Sete, and that they were well aware, and intended, that Sete would perpetuate and expand the longstanding bribe and

---

[10] Paragraph 47 equivocates as to whether the entity that transmitted the Lakeshore Memorandum was acting "as an agent of and/or financial adviser to Sete *and/or* Petrobras," Am. Comp. ¶ 47 (emphasis added), and Petrobras insists that the entity was an agent of Sete, Petrobras Mot. at 36 n.21.  For present purposes, the court construes that allegation against Plaintiffs and assumes that Petrobras is correct.

kickback scheme involving Petrobras." *Id.* ¶ 57; *see also id.* (quoting Barusco's sworn testimony that "the issue of [Sete], about the establishment of bribe amounts, was a continuity of what happened in PETROBRAS").  By alleging that Petrobras executives formed Sete for the specific purpose of perpetrating a bribe scheme, *id.* ¶ 71, Plaintiffs sufficiently pleaded that Petrobras substantially assisted Sete in defrauding Plaintiffs.  Moreover, Petrobras plainly knew that Sete had defrauded its investors by not disclosing the bribe scheme.  After all, the Petrobras executives that established Sete—Barusco, Musa, and Ferraz—assumed executive positions at Sete and are alleged to have funneled kickbacks to their former colleagues at Petrobras, who surely were aware that Sete had not disclosed the bribe scheme to its investors.  *Id.* ¶ 60 (citing Barusco's testimony that Petrobras executives Duque and Gonçalves were recipients of bribes paid on Sete contracts).

In short, the Amended Complaint alleges sufficient facts from which the court can reasonably infer that (1) Petrobras created Sete, at least in part, to continue a longstanding bribe scheme; (2) before Sete's formation, Petrobras made efforts to raise capital to finance Sete and, thus, knew Sete had equity investors, including Plaintiffs; (3) after Sete's formation, Petrobras executives received kickbacks from shipyards contracting with Sete; and (4) Petrobras executives knew that Sete had not disclosed to its investors that Sete intended to use and did use their capital for corrupt purposes.  Accordingly, because Plaintiffs have stated a plausible claim that Petrobras aided and abetted Sete in committing fraud, the court will not dismiss Count Two.

### E. Count III—Civil Conspiracy

At last, the court arrives at Count III, which advances a claim of civil conspiracy against Petrobras and the Shipyard Defendants.  All Defendants move to dismiss for failure to state a claim.  Petrobras Mot. 43–45; Odebrecht Mot. at 27–30; Keppel Mot. at 18–31; Sembcorp Mot. at 9–14; Jurong Mot. at 13–16.  Additionally, the Shipyard Defendants move to dismiss under Rule

12(b)(2), arguing that the court lacks personal jurisdiction over them under the District of Columbia long-arm statute and, further, that exercising jurisdiction over them would violate the Due Process Clause.  See Odebrecht Mot. at 14–22; Keppel Mot. at 8–18; Sembcorp Mot. at 2–9; Jurong Mot. at 5–8.

### 1.   Lack of Personal Jurisdiction under the D.C. Long-Arm Statute and Failure to State a Claim

Whether the court can assert personal jurisdiction over the Shipyard Defendants necessarily dovetails with whether Plaintiffs have adequately pleaded a claim of conspiracy.  That is so because Plaintiffs' only proffered basis for the court exercising personal jurisdiction over the Shipyard Defendants is applying the theory of conspiracy jurisdiction under the "transacting business" prong of the long-arm statute.[11]  Under that theory, if accepted, the court could exercise jurisdiction over the Shipyard Defendants because the conduct of their alleged co-conspirators, Petrobras and Sete, supplies the necessary contacts with the District of Columbia.  Am. Compl. ¶ 29; Pls.' Opp'n 75–79.  Of course, conspiracy jurisdiction over the Shipyard Defendants cannot

---

[11] The D.C. long-arm statute provides, in relevant part:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly *or by an agent*, as to a claim for relief arising from the person's
> (1)  transacting any business in the District of Columbia;
> (2)  contracting to supply services in the District of Columbia;
> (3)  causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> (4)  causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia, . . . .

D.C. Code § 13-423(a) (emphasis added).  The Amended Complaint asserts jurisdiction under both the "transacting business" prong, *id.* § 13-423(a)(1), and the "tortious injury" prong, *id.* § 13-423(a)(3).  Am. Compl. ¶ 29.  However, because the court has concluded that the only Plaintiff that could have suffered injury in the District of Columbia, EIG Management, lacks standing, the court only considers whether the Amended Complaint's allegations satisfy the "transacting business" prong.

exist unless the Amended Complaint actually states a plausible claim of civil conspiracy. *See Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 523–24 (D.C. Cir. 2001). Thus, the court considers those issues in tandem.

To attribute the forum contacts of one co-conspirator to another co-conspirator, a plaintiff must allege: "(1) the existence of a civil conspiracy . . . , (2) the defendant's participation in the conspiracy, and (3) an overt act by a co-conspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy." *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1096 (D.C. Cir. 2008) (alteration in original) (internal quotation marks omitted).

Courts in this Circuit, however, have applied the test for co-conspirator jurisdiction "warily" in order "to prevent a broad extension of long-arm jurisdiction." *Dooley v. United Tech. Corp.*, 786 F. Supp. 65, 78 (D.D.C. 1992), *abrogated on other grounds by FC Inv. Grp. LC*, 529 F.3d 1087. As a result, the D.C. Circuit requires that the plaintiff "plead *with particularity* the conspiracy as well as the *overt acts within the forum* taken in furtherance of the conspiracy" in order to establish conspiracy jurisdiction over a defendant. *Companhia Brasileira Carbureto de Calicio v. Applied Industrial Materials Corp.*, 640 F.3d 369, 372 (D.C. Cir. 2011) (internal quotation marks omitted); *see also World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir. 2002). This particularity requirement is "strictly enforced." *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 141 (D.D.C. 2004).

Here, Plaintiffs define the scope of the alleged conspiracy as an agreement amongst Petrobras, Sete, and the Shipyard Defendants to (1) "pay[] illegal bribes and kickbacks . . . in exchange for shipbuilding contracts," and (2) "prevent[] the public disclosure of those bribe payments by, among other things, fraudulently concealing the existence of those payments from Sete investors." Am. Comp. ¶ 99. Thus, for Plaintiffs to successfully establish the conspiracy

alleged in Count III *and* establish personal jurisdiction over the Shipyard Defendants, they must plead with particularity facts showing not just that Petrobras and the Shipyard Defendants participated in a bribe scheme, but that they agreed not to disclose the bribe scheme *for the purpose* of defrauding Sete's investors.  *See FC Invest. Grp. LC*, 529 F.3d at 1098.

Plaintiffs' pleading comes nowhere close to stating a sufficient claim of civil conspiracy, let alone satisfying this Circuit's rigorous conspiracy jurisdiction pleading requirement.  Plaintiffs, for example, have not even pleaded facts establishing that the Shipyard Defendants knew Sete had equity investors to be defrauded.  The Amended Complaint contains no facts establishing that any Shipyard Defendant was aware Petrobras conceived of capitalizing Sete with equity investments; prepared marketing materials to present to potential equity investors; transmitted such materials to the United States, especially Washington, D.C.; or intended to use investor money to underwrite the bribe scheme.  In short, the Amended Complaint contains no facts from which the court can infer that the Shipyard Defendants agreed to defraud Sete's investors, generally, let alone its investors in Washington, D.C.  *See id.* (rejecting an allegation that defendants had conspired to commit fraud where the plaintiff had pleaded no more than the existence of an ongoing business relationship, but not an agreement or understanding to commit fraud or the defendant's knowing participation in such a scheme).

Moreover, contrary to Plaintiffs' contention, the court cannot infer from the Shipyard Defendants' mere concealment of the bribe scheme an agreement to defraud Sete's investors.  The court can conceive of any number of reasons why the Shipyard Defendants did not disclose the bribe scheme, including most obviously that they did not want to implicate themselves in criminal wrongdoing.  At most—and the court is being very generous here—Plaintiffs have made factual allegations "consistent with" a conspiracy to defraud investors.  *Twombly*, 550 U.S. at 553–54.

Even that reading of the Amended Complaint, though, falls well short of the particularized pleading requirements for conspiracy jurisdiction demanded by the D.C. Circuit.

Accordingly, the court finds that it lacks personal jurisdiction over the Shipyard Defendants under the D.C. long-arm statute and that Plaintiffs failed to state a claim of civil conspiracy amongst Petrobras and the Shipyard Defendants.  For those reasons, the court dismisses Count III of the Amended Complaint as to all Defendants.

### 2.    *Due Process*

The court feels compelled to briefly address the Shipyard Defendants' due process concerns.  *See* Odebrecht Mot. at 18–22; Keppel Mot. at 13–18; Sembcorp Mot. at 2–9; Jurong Mot. at 6–8.  Even if Plaintiffs somehow had managed to satisfy the D.C. long-arm statute, the court's inquiry would not end there.  The exercise of personal jurisdiction still must satisfy the Due Process Clause, which requires a plaintiff to show "minimum contacts" between the defendant and the forum establishing that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).  Important for present purposes, the Supreme Court recently explained that "it is the defendant, *not the plaintiff or third parties*, who must create contacts with the forum State."  *Walden v. Fiore*, 571 U.S. ___, ___, 134 S. Ct. 1115, 1126 (2014) (emphasis added); *see Livnat v. Palestinian Auth.*, No. 15-7024, 2017 WL 1101106, at *8–9 (D.C. Cir. Mar. 24, 2017).  The Shipyard Defendants seize on this language to argue that the theory of conspiracy jurisdiction—which permits courts to exert jurisdiction based on third-party contacts with the relevant forum—runs afoul of the due process demands discussed in *Walden*.  *See* Odebrecht Mot. at 19–20; Keppel Mot. at 13–18; Sembcorp Mot. at 6–7; Jurong Mot. at 6–8.

The court need not decide whether *Walden* forever shuts the door on conspiracy jurisdiction. It is enough for purposes of this case to observe that, following *Walden*, a plaintiff who seeks to establish jurisdiction over a defendant based on a co-conspirator's contacts must plead, at a minimum, that the defendant *knew* his co-conspirator was carrying out acts in furtherance of the conspiracy *in the forum*. *See Youming Jin*, 335 F. Supp. 2d at 83 (observing, pre-*Walden*, that to establish jurisdiction over a defendant based on a co-conspirator's contacts with the District of Columbia, the plaintiff must "show the defendant had *any* knowledge, control, approval or discretion" of the co-conspirator's acts within the District).

As discussed, Plaintiffs failed to allege that the Shipyard Defendants had any knowledge that Sete had equity investors, let alone that such investors were located in the District of Columbia. Also missing from the Amended Complaint is any allegation that would establish the Shipyard Defendants knew that Petrobras and Sete had engaged in alleged conspiratorial acts in the District of Columbia. Accordingly, the court alternatively dismisses Count III against the Shipyard Defendants on the ground that the court cannot exercise jurisdiction over them consistent with the requirements of the Due Process Clause.

### 3. *Jurisdictional Discovery*

Finally, the court denies Plaintiffs' request for jurisdictional discovery. Jurisdictional discovery is only appropriate where the party seeking such discovery provides "some specific indication . . . regarding what facts additional discovery could produce that would affect the court's jurisdictional analysis." *Maqaleh v. Hagel*, 738 F.3d 312, 325–26 (D.C. Cir. 2013) (internal quotation marks omitted). Here, Plaintiffs request for jurisdictional discovery is contained in one paragraph entirely devoid of any "specific indication . . . regarding what facts" Plaintiffs seek to discover. *See* Pls.' Opp'n at 82 (stating only that "[l]imited discovery is particularly justified here

in light of the covert nature of defendants' conspiracy and the actions taken in furtherance of that conspiracy"). Accordingly, Plaintiffs' bare-bones request for jurisdictional discovery is denied.

## IV.     CONCLUSION

For the foregoing reasons, Defendant Petrobras' Motion to Dismiss is denied as to Counts I and II of the Amended Complaint and granted as to Count III. The Shipyard Defendants' Motions to Dismiss are granted.

A separate Order accompanies this Memorandum Opinion.

Dated:  March 30, 2017                    Amit P. Mehta
                                          United States District Judge