**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **EIG ENERGY FUND XIV, L.P., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 1:16-cv-00333 (APM)** |
| | ) | |
| **PETRÓLEO BRASILEIRO S.A.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**MEMORANDUM OPINION**

## I.    INTRODUCTION

In 2014, a Brazilian criminal investigation popularly known as Operation Lava Jato (or "Operation Car Wash") began to uncover a massive political and corporate corruption scheme with Defendant Petróleo Brasileiro S.A. ("Petrobras") at its center. The investigation revealed a longstanding practice at Petrobras of soliciting and accepting bribes in exchange for construction and services contracts, with graft payments shared among Petrobras executives, Brazil's then-governing political party, the Workers' Party, and its members. Several high-ranking Petrobras executives and government officials were prosecuted in Brazil and incarcerated as a result of the investigation, which continued until 2021. The fallout reached the United States, too. Facing criminal and civil liability as a registrant on the New York Stock Exchange, Petrobras entered into a deferred prosecution agreement with the U.S. Department of Justice and a civil settlement with the U.S. Securities and Exchange Commission. As part of the agreement, Petrobras agreed to pay hundreds of millions of dollars in criminal penalties to both U.S. and Brazilian enforcement authorities.

One of the entities entangled in the complex web of corruption exposed by Operation Lava Jato was Sete Brasil Participações ("Sete").  After the discovery of oil reserves off the coast of Brazil, Petrobras established Sete as a financing vehicle to construct a fleet of drillships that Petrobras would then charter to develop the newly discovered oil reserves.  As the plan for Sete developed, so too did the plan to export the existing bribery and kickback scheme from Petrobras to Sete.  Three former Petrobras officials—João Carlos de Medeiros Ferraz, Pedro José Barusco Filho, and Eduardo Costa Vaz Musa—moved over to Sete as executive officers.  They then solicited bribes from various shipyards in exchange for drillship construction contracts.  The illicit proceeds were split amongst Ferraz, Barusco, and Musa; current Petrobras executives; and the Workers' Party and its officials.

When news of Sete's role in the bribery scheme became public, Sete collapsed.  The company's financial plan turned on securing long-term debt financing provided by certain government-backed lending institutions, whose loans would be used to redeem short-term, high-interest-rate bridge loans and to pay shipyards to build drillships.  Those lenders pulled out after the scandal broke, causing Sete to default on the bridge loans and forcing it into the Brazilian equivalent of bankruptcy.

Plaintiffs—EIG Energy Fund XIV, L.P.; EIG Energy Fund XIV-A, L.P.; EIG Energy Fund XIV-B, L.P.; EIG Energy Fund XIV (Cayman), L.P.; EIG Energy Fund XV, L.P.; EIG Energy Fund XV-A, L.P.; EIG Energy Fund XV-B, L.P.; and EIG Energy Fund XV (Cayman), L.P.—are eight related investment funds based in the United States and Cayman Islands that the court refers to collectively as "EIG."  EIG was a significant U.S. investor in Sete; it lost hundreds of millions of dollars when Sete collapsed.  Pointing to numerous misrepresentations and omissions Petrobras made before EIG made its investment—each rooted in Petrobras's failure to disclose the bribery

scheme—EIG claims that Petrobras defrauded it, Petrobras aided and abetted Sete in defrauding EIG, and EIG is entitled to recover their full investment (plus prejudgment interest) and punitive damages.  Petrobras contests all of these points and also challenges the court's subject matter jurisdiction, claiming that it enjoys sovereign immunity as an instrumentality of a foreign sovereign.

Before the court are the parties' cross-motions for summary judgment, as well as EIG's motion to exclude Petrobras's expert testimony and Petrobras's motion to strike two of the declarations EIG attached to its summary judgment motion.  For the reasons that follow, the court (1) grants EIG's motion for summary judgment in part and denies it in part; (2) denies Petrobras's motion for summary judgment; (3) denies as moot Petrobras's motion to strike the declaration of Professor José Rogério Cruz e Tucci, EIG's Brazilian law expert; and (4) reserves until trial ruling on (a) EIG's motion to exclude Petrobras's expert testimony and (b) Petrobras's motion to strike as to the declaration of Drew Moroux, who calculated the prejudgment interest sought by EIG.

## II.    BACKGROUND

### A.    Factual Background

The court begins with a summation of the facts that are not in dispute, including a timeline of events and an introduction of the major players.  Additional facts will be discussed as part of the court's substantive analysis.[1]

---

[1] Throughout its papers, EIG has urged the court to rely on statements made by prosecutors during criminal proceedings in Brazil, which EIG contends Petrobras ratified by participating in those proceedings as a putative victim, as permitted under Brazilian law.  *See* Pls.' Unopposed Mot. for Leave to File Documents Under Seal, ECF No. 185 [hereinafter EIG Mot. to File Under Seal], Pls.' Reply Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J., ECF No. 185-2 [hereinafter EIG Reply], at 8–9.  The court, as it expressed at oral argument, is dubious that such statements are admissible as statements of a party opponent under the Federal Rules of Evidence, *see* Fed. R. Evid. 801(d)(2), regardless of what effect Petrobras's participation had under Brazilian law.  *See* 1 STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA § 2.02 (2022) ("Statements and arguments of the lawyers are not evidence.").  The court therefore does not rely on those statements for any of its factual findings or legal

1.      *Corruption at Petrobras and Key Players*

Petrobras is an oil and gas company owned and controlled by the Brazilian government, headquartered in Rio de Janeiro.  Pls.' Mot. for Summ. J. on All Claims, ECF No. 153 [hereinafter EIG Redacted MSJ], Ex. 180, ECF No. 153-26, Attachment A, ¶ 1.  As early as 2004, some of Petrobras's executives and managers "receiv[ed] bribes" and "facilitated and directed millions of dollars in corrupt payments to politicians and political parties in Brazil."  *Id.* ¶¶ 9, 11.  Throughout that time, individuals other than the executives described in the previous sentence, "including certain members of [Petrobras's] Board of Directors, were aware that Petrobras contractors were involved in corruption at the time those companies were contracting with Petrobras[,] and yet they did nothing to stop those companies from doing business with Petrobras or to investigate the nature and scope of corruption within Petrobras."  *Id.* ¶ 13.  "Indeed, two members of the Company's Board of Directors were involved in facilitating bribes that a major Petrobras contractor was paying to Brazilian politicians."  *Id.*  Typically, contractors involved in the corruption paid bribes "totaling approximately one to three percent of the value of the contracts obtained from Petrobras, which were then typically split among certain Petrobras executives, Brazilian politicians, Brazilian political parties, and other individuals who helped facilitate the payment of the bribes."  *Id.* ¶ 15.

Two key Petrobras officials involved with this scheme were Renato Duque ("Duque") and Pedro Jose Barusco Filho ("Barusco").  Duque was the head of Petrobras's Services division from January 31, 2003, to April 27, 2012, and served as a member of the Petrobras Executive Board for that same time period.  Def.'s Consent Mot. for Leave to File Documents Under Seal, ECF No. 179 [hereinafter Petrobras Opp'n Sealing Mot.], Def.'s Resps. to Pls.' Statement of Material Facts

---

conclusions.  As a result, the court also need not reach the questions raised in Petrobras's motion to strike EIG's Brazilian law expert, Professor Tucci.  *See* Def.'s Mot. to Strike Decls. of José Rogério Cruz e Tucci & Drew Moroux, ECF No. 176.

in Supp. of Def.'s Opp'n to Pls.' Mot. for Summ. J., ECF No. 179-4 [hereinafter Petrobras Resp. SOF], ¶¶ 8–9.  The Executive Board is "the highest level of [Petrobras's] management and [is] responsible for managing [Petrobras's] business, pursuant to the mission, goals, strategies, and guidelines established by the Board of Directors."  *Id.* ¶ 10.  Barusco was an "Executive Manager of Engineering in Petrobras's Services division from February 2003 to March 2011."  *Id.* ¶ 12.  During that time period, Barusco reported to Duque.  *Id.* ¶ 13.  Both Duque and Barusco were involved in the bribery scheme at Petrobras and later at Sete.  EIG Redacted MSJ, Ex. 208[2], ECF No. 153-41 [hereinafter Barusco Testimony], at 36–37, 51.[3]  In all, about 90 contracts included kickback payments.  Petrobras Resp. SOF ¶ 17.  Barusco eventually entered into a plea agreement with Brazilian prosecutors and agreed to return $67.5 million in bribe payments deposited in offshore accounts.  Pls.' Unopposed Mot. for Leave to File Documents Under Seal in Supp. of Pls.' Mot. for Summ. J., ECF No. 152 [hereinafter EIG MSJ Sealing Mot.], Ex. 129, ECF No. 152-128 [hereinafter EIG Ex. 129], cl. 8, § 3.

Another important player was João Carlos de Medeiros Ferraz ("Ferraz"), a Petrobras employee from 1980 until 2011, when he joined Sete.  Petrobras Resp. SOF ¶ 19.  Starting around December 2008, Ferraz was the General Manager of Special Projects Financing in Petrobras's Finance division.  *Id.* ¶ 20.  In that capacity, he was "responsible for designing, developing, and implementing the [Sete] Rigs Project, including negotiating and drafting all contractual instruments relating to the operation and negotiating with all potential capital investors in Sete Brasil."  *Id.* ¶ 21.  Ferraz eventually became CEO of Sete, and Barusco became its COO.  *Id.*

---

[2] When citing exhibits, the court refers to ECF-generated pagination of each PDF, not internal pagination.
[3] Citations to "Barusco Testimony" are to the transcript of his sworn testimony in the Brazilian criminal proceedings. Petrobras has not disputed the admissibility of Barusco's out-of-court testimony, or that of any other Petrobras or Sete official.

¶¶ 107–108; EIG MSJ Sealing Mot., Ex. 29, ECF No. 152-30 [hereinafter EIG Ex. 29] at 13, 17;

EIG Mot. to File Under Seal, Pls.' Reply to Def.'s Statement of Additional Undisputed Material

Facts, ECF No. 185-3 [hereinafter EIG Reply SOF], ¶¶ 38, 42. Ferraz ultimately entered into a

plea agreement with Brazilian authorities. EIG Redacted MSJ, Ex. 173, ECF No. 153-21

[hereinafter EIG Ex. 173], at 4; EIG MSJ Sealing Mot., Ex. 174, ECF No. 152-170 [hereinafter

EIG Ex. 174], at 13.

Two additional Petrobras employees warrant introduction. Eduardo Costa Vaz Musa

("Musa") was employed by Petrobras from 1978 to January 2009 before moving to Sete, first as

Director of Investments and then as Barusco's replacement as Director of Operations. Petrobras

Resp. SOF ¶¶ 22, 115–116. Musa also entered into a plea agreement with Brazilian prosecutors;

together with Ferraz, they agreed to return $5.1 million in bribes deposited in offshore accounts.

EIG Ex. 173 at 4; EIG Ex. 174 at 13. Finally, Almir Barbassa ("Barbassa") was Petrobras's CFO,

Chief Investor Relations Officer, and a member of the Petrobras Executive Board. He participated

in meetings and events, with EIG and others, regarding Sete investment opportunities between

March 2011 and September 2011. Petrobras Resp. SOF ¶¶ 363–364; Def.'s Consent Mot. for

Leave to File Documents Under Seal, ECF No. 189 [hereinafter Petrobras Reply Sealing Mot.],

Def.'s Responses to Pls.' Additional SOF, ECF No. 189-4 [hereinafter Petrobras Resp. to EIG

Additional SOF], ¶¶ 679, 686–688.

Petrobras was not the only company that incurred criminal and civil liability with U.S. and

Brazilian authorities stemming from Operation Lava Jato. Several shipyard contractors eventually

signed deferred prosecution or plea agreements with the Fraud Section of the U.S. Department of

Justice and the U.S. Attorneys' Office for the Eastern District of New York, or "leniency

agreements" with Brazil's Attorney General's Office and Office of the Comptroller General.

Those contractors included (1) Keppel Offshore & Marine Ltd. ("Keppel"), the owner of the BrasFels shipyard in Brazil, EIG MSJ Sealing Mot., Ex. 34, ECF No. 152-35 [hereinafter EIG Ex. 34]; EIG Redacted MSJ, Ex. 179, ECF No. 153-25; (2) Odebrecht S.A., OAS S.A, and UTC Engenharia S.A., the owners of the Estaleiro Paraguçu shipyard in Brazil, EIG Ex 34; EIG Redacted MSJ, Ex. 177, ECF No. 153-23; EIG Redacted MSJ, Ex. 188, ECF No. 153-33; EIG Redacted MSJ, Ex. 178, ECF No. 153-24; (3) Camargo Correa S.A., an owner of the Estaleiro Atlantico Sul shipyard in Brazil, EIG Ex. 34; EIG Redacted MSJ, Ex. 185, ECF No. 153-30; and (4) Engevix Group, an owner of the Rio Grande shipyard in Brazil, EIG Ex. 34; EIG Redacted MSJ, Ex. 187, ECF No. 153-32.

### 2. *The Drilling Rigs Project*

Petrobras discovered oil reserves off the coast of Brazil around 2007, referred to here as the "Pre-Salt Reserves." Petrobras Resp. SOF ¶ 35. In May 2008, at a meeting with the Brazilian federal government as well as other corporate entities and industry representatives, Petrobras announced its intent to charter drilling ships and platforms to exploit the Pre-Salt Reserves. EIG Redacted MSJ, Ex. 1, ECF No. 153-8. But sufficient drilling ships and platforms did not exist in Brazil, and due to domestic law, Petrobras would have to have them built in Brazil. At the end of that month, the Petrobras Executive Board endorsed the building of 28 drillings rigs in Brazil, "implying major investments in infrastructure to ensure that Brazilian industry has the capacity to compete in price and quality, manufacturing the equipment in accordance with the international standards required by the leading oil and gas companies." Petrobras Resp. SOF ¶ 38. Each individual rig would cost approximately $720 million to build; in total, the entity that would become Sete would need about $22 billion in capital. *Id.* ¶ 39.

In July 2008, Duque and Petrobras's Director of Exploration and Production, Guilherme Estrella, created an interdepartmental working group at Petrobras to propose the actions necessary to make it feasible to construct all 28 drillings rigs.  *Id.* ¶ 78.  That same month, a Finance division representative made a presentation to the working group emphasizing the importance of financing the rigs' construction "in a way that does not depend on guarantees from Petrobras, nor on its cash or financing." *Id.* ¶ 79.  The working group eventually recommended, as one strategy, contracting directly with shipyards "through a financial structure sponsored by Petrobras." *Id.* ¶ 80.  The following year, Petrobras hired Banco Santander Brasil S.A. ("Santander") as its financial advisor to assist in structuring and securing financing for the Rigs Project. *Id.* ¶ 81.  The next month, the Executive Board authorized Petrobras, through a foreign subsidiary, to contract for the construction of the first seven drill ships.  *Id.* ¶ 82; *see also id.* ¶ 87 (admitting that the Executive Board approved Petrobras Netherlands B.V. to serve as the foreign subsidiary for these purposes); *id.* ¶¶ 92–93 (Executive Board increased the number of rigs).  In March 2010, the Executive Board approved a strategy for implementing the Rigs Project's corporate and financial structure, and it also approved Santander as the "Financial Structurer" of the project. *Id.* ¶¶ 88–90.

In the second half of 2010, numerous steps were taken to establish the entities and processes by which the Rigs Project would be financed. *See id.* ¶¶ 95, 97–103.  At the end of 2010, Sete was formed, as part of the "financial structure conceived by Petrobras and its Advisors" for the Rigs Project. *Id.* ¶ 104.  Petrobras held 10% of Sete's shares and FIP Sondas, a Brazilian investment vehicle through which equity holders (including EIG) invested in Sete, held the remaining 90%. *Id.* ¶ 105.  Critically, Petrobras's Services division "structured the [drillings rigs] project, together with the financial area.  In other words, [Duque, as head of the Services division,] was involved

until an advanced stage of the project"—"[u]ntil the stage when Sete Brasil was created, the year when Sete Brasil was created. Then Sete Brasil started to lead the processes." *Id.* ¶ 46.

In December 2010, Petrobras temporarily appointed Ferraz as Sete CEO and Barusco as Sete COO. *Id.* ¶¶ 107–108. They thus began to act on behalf of Sete while still employed by Petrobras. *Id.* ¶ 109. In March 2011, the Petrobras Executive Board formally nominated Ferraz and Barusco to those positions. *Id.* ¶¶ 110–111. In May, Sete's shareholders approved their appointments. EIG Reply SOF ¶¶ 38, 42. Duque, still at Petrobras, remained involved with Sete and the contracting of the remaining 21 rigs. Petrobras Resp. SOF ¶ 117. Later, in May 2012, Ferraz asked Musa—also a former Petrobras employee—to join Sete as Director of Investments, and in December 2012, Musa took over Barusco's role as Director of Operations. *Id.* ¶¶ 115–116.

In August 2012, Sete entered into contracts with various shipyards for the second set of drilling rigs (after Petrobras had run the bidding process for the first seven rigs, awarded the first contracts to Estaleiro Atlantico Sul, and assigned the contracts to Sete, *id.* ¶¶ 82, 85, 118, 120–121). Sete entered into charter agreements with Petrobras for those drillships. *Id.* ¶¶ 425–426.

The bribery scheme that Petrobras had run for years carried over to Sete. Both Petrobras and Sete contracted with "the same suppliers, and [the kickbacks] *continued* at Sete Brasil." Barusco Testimony at 42 (emphasis added). Duque and Barusco were among those in charge of the scheme, along with a representative of the Workers' Party, João Vaccari Neto. *Id.* at 53; *see also id.* at 43–44 (Barusco discussing how he negotiated the kickbacks at Sete, as he had at Petrobras, in the contracts with shipyards). As early as 2010, when Petrobras awarded and assigned to Sete the contracts for the first seven rigs, Petrobras Resp. SOF ¶¶ 82, 85, 118, 120–121, Barusco, Duque, and Vaccari were negotiating bribe payments. Barusco Testimony at 44.

Barusco confirmed these arrangements during his sworn testimony as part of the criminal investigation in Brazil. He testified that "the idea of kickbacks" at Sete "did not come up, it was born together," meaning that "the practice of a 1% kickback in construction contracts came from Petrobras and migrated to Sete Brasil." *Id.* at 42. Barusco explained that the kickbacks were split so that all of the money from a particular set of contracts would cover the two-thirds that went to the Workers' Party, while different contracts would cover the remaining third to be split among "house one" and "house two" (that is, Petrobras and Sete executives). *Id.* at 44–46.

3.    *EIG*

In 2010, EIG was seeking opportunities to invest in Brazil. A central figure in this effort was Kevin Corrigan, the most senior investment professional on the team that would eventually evaluate the potential Sete investment (the "Deal Team"). Petrobras Resp. SOF ¶¶ 135–137. Working with him on that team were Kevin Lowder, Clay Taylor, and Simon Hayden. *Id.* ¶ 138. The Deal Team received information from Santander, which the Deal Team understood to be acting as a financial advisor for the Sete transaction. *Id.* ¶¶ 140–141. Later, Lakeshore Financial Partners Participações ("Lakeshore") assumed the role of Sete's financial advisor, and the Deal Team received information about the Sete investment from Lakeshore, too. *Id.* ¶¶ 144–147.

EIG first learned of the Sete investment opportunity through an email that Corrigan received from a former colleague then working at Société Générale, a French investment bank, which included a presentation about the Rigs Project. *Id.* ¶ 148. This was the first of many communications and documents EIG would receive about Sete as it decided whether to pursue an investment; the court discusses many of these communications and documents in greater detail in its substantive discussion of EIG's fraud claim. EIG, as one would expect, conducted its own due diligence on the information it received. These efforts culminated in a final, positive Investment

Recommendation, dated June 27, 2011. *Id.* ¶¶ 316, 340. Also on June 27, 2011, EIG's Investment Committee approved the investment. *Id.* ¶ 352; *see also id.* ¶¶ 366–370 (explaining that EIG's Investment Committee approved "an investment of up to R$250,000,000 of common equity in FIP Sondas" on September 16, 2011, upon review of a revised Investment Recommendation). Afterwards, EIG still continued to receive and review additional information about Sete. *See id.* ¶¶ 354, 363, 383, 398, 405.

EIG entered into a series of investment agreements, including on June 30, 2011, and July 31, 2012. *See* EIG MSJ Sealing Mot., Ex. 52, ECF No. 152-53; Petrobras Opp'n Sealing Mot., Ex. 12, ECF No. 179-11 [hereinafter EIG Ex. 12]; EIG MSJ Sealing Mot., Ex. 80, ECF No. 152-79; EIG MSJ Sealing Mot., Ex. 81, ECF No. 152-80. It made its first investment payment on August 3, 2012. Petrobras Resp. SOF ¶ 430. Its payments went from EIG to Sete-related Luxembourg entities, which then invested in FIP Sondas (which at this point owned 95% of Sete's shares). *Id.* ¶¶ 427–431. EIG went on to make additional contributions over the following years, until January 2015. *Id.* ¶¶ 432, 434, 436, 438, 440, 442, 444, 446, 448, 450, 452, 454. EIG's transfers of funds to the Luxembourg entities totaled $221,111,177.44, and the investment in Sete through FIP Sondas made by EIG totaled BR$509,459,990. *Id.* ¶ 456.

### 4.    Sete's Downfall

Pieces of Brazilian authorities' Lava Jato investigation began to become public in March 2014. EIG Redacted MSJ, Ex. 168, ECF No. 153-19, at 3. Specifically, news broke of the arrest of Paulo Roberto Costa, Petrobras's former Chief Downstream Officer. *Id.* When his testimony became public in October 2014, Petrobras hired independent counsel for an internal investigation into the events around Operation Lava Jato. Petrobras Resp. SOF ¶ 498. In November 2014, it became public that Barusco had entered a plea agreement with Brazilian prosecutors, though the

contents of his plea were not publicly known. *Id.* ¶ 499. This revelation prompted Sete's then-CEO, Luiz Eduardo Guimarães Carneiro ("Carneiro"—also a former Petrobras employee), *id.* ¶¶ 469–470, to initiate an internal audit and investigation as to all documents and contracts related to the Rigs Project. *Id.* ¶ 502. Sete retained the law firms of Clifford Chance and Veirano Advogados and the consulting firms of PricewaterhouseCoopers and KPMG. *Id.* ¶ 503. Between November and December 2014, the two law firms issued four separate opinion letters concluding that—based on their review of the Rigs Project-related documentation only—they had not identified any violation of U.S. or Brazilian law. *Id.* ¶ 504.

By early November 2014, before the news of Barusco's plea agreement broke, Sete was on track to sign long-term financing contracts with the Brazilian Development Bank ("BNDES"), "which were in parallel with the release of another short-term line of credit with Banco de Brasil." *Id.* ¶ 506. Sete's long-term financial viability was dependent on closing these debt arrangements: it did "not have the means to make the payments already due and coming due to the shipyards." *Id.* ¶ 510. But progress toward closing was "halted by news appearing in the media about Operation Car Wash involving various stakeholders in the company," including Barusco. *Id.* ¶ 506. Because of this news, Sete's lenders resubmitted the debt agreements for internal approval. *Id.* ¶ 507. This review resulted in less favorable terms for Sete and, importantly, a condition that Petrobras and the shipyards sign anticorruption declarations. *Id.* Specifically, in December 2014, BNDES added a requirement that "declarations . . . be executed by the respective operators, [Engineering, Procurement, and Construction] contractors, and by Petrobras under terms that are satisfactory to BNDES, stating that there was no corruption in relation to the Project." *Id.* ¶¶ 512–513. In December and January 2015, Petrobras submitted drafts of the anticorruption declarations to BNDES and other lenders. *Id.* ¶¶ 531, 533–534.

By early February, among the final remaining steps before finalizing financing was the signing of an Asset Management Agreement ("AMA") between Sete and Petrobras.  *Id.* ¶¶ 523–524, 540–541.  That step was scheduled to be completed on February 5, 2015.  *Id.* ¶ 546.  But on February 5, the full contents of Barusco's plea agreement and testimony were made public, which implicated Sete in the corruption scheme.  EIG MSJ Sealing Mot., Ex. 158, ECF No. 152-157 [hereinafter EIG Ex. 158]; EIG Redacted MSJ, Ex. 159, ECF No. 153-17 [hereinafter EIG Ex. 159].  Carneiro, Sete's CEO, wrote an email on that day explaining that because of "the disclosure . . . by the press" of Barusco's plea agreement, the anticorruption statements and AMA contracts were not submitted to the Petrobras Executive Board.  EIG Ex. 158.  He further wrote that the information in the plea agreement "ma[de] it impossible" to submit the anticorruption statements.  *Id.*; *see also* Petrobras Resp. SOF ¶ 557.

What followed was the dissolution of Sete.  Financing with BNDES and others fell through.  Petrobras Resp. SOF ¶¶ 563, 566–571, 590.  Sete, lacking resources and unable to obtain credit, was unable to pay its contracts with shipyards, *id.* ¶¶ 558–561, 564, 591.  Ultimately, FIP Sondas's full investment in Sete "posted at a book value of zero," with a negative net equity "on account of the lack of funding to pay its operating expenses."  *Id.* ¶ 623.  FIP Sondas sold its full interest in Sete for the symbolic value of one Brazilian real.  *Id.* ¶ 624.  EIG's entire investment in Sete was lost.

### B.     Procedural Background

EIG filed this suit in 2016.  A three-count Amended Complaint followed.  Am. Compl., ECF No. 11 [hereinafter EIG Am. Complaint].  Count I alleged that Petrobras had fraudulently induced EIG to invest in Sete by making materially false and misleading statements and omissions that failed to disclose the bribery scheme.  *Id.* ¶¶ 72–83.  In Count II, EIG accused Petrobras of

aiding and abetting Sete in making materially false and misleading statements and omissions that fraudulently induced EIG to invest in Sete. *Id.* ¶¶ 84–97. And, Count III claimed that Petrobras and various shipyard companies had conspired to defraud EIG into investing in Sete. *Id.* ¶¶ 98–111.

Each defendant filed a motion to dismiss, asserting both jurisdictional and pleading sufficiency grounds for dismissal. *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.* (*EIG I*), 246 F. Supp. 3d 52, 65–66 (D.D.C. 2017). The court concluded that Petrobras was not immune from suit under the Foreign Sovereign Immunities Act ("FSIA") and that EIG had alleged plausible claims against Petrobras for both fraud and aiding and abetting. *Id.* at 61–62. But the court concluded that it lacked personal jurisdiction over the shipyard defendants and that EIG had failed to state a plausible conspiracy claim against any defendant, leaving only claims against Petrobras on the first two causes of action. *Id.* at 62.[4] On interlocutory review, the D.C. Circuit affirmed that the FSIA conferred jurisdiction as to Petrobras. *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro, S.A.* (*EIG II*), 894 F.3d 339, 349 (D.C. Cir. 2018).

Following discovery, each side now moves for summary judgment. Def.'s Consent Mot. for Leave to File Documents Under Seal, ECF No. 155 [hereinafter Petrobras MSJ Sealing Mot.], Def.'s Mot. for Summ. J., ECF No. 155-3 [hereinafter Petrobras MSJ]; EIG Redacted MSJ. As part of the briefing, EIG seeks to exclude Petrobras's expert report, and Petrobras asks the court to strike certain supporting declarations of EIG's experts. The court held oral argument on June 7, 2022. *See* Hr'g Tr., ECF No. 197 [hereinafter Hr'g Tr.].

---

[4] EIG's investment manager, EIG Management Company, LLC, was also initially a plaintiff in the action. *See* EIG Am. Compl. But the court concluded that this plaintiff did not have standing to assert claims against Petrobras. *EIG I*, 246 F. Supp. 3d at 61.

### III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"; its opposition must be "supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that a reasonable jury could find in its favor. *Elzeneiny*, 125 F. Supp. 3d at 28 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### IV.    DISCUSSION

The court's discussion proceeds as follows. It first takes up Petrobras's renewed challenge to the court's jurisdiction. It then turns to the evidentiary record and addresses whether either party is entitled to summary judgment on EIG's remaining claims of fraud and aiding and abetting. The court concludes with a discussion of damages.

#### A.    Foreign Sovereign Immunities Act

"The Foreign Sovereign Immunities Act provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355

(1993) (internal quotation marks omitted).  "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Id.*  "Once the defendant has asserted the jurisdictional defense of immunity under the FSIA, the court's focus shifts to the [Act's] exceptions to immunity . . . ." *Phx. Consulting Inc. v. Republic of Angl*, 216 F.3d 36, 40 (D.C. Cir. 2000).  "In accordance with the restrictive view of sovereign immunity reflected in the FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity," *id*. (internal quotation marks omitted), even though the plaintiff "bears the ultimate burden of proving its substantive claims," *EIG II*, 894 F.3d at 345.  Here, at the summary judgment stage, what these principles mean is that once EIG comes forward with sufficient facts to establish a prima facie case for jurisdiction, the burden shifts to Petrobras to "establish an affirmative defense to jurisdiction" by showing that there is no genuine dispute of material fact that the FSIA exception does not apply.  *See EIG II*, 894 F.3d at 345.  In other words, EIG's burden is one of production; Petrobras has the burden of persuasion.

EIG invokes the so-called "direct-effect exception" to foreign-state immunity, under which Petrobras is subject to the jurisdiction of U.S. courts if it has "caused a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Under that exception, EIG must show that the lawsuit is "(1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and (3) that 'cause[d] a direct effect in the United States.'"  *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (quoting 28 U.S.C. § 1605(a)(2)).[5]  Petrobras does not contest either element one or

---

[5] There are two other ways to establish jurisdiction based on a foreign state's commercial activities:  the FSIA permits the exercise of jurisdiction where the action is based on (1) "a commercial activity carried on in the United States by

two.  *See* Petrobras MSJ Sealing Mot., Def.'s Mem. of P. & A. in Supp. of Its Mot. for Summ. J.,

ECF No. 155-4 [hereinafter Petrobras MSJ Mem.], at 9–18.  Only the third—the presence of a

direct effect in the United States—is at issue.

On interlocutory review, the D.C. Circuit said that EIG could establish a prima facie case

for jurisdiction under the direct-effect exception by showing that (1) "Petrobras specifically

targeted U.S. investors for Sete," (2) "Petrobras intentionally concealed the ongoing fraud at

Petrobras and at Sete," and (3) "money invested in Sete was used to pay bribes and kickbacks."

*EIG II*, 894 F.3d at 345.  The court held that EIG had adequately plead facts to support those

elements.  The question now is whether discovery has borne out the allegations in EIG's complaint,

and if so, whether Petrobras can otherwise overcome EIG's prima facie case.

### 1.    *EIG's Prima Facie Case*

To be clear, EIG's burden is not to establish that there is no genuine dispute of material

fact as to jurisdiction; its burden is one of production only.  EIG meets this burden by adducing

facts, supported by proof, satisfying the three elements of the prima facie case set forth in *EIG II*.

*See Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)

(explaining that the plaintiff "bears the initial burden to overcome" the FSIA's presumption of

immunity "by producing evidence that an exception applies").  The court takes those elements in

the order articulated by the D.C. Circuit.

*Specific Targeting.*  EIG cites ample evidence showing that Petrobras "specifically targeted

U.S. investors for Sete."  *EIG II*, 894 F.3d at 342.

---

the foreign state" or (2) "an act performed in the United States in connection with a commercial activity of the foreign
state elsewhere."  28 U.S.C. § 1605(a)(2).  EIG invokes neither of these alternatives.  *See* Pls.' Unopposed Mot. for
Leave to File Documents Under Seal, ECF No. 174 [hereinafter EIG Opp'n Sealing Mot.], Pls.' Mem. of P. and A. in
Opp. To Def.'s Mot. for Summ. J., ECF No. 174-2 [hereinafter EIG Opp'n] at 5–15; Hr'g Tr. at 35.

Records from Sete's formative stages show Petrobras's interest in attracting U.S.-based investment. Documents from 2009 reference in-person trips to the United States to engage with potential investors. In October 2009, one Petrobras Engineering Department employee sent Ferraz, who at that time was Petrobras's point person on the Sete project, an English-language presentation about the Rigs Project "for dissemination during [a] trip to Norway and the USA." Pls.' Unopposed Mot. for Leave to File Documents Under Seal, ECF No. 174 [hereinafter EIG Opp'n Sealing Mot.], EIG's (I) Resp. to Petrobras's Statement of Undisputed Material Facts, & (II) Statement of Additional Undisputed Material Facts, ECF No. 174-3 [hereinafter EIG Resp. SOF], ¶¶ 661–662; *see also id.* ¶ 663 (indicating that Ferraz responded to the Engineering Department employee with a revised presentation); Petrobras Resp. to EIG Additional SOF ¶¶ 661–663. Just a few weeks later, in November 2009, Ferraz emailed a Petrobras Investor Relations team member that he was "in the middle of a road show covering a series of presentations and meetings with ECAs [Export Credit Agencies] and international suppliers for the Rigs Project," and that the previous day he had met with "US-Exim," the Export-Import Bank of the United States. Petrobras Resp. to EIG Additional SOF ¶ 664. Ferraz said the US-Exim Bank had "showed a lot of interest, since the project will require an enormous order for goods and services from U.S. companies." *Id.* (admitting the quoted language appears in the email while pointing to other language suggesting that US-Exim faced "constraint[s] . . . preventing them from participating").[6]

Records from 2010 confirm that Petrobras continued to contemplate U.S.-based investors for Sete. Santander, Petrobras's selected investment banker, created a document titled "List with

---

[6] Petrobras makes the point that it was seeking debt financing from the US-Exim Bank, not equity investment. It is not clear to the court why that distinction matters. Both forms of financing "specifically targeted" an infusion of U.S.-based capital.

Potential Investors to be visited during Pre-Deal Roadshow," dated April 2010. *Id.* ¶ 666; EIG Opp'n Sealing Mot., Ex. 223, ECF No. 174-12 [hereinafter EIG Ex. 223].   That document explained that "Petrobras [was] in the process of structuring a new company . . . [that] will implement and operate . . . drillings rigs to be used in part of the Pre-Salt fields."  EIG Ex. 223 at 4.  The document stated that this new company "intend[ed] to obtain funds . . . from local and foreign institutional investors," "right from the start of structuring the [new company] and Rigs Project." *Id.*  Petrobras's "goal," according to the document, was to "schedule meetings about the Rigs Project" with certain potential investors, including "[p]ension funds located in . . . North America." *Id.*  The document specifically identified BlackRock and Capital Group, both based in the United States, as "[p]otential [i]nvestors." *Id.* at 8.

Other records from that time period shed further light on Petrobras's targeting of U.S. investors.  One Petrobras document titled "Drilling Rigs Project in Brazil Weekly Meeting," dated March 4, 2010, discussed "[a]ttracting [i]nvestors."  EIG Opp'n Sealing Mot., Ex. 222, ECF No. 174-11 [hereinafter EGI Ex. 222], at 3–4; Petrobras Resp. to EIG Additional SOF ¶ 665 (denying in part on the basis of EIG's characterization of the document as "focusing on" potential investors, but admitting its contents).  It included a map of the United States showing the locations of fifteen potential U.S. investors, including Morgan Stanley, Goldman Sachs, and JP Morgan. EIG Ex. 222 at 10.  Similarly, in correspondence with Petrobras Investor Relations, Ferraz wrote about an upcoming conference hosted and organized by the U.S. company Marine Money to be held in Rio de Janeiro.  On August 24, 2010, Ferraz wrote that "[s]ince all the big banks will be in attendance" at the conference, "it may be a good opportunity for us to tap into the market, to prepare everyone for the next moves following capitalization, when we will be seeking equity and debt for the viability of the project."  EIG Opp'n Sealing Mot, Ex. 227, ECF No. 174-15, at 3.

After agreeing to present at the conference, Ferraz received from Marine Money an agenda (which featured "a reminder that US Passport Holders . . . need a visa to visit Brazil") and list of attendees, which included U.S.-based firms like Jefferies & Company, Inc.; Standard Chartered Bank; BNP Paribas USA; DnB NOR Bank ASA USA; and Natixis USA.  EIG Opp'n Sealing Mot., Ex. 229, ECF No. 174-17, at 5–8, 11.  The slide deck presentation that Ferraz delivered at the Marine Money conference, held on September 16, 2010, was titled "The Drilling Rigs Project: Petrobras' Strategy for a successful implementation."  EIG Opp'n Sealing Mot., Ex. 230, ECF No. 174-18 [hereinafter EIG Ex. 230].  The presentation included a "[c]autionary [s]tatement for US investors" on its very first page, warning that "[w]e use certain terms in this presentation, such as oil and gas resources, that the SEC's guidelines strictly prohibit us from including in filings with the SEC."  EIG Ex. 230 at 3.

The following year, Petrobras again participated in a conference attended by potential U.S.-based investors.  On March 1, 2011, Barbassa—Petrobras's CFO, Chief Investor Relations Officer, and a member of the Petrobras Executive Board—accepted an invitation to speak at a conference in Rio de Janeiro hosted by First Reserve, a U.S. private equity company.  Petrobras Resp. to EIG Additional SOF ¶ 679; EIG Opp'n Sealing Mot., Ex. 232, ECF No. 174-20 [hereinafter EIG Ex. 232].  In advance of his speech, Barbassa asked Petrobras employees to "prepare a presentation like those for suppliers, also highlighting the Sete Brasil investment opportunities."  EIG Ex. 232 at 4.  Conference participants included eight First Reserve employees based in Greenwich, Connecticut and Houston, Texas.  *Id.* at 15.

At least two U.S.-based investors expressed interest in investing in Sete during the summer of 2011.  In July 2011, a few months after the First Reserve conference, the CEO of Diamond Mountain Capital Group LLC, which has an office in Miami, Florida, wrote to Barbassa and

20

another Petrobras employee: "Thank you for the excellent meeting on the 18th. I would like to confirm that we are extremely interested in the Sete Brasil investment that we discussed.  Please inform me of the next steps so that we can proceed with this operation."  EIG Opp'n Sealing Mot., Ex. 240, ECF No. 174-26, at 3–4.  In August 2011, Alex Zyngier, from Smith Management LLC in New York, similarly wrote to Barbassa, "It was nice to meet you during the Bank of America dinner a few weeks ago."  EIG Opp'n Sealing Mot., Ex. 242, ECF No. 174-28, at 3.  Zyngier went on to inquire, "I would like to ask you if there is a possibility of speaking with someone from Petrobras . . . . From our perspective, we would be looking for opportunities to invest passively or actively, as in the case you mentioned of Sete Brasil."  *Id.*  Barbassa connected Zyngier with Ferraz, who by this time had moved to Sete.  *Id.*[7]

Petrobras disagrees that these facts are capable of establishing "specific targeting" of U.S. investors.  First, Petrobras seems to say that many of the actions do not count because they occurred in Brazil.  *See* Petrobras Reply Sealing Mot., Def.'s Reply Mem. of P. & A. in Supp. of Petrobras Motion for Summ. J., ECF No. 189-3 [hereinafter Petrobras Reply], at 6 (suggesting that Petrobras could not have specifically targeted U.S. investors by presenting information about Sete at two conferences in Brazil).  But the fact that some of the "targeting" acts occurred in or from Brazil is of no import.  The direct-effect exception is fundamentally one for actions taken by foreign states *outside* the United States that nonetheless have direct effects within the United States.  *See* 28 U.S.C. § 1605(a)(2).  So, it makes no difference that some of Petrobras's

---

[7] Petrobras asserts that the examples from this paragraph do not tend to show Petrobras contemplated or targeted U.S. investors because they occurred after Sete started to operate independently.  *See* Petrobras Reply at 7 n.2.  But it makes no difference whether Sete was or was not operating independently at the time of the communications, as Barbassa— unlike Ferraz and Barusco—only ever worked for Petrobras.  These examples show that Barbassa, on behalf of Petrobras, engaged with potential Sete investors based in the U.S., clearly contemplating their potential investment.

communications with U.S.-based investors—via presentations, conferences, emails, and otherwise—originated in Brazil.

Petrobras next, and somewhat relatedly, argues that the court cannot consider documents aimed at or interactions with investors other than EIG.  It argues that "[u]nder FSIA, it is the acts that plaintiffs' claims actually are 'based upon' that must cause the direct effect in the United States."  Petrobras Reply at 5 (quoting 28 U.S.C. § 1605(a)(2)).  And the evidence that EIG points to, Petrobras continues, consists of "presentations and emails concerning *other* potential investors, not EIG."  *Id.* (emphasis added).  "Petrobras['s] interactions with *other* entities do not constitute an element of EIG's claims," Petrobras says, "[s]o EIG's claims are not 'based upon' any of the[se] alleged interactions."  *Id.* at 6.  In so arguing, Petrobras misunderstands the purpose of the other-investor evidence.  The court does not dispute that acts upon which a plaintiff's claims are based must cause the "direct effect in the United States."  That is plain from the statutory text.  But Petrobras's interactions with investors other than EIG supports another element of the jurisdictional inquiry: whether Petrobras "specifically targeted U.S. investors for Sete."  *EIG II*, 894 F.3d at 345.  To meet its burden of production as to that component of the prima facie case, EIG surely can rely on Petrobras's interaction with U.S.-based investors other than EIG.  *See id.* (stating that a prima facie case can be met where the "defendant's misrepresentations about [an] investment cause[d] [a] direct effect in [the] United States when [the] defendant 'contemplated investment *by United States persons*' and '*at least some investors . . .* suffered an economic loss in this country as a result of those misrepresentations'" (quoting *Atlantica Holding, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016) (emphasis added)).  The other-investor evidence establishes that Petrobras "specifically targeted U.S. investors for Sete," including EIG.

22

Next, Petrobras appears to suggest that because some of the conferences EIG points to were attended by both Brazilian and other international investors, Petrobras's efforts to engage investors at those conferences are either not "specific" enough or not "targeting" U.S. investors at all.  *See* Petrobras Reply at 6.  The court sees no reason why this should be the case.  The fact that Petrobras sought investment from non-U.S. investors does not mean it did not "specifically target" U.S.-based investors, as well.  The evidence plainly demonstrates that Petrobras did both. The D.C. Circuit never said that Petrobras's efforts to find investors in Sete needed to be *exclusive* to U.S.-based investors in order to make out its prima facie case.

In any event, the undisputed evidence indicates that Petrobras *did* contemplate an investment from EIG and targeted EIG specifically.  Petrobras argues that "it was EIG that pursued Petrobras in Brazil about an investment in Sete . . . [EIG] first learned about Sete from informal discussions with [a third party] . . . [and EIG] initiated each of the[] interactions."  Petrobras MSJ Mem. at 1,13.  But Petrobras has not articulated a reason why the court should be bound by such a restrictive understanding of "contemplat[ing]" or "specifically target[ing]" U.S. investors. *EIG II*, 894 F.3d at 345.  To be sure, Corrigan first learned about Sete through a former co-worker. Petrobras Resp. to EIG Additional SOF ¶ 697.  But Petrobras did not discourage EIG's interest in investing; in fact, it facilitated and promoted it.  In October 2010, Santander sent Corrigan and Clay Taylor, another EIG employee, an English-language presentation about the "Pre-Salt Oil Rigs Project" that was "prepared by Petrobras Netherlands B.V. . . . advised by its wholly-owned shareholder Petroleo Brasileiro S.A.-PETROBRAS and Banco Santander Brasil S.A."  EIG MSJ Sealing Mot., Ex. 16, ECF No. 152-18 [hereinafter EIG Ex. 16], at 1, 4.  The presentation touted a "[u]nique [o]pportunity to participate in the development and exploration of the Pre-Salt area in partnership with Petrobras."  *Id.* at 6.  The ownership structure, as graphically represented in the

presentation, included "[l]ocal and [i]nternational [i]nvestors."  *Id.* at 11.  Two months later, on December 29, 2010, Petrobras—through Santander—gave EIG permission to access a virtual "Data Room" that contained detailed information about the Sete investment opportunity. *See* Petrobras Resp. SOF ¶¶ 180–181 (admitting that EIG was provided access to the Data Room but clarifying that it first had to sign a confidentiality agreement).  Petrobras's engagement with EIG continued afterward.  In March 2011, before Ferraz was officially accepted by Sete's shareholders as its CEO, Ferraz hosted Corrigan for a meeting in Brazil concerning Sete.  *Id.* ¶ 235. In August 2011, EIG representatives met in Brazil with Ferraz, Luis Reis from Lakeshore, and Barbassa, then the Petrobras CFO and Chief Investor Relations Officer.  *Id.* ¶¶ 363–364.  EIG met with Barbassa again in March 2012; on that visit, the group toured the Keppel shipyard.  *Id.* ¶¶ 405–408.  Regardless of who first initiated communications about Sete, it does not change the fact that Petrobras engaged with EIG in a sustained course of dealing over many months that conveyed its desire to obtain an investment from EIG—one that ultimately resulted in an equity investment worth hundreds of millions of dollars.  That is "specific targeting" of EIG.

Petrobras attempts to avoid this conclusion based on deposition testimony from Kevin Corrigan, who EIG designated as its Rule 30(b)(6) witness.  Corrigan testified that his October 2010 meeting with Ferraz "was a friendly discussion," and that he thought "it was the genesis of [Petrobras's] eventual opening up to a foreign investor," as "[t]he original thesis of this transaction did not foresee outside investors."  Petrobras MSJ Sealing Mot., Ex. 10, ECF No. 155-12 [hereinafter Petrobras Ex. 10], at 24–25.  He also stated that it was his understanding in October 2010 that there was not a "desire to have international investors in Sete Brasil," but that this impression "did not come from Ferraz."  *Id.* at 31–32.  Rather, he said, "I was in contact with their financial advisors who were telling me that."  *Id.* at 32.  Corrigan was later asked whether, "as of

March 2011, Petrobras had not expressed interest in EIG being an investor in Sete Brasil." *Id.* at 35–36. He disagreed with that characterization and instead said, "this was a process of getting to know us, of they themselves deciding that it was a good idea to have an outside of Brazil investor . . . and, you know, I think it happened over time, but eventually, obviously, they were happy we were there and we went in." *Id.* at 36. Based on this testimony, Petrobras contends, "EIG concedes that Sete was not intended to have U.S. investors." Petrobras MSJ Mem. at 12.

There are two main problems with this argument. The first is that the evidence is not admissible for the purpose for which Petrobras offers it. If offered to prove the truth of what Corrigan understood (that Petrobras, in fact, was not seeking U.S. investors), the testimony is hearsay, because his understanding is based on an out-of-court declaration by an unidentified person at Santander. FED. R. EVID. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). The testimony is admissible as a statement of a party opponent, *see* FED. R. EVID. 801(d)(2), but only insofar as it establishes Corrigan's understanding at the time. Absent a second-level hearsay exception, Corrigan's testimony is not proof that Petrobras did not in fact specifically target U.S. investors.

Petrobras argues that there is an applicable second-level hearsay exception: the statements by Santander to Corrigan are admissible to show Petrobras's intent with respect to U.S. investors under Federal Rule of Evidence 803(3). *See* Hr'g Tr. at 14 ("If Santander is telling [Corrigan] that we're not interested in U.S. investors, that would be evidence of whether or not Santander, who's acting for Petrobras, was intending to solicit U.S. investors."). But even if that were so—and the court is not saying Rule 803(3) applies—what Corrigan was told by a Santander employee is hardly a "concession" by EIG that defeats its prima facie case. EIG easily has met its burden of production

by identifying numerous records, previously discussed, showing that Petrobras took active steps to attract and secure capital for Sete from U.S.-based investors.  The facts as they relate to EIG alone establish this.  It is undisputed that by the end of 2010 Petrobras had granted EIG access to the Data Room to allow EIG to rigorously evaluate whether to invest in Sete.  Why else would Petrobras make confidential commercial information available to EIG if not for the purpose of attracting its investment?   Corrigan's understanding of Petrobras's intent, via Santander, is therefore not enough to defeat EIG's prima facie case.

*Intentional Concealment.*   The next element of EIG's prima facie case—that Petrobras "intentionally concealed the ongoing fraud at Petrobras and at Sete"—is easily established.  *EIG II*, 894 F.3d at 345.  First, EIG points to evidence that Petrobras was aware of the fraud at Petrobras and Sete.  *See* Barusco Testimony at 53 (describing how the kickback scheme "started at Petrobras and the persons in charge were . . . Mr. Vaccari, Mr. Duque, and [Barusco]"); *see infra* pp. 52–54. And second, EIG identifies myriad communications between Petrobras and EIG in which Petrobras kept information about the fraud from EIG before it made its investment.  *See, e.g.*, EIG MSJ Sealing Mot., Ex. 14, ECF No. 152-16 [hereinafter EIG Ex. 14]; EIG Ex. 16; EIG MSJ Sealing Mot., Ex. 8, ECF No. 152-10 [hereinafter CIM]; EIG MSJ Sealing Mot., Ex. 20, ECF No. 152-22 [hereinafter Caixa Memorandum]; EIG MSJ Sealing Mot., Ex. 30, ECF No. 152-31.

Petrobras focuses on two allegations EIG previously made at the motion-to-dismiss stage: (1) that Petrobras created Sete for the purpose of perpetrating and expanding a corruption scheme and (2) that Ferraz and Barusco were appointed to positions at Sete by Petrobras for the purpose of continuing corruption.  Petrobras Opp'n Sealing Mot., Def.'s Mem. of P. & A. in Opp'n to Pls.' Mot. for Summ. J., ECF No. 179-3 [hereinafter Petrobras Opp'n], at 7–8; *see EIG I*, 246 F. Supp. 3d at 72.  Petrobras argues that now, after discovery, "there is substantial evidence that Petrobras

created Sete for a legitimate business purpose, not fraud," and there is also evidence that Ferraz and Barusco were chosen for positions at Sete for reasons having "nothing to do with corruption." Petrobras Opp'n at 7–8.  The court agrees that Sete had a valid business purpose:  the construction of drill rigs that Petrobras could charter from Sete to exploit newly found oil reserves.  *See, e.g.*, Def.'s Mem. of P. and A. in Opp'n to Pls.' Mot. for Summ. J., ECF No. 180 [hereinafter Petrobras Redacted Opp'n], Ex. 5, ECF No. 180-2, at 9–13 (deposition testimony of Pedro Bonesio, the former Corporate Finance and Treasury Executive Manager at Petrobras, explaining that Sete was created to provide access to drilling rigs for Petrobras); Petrobras Redacted Opp'n, Decl. of Pedro Augusto Bonesio, ECF No. 180-3 [hereinafter Bonesio Decl.], ¶¶ 5–9; Barusco Testimony at 42–43.  Likewise, there is some evidence that Ferraz and Barusco were recommended for Sete leadership positions in part due to their business experience.  *See* Bonesio Decl. ¶¶ 11–13.

But it does not follow that EIG has not produced evidence that "Petrobras intentionally concealed the ongoing fraud at Petrobras and Sete."  *EIG II*, 894 F.3d at 345.  That element does not require EIG to show that Petrobras created Sete *solely* for fraudulent purposes, or that Ferraz and Barusco were sent to Sete *solely* for corruption-related reasons.  The evidence shows that a bribery scheme identical to the one executed at Petrobras was built into Sete's very DNA. Barusco's testimony is replete with statements to that effect.  Barusco Testimony at 44–47, 49–50, 53–56.  Critically, he testified that the idea of kickbacks and the plan for Sete were "born together" and that the "practice of a 1% kickback in construction contracts came from Petrobras and migrated to Sete Brasil."  *Id.* at 42.  The fact that Sete had a legitimate business purpose does not mean that Petrobras did not also simultaneously conceal the ongoing fraud at Petrobras and Sete from EIG and other investors.

*Use of funds to pay bribes and kickbacks.* There is no dispute of fact as to the third element of the prima facie case: "money invested in Sete was used to pay bribes and kickbacks," *EIG II*, 894 F.3d at 345. Investors contributed capital to Sete, Sete used that capital to pay shipyards, the shipyards kicked back a percentage of the contract payments, and those kicked-backed sums were divided among executives of Petrobras, Sete, and the Workers' Party. *See* Barusco Testimony at 42–45, 53–54.

*      *      *

Because EIG has met its burden of production and established a prima facie case of jurisdiction, the burden shifts to Petrobras to establish an affirmative defense. *See EIG II*, 894 F.3d at 345. It is to that defense the court now turns.

### 2.    *Petrobras's Defense*

Petrobras's affirmative defense is, in sum and substance, that Petrobras's actions did not have a direct effect in the United States. Petrobras MSJ Mem. at 10–14. To make that argument, Petrobras details a litany of milestones between the time Sete began to operate as a separate entity (March 2011) to its ultimate demise (June 2016). They include:

> (i) Sete assuming responsibility for its fundraising; (ii) Sete closing its first-round of financing; (iii) Sete's shareholders confirming its initial officers; (iv) Sete contracting for construction of the first seven drilling rigs; (v) further communications between EIG and Sete; (vi) a decision by Sete to allow a US investor to participate; (vii) four years of Sete operations; and (viii) the collapse of the offshore drilling market.

*Id.* at 12. As a result of these events, Petrobras asserts, EIG's loss "cannot be an immediate consequence of Petrobras'[s] acts or commercial activity," as required for the direct-effect

exception to apply.  Petrobras MSJ Mem. at 12 (internal quotation marks omitted) (quoting *Weltover, Inc.*, 504 U.S. at 618).[8]  *See also* Petrobras Reply at 9.

This argument is essentially a reprise of the one Petrobras unsuccessfully made before the D.C. Circuit.  There, Petrobras asserted that the collapse of Sete's financing is what caused a direct effect in the United States, not its own actions.  *See EIG II*, 894 F.3d at 345–46.  The court rejected that argument for two reasons.  First, it concluded that "EIG was injured by Petrobras's alleged fraud even before the lenders withdrew."  *Id.* at 345–46.  Second, the D.C. Circuit reasoned that, "crucially[,] the lenders withdrew *for the same reason* that EIG's investment became worthless: Petrobras's alleged fraud plainly made Sete unsuitable for investment."  *Id.*

This reasoning applies with equal force to Petrobras's argument at the summary judgment stage.  As the D.C. Circuit said, "EIG's alleged injury—being fraudulently induced to invest in Sete—occurred well before Operation Car Wash came to light."  *Id.* at 347.  So, the fact that EIG made a final decision to invest only after Sete began to operate independently, and after Sete itself had made additional fraudulent statements, does not relieve Petrobras of responsibility for causing a direct effect.  Petrobras cultivated EIG's interest in investing in Sete for months, without ever disclosing that EIG's capital would be used to underwrite a bribery scheme that would migrate over to Sete.  The fact that EIG closed the deal only after Sete began to operate independently does

---

[8] Petrobras relies on *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511 (D.C. Cir. 1988), to argue that "a direct effect requires that something legally significant actually happen in the United States."  Petrobras Opp'n at 7; *see also* Petrobras MSJ Mem. at 9–10.  But as this court has previously noted, a direct effect need not "be legally significant" so long as it is "more than purely trivial."  *Exxon Mobil Corp.*, 534 F. Supp. 3d at 18 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)).  A Supreme Court case post-dating *Zedan*—*Republic of Argentina v. Weltover*—makes no mention of a "legally significant" requirement and instead focuses on the "decidedly less rigorous" standard of whether the effect is "more than purely trivial."  *Id.* at 18–19 (internal quotation marks omitted) (quoting *Weltover*, 504 U.S. at 618).  And Circuit cases in the years following *Zedan* neither apply nor reference an ostensible "legally significant act" test.  *See, e.g.*, *Princz*, 26 F.3d at 1172–73 (applying *Weltover*'s "purely trivial" standard (internal quotation marks omitted)); *EIG II*, 894 F.3d at 345–46 (similar); *see also Global Index, Inc. v. Mkapa*, 290 F. Supp. 2d 108, 113 (D.D.C. 2003) (noting the D.C. Circuit has not "expressly adopted or rejected the 'legally significant act' test," but instead follows the "more general approach set forth in *Weltover*").  The court therefore declines to impose such a requirement here.

not get Petrobras off the hook.  *See EIG II*, 894 F.3d at 346 (rejecting Petrobras's "highly restrictive causation requirement under which contributing factors readily and predictably caused by the defendant's same act would preclude jurisdiction").  Additionally, the subsequent events Petrobras cites, such as the global collapse of the offshore-drilling market, post-date the direct effect in the United States.

All the above reasoning applies to Count I and Count II alike, as EIG relies on a subset of the same Petrobras actions for its aiding-and-abetting claim (Count II) as it does for its fraud claim (Count I).  *See* EIG MSJ Sealing Mot., Mem. of P. & A. in Supp. of EIG MSJ, ECF No. 152-2 [hereinafter EIG MSJ Mem.], at 30–31 (relying, for purposes of establishing Petrobras's awareness of Sete's fraud, on the same evidence EIG points to for purposes of establishing intentional concealment in Count I); *id.* at 31–32 (similar, in context of establishing Petrobras's substantial assistance of Sete's fraud).  The court is satisfied that it has jurisdiction over EIG's claims under the FSIA's direct-effect exception.  It therefore proceeds to the merits.

### B.    Fraud

The first of EIG's two remaining claims is for fraud, specifically that Petrobras fraudulently induced EIG to invest in Sete.  To make out that claim, EIG must establish by clear and convincing evidence that Petrobras made false representations as to material facts with both knowledge of their falsity and the intent to deceive, and that EIG took actions in reliance on those representations. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013); *Wash. Inv. Partners of Del., LLC v. Secs. House, K.S.C.C.*, 28 A.3d 566, 575 n.7 (D.C. 2011).[9]  Rather than recreate the wheel, the court uses the legal framework from the motion-to-dismiss stage and applies it to the evidence (rather than the allegations) under the applicable summary judgment standard (rather

---

[9] Neither party argues for the application of any law other than the District of Columbia's.

than the standard for pleadings).  Using this framework, the court finds that EIG prevails on its fraud claim.

###### 1.  Duty to Disclose

A fraud claim based on a material omission is actionable only if the defendant had a duty to disclose.  *See EIG I*, 246 F. Supp. 3d at 84 (citing *Kapiloff v. Abington Plaza Corp.*, 59 A.3d 516 (D.C. 1948)).  Petrobras argues that it had no duty to disclose the corruption scheme to EIG.  Petrobras MSJ Mem. at 18.  The court disagrees.

The central premise of EIG's fraud claim is that, when Petrobras conceived of Sete, it knew that its long-standing bribery scheme would be implemented at Sete.  Barusco's uncontested testimony by itself proves that thesis.  He testified that Sete and the idea of kickbacks were "born together."  Barusco Testimony at 42.  A portion of every dollar invested in Sete and used to underwrite the shipyard agreements, he said, would ultimately go to pay bribes and kickbacks to the Workers' Party and Petrobras and Sete executives.  *See id.* at 44–45.  Thus, there is no genuine dispute that a corruption scheme was sewn into Sete's very fabric from the start.  "The act of soliciting money to fund such a scheme, without disclosing it . . . is quintessential fraud," and a duty to disclose unquestionably exists.  *EIG I*, 246 F. Supp. 3d at 84.

In a footnote, Petrobras argues that it had no duty to disclose because the evidence shows that Sete was created for legitimate purposes.  Petrobras MSJ Mem. at 21 n.6.  That is accurate as a factual matter.  But Petrobras cites no authority for the proposition that a duty to disclose arises only when an enterprise is conceived *solely* to commit fraud.  It is enough that *a* purpose of the enterprise was to commit fraud.  And that fact is undisputed here: the Rigs Project and the corruption scheme were conceived together.  *See* Barusco Testimony at 42–47, 49–50, 53–54, 55–56.  That is sufficient to have triggered a duty to disclose.

31

The court now moves from the general to the specific.  At the motion-to-dismiss stage, the parties agreed that *Menaldi v. Och-Ziff Capital Management Group, LLC*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016), a securities-fraud case, provided a framework to guide the court's analysis of duty and misrepresentation in this case.  *See EIG I*, 246 F. Supp. 3d at 85.  The parties rely on that framework once more.  *See* EIG MSJ Mem. at 11–17; Petrobras MSJ Mem. at 20.  According to *Menaldi*, a company has a duty to disclose the uncharged wrongdoing of its employees when it (1) "puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices"; (2) "makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring"; or (3) "states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." 164 F. Supp. 3d at 581 (internal quotation marks omitted); *see also Kapiloff*, 59 A.2d at 518 ("[T]he familiar principle [is] that when one undertakes to speak, either voluntarily or in response to inquiry, he must not only . . . state truly what he tells but also must not suppress or conceal any facts within his knowledge which materially qualify those stated.  If he speaks at all he must make a full and fair disclosure." (internal quotation marks omitted)).  The court will refer to these three circumstances as *Menaldi*'s "guideposts."  The court applies these guideposts to particular statements that EIG says gave rise to a duty to disclose.

### a.   September 2010 Drilling Presentation

EIG first points to statements contained within a September 2010 presentation titled "The Drilling Rigs Project: Petrobras' Strategy for its successful implementation" (referred to here as the "Drilling Presentation" or "Presentation").  EIG MSJ Mem. at 12; EIG Ex. 14.  EIG received this presentation via email not from Petrobras or Santander but from Société Générale.  The subject of the presentation was a "finance structure" to build drill ships for Petrobras to use to exploit oil

reserves—that is, what eventually became Sete.  EIG Ex. 14 at 29.  The presentation described Petrobras's "main objectives" for this project as "ensur[ing] the availability of its demand for drilling rigs for Pre Salt application, minimizing charter costs and associated risks." *Id.* at 31.  As the court previously observed, "[w]hat the Presentation did not disclose . . . was that one of Petrobras'[s] other main objectives in establishing Sete was to further the longstanding corruption scheme to enrich Petrobras executives and the Workers['] Party." *EIG I*, 246 F. Supp. 3d at 85 (internal quotation marks omitted).  Discovery has not changed the court's conclusion:  when Petrobras stated to potential investors that their capital would be used to build and ensure availability of drilling rigs, and thereby minimize charter costs and risks, it became duty-bound to also disclose "the corresponding illegitimate purpose of underwriting a bribe scheme designed to enrich certain Petrobras executives and government officials." *Id.*  That omission aligns with the third *Menaldi* guidepost (when a company expresses an opinion or makes a statement "that, absent disclosure, misleads investors about material facts underlying" it, 164 F. Supp. 3d at 581).

Other statements in the Drilling Presentation triggered a duty to disclose under the same *Menaldi* guidepost.  The Presentation included a chart of the corporate structure and agreements governing the parties in "[e]ach [d]rilling [u]nit."  EIG Ex. 14 at 33.  The chart included financial investors, strategic investors, foreign lenders, and local lenders as well as the contractors for the construction and chartering of drill ships.  *See id.*  This flow chart misled investors by not including illicit agreements with the Workers' Party.  *See generally* EIG Ex. 14; Barusco Testimony at 44–45.  Additionally, the Drilling Presentation identified the "Main Risks and Challenges" of the Rigs Project to include "Credit Risk," "Guarantees," "Shortfall of Revenues," "Technological Risk," "Charter Daily Rates," and "Delay and Cost Overrun."  EIG Ex. 14 at 26.  The failure to disclose

the bribery scheme made the "Main Risks and Challenges" disclosure a materially misleading statement.

Petrobras argues that EIG cannot rely on the Drilling Presentation to establish a duty to disclose because EIG received it from an entity (Société Générale) other than Petrobras or Santander. *See* Petrobras MSJ Mem. at 21, 26; EIG Ex. 14 at 3. But that is not the end of the matter. "In the District of Columbia, a defendant is not excused from the harm caused by his misrepresentations simply because the plaintiff did not personally hear the defendant's utterances." *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the U.S.*, 325 F.R.D. 6, 14 (D.D.C. 2018). Rather, "the maker of material misrepresentations may be held liable for losses incurred by third parties who reasonably rely on those representations, so long as the third party falls within an identifiable class of persons that the defendant intended to influence." *Id.* Petrobras argues that, "since EIG has admitted that Petrobras was not interested in U.S. investors, there is no reason Petrobras should have foreseen that EIG would receive or rely upon" the Drilling Presentation. Petrobras MSJ Mem. at 21.

As a threshold matter, the court has already rejected the argument that Corrigan's deposition testimony conclusively establishes that Petrobras did not seek U.S. investors in the context of the FSIA's direct-effect exception. *See supra* pp. 24–26. That same conclusion applies here. What's more, the Drilling Presentation itself bears indicia that Petrobras intended to reach potential investors like EIG. The very first slide of the Presentation includes a "Cautionary Statement for *US Investors*." EIG Ex. 14 at 7 (emphasis added). There would have been no need to warn "US Investors" if Petrobras was not interested in their investments. Because EIG was part of an "identifiable class of persons" that Petrobras "intended to influence," Petrobras had a duty to disclose in the context of the Drilling Presentation that extended to EIG.

b.    October 2010 Pre-Salt Presentation

The following month, in October 2010, Santander (working on behalf of Petrobras) emailed EIG an English-language presentation entitled "Pre-Salt Oil Rigs Project" (referred to as the "Pre-Salt Presentation"). EIG Ex. 16 at 2, 3. This presentation, among other things, expressed that the Sete "Investment Opportunity" was a "Unique Opportunity to participate in the development and exploration of the Pre-Salt area in partnership with Petrobras, Brazil's leading oil & gas company." *Id.* at 6. But the Pre-Salt Presentation did not disclose that the "partnership with Petrobras" also would involve a corrupt partnership with the Workers' Party. This circumstance maps onto the first *Menaldi* guidepost: Petrobras touted its "leading" status as a reason to invest in Sete without disclosing that a key reason for its standing was an ongoing bribe scheme that benefitted government officials. *See* 164 F. Supp. 3d at 581.

c.    Data Room Confidential Information Memorandum

In December 2010, Santander gave EIG access to a virtual Data Room filled with information about the Sete investment. EIG MSJ Sealing Mot., Ex. 19, ECF No. 152-21 [hereinafter EIG Ex. 19]. Only potential investors were given access to the Data Room. *See id.*; EIG Ex. 12 ("Presentation to Investors" from June 2010 including a slide about the information available in the Data Room). The Data Room included a memorandum (referred to as the "Confidential Information Memorandum" or "CIM") dated January 2010 that Petrobras had prepared along with its advisors. CIM at 4; EIG MSJ Sealing Mot., Ex. 196, ECF No. 152-182 [hereinafter EIG Ex. 196], at 61 (testifying that there were two information memoranda in the data room, including the one prepared by Santander). The CIM contained multiple statements giving rise to a duty to disclose.

For one, it touted Sete's "strong support from the federal government, including financial support." CIM at 12. "Of course, what Petrobras did not disclose was that its 'strong relationship' with the Brazilian government was built, at least in part, on the payment of bribes." *EIG I*, 246 F. Supp. 3d at 85. The first *Menaldi* guidepost applies to that material omission: Petrobras "put[] the reasons for its success . . . at issue, but fail[ed] to disclose that a material source of its success is the use of improper or illegal business practices." *Menaldi*, 164 F. Supp. 3d at 581 (internal quotation marks omitted).

Another statement in the CIM implicates a different *Menaldi* guidepost. The CIM stated that the construction contracts between Sete and shipyards would require shipyards to "perform the work . . . in accordance with . . . applicable legislation" and "according to best practices of the industry." CIM at 52. Of course, these statements were false: Petrobras knew that shipyards would in fact be breaking the law by kicking back a percentage of the contract value, as had been done at Petrobras. These representations were "plainly aimed at assuring investors that the shipyards would be expected to comply with the law." *EIG I*, 246 F. Supp. 3d at 86. That is a circumstance under which the second *Menaldi* guidepost applies: Petrobras "ma[de] a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring." 164 F. Supp. 3d at 581.

Like the Drilling Presentation, the CIM also made representations about the risks associated with a Sete investment. Petrobras enumerated seven different "risks and mitigating factors." CIM at 79. It did not identify as a risk the unmasking of a criminal endeavor. *See generally id.* For the same reasons given above, this omission meets the third *Menaldi* guidepost.

36

Petrobras's main challenge to EIG's arguments related to the CIM are that EIG cannot show it received this document from Petrobras.  *See* Petrobras MSJ Mem. at 21; Petrobras Opp'n at 12 n.4.  But Petrobras's own documents prove that Santander exchanged drafts of the CIM with Petrobras and notified Petrobras that the CIM would be in the Data Room.  EIG Opp'n Sealing Mot., Ex. 225, ECF No. 174-13; EIG Opp'n Sealing Mot., Ex. 226, ECF No. 174-14; Petrobras Resp. SOF ¶ 179 (admitting that "Santander populated a shared filed site called *Intralinks* (a 'Data Room') with information about the Rigs Project" (emphasis omitted)).  And EIG's Kevin Corrigan testified that he reviewed and relied on all documents in the Data Room in conducting due diligence as to Sete.[10]  Petrobras Resp. SOF ¶¶ 190–193; EIG Ex. 196 at 15, 21, 61–62.  There is no genuine fact issue as to whether EIG received the CIM from Petrobras through the Data Room.

### d.    Data Room Caixa Memorandum

EIG also points to statements in another document in the Data Room:  an investment memorandum dated January 6, 2011 (referred to as "the Caixa Memorandum"), prepared by Caixa Econômica Federal, the manager of FIP Sondas (the investment vehicle through which equity holders invested in Sete).  Caixa Memorandum; *see* EIG Ex. 174 at 7.  The Caixa Memorandum represented the following about Petrobras's corporate governance: "Petrobras adopts best practices of corporate governance.  As it is a publicly held company, it is subject to the rules of the Brazilian Securities and Exchange Commission . . . and the Brazilian Stock Exchange . . . .  Abroad, it complies with the rules of the Securities and Exchange Commission (SEC) and the New York

---

[10] During his deposition, Corrigan could not conclusively state that he had received a so-called "confidential information memorandum dated January 2010" through the Data Room.  EIG Ex. 196 at 58–59 (internal quotation marks omitted).  In a later declaration, Corrigan explained that his uncertainty at the deposition was due to Petrobras's counsel not showing him a copy of the CIM.  EIG Opp'n Sealing Mot., Decl. of Kevin Corrigan, ECF No. 174-41 [hereinafter Corrigan Decl.], ¶¶ 4–5.  His declaration confirms that the "confidential information memorandum dated January 2010" he was asked about during his deposition was in fact the CIM.  *Id.*  Nevertheless, the court has not relied on Corrigan's clarification to find that EIG received the CIM through the Data Room.

Stock Exchange (NYSE) in the United States . . . ."  Caixa Memorandum at 34.  It also stated that Petrobras had adopted a "Code of Best Practices, which deals with policies, such as the disclosure of information on material facts or actions and the trading of securities, related to the use of privileged information and the conduct of management and employees from senior management." *Id.* at 35.  Petrobras made these statements to convey to investors the impression that it strictly followed applicable law and other rules and would run afoul of neither.  Of course, Petrobras did not disclose in the Caixa Memorandum that it was in fact not in compliance with the rules of the Brazilian and U.S. authorities and exchanges.  Once again, it "ma[de] a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring," falling neatly within the second *Menaldi* guidepost.  164 F. Supp. 3d at 581.

The Caixa Memorandum also stated that the shipyards would be required by their governing contracts to "[c]omply[] with applicable legislation," without disclosing that Petrobras in fact knew the shipyards would be breaking the law, and identified "main risks and mitigating factors of the Rigs Project," without disclosing the risks posed by its corruption scheme.  Caixa Memorandum at 68, 107–10.  For the same reasons given above, those omissions triggered a duty to disclose under the second and third *Menaldi* guideposts, respectively.[11]

---

[11] EIG also argues that statements made in various calls and meetings between Petrobras and EIG officials leading up to EIG's investment triggered a duty to disclose.  EIG MSJ Mem. at 18.  Petrobras counters that because, in general, EIG points to no evidence of specific statements made during those calls and meetings, no duty to disclose can be grounded in them.  *See* Petrobras Opp'n at 14–15.  Petrobras relatedly argues, as to some of these in-person interactions, that they cannot be attributed to Petrobras because they in fact involved only Sete officials and/or they "occurred after EIG made its investment decision" and so "cannot have been relied upon and [are] irrelevant to Plaintiffs' claims."  *Id.* at 15.  The court does not rely on these calls and in-person meetings to establish that a duty to disclose existed and so does not reach these arguments.  That said, as to this latter argument regarding the sequence of interactions with Petrobras and EIG's investment decision, the court is compelled to note that Petrobras appears to confuse EIG's arguments with respect to a 2011 information memorandum prepared by Lakeshore.  Petrobras argues EIG cannot rely on that record to establish Petrobras's duty to disclose, but EIG does not attempt to rely on the Lakeshore Memorandum for that purpose at all.  Instead, EIG relies on it to establish that Sete defrauded EIG for purposes of establishing Petrobras's *aiding-and-abetting* liability.  *See* EIG MSJ Mem. at 28.  The court therefore discusses this memorandum in greater detail below when discussing EIG's second cause of action.

e.     Disclaimers and Nondisclosure Agreement

Many of the documents EIG relies on to establish duty—the Drilling Presentation, the Pre-Salt Presentation, the CIM, and the Caixa Memorandum—contain similar disclaimers against completeness and reliance.  Petrobras's overarching counterargument is that these disclaimers and waivers defeat any duty to disclose.  Petrobras Opp'n at 11 (citing *Kirschner as Tr. of Millennium Lender Claim Tr. v. J.P. Morgan Chase Bank, N.A.* (*Kirschner I*), No. 17 Civ. 6334, 2020 WL 2614765, at \*13 (S.D.N.Y. May 22, 2020) (concluding that disclaimers precluded the essential fraud elements of duty to disclose and reliance)).  Petrobras is wrong.

For one, the disclaimers are boilerplate and generalized and therefore cannot defeat EIG's fraud claim.  *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 785 (2d Cir. 2003) ("To be sure, it is well established that a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud." (applying New York law)); *cf. Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995) (holding that a boilerplate integration clause cannot foreclose a fraud-in-the-inducement claim; a reading to the contrary "would leave swindlers free to extinguish their victims' remedies by sticking in a bit of boilerplate").  The September 2010 Drilling Presentation contains a "[d]isclaimer" slide that states "readers must not base their expectations exclusively on the information presented," as well as another slide stating that the information and data within the presentation is "merely informative" and "shall not be used as support for any decision for an investment."  EIG Ex. 14 at 7–8.  Similarly, the October 2010 Pre-Salt Presentation states the information within it is "not intended to be complete" and it disclaims liability for "any investment decision made based on the information and statements contained in this presentation."  EIG Ex. 16 at 4.  The CIM contains a disclaimer with substantially the same contents.  And finally, the Caixa Memorandum stated that "the reader must not base their decision exclusively on the information

contained herein," which might not reflect the "future results of FIP Sondas operations." Caixa Memorandum at 4. None of the misrepresentations at issue in this case were "specifically disclaimed" by these broad, generic disclaimers. *Dallas Aerospace*, 352 F.3d at 785 (explaining that a "party cannot justifiably rely on a representation that is *specifically* disclaimed in an agreement" (emphasis added)).

The cases cited by Petrobras are inapposite. All involve disclaimers that, unlike the ones at issue here, pertained directly to allegedly misrepresented or omitted facts. *See* Petrobras MSJ Mem. at 29–30. In *Kirschner v. J.P. Morgan Chase Bank, N.A.*, the court concluded that disclaimers barred the plaintiff's fraud claims because "'the contractual disclaimers . . . address[ed] the evaluation of credit risk, which is exactly what the alleged misrepresentations relate[d] to,'" and so the language was "sufficiently specific to be effective." No. 17 Civ. 6334, 2020 WL 9815174, at *14 (S.D.N.Y. Dec. 1, 2020) (citing *Kirschner I*, 2020 WL 2614765, at *14). Similarly, in *UniCredito Italiano SPA v. JPMorgan Chase Bank*, the court concluded that the disclaimers precluded a finding of duty (and reasonable reliance) because they specifically stated that the defendant banks had no obligations to monitor compliance and the alleged misrepresentations concerned withheld monitoring information. 288 F. Supp. 2d 485, 498–99 (S.D.N.Y. 2003); *cf. Middleton v. IBM Corp.*, No. 1:18-CV-3724, 2019 WL 11646259, at *5 (N.D. Ga. Jan. 2, 2019) (finding no reasonable reliance on representations as to compensation where disclaimers specifically stated defendants retained the ability to modify compensation). These cases therefore do not govern the circumstances of this case.

More importantly, Petrobras's own fraudulent conduct rendered its disclaimers meaningless. Where defendants are aware that plaintiffs are relying on incomplete or inaccurate information, courts decline to enforce disclaimers. *See, e.g.*, *In re Platinum-Beechwood Litig.*,

427 F. Supp. 3d 395, 467 (S.D.N.Y. 2019) (finding statements disclaiming the "accuracy and completeness" of information to be "empty" and "meaningless" where defendant was aware that the plaintiffs were relying on information that "might not have been complete or accurate" (internal quotation marks omitted)).  Indeed, in a different context, this court refused to allow a disclaimer to automatically preclude the plaintiffs' fraud claim under D.C. law.  *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 205 n.6 (D.D.C. 2016).  The court held in *Jacobson* that where the plaintiffs had alleged that the defendants "knew about the defects in [a] Property's construction, but failed to disclose them in an effort to induce [the plaintiffs] to buy the Property," it could not conclude at the motion-to-dismiss stage "that [the plaintiffs'] reliance on the representations or omissions in [a] Disclosure Statement was unreasonable."  *Id*.  The evidence shows that something quite similar happened here:  Petrobras knew about the corruption scheme that would be part of Sete's operations from the beginning and did not disclose it through its marketing materials to EIG and other potential investors, whose capital was solicited and necessary to get Sete off the ground.[12]

Separately, Petrobras argues that EIG cannot rely on any the documents within the Data Room to establish duty because, as a condition of accessing the Data Room, EIG signed a non-disclosure agreement ("the NDA") that contained the following provision:

> The RECIPIENT further acknowledges that neither PETROBRAS nor SANTANDER and its Representatives make any representation or warranty with respect to the accuracy or completeness of the Confidential Information, whether explicitly or implicitly. The RECIPIENT agrees that neither PETROBRAS nor SANTANDER and its Representatives will be responsible for any damage

---

[12] EIG also argues that the disclaimers are unenforceable because Petrobras had peculiar knowledge as to the corruption scheme and EIG had no means to discover the truth about that scheme.  EIG Opp'n at 18–19.  In its briefing, Petrobras argues that the peculiar-knowledge exception is relevant only to reasonable reliance, *see* Petrobras Reply at 13 n.5, but at oral argument, it suggested that arguments about the exception also go toward duty, *see* Hr'g Tr. at 44–47 (responding to the question "how can that waiver or the disclaimer can be considered valid" when corruption goes undisclosed by discussing the *UniCredito* court's analysis of the particular-knowledge exception).  To avoid any repetition, and because the court resolves the effect of the disclaimers based on the foregoing analysis, the court addresses the peculiar-knowledge exception in the portion of its analysis as to reasonable reliance.

> connected to or arising from the use of the Confidential Information
> by the RECIPIENT, its Representatives or third parties, from any
> inaccuracies contained therein or from any omission that the
> Confidential Information may have. The RECIPIENT
> acknowledges that neither PETROBRAS nor SANTANDER and its
> Representatives have any obligation to update or correct any
> inaccuracy or imprecision in the Confidential Information.

Petrobras Opp'n, Ex. 10, ECF No. 179-9 [hereinafter NDA], at 4–5. This disclaimer is more

preclusive than the others, Petrobras contends, because the NDA was a negotiated agreement, not

mere boilerplate. *See* EIG Ex. 19, at 5–9 (detailing email correspondence between Corrigan and

Santander representatives exchanging drafts of the NDA, including versions with comments by

EIG's legal counsel). Even if this is an accurate characterization of the NDA, the court is aware

of no case that would permit a party to use a general disclaimer about accuracy and completeness,

even in a negotiated agreement, to defeat a fraud claim where one of the agreement's purposes is

to attract investment funds that will be used to underwrite criminal conduct.

When asked at oral argument to identify a case to support its position, Petrobras pointed to

*UniCredito Italiano SPA v. JPMorgan Chase Bank*, *see* Hr'g Tr. at 46, but that case is inapposite.

Petrobras argues that case is analogous to this one because both involve alleged fraud on the part

of third parties (Enron in *UniCredito* and Sete here) with whom the plaintiffs transacted—not the

defendants, who made the disclaimers. *See id.* at 45 ("This is a deal between EIG and Sete, and

they're not getting recourse against Petrobras, and that's what they agreed to."). The *UniCredito*

court observed that "[i]nformation as to the true nature of Enron's financial condition plainly was

not the exclusive province of the Defendant banks" and the so-called peculiar-knowledge

exception did not extend from Enron to the banks. *UniCredito*, 288 F. Supp. 2d at 500–01. But

the distinction plainly does not apply here. This is not a case in which a defendant failed to disclose

a third party's misconduct; Petrobras failed to reveal *its own* misconduct. And, while it is true that

the ultimate investment transaction would be between EIG and Sete, the NDA was an agreement between Petrobras and EIG that occurred before EIG made any deal with Sete. EIG signed the NDA with Petrobras as the counterparty—without any inkling of the corruption scheme—in exchange for access to the Data Room. By contrast, in *UniCredito*, the plaintiff invested in credit facilities for Enron, an independent entity and the counterparty of the relevant transactions, that were administered by the defendant banks. *See* 288 F. Supp. 2d at 491. So, the reasons the *UniCredito* court gave for enforcing the waiver at issue do not apply here. (And, as discussed in greater detail in the court's analysis as to the reasonableness of EIG's reliance, the peculiar-knowledge exception does in fact apply in this case.)

The court thus returns to the overarching principle that a party cannot inoculate itself against a fraud claim with a generalized disclaimer. *Cf. Carleton v. Winter*, 901 A.2d 174, 181 (D.C. 2006) ("Courts do not enforce agreements to exempt parties from tort liability if the liability results from that party's own gross negligence, recklessness, or intentional conduct." (internal quotation marks omitted)); *Koch v. Greenberg*, No. 07 CV 9600, 2012 WL 7997484, at *6 (S.D.N.Y. Sept. 30, 2012) ("[P]arties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct."). The relevant paragraph of the NDA here generally disclaims the "accuracy [and] completeness of the Confidential Information" to which it applies. NDA ¶ 2.6. As already discussed, the case law makes clear that where a waiver is with respect to a specific term it is enforceable, but that *general* disclaimers, like the ones contained within the NDA, may not be relied upon to disclaim fraud.

In any event, the NDA does not protect Petrobras from any failures to disclose that preceded that agreement. EIG received and relied upon the Drilling Presentation and the Pre-Salt Presentation months before EIG received access to the Data Room. The NDA does not apply to

43

them and the information they contain.  *See* NDA ¶ 5.1 (stating that the NDA "shall enter into effect on the date of its execution," which could not have been before December 29, 2010, *see* EIG Ex. 19 at 5); *id.* ¶ 1.2 (defining "Confidential Information," to which the NDA applies, to exclude information that is "public" or "already known by [EIG]").[13]

### f.    Ferraz's Awareness

Petrobras next argues that none of these materials—the Drilling Presentation, the Pre-Salt Presentation, the CIM, and the Caixa Memorandum—and interactions created a duty to disclose because EIG has not shown that the individual primarily acting on behalf of Petrobras at the time— Ferraz—knew about the corruption when speaking with EIG.  Petrobras Opp'n at 15.  The evidence shows that Ferraz learned of the bribery scheme only after moving to Sete, and EIG concedes this. EIG Redacted MSJ, EIG's Statement of Material Facts as to Which There is No Genuine Issue, ECF No. 153-5 [hereinafter EIG SOF], ¶ 55 ("Ferraz learned about the bribery scheme when he arrived at Sete Brasil." (alteration and internal quotation marks omitted)); Petrobras Resp. SOF ¶ 55.  According to Petrobras, this is a "fatal flaw" in EIG's fraud claim because "a person cannot have a duty to disclose something they do not know."  Petrobras Opp'n at 15 (citing *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 106 (D.D.C. 2015)).

EIG responds that it is not simply relying on Ferraz's interactions with EIG.  At oral argument, EIG suggested that a failure to disclose by Ferraz is inseparable from the lack of disclosure within the written Petrobras materials EIG received, because the individuals who established the scheme purposely shielded Ferraz from the bribery scheme so as not to compromise him.  Hr'g Tr. at 78–79.  The court finds that argument compelling.  Ultimately, though, the

---

[13] Information provided by Sete and Lakeshore also are not within the scope of the NDA.  *See* Petrobras Opp'n at 13. The NDA's disclaimer therefore does not affect EIG's aiding-and-abetting claim.

question of Ferraz's awareness in the context of whether a duty to disclose exists is something the court need not reach at this step of the analysis. There is no genuine dispute of material fact that the written statements upon which EIG relies—and within which the court has located statements that triggered a duty to disclose under *Menaldi*—were sent out without warning of the scheme. Those materials were prepared by or on behalf of Petrobras, and knowledge of the corruption scheme can be attributed to the company, as discussed in further detail below, through its high-level executives who established, participated in, and perpetuated it. Therefore, the defense that Petrobras "cannot have a duty to disclose something [it] do not know" does not apply here.

### 2. *Materiality*

Having concluded that Petrobras had a duty to disclose, the court turns to whether the omissions in question were material. Under D.C. law, a representation is material "if it reasonably influences a plaintiff to take an action he or she may have refrained from taking if aware of the actual facts." *Djourabchi v. Self*, 571 F. Supp. 2d 41, 49 (D.D.C. 2008); *see also Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) ("A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." (internal quotation marks omitted)). EIG argues that "Petrobras's failure to inform EIG about the existence of the bribery scheme and its affirmative misrepresentations that it was in compliance with, among other things, the rules of the [SEC] were unquestionably material as a matter of law." EIG MSJ Mem. at 18 (internal quotation marks omitted); *see* EIG Ex. 196 at 50 (Corrigan deposition testimony stating that EIG "would not have pursued [the Sete investment] beyond [the] very initial phase if [they] thought there was going to be some huge payment scheme involved"). The court agrees.

45

Courts have reached similar conclusions in analogous factual circumstances. *See, e.g.*, *SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 177 (D.D.C. 1998) (concluding, in the context of an SEC enforcement action, that "no rational investor would knowingly invest in a project which never funded profitable ventures and which diverted substantial funds to the personal use of its promoters," and that "[t]herefore, there is no question that defendants' frequent misrepresentations and misleading omissions were material"); *Int'l Telecomms. Satellite Org. v. Colino*, No. 88-cv-1266 (RCL), 1992 WL 93129, at *9 (D.D.C. Apr. 15, 1992) (finding materiality element satisfied as to omissions about kickbacks); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (finding failure to disclose participation in a long-standing bribery scheme material in securities context). Frankly, it is difficult to imagine how the failure to disclose a massive corruption scheme implicating corporate executives and political party leaders could be anything but material to a reasonable investor whose capital is solicited to fund such a scheme.

Yet, that is Petrobras's position. It maintains that because EIG's due diligence discovered "conduct similar to what EIG claims should have been disclosed," and EIG invested anyway, the failure to disclose the bribe scheme was not material. Petrobras Opp'n at 17. Specifically, Petrobras points to the results of EIG's June 2011 Complinet search[14] as evidence that EIG would not have stopped—and in fact did not stop—pursuing the Sete investment despite discovering "a whiff" of corruption. *Id.* (internal quotation marks omitted) (quoting EIG Ex. 196 at 149). That search yielded "two noteworthy results": (1) that "employees of Camargo Correa," a major stakeholder in the shipyard building Sete's first seven drilling rigs, "were arrested in connection with a year-long corruption probe," and (2) that a "congressional inquiry [had] asked prosecutors

---

[14] Complinet is the name of the system EIG used to search for indications of money laundering and corruption as part of its diligence on the Sete investment. *See* Petrobras Resp. SOF ¶ 265.

to bring charges against" Demosthenes Marques, an investment director at FUNCEF (one of Sete's major investors and a substitute board member for Sete), after he was "accused of funneling funds to politicians through private banks." EIG MSJ Sealing Mot., Ex. 49, ECF No. 152-50 [hereinafter Complinet Search Emails], at 3–4. According to Petrobras, these "results involved conduct similar to what EIG claims should have been disclosed," yet "EIG did nothing with this information." Petrobras Opp'n at 17 (arguing that EIG did not hire outside counsel (citing Petrobras Opp'n Sealing Mot., Ex. 13, ECF No. 179-12, at 7–11); conduct further inquiry or diligence; or escalate the Complinet findings to its investment committee).

Petrobras mischaracterizes the record. As to the first Complinet result, Camargo Correa was a minority owner of the Estaleiro Atlantico Sul ("EAS") shipyard that received the initial rig-building contracts, and EIG's searches turned up "no information regarding resolution of the charges." Complinet Search Emails at 2–3. (In fact, the Superior Court of Brazil dismissed the entire matter in April 2011, although EIG does not appear to suggest that it was aware of this at the time of the search. Pls.' Mem. of P. & A. in Opp'n to Petrobras MSJ, ECF No. 175, Ex. 237, ECF No. 175-6, at 3.) The email thread discussing the results of the Complinet search mentions multiple "independent searches," none of which showed any further results about the charges. *See* Complinet Search Emails at 3–4. Additionally, EIG ran a second Complinet search in January 2012 that yielded no additional results relating to Camargo Correa, well before it entered the Investment Commitment Agreement. *See* EIG MSJ Sealing Mot., Ex. 64, ECF No. 152-65, at 3–4. Similarly, EIG found no "further information regarding the allegations" against Marques and, in fact, performed multiple "[i]ndependent searches" that "indicated that Mr. Marques ha[d] continued to serve as a director for several companies from 2006 to the present." Complinet Search

Emails at 3–4.  For both of the noteworthy Complinet results, "no subsequent findings were identified in [EIG's] searches."  *Id.* at 2.

The EIG compliance department concluded that the Complinet information was low-risk and therefore did not escalate it.  *See id.*  As EIG's Chief Compliance Officer observed, the articles containing the information were "several years old" and later searches yielded "no subsequent findings."  *Id.*  And "the role these subjects [had] in [EIG's] investment" was remote:  Camargo Correa was just a 40% owner of one of the shipyards, and Marques was an investment director at one of many investors in Sete and "one of twenty-two board members."  *Id.* at 2–4.  As to both pieces of information, then, Petrobras incorrectly describes EIG's follow-up and Complinet's initial results; such results were not sufficiently similar to Petrobras's undisclosed corruption scheme to render its omissions immaterial to EIG.

Petrobras also argues that EIG's continued investments in Sete after corruption at Petrobras was made public shows that the misrepresentations and omissions at issue were not material.  Petrobras Opp'n at 18.  By November 2014, Petrobras points out, some details of the Lava Jato investigation were widely reported, including the arrests of certain executives of Petrobras and related construction companies and investors, and news broke that Barusco had entered a plea agreement.  *Id.*  Despite this publicly known information, Petrobras argues, EIG "made another $57 million in capital calls without independent investigation."  Petrobras Opp'n at 18.  Petrobras says this evidence of "EIG's conduct undercuts its testimony about materiality," distinguishing this case from those cited by EIG, in which the record as to materiality was unrebutted.  *See id.* at 18–19 n. 9 (first citing *Djourabchi*, 571 F. Supp. 2d at 49; then citing *SEC v. Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001); then citing *Better Life Club of Am.*, 995 F. at 177; and then citing *Colino*, 1992 WL 93129, at *9)).

48

But EIG's post-November 2014 capital contributions to Sete do not create a genuine dispute of fact as to the materiality of Petrobras's failure to disclose. The public disclosures about Operation Lava Jato as of November 2014, even the news of Barusco's plea agreement, did not directly implicate Sete. Petrobras Resp. SOF ¶¶ 497 (admitting that Costa was arrested in March 2014 and only publicly described the scheme at *Petrobras*—not Sete—and denying only EIG's characterization of the corruption as "corruption of 'Petrobras' as opposed to corruption of the specific individuals involved"); *id.* ¶ 499 (admitting that when news of Barusco's plea broke in November 2014, he had "not yet said anything about Sete" (internal quotation marks omitted)). That is important because Petrobras identifies no investor or lender that disassociated itself from Sete as a result of those revelations. Indeed, *Petrobras* itself "made contributions to Sete and FIP Sondas . . . after November 2014." Petrobras Resp. to EIG Additional SOF ¶ 742. Nor did BNDES and other lenders abandon their long-term financing agreements with Sete valued at over $5 *billion* dollars. *See* Petrobras Resp. SOF ¶¶ 531, 534–546. The post-November 2014 financial commitments by other sophisticated parties shows that the early publicity about Operation Lava Jato did not render immaterial the later disclosures that directly implicated Sete.

The events that followed the November 2104 publicity also factor into the court's assessment. During that time, Sete hired both U.S. and Brazilian counsel, who issued four opinion letters indicating that they had identified no violation of U.S. or Brazilian law in the shipyard deal documents. *Id.* ¶¶ 503–504. And, as late as February 4, 2015, lenders were awaiting Petrobras Board approval of anticorruption declarations in which Petrobras was prepared to disavow any knowledge of "corruption in relation to the [Rigs] Project." *Id.* ¶¶ 513, 540, 543. On January 27, 2015, Petrobras circulated a draft anticorruption declaration expressly disclaiming any participation in a Sete bribery scheme. *Id.* ¶¶ 531, 533–537. Only after the details of Barusco's

plea emerged in early February 2015, implicating Sete for the first time, did the lenders walk away from Sete. *Id.* ¶¶ 507, 563, 590. These undisputed facts demonstrate that the public information available about Operation Lava Jato in November 2014 still left EIG in the dark about the Sete corruption scheme. If anything, the timeline only strengthens the conclusion as to materiality: Sete's long-term financing collapsed only after details of Sete's involvement in the bribery scheme became public.

That does not mean that any EIG payments made after public reporting of the corruption scheme are irrelevant in this case. Whether EIG should have mitigated its damages by ceasing payments once *some* corruption was revealed is a separate question, which the court analyzes further below.

### 3. *Knowledge and Specific Intent*

Under D.C. law, EIG must show by clear and convincing evidence that Petrobras made the fraudulent statements with knowledge of their falsity, which it can do by making "a showing that the statements were recklessly and positively made without knowledge of their truth." *Djourabchi*, 571 F. Supp. 2d at 48 (internal quotation marks and parentheses omitted); *see Ehlen v. Lewis*, 984 F. Supp. 5, 9 (D.D.C. 1997). According to EIG, the fact that Petrobras was one of the "masterminds behind the bribery scheme" means the knowledge element is easily satisfied. EIG MSJ Mem. at 19 (emphasis omitted); *see* Barusco Testimony at 42.[15] EIG is correct.

In *United States v. Philip Morris USA, Inc.*, the D.C. Circuit held that "[t]o determine whether a corporation" like Petrobras "made a false or misleading statement with specific intent

---

[15] Petrobras says that the court cannot rely on alleged hearsay statements by Antonio Palocci, the Brazilian Finance Minister as of early 2010, as to statements made during a meeting with the Brazilian President, other government officials, and the President of Petrobras. Petrobras Opp'n at 23; *see* Petrobras Resp. SOF ¶ 40. To be clear, the court relies here on Barusco's testimony, not Palocci's.

to defraud, [courts] look to the state of mind of the individual corporate officers and employees who made, ordered, or approved the statement." 566 F.3d 1095, 1118 (D.C. Cir. 2009). The facts of *Philip Morris* are instructive. There, the district court had found corporate intent by Philip Morris where its executives, who had knowledge of smoking's harmful effects, "made, caused to be made, and approved public statements contrary to this knowledge." *Id.* at 1121. The D.C. Circuit agreed, finding that there was "overwhelming indirect and circumstantial evidence . . . to allow the district court to reasonably infer that the high level executives" were aware of the "internal knowledge and practice of the company" and "made, caused to be made, and approved public statements contrary to this knowledge." *Id.* (internal quotation marks omitted). Those public statements included some made directly by specific, identified executives—for example, trial testimony and statements made during television appearances. *See id.* But they also included a "press release," a "newspaper advertisement," and a "booklet" not attributed to any individual person. *Id.* The issuance of these materials, combined with the executives' knowledge of the falsity of statements they contained, "demonstrate[d] that [the] executives at least acted with reckless disregard for the truth or falsity of their statements," which "suffices to demonstrate the requisite intent." *Id.*

Here, the evidentiary basis to impute knowledge to Petrobras is even stronger than in *Philip Morris*. Duque, as a member of Petrobras's Executive Board, had first-hand knowledge of the corruption scheme; after all, he was the architect of it. And he caused statements to issue, at least recklessly, without disclosing the scheme. Duque was on Petrobras's Executive Board—"the highest level of the Company's management"—for the years during which he facilitated and participated in corruption schemes at Petrobras. *See* Petrobras Resp. SOF ¶¶ 8–10; Barusco Testimony at 42–45, 53–54; Petrobras Resp. SOF ¶¶ 67–71 (not contesting that Duque was aware

of and participated in the Sete bribery scheme).   In fact, Duque was part of the group that "established" how the kick-backed monies would be divided among the recipients (including himself).  Barusco Testimony at 44.  When the Sete corruption scheme was "born at Petrobras," Duque was in the delivery room.  Barusco Testimony at 42–47, 53–54.

Duque's actions as a member of Petrobras's Executive Committee allow the court to impute the requisite knowledge and intent to the company.  In July 2009, the Executive Board approved both the hiring of Santander and its scope of work—including preparing the CIM and other marketing materials for potential investors.  *See generally* EIG Opp'n Sealing Mot., Ex. 217, ECF No. 174-6 (reflecting Petrobras Executive Board approval of hiring Santander); *id.* at 10 (attaching Draft Service Agreement); EIG Opp'n Sealing Mot., Ex. 216, ECF No. 174-5, at 6–7 (Draft Service Agreement stating that Santander's responsibilities would include "[p]repar[ing] the Project Information Memorandum" among other duties).  Santander then went on to draft the CIM and other materials.  *See, e.g.*, EIG MSJ Sealing Mot., Ex. 9, ECF No. 152-11 [hereinafter EIG Ex. 9], at 5 (indicating Santander's preparation of a "Project Information Memorandum" was in progress).  These were among the materials EIG reviewed and relied on in making its investment decision.  *See infra* pp. 54–55; EIG Ex. 196 at 21 (Corrigan stating in his deposition that he "thoroughly" read the "two big info memos").  Duque surely knew that the "Project Information Memorandum" written by Santander would make no mention of a bribe scheme.

Later, in March 2010, Duque and the rest of the Executive Board approved retaining Santander as Sete's financial "Structurer."  EIG Ex. 9 at 11.  Santander's new responsibilities included "identify[ing] potential investors" and "negotiating with them," "prepar[ing] . . . marketing material to be distributed to the Potential Investors," "coordinat[ing] marketing efforts and organiz[ing] meetings between potential investors and the main executives from

PETROBRAS and PNBV," and generally "carry[ing] out any activity that is related to fundraising to capitalize companies and vehicles of the financial structuring" until the project was fully funded. *Id.* at 8–9.   During the same time period, Petrobras, through the Executive Board, ran the bid process for the first seven drill ships, approved the award of contracts for those ships to EAS, and then assigned those contracts to Sete.   Petrobras Resp. SOF ¶¶ 82, 85, 118, 120–121.   According to Barusco, negotiations for bribes were already live "when [EAS] won the first contract."   Barusco Testimony at 44.   Duque negotiated the structure of those payments.   *Id.*

In sum, undisputed evidence establishes (1) Duque's direct participation in the bribery scheme and (2) his causing of Santander to prepare promotional materials, including the CIM, that he knew would make no mention of the corruption scheme.   That is enough evidence to impute knowledge and intent to Petrobras.   *See Philip Morris*, 566 F.3d at 1121.[16]

Petrobras makes a number of arguments to avoid this result.   First, it attempts to focus the knowledge element exclusively on Ferraz, "the Petrobras employee [who had] relevant interactions with EIG prior to its investment decision."   Petrobras MSJ Mem. at 23.   Because Ferraz did not have knowledge of the corruption scheme until after he left Petrobras and started working at Sete—at which point his conduct can no longer be attributed to Petrobras—Petrobras maintains that EIG has failed to present proof of an executive whose knowledge of the bribe

---

[16] EIG additionally argues that "[w]hile Duque's intent, alone, is sufficient to defeat Petrobras's argument, the [c]ourt may also infer from undisputed evidence that additional members of Petrobras's Executive Board possessed the requisite knowledge and intent."   EIG Opp'n at 28–29.   Based on evidence of "widespread knowledge and acceptance of bribery and kickbacks among Petrobras's highest-ranking executives," other members of the Board—notably Paolo Roberto Costa and Jorge Luiz Zelada—"at least acted with reckless disregard for the truth or falsity" of the misrepresentations at issue here.   *Id.*   As proof, EIG points to Petrobras's non-prosecution agreement ("NPA") with the U.S. Department of Justice, which admits the culpability of multiple unnamed executives, whose identities EIG attempts to infer.   *See* EIG Resp. SOF ¶¶ 723–736.   *See id.* (citing paragraphs of the Response Statement of Facts that, in turn, cite the NPA's statement of facts).   But the court cannot say for certain that the NPA refers to the Sete bribery scheme, and Petrobras affirmatively says that it does not.   Hr'g Tr. at 70; *id.* at 55 ("But the NPA . . . doesn't say anything about Sete at all.").   As a result, the court does not rely on EIG's citations to the NPA to establish Petrobras's knowledge and intent.

scheme can be attributed to the company. *See id.*  Petrobras is correct "that a party cannot be held liable for failing to disclose information that it does not possess." *Sandza*, 151 F. Supp. 3d at 106. But beyond that the argument fails.

First, as already explained, the court does not rely on Ferraz's direct communications with EIG to establish knowledge and intent.  Instead, it relies on statements made in presentations and information memoranda prepared by Santander.  Still, even as to those statements only Ferraz's knowledge matters, Petrobras contends, because "the evidence demonstrates that Santander's work required approval only from Ferraz."  Petrobras Reply at 14–15 (citing Petrobras Reply Sealing Mot., Ex. 62, ECF No. 189-6, ¶¶ 1.6, 14, 15 (Petrobras's agreement with Santander)).  To support its position, Petrobras relies on the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Trader*, 564 U.S. 135 (2011).  But *Janus* is inapposite.  *Janus* answered the question: who "makes" a statement for purposes SEC Rule 10b-5, which forbids "any person . . . [to] make any untrue statement of material fact"?  *See* 564 U.S. at 137.  The Court held that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142.  Focusing strictly on who "made" the fraudulent statements, as Petrobras does, is not the right inquiry in this case.  It is too narrow.  Because the cause of action is not a violation of Rule 10b-5, but common law fraud, the question is a broader one: who "made, caused to be made, [or] approved [the] [ ] statements" at issue?  *Philip Morris*, 566 F.3d at 1121.  The answer to that question in this case reaches beyond Ferraz and includes the likes of Duque.  Duque's knowledge and intent therefore can be imputed to Petrobras.

Petrobras also takes another tack.  It invokes what is known as the "adverse-interest exception."  Petrobras asserts, in short, that because the interests of the scheme's participants were

adverse to Petrobras, their knowledge and intent cannot be attributed to the company. That argument is simply wrong.

Under principles of agency law, an agent's scienter is not imputed to the principal where the agent's interests are adverse to those of the principal. *See BCCI Holdings (Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997). That is because "[i]t cannot be presumed that an officer or agent will communicate knowledge to a corporation where it is to the agent's own interest not to impart the knowledge to the principal." *Id.* (internal quotation marks omitted). The adverse-interest exception applies, however, only where the agent has "totally abandoned the corporation's interests and [is] acting entirely for his own . . . purposes." *Kirschner v. Grant Thornton LLP*, No. 07-cv-11604, 2009 WL 1286326, at *5 (S.D.N.Y. Apr. 14, 2009) (internal quotation marks, citation, and alteration omitted), *aff'd sub. nom. Kirschner v. KPMG LLP*, 626 F.3d 673 (2d Cir. 2010). The problem with Petrobras's argument is that the Petrobras officials who knew about the corruption scheme were not engaged in "fraud *against*" Petrobras; theirs was a scheme "*on behalf of* the corporation." *BCCI Holdings*, 964 F. Supp. at 478. The corruption scheme inured to the benefit of Petrobras: it included kickbacks to the political party in power, presumably meant to gain favor with government actors who could advance the company's interests. *See* Petrobras Resp. SOF ¶ 15 (admitting that bribes linked to at least some Petrobras contracts paid between February 2003 and March 2011 were divided among the Workers' Party and others); CIM at 12 (touting the "strong support from the federal government" that would make the Sete venture a success). Thus, because Duque, Barusco, and others did not "totally abandon" corporate interests in favor of their own, the adverse-interest exception does not apply.

The cases Petrobras cites do not help it. Petrobras MSJ Mem. at 24–25 & n.7 (first citing *Baena v. KPMG LLP*, 453 F.3d 1, 8 (1st Cir. 2006); and then citing *FDIC v. Shrader & York*, 991

F.2d 216, 223–4 (5th Cir. 1993)).  Indeed, one of the cases Petrobras cites in particular undercuts its argument and bolsters the court's conclusion:  in *Baena*, the First Circuit held that the exception did not apply because "fraud by top management" that was "not in the long-term interest of the company" nonetheless "profit[ed] the company in the first instance."  453 F.3d at 7–8.

The fact that Petrobras invested in Sete—and lost its investment when the corruption scheme became public—does not change this analysis.  *See* Petrobras MSJ Mem. at 25 (citing Ex. 50; Ex. 51).  Apparently, acting through its executives, Petrobras viewed the risk of the bribery scheme as worthwhile.  As EIG's counsel put it, "[Petrobras] didn't think they were going to get caught."  Hr'g Tr. at 68.  The small percentage that the shipyards paid as kickbacks paled in comparison to what Petrobras hoped it would earn by exploiting the newly discovered oil reserves using drill ships chartered from Sete.  Petrobras's investment in Sete does not support applying the adverse-interest exception on this record.

4.    *Reasonable Reliance*

Under D.C. law, EIG must establish that it took action relying reasonably on the allegedly fraudulent statement—that is, it must show it in fact did rely on Petrobras's misrepresentations and that it did so reasonably.  *See Djourabchi*, 571 F. Supp. 2d at 51.  A plaintiff can establish actual reliance by showing that she would not have acted were it not for the misrepresentation.  *See id.* Here, EIG has established that it would not have invested in Sete if it had known about the corruption scheme.  *See supra* pp. 45–50.  Additionally, there is contemporaneous evidence of actual reliance:  Corrigan and other EIG employees involved in the investment decision incorporated information EIG received from Petrobras into EIG's internal work product about the Sete investment.  EIG MSJ Sealing Mot., Ex. 200, ECF No. 152-186, at 12–15 (stating that Lowder remembered reviewing the Pre-Salt Presentation prior to EIG's investment decision and

incorporating some of its information into early memoranda about the potential investment); EIG Ex. 196 at 60–62 (stating that Corrigan and his team read and relied on both the CIM and Caixa Memorandum in deciding to invest); EIG Opp'n Sealing Mot., Decl. of Kevin Corrigan, ECF No. 174-41, ¶ 5 (confirming that Corrigan relied on the CIM to make the investment decision); Petrobras Resp. SOF ¶¶ 190–193, 316, 319–320, 323–326, 328–332, 334, 336–341, 368–369 (admitting that EIG prepared internal investment recommendation documents that contained information also contained within documents received from Santander and Petrobras, including through the Data Room).

Petrobras counters with the perplexing argument that EIG did not actually rely on Petrobras's misrepresentations and omissions because "EIG has admitted that even in March 2011, after all of these interactions, it had not made any decision to invest in Sete." Petrobras MSJ Mem. at 29. According to Petrobras, this is tantamount to an admission that EIG did not rely on Petrobras's—as opposed to Sete's—failure to disclose the bribery scheme. But no case stands for the proposition that the failure to disclose criminal conduct that permeates a proposed venture somehow grows stale with time. The statements upon which EIG relied—the Drilling Presentation, Pre-Salt Presentation, CIM, and Caixa Memorandum—were part of a sustained diligence campaign that resulted in EIG's eventual decision to invest. The fact that EIG's ultimate decision to invest came after Sete began operating independently does not mean that Petrobras's earlier, fraudulent statements somehow vanished from EIG's investment calculus. *See* RESTATEMENT (SECOND) OF TORTS § 546 cmt. b (AM. L. INST. 1977) (noting that "reliance upon the truth of the fraudulent misrepresentation [need not] be the sole or even the predominant or decisive factor in influencing his conduct" as long as the plaintiff was "substantially influenced" by the misrepresentation). For the same reasons, Petrobras's more specific argument as to the Pre-

Salt Presentation—that Corrigan acknowledged that EIG had "barely scratch[ed] the surface" after receiving it and had not yet made an investment decision—also fails.  *See* Petrobras MSJ Mem. at 26–27 (internal quotation marks omitted).[17]

Nor do the cases Petrobras cites in support of this argument advance its cause.  They all stand for the uncontroversial proposition that reliance is an element of fraud that a plaintiff must prove.  *See* Petrobras MSJ Mem. at 29 (first citing *Hammond v. Alpha 1 Biomedicals*, No. 92-cv-1558, 1994 WL 86602, at *2–3 (D.D.C. Feb. 28, 1994) (holding that a plaintiff cannot establish fraud where he "admits that he did not place reliance on" fraudulent statement); then citing *Va. Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs.*, 878 A.2d 1226, 1238–39 (D.C. 2005) (affirming grant of summary judgment against fraud claim where evidence of reliance was lacking); and then citing *Kitt v. Cap. Concerts, Inc.*, 742 A.2d 856, 861 (D.C. 1999) (same where there was "no proof" the plaintiff relied on the defendant's promise)).

Petrobras's backup position—mentioned in passing in a footnote—that, "[v]iewed differently, these interactions with Petrobras[] . . . are too remote to serve as a basis for reasonable reliance" is no more availing.  Petrobras MSJ Mem. at 29 n.8 (internal quotation marks omitted).

---

[17] Petrobras also dedicates significant airtime in its reliance discussion, as well as elsewhere in its analysis of EIG's fraud claim, to a memorandum EIG received from Lakeshore in September 2011.  *See* Petrobras MSJ Mem. at 22, 28. But the court reads EIG's briefs to argue that the "Lakeshore Memorandum gives rise to liability on EIG's *aiding and abetting claim.*"  EIG Reply at 11 n.6 (emphasis added); *see also* EIG MSJ Mem. at 28 (discussing the Lakeshore Memorandum in the context of the elements of EIG's aiding-and-abetting claim).  Viewed in that light, it is not clear to the court why the timing of the Lakeshore Memorandum relative to EIG's investment decision is relevant to EIG's *fraud* claim.  In any event, the "First Amendment and Restatement Agreement," which Petrobras points to in order to argue that EIG had already agreed to invest, made clear that EIG's investment in Sete was contingent on conditions including EIG's execution of a subsequent Investor Commitment Agreement.  Petrobras Resp. to EIG Additional SOF ¶ 706 (admitting that EIG agreed in the First Amendment and Restatement Agreement "to invest up to 500 million Brazilian reais in Sete subject to certain conditions, including EIG's subsequent execution of the Investment Commitment Agreement," though admitting that the cited documents indicate that this agreement was executed in Washington, D.C.).  Thus, in the year that passed between the September 2011 agreement and EIG's execution of the Investor Commitment Agreement, *see* Petrobras Resp. SOF ¶¶ 383, 417, 420–421 (admitting the dates of the various agreements and amendments), EIG retained the right to rescind its commitment.  The Lakeshore Memorandum's failure to disclose the bribery scheme kept EIG's investment in Sete on track.

Petrobras cites a case in which the Northern District of New York granted summary judgment because, in the court's words, "[it] simply cannot be said that plaintiffs reasonably relied on an individual with whom they had such minimal contact to be the one to tell them the truth." *Amerio v. Gray*, No. 5:15-CV-538, 2020 WL 4192618, at *13 (N.D.N.Y. July 21, 2020). "[M]inimal contact" certainly does not describe EIG and Petrobras's interactions leading up to EIG's investment decision. Nor were EIG's interactions with Petrobras "too remote." In August 2011, the month before EIG's Investment Committee approved moving forward, EIG representatives met in Brazil with Barbassa, then the Petrobras CFO and Chief Investor Relations Officer, along with Ferraz and Luis Reis from Lakeshore. *Id.* ¶¶ 363–364.

EIG did in fact, then, rely on Petrobras's misrepresentations and omissions. That reliance was also reasonable. EIG conducted a months-long diligence process regarding the potential Sete investment. It analyzed "thousands of pages of documents" in the Data Room, to which Petrobras and Santander granted EIG access. EIG Ex. 196 at 16–17, 35, 59. It hired outside Brazilian counsel to review and analyze the investment transaction documents. Petrobras Resp. SOF ¶¶ 139, 192, 311, 313. It both conducted its own financial modeling and analyzed financial models provided by Petrobras and Santander. Petrobras Resp. SOF ¶¶ 251–252, 255. It sent employees on diligence trips to Brazil on multiple occasions between October 2010 and March 2012, meeting with Ferraz and other Petrobras and Santander employees. Petrobras Resp. SOF ¶¶ 162, 165, 235, 237–238, 405–408. And, as discussed above, it used Complinet to search for indicia of money laundering and corruption. Petrobras Resp. SOF ¶¶ 265–266, 269–270, 273–283. None of these steps revealed the corruption scheme. Under D.C. law, a plaintiff can establish reasonable reliance based on a far lesser degree of diligence than EIG undertook here. *See, e.g.*, *Djourabchi*, 571 F. Supp. 2d at 51 (finding plaintiff's reliance on contractor's false representations reasonable

where plaintiff "visited [contractor's] other construction projects" and entered into contract in which contractor explicitly stated he was "a licensed home improvement contractor").

Similarly, numerous sophisticated financial institutions and pension funds also decided to invest in Sete and did not discover the corruption—including BNDES, Bank Santander, Banco BTG Pactual, Citibank, and Petrobras's pension fund. Petrobras Resp. SOF ¶¶ 422, 512 (admitting that these entities invested in Sete at some point and that BNDES issued its Executive Board Decision adding new conditions to financing in December 2014, mere weeks before the bribery scheme was made public). EIG therefore was in good company in putting its faith in Petrobras. *See* Petrobras Resp. SOF ¶ 263 (EIG's CEO's "perception of this transaction was that all roads in this transaction—everything revolved around Petrobras" and that "Sete was just a securitization vehicle, . . . [i]t wasn't a real company[,] and . . . what mattered is what Petrobras thought"); EIG Ex. 196 at 28–29 (Corrigan testifying that because "the largest private investment bank, the largest foreign bank, [and] the most prestigious pension funds" were involved in Sete, "[t]his was a club we wanted to enter, but Petrobras ran this show").

Petrobras relies, again, mainly on the disclaimers contained in the Drilling Presentation, the Pre-Salt Presentation, the CIM, and the Caixa Memorandum, as well as the NDA EIG signed to access the Data Room, to disprove the reasonableness of EIG's reliance. *See* Petrobras MSJ Mem. at 29–30 (citing *Middleton v. IBM Corp.*, No. 1:18-CV-3724, 2019 WL 11646259, at *5 (N.D. Ga. Jan. 2, 2019) ("[I]n the Eleventh Circuit, although the question of reasonable reliance is generally one for the jury, this determination can be made as a matter of law if a disclaimer or disclosure renders justifiable reliance on the misrepresentation improbable." (internal quotation marks and alteration omitted)); Petrobras Opp'n at 25. Because "the documents themselves made clear that these materials were never intended to be complete, specifically disclaiming accuracy or

completeness," Petrobras argues, "[r]eliance on them as a complete statement of risk, or anything else, is unreasonable as a matter of law." Petrobras MSJ Mem. at 30 (internal quotation marks omitted). But for largely the same reasons articulated by the court in its analysis of the effect of the disclaimers on Petrobras's duty to disclose, these disclaimers do not render EIG's reliance unreasonable. *See supra* pp. 38–44. This case resembles those in which courts have declined to construe sweeping, general disclaimers to render plaintiffs' reliance unreasonable. *See, e.g.*, *Quaker Oats Co. v. Borden, Inc.*, No. 95-cv-9300, 1996 WL 255386, at *1–2 (S.D.N.Y. May 15, 1996) (concluding, at the motion-to-dismiss stage, that plaintiff's reliance on "sweeping general disclaimer[]" as to "accuracy or completeness" of a document was not unreasonable precisely because the disclaimer was so general); *cf. Genetec, Inc. v. PROS, Inc.*, No. 20-cv-07959 (AJN), 2021 WL 4311208, at *7 (S.D.N.Y. Sept. 21, 2021). The boilerplate disclaimers therefore do not render EIG's reliance unreasonable. *See In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 467 (S.D.N.Y. 2019).

Also, the disclaimers lack force because EIG had no means to uncover the information Petrobras failed to disclose. When a plaintiff has "no independent means of ascertaining the truth" about certain information, such information is deemed to be "within the defendant's peculiar knowledge." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 517 (S.D.N.Y. 2014). And "if the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge, even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations." *Genetec, Inc.*, 2021 WL 4311208, at *7 (internal quotation marks omitted). That principle squarely applies here. It took Brazilian authorities a decade to uncover the corruption scheme at Petrobras. Petrobras Resp. SOF ¶¶ 495–496. The law does not require more of EIG.

5.     *Causation*

"Under D.C. law, a plaintiff seeking recovery for fraudulent misrepresentation must prove that the defendant's challenged conduct proximately caused the plaintiff's injury." *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of U.S.* (*Boomer I*), 258 F. Supp. 3d 1, 19 (D.D.C. 2017) (internal quotation marks and alteration omitted).  And "[a] defendant's challenged conduct is the proximate cause of a plaintiff's injury only if the injury is the natural and probable consequence of the negligence or wrongful act and ought to have been foreseen in light of the circumstances." *Id.* (internal quotation marks and alteration omitted).  Establishing causation under this standard "does not require proof of causation to a certainty but rather requires that a defendant's conduct is a substantial factor in bringing about the harm." *C & E Servs., Inc. v. Ashland, Inc*., 498 F. Supp. 2d 242, 256 (D.D.C. 2007) (internal quotation marks omitted); *see also Majeska v. District of Columbia*, 812 A.2d 948, 951 (D.C. 2002) (citing Restatement (Second) of Torts § 431 (Am. L. Inst. 1965)).  Under the Restatement (Second) of Torts, which D.C. law has adopted, *see Majeska*, 812 A.2d at 951, "[i]f two forces are actively operating, one because of the actor's [misconduct], the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's [misconduct] may be found to be a substantial factor in bringing it about." Restatement (Second) of Torts § 432(2) (Am. L. Inst. 1965).

The parties generally agree on these principles of proximate causation, and they agree that EIG must show that Petrobras's challenged conduct was a substantial factor in the harm suffered by EIG.  *See* EIG MSJ Mem. at 32–33; Petrobras MSJ Mem. at 33.  But most of Petrobras's specific causation-related arguments are actually *damages*-related arguments, in that they center on the question of whether the revelation of the corruption scheme caused EIG's full loss or whether, instead, external market forces caused Sete's decline, precluding recovery of some

amount of EIG's initial investment. Indeed, Petrobras advances its causation-related arguments under the headers "EIG's damages are not attributable to any alleged fraud," Petrobras MSJ Mem. at 32, and "EIG is not entitled to recover its full investment with prejudgment interest," Petrobras Opp'n at 30. *See also* Petrobras Reply at 19. The court will address these arguments—specifically, Petrobras's arguments about loss causation and the out-of-pocket rule—in its damages analysis below.

As to the present issue, the court finds that there is no genuine dispute of material fact that the revelation of Operation Lava Jato, particularly the contents of Barusco's plea agreement, was a substantial factor in Sete's demise and, in turn, the harm to EIG. As the D.C. Circuit explained in *EIG II*, "EIG's alleged injury—being fraudulently induced to invest in Sete—occurred well before Operation Car Wash came to light, and certainly before the lenders reacted to the revelation of Petrobras's alleged fraud." 894 F.3d at 347. Viewed in this way, the series of events that occurred after Operation Lava Jato became public do not constitute the injury; they confirm and are evidence of it. *See id.*

Sete was, from its inception through its collapse, reliant on long-term financing provided by BNDES and its consortium of lenders. *See* EIG Redacted MSJ., Ex. 24, ECF No. 153-11; Petrobras Resp. SOF ¶¶ 120, 200, 578–591. After some hiccups, BNDES and other long-term lenders were on the cusp of entering into long-term financing contracts with Sete on February 6, 2015. EIG MSJ Sealing Mot., Ex. 158, ECF No. 152-157, at 4. But one day before that happened, on February 5, 2015, the contents of Barusco's plea agreement were made public. *See id.* at 3; EIG Redacted MSJ, Ex. 159, ECF No. 153-17. When the involvement of the shipyards and Sete officers came to light through that disclosure, BNDES and other lenders backed out. EIG MSJ Sealing Mot., Ex. 171, ECF No. 152-168 [hereinafter EIG Ex. 171], at 14; EIG MSJ Sealing Mot.,

Ex. 172, ECF No. 152-169 [hereinafter EIG Ex. 172], at 8.  Sete was then left without funds to pay

off more than $4 billion in bridge loans and build its rigs.  Petrobras Resp. SOF ¶¶ 508–510.  In

March 2015, Sete entered into a Standstill Agreement with creditors and shareholders, and around

June 2016, a Brazilian court approved Sete's filing for the Brazilian reorganization-bankruptcy

equivalent.  Petrobras Resp. SOF ¶¶ 619–621.  In early 2020, FIP Sondas's shares of Sete were

sold "for the symbolic value of one Brazilian *real.*"  Petrobras Resp. SOF ¶ 622 (internal quotation

marks omitted).  This timeline—particularly the close temporal proximity between public

disclosure of Sete's role in Operation Lava Jato and the long-term financing institutions' pulling

out of their deals—demonstrates that the public disclosure of the corruption scheme was at least a

substantial factor in Sete's downfall and EIG's harm.  It was certainly foreseeable that Sete would

be harmed financially, and so too would its investors, if the bribery scheme were to come to light.

*Cf. Boomer I*, 258 F. Supp. 3d at 19 (concluding that it was foreseeable, for proximate-causation

purposes, that plaintiffs and others would participate in a loan program and that those participants

would lose money when the risks underlying defendant's misrepresentations materialized).

     Numerous internal Petrobras documents confirm this causal relationship.  First, in a March

2016 letter to Brazilian Prosecutors, Petrobras wrote the following:

> In February 2015, the demands of the lenders were met and the date
> for signing the financing agreements was scheduled for the same
> month.  However, disclosure of Barusco's plea involving the name
> of Sete Brasil made it unfeasible to grant financing, since lenders
> began to make new demands that could not be met.

EIG Ex. 174 at 13.  Next, Petrobras managers submitted a document dated March 31, 2015, to the

Executive Board reporting that

> [d]espite the prior approval of the long-term financing in 2013 and
> 2014 by BNDES and the other lenders, after additional negotiations,
> the financing agreements were not executed.  This was due to the

> fact that, with the disclosure of new facts arising from "Operation
> Car Wash," BNDES, Sete Brasil, and Petrobras were unable to reach
> a consensus as to the new guarantees required to release the
> financing.

EIG MSJ Sealing Mot., Ex. 165, ECF No. 152-163, at 5–6.  In June 2015, Petrobras's Production

Units and Rig Management Program and Corporate Finance department delivered a presentation

to the Executive Board with a "Sete Brasil Chronology" slide that included as an event,

"[w]ithdrawal from long-term financing agreement due to Operation Car Wash" in February 2015.

EIG MSJ Sealing Mot., Ex. 170, ECF No. 152-167, at 12.  Soon after that, in July 2015, Petrobras

delivered a presentation to the Brazilian corruption-focused Court of Audits stating, "Operation

Car Wash: involvement of the shipyards and Sete's former officers in the scheme contributed to a

significant delay in securing financing.  In February 2015, BNDES backed out, which would have

provided approximately US$9 billion in financing."  EIG Ex. 171 at 14.  The following month, in

August 2015, Petrobras Corporate Finance sent a memorandum to Petrobras's Audit Committee

explaining that

> [a]fter a series of extensions, Sete Brasil's latest expectation for
> securing long-term financing was for February 2015.  Meanwhile,
> due to the allegations involving Sete Brasil under the scope of
> "Operation Car Wash," BNDES began to require new guarantees
> which, due to Sete Brasil's inability to meet them, ended up
> preventing BNDES from providing long-term financing.

EIG Ex. 172 at 8.[18]

Notwithstanding these admissions, Petrobras argues that EIG has not identified a sufficient

"nexus" between the loss of its investment and Operation Lava Jato in light of the general decline

---

[18] Statements made in internal Sete records corroborate Petrobras's statements, and Petrobras does not object to them on evidentiary grounds.  *See* Petrobras Resp. SOF ¶ 565 (quoting EIG MSJ Sealing Mot., Ex. 166, ECF No. 152-164, at 4 (letter from Sete CEO to Sete shareholders stating, "Unfortunately, despite all of the efforts made, the disclosure of the contents of the plea agreement entered by former director Pedro Barusco made it impossible to sign the long-

of the offshore drilling market.  *See* Petrobras MSJ Mem. at 34 (citing *Greenberg v. de Tessieres*,

902 F.2d. 1002, 1004 (D.C. Cir. 1990)).  In fact, Petrobras appears to argue that EIG must prove

that "the market collapse, and Sete's other problems, did *not* cause [EIG's] loss."  *See* Petrobras

Opp'n at 38 (emphasis added).  But EIG is not required to prove a negative for causation purposes.

*See C & E Servs.*, 498 F. Supp. 2d at 256 (noting that establishing causation "does not require

proof of causation to a certainty but rather requires that a defendant's conduct is *a* substantial factor

in bringing about the harm" (emphasis added) (internal quotation marks omitted)).  Again, that

does not mean that the effect of a global market collapse is irrelevant to what EIG may ultimately

recover in this case.  But that is a separate issue, even if Petrobras prefers not to treat it that way.

\*     \*     \*

EIG has demonstrated that no genuine dispute of material fact exists as to each element of

its fraud claim:  duty, materiality, Petrobras's knowledge and intent, reasonable reliance, and

causation.  The court therefore will grant summary judgment in favor of EIG as to liability on its

fraud claim.  That leaves damages.  The court turns to that topic after discussing EIG's aiding-and-

abetting claim.

## C.      Aiding and Abetting Fraud

EIG's second cause of action is that Petrobras aided and abetted Sete's fraud on EIG.  This

claim requires EIG to demonstrate that "(1) Sete committed fraud against Plaintiffs; (2) Petrobras

was aware Sete was defrauding Plaintiffs; and (3) Petrobras knowingly and substantially assisted

---

term contracts scheduled for February 6, 2015, and the company is currently uncertain about its ability to continue as a going concern")); *id.* ¶¶ 572–573 (quoting EIG MSJ Sealing Mot., Ex. 169, ECF No. 152-166, at 4 (Sete's Announcement of Special Meeting of Shareholders, dated May 19, 2015, stating, "Based on the[] revelations [of Barusco's plea agreement], BNDES, the lead party financing the Project, halted final negotiations for granting direct, long-term financing. As a result of the lack of transparency regarding the take-out, the short-term creditors did not approve extension of their debts, which caused the Sete group to be in default")).  These documents arguably are admissible under the business records exception.  FED. R. EVID. 803(6).

Sete in committing that fraud." *EIG I*, 246 F. Supp. 3d at 88 (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).  The court concluded at the motion-to-dismiss stage that EIG had met those requirements, *see id.*, and again, as with EIG's fraud claim, the court finds that discovery has borne out EIG's allegations and that no genuine dispute of material fact exists as to the elements of its aiding-and-abetting claim.

1.    *Sete's Fraud*

Petrobras does not contest that Sete defrauded EIG.  *See* Petrobras MSJ Mem. at 30–32 (arguing that "Plaintiffs cannot establish at least the last two elements" of their aiding-and-abetting claim and omitting discussion of the first (i.e., fraud) element).  The court therefore keeps its discussion of this element relatively short.

Sete, like Petrobras, sent EIG promotional materials that gave rise to a duty to disclose the bribery and corruption scheme.[19]  First, in August 2011, Lakeshore, Sete's financial advisor and agent, sent EIG a presentation entitled "Sete Brasil Participações S/A Investment Opportunity" (the "Investment Opportunity Presentation").  EIG MSJ Sealing Mot., Ex. 54, ECF No. 152-55. This presentation described the "investment in Sete Brasil [as] a unique opportunity" and specifically noted Sete's "close strategic partnership with Petrobras" and "attractive returns."  *Id.* at 15.  The record did not, however, disclose that, from its inception, this "close strategic partnership" with Petrobras included a shared corruption and bribery scheme that started at Petrobras and was exported to Sete.  The Investment Opportunity Presentation also touted the "professional and experienced management, including former Senior Petrobras employees," at

---

[19] EIG also identifies numerous communications via email and in person in which Sete promoted itself as a potential investment without disclosing the bribery scheme.  *See* EIG MSJ Mem. at 28–30.  For the sake of brevity, particularly since Petrobras does not contest Sete's fraud, the court does not highlight these interactions or communications but incorporates them by citation.  *See* Petrobras Resp. SOF ¶¶ 237–238, 240–241; EIG MSJ Sealing Mot., Ex. 61, ECF No. 152-62; Petrobras Resp. SOF ¶¶ 402–403, EIG Ex. 196 at 38–39, 49–50.

Sete, and it highlighted both Ferraz and Barusco's roles—without, of course, explaining that these managers were expanding Petrobras's bribery campaign at Sete and so were not acting in conformance with high standards of professionalism. *Id.* at 23–24. The presentation also included, like many of Petrobras's marketing materials, a discussion of risks and mitigants of the Sete investment without identifying the risk posed by Sete's involvement in the bribery scheme. *Id.* at 25–26. One of these mitigants was that the Sete project could "count on full support and commitment from Brazilian Government and BNDES"—omitting mention that such "full support" was won with bribe payments to the Workers' Party. *Id.* at 26.

Next, Lakeshore sent EIG a "Sete Brasil Participações Private Placement Confidential Information Memorandum" (the "Lakeshore Memorandum") in September 2011. EIG MSJ Sealing Mot., Ex. 58, EF No. 152-59 [hereinafter EIG Ex. 58]; Petrobras Resp. SOF ¶ 383. This document included essentially the same misrepresentations and omissions as those made in the Petrobras-produced CIM regarding the Brazilian government's strong support of Sete; the project's risks and mitigants; the fact that construction contracts required shipyards to comply with applicable law; and the fact that shipyards were selected for their expertise. EIG Ex. 58 at 10, 16–21, 52, 58, 84–88; *see supra* pp. 35–37. The misrepresentations and omissions in these presentations track those made in Petrobras's materials and, for the same reasons, triggered a duty to disclose under the *Menaldi* framework. *See* 164 F. Supp. 3d at 581. Also, for the same reasons, these misrepresentations and omissions were material. *See supra* pp. 46–51. Again, Petrobras does not dispute this, because it does not contest that Sete defrauded EIG.

Petrobras *does* contest EIG's reliance on the Lakeshore Memorandum, but only in the context of EIG's fraud claim—not its aiding-and-abetting claim. *See supra* note 18. Indeed, Petrobras does not acknowledge that EIG cites the Lakeshore Memorandum in support of "liability

on EIG's *aiding and abetting claim.*"  EIG Mot. to File Under Seal, Pls.' Reply Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J., ECF No. 185-2 [hereinafter EIG Reply], at 11 n.6 (emphasis added).  In any event, the court reiterates that EIG's receipt of the Lakeshore Memorandum in September 2011, only days after it signed a "First Amendment and Restatement Agreement," does not mean EIG could not have actually relied on the Memorandum, nor that its contents could not have triggered a duty to disclose.  *See* Petrobras MSJ Mem. at 22, 28.  EIG did not execute the final investment documents until a year later.  Petrobras Resp. SOF ¶¶ 383, 417, 420–421 (admitting the dates of the various agreements and amendments); Petrobras Resp. to EIG Additional SOF ¶ 706 (admitting that EIG agreed in the First Amendment and Restatement Agreement "to invest up to 500 million Brazilian reais in Sete subject to certain conditions, including EIG's subsequent execution of the Investment Commitment Agreement").  So, the September 2011 agreement is not a cut-off date for reliance purposes.  EIG's reliance on the Lakeshore Memorandum was reasonable for the same reasons already discussed.  *See supra* pp. 56–62.[20]

Finally, undisputed evidence establishes that Sete made these misrepresentations and omissions with knowledge of their falsity and with intent to deceive.  Senior executives of Sete— Barusco, Ferraz, and Musa—led the fraud scheme and personally received millions of dollars in bribes.  *See* EIG MSJ Sealing Mot., Ex. 129, ECF no. 152-128, at 10 (Barusco's plea agreement stating that he agreed to return $67.5 million in bribes); EIG Redacted MSJ, Ex. 173, ECF no. 153-21 (reflecting plea agreements of Ferraz and Musa); EIG Ex. 174 at 12–13 (Petrobras letter to

---

[20] To the extent Petrobras argues that the disclaimer in the Lakeshore Memorandum precluded a duty to disclose on Sete's part, *see* Petrobras Opp'n at 5 n.6, the court incorporates its reasoning as to why the disclaimers in the Drilling Presentation, Pre-Salt Presentation, CIM, and Caixa Memorandum did not preclude a duty on Petrobras's part.  The same result obtains as to Sete.

Brazilian prosecutors confirming pleas of Barusco, Ferraz, and Musa).  Their knowledge is attributable to Sete.  *Philip Morris*, 566 F.3d at 1118; *see supra* pp. 50–56.

## 2.   *Petrobras's Awareness*

"A general awareness of wrongdoing on the part of the one being aided or abetted is sufficient to show knowledge on the part of an aider and abettor . . . ."  *Nat'l R.R. Passenger Corp. v. Veolio Transp. Servs., Inc.*, 592 F. Supp. 2d 86, 96 (D.D.C. 2009) (citing *Halberstam*, 705 F.2d at 487–88).  And, in the case of a corporate actor, "knowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself."  *BCCI Holdings*, 964 F. Supp. at 478.  Here, the evidence establishes—beyond dispute—that Petrobras knew Sete had defrauded EIG by not disclosing the bribery scheme:  First, Barusco testified that "the idea of kickbacks . . . was born together" with Sete as conceived by Petrobras executives.  Barusco Testimony at 42.  "[T]he practice of a 1% kickback in construction contracts came from Petrobras and migrated to Sete Brasil."  *Id.*; *see* Petrobras Resp. SOF ¶ 54 (denying only that "Sete was . . . created for the purpose of kickbacks" and that "Barusco received any bribes related to Sete while working at Petrobras").  Also, one of the Petrobras Executive Board members, Duque, participated in appointing Barusco and Ferraz to their leadership positions at Sete, knowing full well that they would carry out the bribery scheme.  EIG Ex. 29; Petrobras Opp'n Sealing Mot., Ex. 22, ECF No. 179-16 [hereinafter Petrobras Ex. 22].  Petrobras was not only aware when Sete was first conceived that the bribes *would* continue there; it was also aware that the scheme *did* continue there.  Barusco, Musa, and Ferraz, working as Sete executives, funneled kickbacks to their former colleague, Duque, at Petrobras.  *See* EIG SOF ¶ 59 ("All shipyards that contracted to build drilling rigs for Sete paid bribes to Duque, Barusco, Ferraz, Musa and the Workers' Party, through its representative Vaccari."); Petrobras Resp. SOF ¶ 59 (denying only as to one shipyard).  In fact, Duque, Barusco,

and Ferraz traveled to Italy together in September 2011 and opened offshore accounts for depositing their cut of the monies kicked back from Sete's shipyard contracts.  Barusco Testimony at 37; Petrobras Resp. SOF ¶¶ 69–71.  Duque, and thus Petrobras, surely knew that Sete had not disclosed the bribery and corruption scheme to EIG and other investors.

Petrobras deals with all of this evidence by reasserting its arguments that Ferraz did not know about the corruption at Sete or Petrobras until after he left Petrobras and that "[a]ny knowledge of corruption by rogue Petrobras employees is not imputable to Petrobras" under the adverse-interest exception.  Petrobras MSJ Mem. at 30–31.  The court has already explained why it finds these arguments to be unavailing.  *See supra* pp. 50–56.  The same logic applies here.

### 3.  *Knowing and Substantial Assistance by Petrobras*

Under D.C. law, courts consider a number of factors in evaluating "how much . . . assistance is substantial enough":  "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor[,] . . . his state of mind," and the "duration of the assistance provided."  *Halberstam*, 705 F.2d at 478, 484 (alteration and emphasis omitted).  Each of these considerations confirms Petrobras's substantial assistance in Sete's fraud.

As discussed, Petrobras set the bribery scheme in motion at Sete.  It hatched the plan to embed a kickback condition within the contracts for drilling rigs and negotiating the amount and structure with shipyards.  Barusco Testimony at 42–45, 53–54.  The Petrobras Executive Board nominated its own officials for leadership positions at Sete, including Barusco, who had been involved in carrying out the bribery scheme at Petrobras.  *See id.*; EIG Ex. 29 at 7; Petrobras Ex. 22.  Once at Sete, Barusco testified that he was not independent from Duque—a member of the Petrobras Executive Board—"with respect to the kickbacks."  Barusco Testimony at 53.

71

Petrobras carried out the bidding process and awarded contracts for the first seven rigs to EAS, Petrobras Resp. SOF ¶¶ 82, 85, 118, 120, before assigning those contracts to Sete. *Id.* ¶ 121. When these first seven contracts were awarded, negotiations for bribe payments were already underway; the EAS contracts eventually would become part of the division in which a total of one-third of bribe payments across agreements went to Petrobras and Sete executives and two-thirds went to the Workers' Party. Barusco Testimony at 44–45. Petrobras promoted the Sete investment to potential investors, including EIG, making misleading statements in the process. And, then, once Sete began its separate operations, Petrobras officials both facilitated and benefited from the bribery scheme. *See id.* at 44 (describing Duque's role in establishing the bribery scheme); *id.* at 44–46 (identifying at least Duque and Roberto Gonçalves (a Petrobras engineering official) as bribe recipients for "House Two," or Petrobras); *id.* at 53 (explaining that Barusco, while at Sete, was "not independent from" Duque "with respect to the kickbacks"). Petrobras's assistance in aiding and abetting Sete's fraud therefore was substantial in every sense of the term. *See* Petrobras Resp. SOF ¶¶ 78–82.

Petrobras argues that the substantial-assistance element is not met because "[t]he record evidence shows that Petrobras formed Sete for legitimate business reasons without any intent to further corruption." Petrobras Opp'n at 29. In support of this argument, Petrobras points to a declaration from Pedro Bonesio, the former Corporate Finance and Treasury Executive Manager at Petrobras, stating that extracting oil from the pre-salt basin required an immense amount of equipment to be built. Petrobras Redacted Opp'n, Ex. 6, ECF No. 180-3 [hereinafter Bonesio Decl.], ¶¶ 2, 6–8. Brazilian law imposed certain requirements that little or no existing equipment met, including local-contents requirements in manufacturing. *Id.* ¶ 6. Sete was meant to "thread this needle": the ships would be built in Brazil but not on Petrobras's books. Petrobras Opp'n at

29; Bonesio Decl. ¶¶ 7–9; Petrobras Redacted Opp'n, Ex. 5, ECF No. 180-2, at 9–11 (Bonesio's deposition testimony). Indeed, Barusco testified that this was "why Sete Brasil was established," and that "Sete Brasil was not created specifically to get kickbacks." Barusco Testimony at 42. But this evidence simply shows that the reasons and purposes for creating Sete included legitimate ones. It does not contradict any of the facts establishing that, simultaneously, there were illegitimate aspects to Sete's design and operations.

Petrobras also argues that any role it played in assisting Sete was not knowing because Ferraz did not know about the corruption until after he was at Sete, "Petrobras nominated Mr. Barusco without knowing of any illegal conduct," and legitimate reasons existed to place Ferraz and Barusco in their leadership positions at Sete. Petrobras MSJ Mem. at 32; Petrobras Opp'n at 30. In support of this argument, Petrobras cites *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018), for the proposition that "[a]iding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in" the tortious conduct. Petrobras MSJ Mem. at 32. But as the court's *Phillip Morris* analysis makes clear, Petrobras did not "[m]erely appoint[] officers, without knowledge of past corruption or future plans." *Id.* It did in fact "assum[e] a 'role'" in Sete's defrauding of investors. *Linde*, 882 F.3d at 329.

Finally, Petrobras asks the court to "refuse to infer scienter" from what it considers to be "illogical allegations," namely, that Petrobras simultaneously aided and abetted Sete and put its own assets at risk. Petrobras Reply at 19 (internal quotation marks omitted) (quoting *In re GeoPharma, Inc., Sec. Litig.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006)). But there is no inconsistency here: Petrobras executives involved in the corruption scheme evidently believed they could both advance company interests and line their own pockets at the same time. There is nothing "illogical" about striving to achieve those two objectives in tandem.

Accordingly, the court will grant EIG summary judgment on its aiding-and-abetting claim as to liability.

### D.    Damages

The court now arrives at damages, the thorniest issue posed by the cross-motions for summary judgment.  The court begins by addressing the proper rule for assessing damages.  Next, the court analyzes the issue of mitigation.  Finally, the court touches briefly on the question of punitive damages.

#### 1.    *Loss Causation and the Out-of-Pocket Rule*

The parties agree that under D.C. law, compensatory damages in fraud cases are governed by the "out-of-pocket" rule.  EIG MSJ Mem. at 37, Petrobras Opp'n at 31; *see Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 840 n.18 (D.C. 1983).  But they disagree about what that means in this case.[21]

Petrobras contends that "[u]sually, out-of-pocket damages are calculated as of the time of the transaction," not "as of the date of the discovery of the fraud," as EIG would have it.  Petrobras Opp'n at 31 (internal quotation marks and emphasis omitted) (quoting *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1032 (9th Cir. 1999)).  And it says that EIG has provided no evidence as to the actual value of the investment when it was made other than the amount of the capital contributed.

---

[21] Petrobras's primary position is that, under the loss-causation rule, EIG can collect no damages because the revelation of the bribery scheme did not cause any of EIG's loss.  *See* Petrobras MSJ Mem. at 32–34 (citing *McCabe v. Ernst & Young, LLP*, No. Civ. 01-5747, 2006 WL 42371, at *13 (D.N.J. Jan. 6, 2006) (collecting cases recognizing the loss-causation rule)).  This argument flows from Petrobras's view that *only* the global market collapse and other issues surrounding Sete—and not the revelation of its participation in a corruption and bribery regime—caused its collapse.  The court has already rejected that argument with respect to the element of causation.

EIG, too, says that the appropriate measure of damages is the amount of its investment minus its value at the time EIG invested.  *See* EIG Reply at 22.  But it views the value of the investment post-disclosure—$0—as an accurate measure of the real value of the investment at the time EIG made it.  *See id.* ("The value of EIG's investment in Sete, a corrupt enterprise at its formation, was zero *when EIG invested*, as later revealed upon the fraud's disclosure."); Petrobras Resp. SOF ¶¶ 623–624.  EIG therefore argues that it is entitled to recover its full investment—totaling $221,111,177.44 (or BR$509,459,990).  *See* Petrobras Resp. SOF ¶ 456.

Neither EIG's nor Petrobras's framing is entirely consistent with the D.C. Circuit's guidance in *EIG II* as to the proper measure of damages.  There, the court recognized that, as a general matter, principles of "loss causation" in securities law limit recovery by fraud plaintiffs to only the loss caused by the fraud (as opposed to other, external causes).  It wrote that the loss-causation rule "ensures that securities law does not become an insurance policy to protect against bad investments." 894 F.3d at 347 n.5.  It also observed that "the law . . . provides that the market's reaction to corporate fraud is a sound measure of loss causation."  *Id.* (citing 15 U.S.C. § 77k(e) (authorizing damages measured by "the difference between the amount paid for the security . . .  and [] the value thereof as of the time such suit was brought," subject to adjustment if the defendant establishes that a portion of the difference is *not* attributable to fraud)); *see also* RESTATEMENT (SECOND) OF TORTS § 549 cmt. c (explaining that, in the securities-fraud context, "value is determined by [the investment's] market price after the fraud is discovered").

Applying the Circuit's guidance here, the court must ensure that EIG is compensated for what it lost because of the fraud—and only what it lost because of the fraud.  It must do so applying the loss-causation rule: that is, by subtracting the post-disclosure value of the investment (zero) from the value of the investment immediately before the disclosure (to account for any depreciation

caused by market forces).  *See EIG II*, 894 F.3d at 347 n.5; *see also Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 966–67 (7th Cir. 1989) (explaining that under some circumstances in fraud cases "the drop when the truth appears is a good measure of the value of the information, making it the appropriate measure of damages"); *cf.* 15 U.S.C. § 77k(e).

Petrobras argues that, if damages are in fact measured by the value lost at the time of disclosure, "to know the size of [this] decline, one has to know the value of the stock just before the fraud was disclosed; simply knowing the value after disclosure is not sufficient."  Petrobras Opp'n at 33.  And it says that EIG has offered no evidence from which to assess the value of its investment in February 2015, when the bribery scheme came to light.  *See id.* at 32–33. Additionally, Petrobras has suggested, through expert testimony, that EIG's investment in Sete had lost value immediately prior to the public disclosure due to market forces.  Its experts opine that, because the Brazilian pre-salt reserves were "among the largest offshore fields ever discovered" and oil prices were high, Sete had a high market value at the time EIG invested.  EIG MSJ Sealing Mot., Ex. 191, ECF No. 152-177 [hereinafter EIG Ex. 191], ¶¶ 3.2, 3.20.  But later, per the experts, "Sete was ultimately compromised by an industry wide downturn that was precipitated by cyclical headwinds that began years earlier," *id.* ¶ 5.5; *see id.* §§ 5, 10, resulting in an investment value "approaching zero, if not already zero," Petrobras Opp'n at 37.[22]

EIG responds that it has offered evidence of the investment's pre-disclosure value. Specifically, EIG points to its internal valuations before the public disclosure that show expected

---

[22] EIG has moved to exclude Petrobras's experts on the grounds that their opinions are without documentary foundation, speculative, and beyond the scope of their expertise.  *See* Pls.' Unopposed Mot. for Leave to File Documents Under Seal, ECF No. 150, Pls.' Mot. to Preclude Purported Expert Testimony, ECF No. 150-20 [hereinafter EIG Mot. to Preclude].  *See generally id.*  At this time, the court accepts the expert testimony at face value and will reserve ruling on the motion pending further testimony at trial.  As "the gatekeeping requirement is substantially relaxed when the judge will serve as factfinder in a trial," as the court will in this case, "the need to make such decisions regarding reliability prior to hearing the testimony is lessened."  *DL v. District of Columbia*, 109 F. Supp. 3d 12, 28 (D.D.C. 2015) (internal quotation marks and alteration omitted).

positive returns on its investment. *See* Hr'g Tr. at 87–88; *see also* EIG Reply at 23 n.15. Indeed, Petrobras's own experts cite these EIG valuations in their report. *See* EIG Ex. 191 ¶¶ 4.79–4.81.

Given this record, there is a genuine dispute of material fact as to the value of EIG's investment and the amount of its loss. At trial, EIG may rely on its internal valuations and testimony about those valuations. The court rejects Petrobras's view that only through expert testimony can such evidence be admitted. "[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." FED. R. EVID. 701 advisory committee's note to 2000 amendment. "Such opinion testimony is admitted not because of experience, training[,] or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." *Id.*; *see also Atlanta Channel, Inc. v. Solomon*, No. 15-cv-1823 (RC), 2021 WL 4243383, at *3 (D.D.C. Sept. 17, 2021) (observing that "[c]ourts have also permitted businesspeople to offer lay opinions estimating the value of their businesses' assets, costs, and outputs"). The court will have to consider this evidence from EIG alongside Petrobras's expert testimony to fix the value of EIG's investment as of February 2015 to determine its damages.

## 2.    *Mitigation*

Under D.C. law, "[t]he doctrine of avoidable consequences, also known as the duty to mitigate damages, bars recovery for losses suffered by a non-breaching party . . . that could have been avoided by reasonable effort and without risk of substantial loss or injury." *Trs. of Univ. of D.C. v. Vossoughi*, 963 A.2d 1162, 1178 (D.C. 2009) (internal quotation marks omitted). "The burden of proving circumstances giving rise to the duty to mitigate rests upon [the party that] asserts it"—here, Petrobras. *Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.*, 513 F.2d

407, 420 n.92 (D.C. Cir. 1975).  Petrobras argues that at least $57,656,496.42 of EIG's damages are barred for failure to mitigate.  Petrobras MSJ Mem. at 40.

A brief timeline is useful here.  EIG made its first capital contribution to Sete on August 3, 2012.  Petrobras Resp. SOF ¶ 430.  It made additional contributions on August 9, 2012; May 7, 2013; and October 1, 2013. *Id.* ¶¶ 432, 434, 436.  Petrobras says that Operation Lava Jato became public no later than March 2014.  *Id.* ¶ 372.  But at that time, only the arrest of Paulo Roberto Costa, Petrobras's former Chief Downstream Officer, for alleged money laundering was known—he did not testify publicly about the specific payment scheme until October 2014. *Id.* ¶ 497.  EIG made its next payments on April 11, 2014; May 7, 2014; June 4, 2014; August 12, 2014; August 25, 2014; and October 15, 2014.  *Id.* ¶¶ 438, 440, 442, 444, 446, 448.  In October 2014, Petrobras hired independent counsel to conduct internal investigations of the events underlying Operation Lava Jato.  Petrobras Resp. SOF ¶ 498.  Then, in November 2014, the media reported that Barusco had entered a plea agreement, but because those reports contained no specifics about the basis for the plea, Sete's role in Operation Lava Jato still remained concealed.  Petrobras Resp. SOF ¶ 499.  EIG made another payment in November 2014.  *Id.* ¶ 450.  In November and December, two law firms that Petrobras had retained, one American and one Brazilian, issued opinion letters stating that, based on their review of the drilling rig agreements and chartering contracts, Sete's conduct did not support a violation of U.S. or Brazilian law.  Petrobras Resp. SOF ¶ 504.  As a result of the public revelations, BNDES and other lenders demanded anticorruption declarations from Petrobras and the shipyards, which Petrobras was on the cusp of approving in early February 2015.  Petrobras Resp. SOF ¶¶ 531, 533.  Amid these events, EIG made further payments in December 2014 and January 2015.  *Id.* ¶¶ 452, 454.  It was only after the contents of Barusco's plea agreement

came to light on February 5, 2015, that BNDES and the other long-term lenders abandoned their financing of Sete.  *See* EIG Ex. 158; EIG Ex. 159.

According to Petrobras, "[i]t was unreasonable for EIG to continue sending money to Sete, at a minimum, after November 2014."  Petrobras MSJ Mem. at 41.  In support of this argument, Petrobras points to the report of its experts, who opine that "a sophisticated, international institutional investor with no operational benefit from investing in Sete would not have made these additional capital contributions after this information became public."  EIG Ex. 191 ¶ 4.78.  Instead, they believe that a reasonable investor would have ceased payments until it could discern whether the conduct disclosed by Operation Lava Jato was material to its investment.  *Id.*[23]

For its part, EIG points to case law stating that a duty to mitigate only "comes into play *after* a legal wrong has occurred."  *Vossoughi*, 963 A.2d at 1178 (rejecting mitigation argument in breach-of-contract case); *see also Edelson V., L.P. v. Encore Networks, Inc.*, No. 2:11-4802, 2013 WL 1952309, at *8 (D.N.J. May 9, 2013) ("[I]n fraud cases, a plaintiff has a duty to mitigate damages *after* learning about the fraud." (emphasis added)); *Clements Auto Co. v. Serv. Bureau Corp.*, 444 F.2d 169, 184 (8th Cir. 1971).  EIG argues that Sete's involvement in the bribery scheme only came to light on February 5, 2015, which was a month after EIG's last investment, and that there was no duty to mitigate before then.  EIG Ex. 158; EIG Ex. 159; *see* Petrobras Resp. SOF ¶ 454.  EIG also says that a duty to mitigate did not arise because it would have had to breach its agreement(s) with Sete in order to stop making capital contributions in November 2014, which would have exposed it to penalties and potential legal action.  EIG Opp'n Sealing Mot., Pls.' Mem. of P. & A. in Opp'n to Petrobras MSJ, ECF No. 174-2 [hereinafter EIG Opp'n at 41–42]; *see* EIG

---

[23] EIG also challenges and seeks to exclude the Petrobras's experts' opinions as to the reasonableness of its due diligence.  For the reasons already discussed, *see supra* note 23, the court will defer ruling on that motion until trial.

MSJ Sealing Mot., Ex. 80, ECF No. 152-79, ¶ 4.2 (establishing penalties for failure to comply with capital-contribution obligations); EIG MSJ Sealing Mot., Ex. 81, ECF No. 152-80, ¶ 3.6 (stating that failure to pay would be considered a default, triggering penalties). No duty to mitigate lies where the alleged harm cannot be "avoided by reasonable effort and without risk of substantial loss or injury," *Vossoughi*, 963 A.2d at 1178 (internal quotation mark omitted), which is precisely what EIG says would have happened had it breached.

Genuine disputes of material fact remain as to whether EIG was obligated to mitigate damages. On this record, the court cannot conclusively say when, if at all, EIG should have ceased making capital contributions to Sete; whether it should have exercised more diligence to inquire into corruption at Sete once stories emerged of corruption at Petrobras; and what EIG's exposure to additional loss and injury would have been had it ceased its capital contributions. The court agrees with Petrobras that "the reasonableness of [EIG's] failure to stop investing is a fact question that cannot be resolved on summary judgment." Petrobras Opp'n at 41. The court will consider these issues at trial.

### 3. *Punitive Damages*

Finally, EIG seeks punitive damages. Where a plaintiff shows "by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages," they may be awarded. *Chatman v. Lawlor*, 831 A.2d 395, 400 (D.C. 2003) (internal quotation marks and citation omitted). Fraud must be "accompanied by outrageous conduct such as maliciousness, wantonness, gross fraud, recklessness[,] and willful disregard of another's rights." *Id.* (internal quotation marks omitted). EIG argues that punitive damages, and particularly treble damages, are warranted here. EIG MSJ Mem. at 41–42. Petrobras, of course, disagrees. Petrobras MSJ Mem. at 42–44. Because there

remains a genuine dispute as to the amount of compensatory damages, the court will defer ruling on whether the record establishes a basis to award punitive damages.

## V.    CONCLUSION

For the foregoing reasons, EIG's motion for summary judgment is granted as to its fraud and aiding-and-abetting claims as to liability but not damages.  Petrobras's motion for summary judgment is denied.  The court reserves ruling on EIG's *Daubert* motion and Petrobras's motion to strike as to Moroux and denies as moot Petrobras's motion to strike as to Tucci.

The parties shall appear for a remote status conference on August 23, 2022, at 11:30 a.m. The parties shall be prepared to discuss a schedule for further proceedings.

Dated:  August 8, 2022

Amit P. Mehta
United States District Court Judge